IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT FLORIDA

|  |  |
|---|---|
| STELOR PRODUCTIONS, INC. <br> (a Delaware Corporation)      ) <br>      ) <br> Plaintiff,      ) <br>      ) <br> V.      ) <br>      ) <br> STEVEN A. SILVERS <br> (a resident of Palm Beach County, Florida),      ) <br>      ) <br> Defendant.      ) | CASE NO. 04-80954 - CIV - HURLEY <br><br> Magistrate: Judge James M. Hopkins |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**

## I. INTRODUCTION

Plaintiff brings this Motion for a Preliminary Injunction to enjoin the Defendant

from unilateral actions which materially breach his contractual obligations and, if left

unchecked, will further undermine and irreparably injure the Plaintiff, its business, and

the intellectual property rights which Defendant has licensed and entrusted exclusively

to the Plaintiff.

## II. STATEMENT OF FACTS

In or about 1991, Defendant Steven A. Silvers ("Defendant" or "Silvers") authored

a children's book entitled "Googles and the Planet of Goo." (Declaration of Steven A.

Esrig ¶ 3, attached as Ex. 1.) The book made little critical or commercial impact when it

**NON-COMPLIANCE OF S.D. fla. L.R.** ~~S.L.A.5~~

Dockets.Justia.com

entered the marketplace.  (Id.)  Undaunted, Defendant envisioned a program to

transform this creation into an expansive, multimedia entertainment and educational

empire.  To that end, Defendant licensed the Florida-based Aurora Collection, Inc. to

develop and commercialize the "Googles" concept.  (Id. ¶ 4.)  That relationship,

however, did not bear fruit.  (Id.)  Still, Defendant did not abandon the project.

Defendant had many personal and business hurdles to overcome.  Significant among

them was the increasingly adverse relationship between him and Aurora and

Defendant's criminal background which made Defendant unsuited to serve as

figurehead or spokesperson for an enterprise aimed at providing wholesome and

enriching entertainment to an audience of impressionable children.  (Id. ¶ 5.)  Defendant

spent seven years in a federal penitentiary for conspiring to possess with intent to

distribute cocaine, possession with intent to distribute cocaine, interstate travel in aid of

racketeering, and conspiring to defraud the United States.  (Id.)  See also United States

v. Silvers, 90 F.3d 95 (4th Cir. 1996).

Accordingly, when Plaintiff Stelor Productions, Inc. ("Plaintiff" or "Stelor") was

formed to develop Defendant's "The Googles" concept into a reality, Stelor's

enthusiasm and interest were tempered by legitimate concerns and reservations.  (Id.

¶¶ 6, 7.)  Stelor saw potential in the "The Googles" story, trademarks, copyrights, and

other intellectual property.  (Id. ¶ 6.)  Stelor's founders also had confidence in their

ability to raise the needed funds and to create a compelling and attractive "Googles"

universe that would enlighten, entertain, educate, and develop children by providing

them with fascinating and uplifting products, programs, and services.  (Id.)  But aware of Aurora's aborted effort, and wary that Defendant's background could jeopardize the "Googles" program, Stelor insisted that any arrangement with Defendant contain safeguards and protections.  (Id. ¶ 7.)

Thus, when on or around June 1, 2002 Stelor and Defendant entered into a "License, Distribution, and Manufacturing Agreement" (hereinafter "License Agreement") and a Consulting Agreement, Stelor bargained for, and obtained, the following promises, commitments, and obligations from Defendant designed to ensure Stelor's ability to develop the "Googles" program free from undue interference by Defendant:

(a)    The License Agreement gives Stelor exclusive rights in the "Googles" products, trademarks, and intellectual property and specifies that those rights are exclusive even as to Defendant.

(b)    The License Agreement gives Stelor an irrevocable power of attorney to apply for, maintain, enforce and defend intellectual property rights, including trademarks, websites, and domain names. The power of attorney specifically gives Stelor the right "to act for and on [Defendant's] behalf and instead of [Defendant]."  Stelor, not Defendant, assumed responsibility for handling all Googles Trademark and other Intellectual Property matters.

(c)    The License Agreement and Consulting Agreement require Defendant to fully cooperate with Stelor, while the Consulting

3

Agreement makes plain that Defendant shall have no power to
direct or control the daily activities of Stelor.

(d)    Finally, to protect Stelor from possible public embarrassment, both
the License Agreement and Consulting Agreement expressly
prohibit Defendant from initiating or maintaining "any relationship or
conversation with [Stelor's] current or prospective clients, vendors,
any company relationships with the media (press, etc.), without the
prior express written request by [Stelor]."

(Id. ¶ 7; License Agreement at Ex. 2, ¶ VIII; Consulting Agreement at Ex. 3, ¶ 2.)

Stelor, believing it had the necessary rights and protections, then threw itself
enthusiastically into the task of using its best efforts to develop The Googles concept
and intellectual property. (Ex. 1, ¶ 8.) To this end, Stelor has spent approximately three
million dollars, and its principals and employees have devoted themselves tirelessly to
making Stelor and the "Googles" successful and profitable, both for themselves and for
the benefit of Defendant. (Id.)

However, Defendant, having received from Stelor $186,500, obligations for
options for Stelor stock, and health insurance, has not lived up to his part of the bargain.
(Id. ¶ 9.) After giving Stelor the exclusive rights to develop and market the "Googles"
concept without interference from him, Defendant commenced a campaign to inject and
entwine himself into the very fabric of Stelor's business. (Id.) In breach of his
contractual obligation to cooperate fully with Stelor in protecting, preserving, and

4

enforcing the Googles intellectual property rights, Defendant has subverted those efforts, going so far as to unilaterally divert official communications from the United States Patent and Trademark Office ("USPTO") from Stelor's intellectual property counsel to himself.  (Id. ¶ 11; Ex. 6.)  Under the irrevocable power of attorney Defendant bestowed on Stelor under the License Agreement, all such communications from the USPTO must go directly to Stelor, as Stelor has the right "to act for and on [Defendant's] behalf and instead of" Defendant in protecting and enforcing the Googles Intellectual Property.  (Ex. 2, ¶ VIIIA.)

Stelor, in fulfilling its duty to enforce and defend the Googles Intellectual Property, retained counsel to bring actions against Google, Inc. in the USPTO.  (Ex. 1 ¶ 15.)  Defendant wrote to Stelor's counsel and instructed them to act no further on these matters and threatened to obtain his own attorney to handle them despite Defendant's having given Stelor an irrevocable power of attorney to act for and on Defendant's behalf to enforce and defend the Googles Intellectual Property.  (Id. ¶ 16; Ex. 7)

In breach of his promise not to initiate or maintain any relationship or conversations with prospective clients and vendors, Defendant has held himself out as a Stelor representative at crucial industry trade shows.  (Id. ¶ 19.)  And despite Stelor's displeasure over that breach of contract, Defendant now threatens to initiate more contacts and conversations with the trade and press, oblivious and totally indifferent to his contractual obligations.  (Id.)

Finally, Defendant flouts his duty to cooperate by withholding information vital to

Stelor's ability to carry out the business of transforming the basic "Googles" idea into a thriving and profitable entertainment phenomenon. Stelor has developed and operates a website devoted to the "Googles" characters, offering a variety of services and features geared to delighting children and their parents. (Id. ¶ 13.) At present, the website is the public's window into the Googles' world. Being able to operate and modify this website is among Stelor's most important priorities. (Id.) To ensure its ability to do so, Stelor must have immediate and unfettered access to the domain names. (Id.) Despite Stelor's constant urging, Defendant insists on keeping those domain names under lock and key by refusing to give Stelor the passwords needed to manage the websites, thereby jeopardizing Stelor's substantial investment of time, money, talent, and creative energy. (Id. ¶ 14.)

Also in violation of his obligation to cooperate, Silvers refused to allow Stelor to videotape and interview him to preserve Silvers' "Googles" concepts and dreams in order that it may be used in the future if desirable in connection with promoting the Googles project. (9/14/2004 Letter from Marty Jeffery to Silvers at Ex. 4; 10/5/2004 Letter from Silvers to Laurence Hefter at Ex. 5, ¶ 9.)

In sum, Defendant is fixated on controlling every aspect of the "Googles" development. Defendant continually and persistently eschews his contractual commitments and obligations, holding key information and documents hostage, interfering with Stelor's daily activities, refusing to cooperate and contribute when requested, and endangering Stelor's business prospects with threats to make

6

unauthorized contacts with the media and  prospective customers.

By itself, Defendant's constant intermeddling, cajoling, and criticism of Stelor's genuine good faith efforts constitute a breach of Defendant's express contractual obligation to "cooperat[e] in every way necessary and desirable to strengthen, establish or maintain the "Googles" intellectual property and related assets."  Defendant, however, couples this material breach with a series of past, current, and threatened material breaches, as touched upon above and explained more fully below.  And now, in an attempt to divert attention from his own breaches of the contracts, Defendant threatens Stelor with charges of having breached its contractual obligations, without any basis in law or in fact.

Stelor has embraced enthusiastically its duty to transform the "Googles" story and characters into a thriving entertainment phenomenon.  (Ex. 1, ¶ 8.)  Stelor bargained for, and obtained, the right to do so with Defendant remaining squarely in the background, cooperating fully when called upon, and not placing stumbling blocks in Stelor's path.  Stelor has lived up to its obligations, Defendant has not.  Having exhausted all reasonable avenues and approaches for resolving its differences with Defendant amicably, and facing imminent threats to its ability to protect the critical intellectual property in which it has invested so heavily, Stelor now brings this Motion for a Preliminary Injunction to preserve the status quo while this case is pending and prevent the irreparable harm Stelor will undoubtedly suffer if Defendant's actions go unchecked.

### III. ARGUMENT

Stelor seeks the entry of a preliminary injunction to preserve the status quo and to prevent the further, irreparable injury to its valuable intellectual property rights. To obtain a preliminary injunction, Stelor must demonstrate (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury to Stelor outweighs the harm an injunction may cause the Defendant; and (4) that the injunction would not disserve the public interest. International Cosmetics Exch., Inc. v. Saba, No. 00-2280-Civ-HUCK, 2001 U.S. Dist. LEXIS 2453, at *49 (S.D. Fla. Oct. 19, 2001) (citing American Red Cross v. Palm Beach Blood Bank, Inc., 143 F.3d 1407 (11th Cir. 1998)).

**A.    Stelor Has a Substantial Likelihood of Success on its Breach of Contract Claim**

To prove a breach of contract under Florida law, Stelor must establish (1) the existence of a contract, (2) a breach thereof and (3) damages. Profilet v. Cambridge Fin. Corp., 231 B.R. 373, 382 (S.D. Fla. 1999).

**1.    Stelor and Defendant Entered into a Valid License Agreement and Consulting Agreement**

As shown in attached Exhibits 2 and 3, Stelor and Defendant have entered into a valid "License, Distribution and Manufacturing Agreement" (the "License Agreement") and a Consulting Agreement. These agreements were knowingly signed by both parties after extensive negotiation and compromise. (Ex. 1, ¶ 7.) Moreover, neither Stelor nor the Defendant has ever challenged the validity of these agreements.

8

### 2. Defendant Has Materially Breached At Least Three Separate Provisions of the License Agreement and the Primary Provision of the Consulting Agreement

#### (a) Defendant has breached the License Agreement by interfering with Stelor's sole and exclusive right to seek, obtain, maintain, and enforce the Googles Intellectual Property Rights

Under Paragraph VIII(A) of the License Agreement, Defendant granted to Stelor "all right, power and interest to seek, obtain, and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Trademarks, Licensed Copyrights, and other Intellectual Property Rights." (Ex. 2, ¶ VIIIA.)  In the same paragraph, Defendant also granted to Stelor an "irrevocable power of attorney" to execute and file all documents necessary to "maintain" the rights to the Googles Intellectual Property and to act for and instead of Defendant. (Id.)  This irrevocable power of attorney clearly gives Stelor the exclusive right and duty to file, maintain, and renew all trademark applications and registrations relating to the Googles Intellectual Property.

In furtherance of its rights and duties under the License Agreement to "obtain" and "maintain" the Googles Intellectual Property Rights, Stelor has applied for and maintains numerous federal trademarks and service marks[1] (the "Googles Applications

---

[1] These registrations and applications include, but are not limited to GOOGLES and Design (Reg. No. 2,087,590); IGGLE (Reg. No. 2,496,754); OGGLE (Reg. No. 2,496,753); OOGLE (Reg. No. 2,496,755); GOOROO (App. No. 76/591,381); GOOLALA (App. No. 76/591,394); GOOMAIL (App. No. 76/592,805); GOOPETS (App. No. 76/592,806); GOOSICAL(S) (App. No. 76/591,384); GOOTAINMENT (App. No. 76/591,385); GOOTER (App. No. 76/591,393); GOOTUNE(S) (App. No. 76/592,804);

and Registrations"). Pursuant to the License Agreement, these applications and registrations list Silvers Entertainment, Defendant's company, as the owner. (Ex. 1, ¶ 10.) However, exercising its rights under the License Agreement, Stelor specified that all correspondence from the USPTO be mailed to Stelor's duly appointed counsel of record. (Id.) In clear breach of the exclusive rights Defendant granted to Stelor relating to the Googles Intellectual Property, Defendant has unilaterally, without notice to or authorization from Stelor or Stelor's attorneys, instructed the USPTO to send all correspondence for each of the Googles Applications and Registrations to "Steven A. Silvers / Silvers Entertainment Group, Inc. / 8983 Okeechobee Blvd., Ste 202, PMB 203 / West Palm Beach, FL 33411," instead of to Stelor's duly appointed attorneys. (Id. ¶ 11; Ex. 6.) This unwarranted action clearly violates Stelor's right, power, and duty to deal with the USPTO regarding the registration and maintenance of all the Googles Trademarks. Defendant's actions are not authorized under his limited role as a creative consultant and violate the clear terms of the License Agreement.

     **(b)**    **Defendant has breached the section of the License Agreement granting Stelor the sole and exclusive right to defend all actions brought by third parties challenging the Googles Intellectual Property Rights**

---

GOOWARE (App. No. 76/591,389); GOOWEAR (App. No. 76/591,391); GOOLAGONG (App. No. 76/591,383); GOO (App. No. 76/591,382); GOOBERRY (App. No. 76/591,388); GOOGLES EDUTAINMENT (App. No. 76/591,386); GOOBOO (App. No. 76/591,378); GOOBOP (App. No. 76/591,390); GOOGEAR (App. No. 76/591,387); and GOOKIDS (App. No. 76/591,392). See Ex. 1, ¶ 10.

Paragraph VIII(A) of the License Agreement grants Stelor an irrevocable power of attorney to "enforce" and "defend" the Googles Intellectual Property Rights, and to act for, on behalf of, and instead of Defendant. (Ex. 2, ¶ VIIIA.) Thus Defendant gave Stelor the sole and exclusive right to defend all actions brought by third parties challenging the Googles Intellectual Property Rights. On September 22, 2004, Google, Inc. brought a cancellation proceeding at the Trademark Trial and Appeal Board ("TTAB") to cancel Defendant's registration for GOOGLES & Design (Reg. No. 2,087,590) (Ex. 1, ¶ 17.) This mark was licensed to Stelor. (Ex. 2, ¶ IA.) This proceeding is currently pending before the TTAB. (Ex. 1, ¶ 17.) An answer to Google, Inc.'s petition for cancellation is due on November 9, 2004. (Id.)

In breach of the License Agreement which gives Stelor the exclusive right to defend all actions brought by third parties challenging the Googles Intellectual Property Rights, Defendant has claimed the right to defend the cancellation proceeding brought by Google, Inc. himself, and has "instructed" Stelor's counsel to take no action. (Id. ¶ 18.) On October 5, 2004, Defendant sent a letter to Stelor's counsel with the instructions that "under no circumstances are you to initiate any proceedings on my behalf regarding the now pending administrative proceeding initiated by Google Inc. against me." (10/5/2004 Letter from Silvers to W. Borchard, attached as Exhibit 7.) Defendant also indicated that he intends to "go it alone" and "defend myself the best I can" because he is "not in any position to retain counsel." (Ex. 5, ¶ 10.) Defendant's stated intention to defend the cancellation proceeding himself in violation of the License

Agreement constitutes an anticipatory breach of contract under Florida law, entitling Stelor to immediate relief.  Brandon, Jones, Sandall, Zeide, Kohn, Chalal, & Musso v. Medpartners, Inc., 203 F.R.D. 677, 685 (S.D. Fla. 2001) (recognizing anticipatory breach under Florida law and holding that "Florida law gives [plaintiff] an immediate right to claim damages owed for anticipatory breach of contract").

> **(c)    Defendant has breached the sections of the License Agreement giving Stelor the exclusive right to enforce the Googles Intellectual Property Rights against third parties**

The License Agreement expressly provides that Stelor "shall have the sole right, in its discretion and at its expense, to take any and all actions against third persons to protect the Intellectual Property Rights licensed in this Agreement."  (Ex. 2, ¶ XI(A).) Paragraph VIII(A) of the License Agreement also grants Stelor an irrevocable power of attorney to "enforce" the Googles Intellectual Property Rights, thereby giving Stelor the sole and exclusive right to bring any and all actions against third parties to enforce the Googles Intellectual Property Rights.  (Id. ¶ VIII(A).)  Stelor duly exercised this right on July 6, 2004 when it filed at the TTAB a petition to cancel the trademark registration for GOOGLE (Reg. No. 2,806,075) owned by Google, Inc., and a Notice of Opposition against Google, Inc.'s application to register GOOGLE (Ser. No. 76/314,783) (Ex. 1, ¶ 15.)  These actions are currently pending before the TTAB.  Additionally, the License Agreement obligates Defendant to "cooperate in every way necessary and desirable" in any action brought by Stelor to protect the Googles Intellectual Property Rights.  (Ex. 2, ¶ XI(B).)

In breach of the License Agreement, however, Defendant has attempted to hinder these enforcement efforts at every turn.  For instance, on October 5, 2004, Defendant sent a letter to Stelor's counsel with the instructions that Stelor "cease and desist" any "pending, existing or future challenges" against Google, Inc.  (Ex. 7.)  This and other communications reflect Defendant's repudiation of his contractual obligation to cooperate fully with Stelor's enforcement efforts.  Defendant's refusals to cooperate imperil Stelor's ability to carry out its right and duty to enforce the Googles Intellectual Property Rights as necessary to protect its substantial investment in the Googles business.  (Ex. 1, ¶ 16.)  Defendant's obstinacy and intrusive interference with Stelor's exclusive rights threaten to impair Stelor's enforcement efforts and irreparably injure the Googles Intellectual Property Rights.

> **(d)    Defendant has breached the primary provision of the Consulting Agreement obligating Defendant to use his "best efforts" and to cooperate "in every way necessary" to assist Stelor in promoting the Googles business**

Paragraph 3(a) of the Consulting Agreement requires Defendant to "use his best efforts to perform such services as may be requested by [Stelor] from time to time consistent and commensurate with his position as Executive Creative Consultant… and [to] otherwise cooperat[e] in every way necessary and desirable to strengthen, establish or maintain any intellectual property right granted under this Agreement or the [License Agreement]."  (Ex. 3, ¶ 3(a).)  On September 14, 2004, Stelor's Vice President of Marketing sent a letter to Defendant requesting that Defendant participate in a videotaped interview in which Defendant would discuss the background relating to his

13

inspiration for creating the "Googles" concept.  (Ex. 4.)  In clear violation of his

obligation to cooperate as outlined in the Consulting Agreement, Silvers, without any

explanation, refused to allow Stelor to conduct this interview.  (Ex. 5, ¶ 9.)

### 3.    Defendant's Breaches of the License Agreement and Consulting Agreement Have Caused Stelor Incalculable Damage

Defendant's numerous breaches of the License Agreement and Consulting

Agreement, as detailed above, have caused Stelor significant damage.  (Ex. 1, ¶ 20.)

Not only have they ultimately necessitated this lawsuit, they have for over two years

consumed the valuable time and resources of Stelor's management in dealing with

Defendant's various attempts to thwart and impair Stelor's duty to develop, maintain,

defend, and enforce the Googles Intellectual Property Rights.  (Id.)  More significantly,

as detailed below, Defendant's breaches of the License Agreement have caused, and

will continue to cause, Stelor irreparable harm.

## B.    Stelor Faces a Substantial Threat of Irreparable Injury if an Injunction is Not Granted

Defendant's material breaches of the License Agreement have caused Stelor to

face a substantial threat of irreparable injury.  This irreparable injury will materialize if a

preliminary injunction is not immediately granted in this case.

First, by ordering the USPTO to send communications for all the Googles

Applications and Registrations directly to the Defendant rather than to Stelor's duly

appointed counsel who specialize in trademark law, Defendant not only interferes with

Stelor's ability to maintain the commercially valuable Googles Trademarks, but puts

those trademark rights at risk.  In the event Defendant fails to inform Stelor of required

actions to maintain any of the Googles Applications and Registrations, these

applications and registrations will lapse and the rights to the Googles Intellectual

Property could be irrevocably lost, causing Stelor irreparable injury.  Also, Defendant,

not being an attorney trained or experienced in trademark law, is unsuited for

prosecuting the pending trademark applications himself.  If these applications are not

handled properly, it is possible that valuable trademark rights will be lost.  By definition,

such injury to intangible assets such as trademark rights is irreparable.  McDonald's

Corp. v. Robertson, 147 F.3d 1301, 1310 (11th Cir. 1998).

Second, Defendant's attempt to "fire" Stelor's chosen intellectual property

counsel (the highly regarded "IP" boutique Cowan, Liebowitz, & Latman P.C.) and his

stated intention to take over the defense of the cancellation proceeding brought by

Google, Inc., without aid of counsel, threaten to undermine Stelor's efforts to defend the

Googles Intellectual Property Rights from challenge by third parties.  Indeed, the

prospect of Defendant undertaking a shadow pro se defense with the potential for

inconsistent or conflicting positions would be antithetical to Defendant's contractual

commitments.  Any unilateral actions or submissions by Defendant could undermine

Stelor's rights, efforts, and ability to defend the Googles Intellectual Property Rights and

may result in the impairment or loss of these rights, irreparably harming Stelor.

Moreover, Stelor cannot rely on the TTAB to recognize Stelor as the sole party with

standing to defend the cancellation action.  The TTAB has neither the resources nor the

15

procedures to mediate Licensor / Licensee disputes. An answer must be filed in the cancellation action by November 9, 2004. Defendant must therefore be immediately enjoined from filing an answer, and taking any other action with respect to the cancellation proceeding (including contacting Google, Inc. directly for any reason, including to negotiate a settlement), to prevent irreparable damage to Stelor's rights in the Googles Intellectual Property.

Finally, Defendant's refusal to cooperate with Stelor in the opposition and cancellation proceedings against Google, Inc., threaten to impair Stelor's coordinated enforcement efforts with respect to the Googles Intellectual Property Rights and will cause irreparable harm. Defendant, as the originator, owner, and licensor of the Googles Intellectual Property, possesses certain evidence regarding the genesis of the Googles Intellectual Property that may be vital for prevailing in the cancellation and opposition proceedings against Google, Inc. (Ex. 1, ¶16.) Without such evidence, Stelor's ability to prevail in the cancellation and opposition proceedings against Google, Inc. may be impaired and Stelor's ability to successfully enforce the Googles Intellectual Property Rights against third parties jeopardized. Additionally, Defendant's instructions to Stelor to "cease and desist" any further action in the opposition and cancellation proceedings indicate that Defendant may be inclined to contact Google directly (if he has not done so already) to negotiate a settlement. A unilateral settlement would clearly not take into account Stelor's interests and substantial investment in the Googles Intellectual Property, and could irreparably harm Stelor.

16

C.    **The Threatened Injury to Stelor Outweighs the Harm an Injunction May Cause the Defendant**

As detailed above, Stelor faces a substantial threat of irreparable injury if a preliminary injunction is not immediately granted in this case.  This threatened injury clearly outweighs any harm the Defendant might suffer if an injunction is granted.  In fact, granting an injunction in this case will merely force the Defendant to comply with his contractual obligations and will not cause the Defendant any harm whatsoever. Ordering the Defendant to instruct the USPTO to send all communications for the Googles Applications and Registrations to Stelor's duly appointed counsel will not harm the Defendant, as the License Agreement gives Stelor the exclusive right to "maintain" the Googles Intellectual Property.  Similarly, ordering that Defendant refrain from taking any action in the pending cancellation proceeding brought by Google, Inc. will cause no harm because, the right to "defend" the Googles Intellectual Property belongs solely to Stelor under the License Agreement.  And, an order requiring the Defendant to cooperate with Stelor in the cancellation and opposition proceedings that Stelor has brought against Google, Inc. (including an order prohibiting the Defendant from contacting Google, Inc. directly and an order requiring the Defendant to provide whatever evidence may be needed to prevail in these proceedings) will not harm the Defendant, as the Defendant has no rights to "enforce" the Googles Intellectual Property Rights under the License Agreement, and the License Agreement specifically obligates Defendant to "cooperate in every way necessary and desirable" in any action brought by Stelor to protect the Googles Intellectual Property Rights.

17

**D.    A Preliminary Injunction Would Not Disserve the Public Interest**

Requiring the Defendant to comply with his contractual obligations, as detailed above, clearly does not disserve the public interest.  In fact, complying with contractual obligations and upholding the sanctity of such obligations is necessary for a legal system depending on the rule of law and is in the public interest.

## V.  CONCLUSION

For the reasons set forth above, Stelor respectfully requests that this Court grant Stelor's motion for a preliminary injunction under the terms set forth in the accompanying proposed Order.

Dated:                                             Respectfully submitted,


                                                   _Christopher Dopet_

                                                   s/ Stanley A. Beiley   F.B.N. 045114
Of Counsel:                                        Florida Bar No. 004848
                                                   SACHER ZELMAN VAN SANT PAUL BEILEY
Laurence R. Hefter                                 HARTMAN, ROLNICK & WALDMAN P.A.
FINNEGAN, HENDERSON, FARABOW,                      1401 Brickel Avenue, Suite 700
GARRETT & DUNNER, L.L.P.                           Miami, FL  33131
1300 I Street, N.W.                                Tel:  305-371-8797
Washington, D.C.  20005-3315                       Fax:  305-374-2605
Tel:  202-408-4000
Fax:  202-408-4400                                 Attorneys for Plaintiff,
                                                   STELOR PRODUCTIONS, INC.

18

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT FLORIDA

|  |  |
|---|---|
| STELOR PRODUCTIONS, INC.<br>(a Delaware Corporation)<br><br>Plaintiff,<br><br>v.<br><br>STEVEN A. SILVERS<br>(a resident of Palm Beach County, Florida),<br><br>Defendant. | )<br>)<br>)<br>)<br>)  CASE NO. 04-80954 - CIV -<br>)  HURLEY<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF STEVEN A. ESRIG

I, Steven A. Esrig, hereby declare as follows:

1.     I am the President and CEO of Stelor Productions, Inc. ("Stelor").  I have been employed by Stelor since its inception, and I have held my current position for more than two years.  The facts stated herein are based upon my own personal knowledge and/or on corporate records and documents maintained by Stelor in the ordinary course of business.

2.     In 2001, a company by the name of The Aurora Collection, Inc. ("Aurora") hired my company, EGG International LLC, as a consultant to find a buyer for Aurora and its products, including a product known as the "Googles."

3.     In or about 1991, Steven A. Silvers ("Silvers") authored a children's book entitled "Googles and the Planet of Goo."  This book made little critical or commercial impact when it entered a marketplace crowded with children's titles from bigger and better financed publishers and more famous authors.

4.    Silvers licensed Aurora to develop the Googles concept into a multimedia entertainment and educational business.  Aurora did not succeed.

5.    During Silvers' relationship with Aurora, Silvers and Aurora had many disagreements which developed into an adverse relationship.  Silvers also has a criminal background which made Silvers unsuited to serve as figurehead or spokesperson for an enterprise aimed at providing wholesome and enriching entertainment to an audience of impressionable children.  He spent seven years in a federal penitentiary for conspiring to possess with intent to distribute cocaine, possession with intent to distribute cocaine, interstate travel in aid of racketeering, and conspiring to defraud the United States.

6.    Stelor was formed in 2002 to pick up where Aurora had left off and develop the "Googles" concept into a reality.  Stelor acquired Aurora's rights under its agreement with Silvers at considerable expense.  Stelor saw potential in the "The Googles" story, trademarks, copyrights, and other intellectual property.  Stelor's founders also had confidence in their ability to raise the needed funds and to create a compelling and attractive "Googles" universe that would enlighten, entertain, educate, and develop children by providing them with fascinating and uplifting products, programs, and services.

7.    Stelor's enthusiasm and interest, however, were tempered by legitimate concerns and reservations.  Aware of Aurora's aborted efforts, and wary that Silvers' background could jeopardize the "Googles" program, Stelor's representatives, including me, insisted that any arrangement with Silvers contain certain safeguards and protections.  Thus, when on or around June 1, 2002, after months of extensive

negotiations, Stelor and Silvers entered into an exclusive "License, Distribution, and Manufacturing Agreement," ("the "License Agreement") and a Consulting Agreement, Stelor bargained for, and obtained, a number of promises, commitments, and obligations from Silvers designed to ensure Stelor's ability to develop the "Googles" program free from undue interference by Silvers. Anxious to achieve what he himself has described as his "dream," Silvers agreed to these and other contractual obligations and restrictions.

8.    Stelor, believing that the License Agreement and Consulting Agreement provided it with the necessary rights and protections, then threw itself enthusiastically into the task of using its best efforts to develop the "Googles" concept and intellectual property into a thriving entertainment phenomenon. To this end, Stelor has spent approximately three million dollars, and its principals and employees have devoted themselves tirelessly to making Stelor and the "Googles" successful and profitable, both for themselves and for the benefit of Silvers.

9.    However, Silvers, having received from Stelor $186,500, obligations for options for Stelor stock, and health insurance, has not lived up to his part of the bargain. After giving Stelor the exclusive rights, even as to Silvers, to develop and market the "Googles" concept without interference from him, Silvers commenced a campaign to inject and entwine himself into the very fabric of Stelor's business.

10.    In furtherance of its rights and duties under the License Agreement, Stelor has applied for and maintains numerous federal trademarks and service marks, including but not limited to:  GOOGLES and Design (Reg. No. 2,087,590); IGGLE (Reg. No. 2,496,754); OGGLE (Reg. No. 2,496,753); OOGLE (Reg. No. 2,496,755);

GOOROO (App. No. 76/591,381); GOOLALA (App. No. 76/591,394); GOOMAIL (App. No. 76/592,805); GOOPETS (App. No. 76/592,806); GOOSICAL(S) (App. No. 76/591,384); GOOTAINMENT (App. No. 76/591,385); GOOTER (App. No. 76/591,393); GOOTUNE(S) (App. No. 76/592,804); GOOWARE (App. No. 76/591,389); GOOWEAR (App. No. 76/591,391); GOOLAGONG (App. No. 76/591,383); GOO (App. No. 76/591,382); GOOBERRY (App. No. 76/591,388); GOOGLES EDUTAINMENT (App. No. 76/591,386); GOOBOO (App. No. 76/591,378); GOOBOP (App. No. 76/591,390); GOOGEAR (App. No. 76/591,387); and GOOKIDS (App. No. 76/591,392) (the "Googles Trademarks").  These applications and registrations list "Silvers Entertainment," Silvers' company, as the owner, but specify that all correspondence between the USPTO and Stelor be mailed to Stelor's duly appointed counsel of record.

11.    Within the past two months, Silvers has unilaterally, without authorization from Stelor, instructed the USPTO to send all correspondence for each of the Googles applications and registrations to "Steven A. Silvers / Silvers Entertainment Group, Inc. / 8983 Okeechobee Blvd., Ste 202, PMB 203 / West Palm Beach, FL 33411," instead of to Stelor's duly appointed attorneys.

12.    Stelor's exclusive license under the License Agreement specifically extends to websites and domain names and includes the following domain names: GOOGLES.COM, GOOKIDS.COM, GOOTOYS.COM, PLANETOFGOO.COM, GOOMAIL.NET, THEGOOGLESMAIL.COM, GOOGLESMAIL.COM, GOOGLESFROMGOO.COM, OOGLESFROMGOO.COM, THEGOOGLES.COM, THEGOOGLESFROMGOO.COM, and approximately eighty (80) more (hereinafter referred to as the "Googles Domain Names").

13.     Stelor has developed and operates a website devoted to the "Googles" characters, offering a variety of services and features geared to delighting children and their parents.  At present, the website is the public's window into the Googles' world. Being able to operate and modify this website is among Stelor's most important priorities.  To ensure its ability to do so, Stelor must have immediate and unfettered access to the Googles Domain Names.

14.     Despite Stelor's constant urging, Silvers insists on keeping the Googles Domain Names under lock and key and thereby jeopardizes Stelor's substantial investment of time, money, talent, and creative energy.  Silvers has repeatedly refused to provide Stelor with the passwords for these Domain Names, making it impossible for Stelor to properly manage and use the Googles Domain Names to which it was licensed.  Silvers has also made it abundantly clear in correspondence to Stelor's counsel that he has "absolutely no intentions" of turning over to Stelor the passwords for any of the Googles Domain Names, and that the only way he will turn over these passwords is "when a judge orders [him] to do so."

15.     Pursuant to its exclusive right under the License Agreement to enforce the Googles Trademarks, on July 6, 2004 Stelor, through its intellectual property counsel, filed at the Trademark Trial and Appeal Board ("TTAB") a petition to cancel the trademark registration for GOOGLE (Reg. No. 2,806,075) owned by Google, Inc., and a Notice of Opposition against Google, Inc.'s application for GOOGLE (Ser. No. 76/314,783).

16.     For instance, Silvers has written to Stelor's intellectual property counsel and instructed them to take no further actions in the cancellation and opposition

proceedings brought by Stelor at the TTAB. Silvers' refusals to cooperate with Stelor's enforcement efforts imperil Stelor's ability to carry out its right and duty to enforce the Googles Trademarks as is necessary to protect Stelor's substantial investment in the Googles business. For instance, Silvers may possess evidence vital to Stelor's actions against Google, Inc., and Silvers' refusal to cooperate with Stelor in the opposition and cancellation proceedings threatens to impair Stelor's enforcement efforts.

17.    On September 22, 2004, Google, Inc. brought a cancellation proceeding at the Trademark Trial and Appeal Board ("TTAB") to cancel the registration for GOOGLES & Design (Reg. No. 2,087,590). This proceeding is currently pending before the TTAB. An answer to Google, Inc.'s petition for cancellation is due on November 9, 2004.

18.    Silvers has written to Stelor's intellectual property counsel and claimed the right to defend the cancellation proceeding brought by Google, Inc. himself, and has "instructed" Stelor's counsel to take no action on his behalf.

19.    Silvers has repeatedly threatened to communicate with the press without requesting prior authorization from Stelor. Silvers has also held himself out as a Stelor representative at crucial industry trade shows.

20.    Silvers' actions in breach of the License Agreement and Consulting Agreement have caused Stelor incalculable damage. His actions have required several members of Stelor's Board of Directors, several of Stelor's limited staff and me, Stelor's President and CEO, to spend innumerable hours dealing with, and attempting to correct, the problems caused by Silvers' actions. This time should have been spent advancing the business of Stelor and has resulted in considerable delay in Stelor being

able to complete tasks necessary for it to become a viable business. His actions also have caused Stelor to spend considerable money in attorneys' fees dealing with the actions and threats of Mr. Silvers.

21.    I have first hand knowledge of the truth of the statements above and represent them to be truthful and accurate and complete.

I, being hereby warned that willful false statements and the like are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, state that all statements made herein of my own knowledge are true; and all statements made herein on information or belief are believed to be true.

Signed at _Reisterstown, Md._ , this _21st_ day of _October_ , 2004

_____
Steven A. Esrig

# Exhibit 2

# LICENSE, DISTRIBUTION
# AND MANUFACTURING AGREEMENT

This LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT between Steven A. Silvers and Stelor Productions, Inc. is effective as of June 1, 2002 and is entered into by and between Steven A. Silvers (LICENSOR), an Individual, whose official address is 3741 NE 163rd Street, PMB #325, North Miami Beach, FL 33160 and Stelor Productions, Inc. (LICENSEE), a Delaware corporation with its current offices located at: 14701 Mockingbird Drive, Darnestown, Maryland, 20874.

### WITNESSETH

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES characters identified more fully in "Schedule A" attached hereto (the "Licensed Property");

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES trademarks identified more fully in "Schedule A" attached hereto (the "Licensed Trademarks");

WHEREAS, LICENSOR has the power and authority to grant to LICENSEE the right, privilege and license to use, manufacture, distribute, and sell those types of products that incorporate or are otherwise based on the Licensed Property as identified in "Schedule A" attached hereto (the "Licensed Products") and to use the Licensed Trademarks on or in association with such Licensed Products;

WHEREAS, LICENSEE has or will have the ability to manufacture, have manufactured, have sub-manufactured, distribute and sell or have sold and distributed the Licensed Products in the Licensed Territory more clearly defined in Schedule A (the Territory) and to use the Trademark(s) on or in association with the Licensed Products;

WHEREAS, LICENSEE desires to obtain from LICENSOR an exclusive license to use, manufacture, have manufactured and sell Licensed Products in the Territory and to use the Licensed Trademarks on or in association with the Licensed Products;

WHEREAS, LICENSEE has agreed, pursuant to a letter agreement, to act as a consultant for LICENSOR; and

NOW, THEREFORE, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do hereby agree as follows:

### I. LICENSE GRANT

A.    LICENSOR hereby grants to LICENSEE, for the Term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use, reproduce, modify, create derivative works of, manufacture, have manufactured, market, advertise, sell, distribute, display, perform, and otherwise commercialize the Licensed Products and Licensed Properties in the Territory. The license includes a license under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with the creative characters known as The Googles, anything that contains the letters GOO (in upper or lower case) together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

B.     LICENSOR hereby grants to LICENSEE for the term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use the Licensed Trademarks on or in association with the Licensed Products as well as on packaging, promotional, and advertising material associated therewith

C.     LICENSEE shall have the right to sublicense LICENSEE's rights under this Agreement, provided that any and all such sublicenses shall be subject to the terms and conditions of this Agreement

D.     No licenses will be deemed to have been granted by either party to any of its Intellectual Property Rights, except as otherwise expressly provided in this Agreement

E.     LICENSEE agrees to place on all Licensed Products, where practicable, the phrase "created by Steven A. Silvers" or other similar wording

## II. TERM OF THE AGREEMENT

This Agreement and the provisions hereof, except as otherwise provided, shall be in full force and effect commencing on the date of execution by both parties and shall extend for a Term as recited in "Schedule A" attached hereto (the "Term")

## III. COMPENSATION

A.     In consideration for the licenses granted hereunder, LICENSEE agrees to pay to LICENSOR, during the Term of this Agreement, a royalty in the amount recited in "Schedule A" attached hereto (the "Royalty") based on LICENSEE's Net Sales of Licensed Products. "Net Sales" shall mean the gross revenues on a cash basis (i.e., actually collected by LICENSEE but without counting any gross revenues twice) excluding shipping and handling charges, sales taxes, VAT, and other taxes imposed upon sales less (i) customary trade discounts, (ii) allowances actually shown on the invoice (except cash discounts not deductible in the calculation of Royalty) (iii) bona fide returns, charge backs, refunds or credits (net of all returns actually made or allowed as supported by memoranda actually issued to the customers), (iv) sales of remainder inventory made at less than the total of LICENSEE's actual cost of goods and actual direct selling costs solely for purposes of liquidation or close-out, (v) other uncollectible accounts, (vi) cooperative advertising allowances, (vii) sales commissions paid

B.     The Royalty owed LICENSOR shall be calculated on a quarterly calendar basis on collected funds (the "Royalty Period") and shall be payable no later than thirty (30) days after the termination of the preceding full calendar quarter, i.e., commencing on the first (1st) day of January, April, July and October with the exception of the first and last calendar quarters which may be "short" depending upon the effective date of this Agreement

C.     With each Royalty Payment, LICENSEE shall provide LICENSOR with a written royalty statement in a form acceptable to Licensor. Such royalty statement shall be certified as accurate by a duly authorized officer of Licensee, reciting on a country-by-country basis, the stock number, item, units sold, description, quantity shipped, gross invoice, amount billed to customers less discounts, allowances, returns and reportable sales for each Licensed Product. Such statements shall be furnished to Licensor whether or not any Licensed Products were sold during the Royalty Period. The LICENSEE hereby further agrees to provide the LICENSOR with a list of all of it's sub licensees added during the current royalty period.

D.     If LICENSEE sells any Licensed Products to any party affiliated with LICENSEE, or in any way directly or indirectly related to or under the common control with LICENSEE, at a price less than the average weighted price charged to other parties, the Royalty payable to LICENSOR shall be computed on the basis of the averaged weighted price charged to other parties if the Licensed Products are not ultimately resold to unaffiliated third parties

2

E.    All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties and may offset or be offset from any other payments due to LICENSEE under this or any other agreement between the parties.

F.    Late payments shall incur interest at the rate of ONE PERCENT (1%) per month from the date such payments were originally due.

## IV. AUDIT

A.    LICENSOR shall have the right, at its own expense, to have a nationally recognized certified public accounting firm, upon at least thirty (30) days written notice and no more than twice per calendar year, to inspect during normal business hours, LICENSEE's books and records and all other documents and material in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

B.    In the event that such inspection reveals an underpayment discrepancy greater than 5% of the amount of Royalty owed LICENSOR from what was actually paid, LICENSEE shall have the opportunity to conduct its own audit. If LICENSEE agrees to the amount, if any, of any discrepancy, LICENSEE shall pay such discrepancy, plus interest, calculated at the rate of ONE AND ONE-HALF PERCENT (1 1/2%) per month. Upon settlement of any underpayment discrepancy, no further audit by LICENSOR shall be requested that year. That period end date shall represent the new period start date for future audits for underpayment discrepancies. In the event that such discrepancy is in excess of TEN THOUSAND UNITED STATES DOLLARS ($10,000.00), LICENSEE shall also reimburse LICENSOR for the cost of auditing fees in connection therewith.

C.    All books and records relative to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection for at least three (3) years after the expiration of the initial or any subsequent term.

D.    In the event that an investigation of LICENSEE's books and records is made, certain confidential and proprietary business information of LICENSEE may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be held in confidence by LICENSOR and shall not be used by LICENSOR or disclosed to any third party for a period of two (2) years from the date of disclosure, or without the prior express written permission of LICENSEE unless required by law, except LICENSOR may not disclose at any time to any third party any such confidential and proprietary business information which are trade secrets of LICENSEE. It is understood and agreed, however, that such information may be used by LICENSOR in any proceeding based on LICENSEE's failure to pay its actual Royalty obligation.

## V. WARRANTIES AND OBLIGATIONS

A.    LICENSOR represents and warrants that:

(i)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSOR and this Agreement is a valid and binding obligation of LICENSOR, enforceable in accordance with its terms;

(ii)    the execution, delivery and performance by LICENSOR of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSOR is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSOR;

(iii)    LICENSOR owns the exclusive rights in and to the Licensed Intellectual Property, Licensed Trademarks, Licensed Patents and Licensed Copyrights necessary to effectuate the granting of the Licensing Rights from the LICENSOR to the LICENSEE as contemplated herein.

2



(iv)     the Licensed Intellectual Property and Licensed Trademarks do not infringe the rights, including without limitation, Intellectual Property Rights, of any third party; and

(v)     except as set forth in Schedule B attached hereto, LICENSOR has not received any notice from any third party of any alleged or actual infringement of the Licensed Intellectual Property or Licensed Trademarks and the Licensed Intellectual Property and/or Licensed Trademarks are not the subject, and has not been the subject, of any previous or pending litigation with the exception of the Ganz litigation which has been resolved.

B.   **LICENSEE** represents and warrants that

(i)     the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSEE and this Agreement is a valid and binding obligation of LICENSEE, enforceable in accordance with its terms;

(ii)     the execution, delivery and performance by LICENSEE of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSEE is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSEE; and

(iii)     it will use its commercially reasonable efforts to promote, market, sell and distribute the Licensed Products.

C.   _Disclaimer of Warranties_. EXCEPT AS EXPRESSLY PROVIDED ABOVE, NEITHER PARTY MAKES ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, REGARDING THIS AGREEMENT AS TO ANY MATTER INCLUDING, BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

D.   LICENSEE shall be solely responsible for the manufacture, production, sale and distribution of the Licensed Products or to have such Licensed Products manufactured, produced, sold and distributed, and will bear all related costs associated therewith.

### VI.  NOTICES, QUALITY CONTROL, AND SAMPLES

A.   The Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices.

B.   The Licensed Products shall be of a high quality which is at least equal to comparable products manufactured and marketed by LICENSEE and in conformity with a standard sample provided by LICENSEE.

C.   Prior to the commencement of manufacture and sale of the Licensed Products, LICENSEE shall submit to LICENSOR for his input, at no cost to LICENSOR, a reasonable number of samples of all Licensed Products which LICENSEE intends to manufacture and sell and of all promotional and advertising material associated therewith.

### VII.  NOTICES AND PAYMENT

A.   Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at the above-stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

B.   Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.

## VIII. INTELLECTUAL PROPERTY PROTECTION

A.    LICENSOR hereby grants LICENSEE all right, power and interest to seek, obtain and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Trademarks, Licensed Copyrights and any other Intellectual Property Rights granted herein. LICENSOR further agrees to assist LICENSEE as may be required to apply for and obtain recordation of and from time to time enforce, maintain and defend such Intellectual Property Rights. LICENSOR hereby grants LICENSEE an irrevocable power of attorney for the initial and any subsequent terms of this Agreement to act for and on LICENSOR's behalf and instead of LICENSOR, at LICENSEE's expense, to execute and file any such document(s) and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by LICENSOR.

B.    LICENSOR shall retain all rights, title and interest in the Licensed Intellectual Property and Licensed Trademarks and any modifications thereto based solely on such Licensed Intellectual Property. LICENSEE acknowledges LICENSOR's exclusive rights in the Licensed Intellectual Property and, further, acknowledges that the Licensed Intellectual Property and/or the Licensed Trademarks rights are unique and original to LICENSOR and that LICENSOR is the owner thereof. LICENSEE shall not, at any time during or after the effective Term of the Agreement, dispute or contest, directly or indirectly, LICENSOR's exclusive right and title to the Licensed Intellectual Property and/or the Licensed Trademarks(s) or the validity thereof.

C.    LICENSEE agrees that its use of the Licensed Intellectual Property and/or the Licensed Trademarks(s) inures to the benefit of LICENSOR and that the LICENSEE shall not acquire any rights in the Licensed Intellectual Property and/or the Licensed Trademarks(s) except for the license granted herein

D.    LICENSOR shall retain all rights, title and interest in and to the Licensed Intellectual Properties. The LICENSOR owns the exclusive rights to the Licensed Intellectual Property. LICENSOR hereby waives and releases LICENSEE from any and all current or future claims or causes of actions by third parties, whether known or unknown, arising out of or relating to such Licensed Intellectual Properties including, but not limited to, any claim that Licensed Products violate, infringe on or misappropriate any of LICENSOR's Intellectual Property Rights.

E.    Each party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable to effect any of the provisions under this Section (Intellectual Property Protection). The party requesting such shall reimburse the other party for the expenses incurred as a result of such cooperation. The parties agree to take any actions or prepare or execute any documents reasonably requested by the other party. Furthermore, during the term of this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

## IX. TERMINATION

A ..    Right to Terminate on Notice. This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party fails to cure such breach





B. LICENSEE shall have the right to terminate this Agreement at any time on thirty (30) days written notice to LICENSOR. In such event, all moneys paid to LICENSOR shall be deemed non-refundable and LICENSEE's obligation to pay any unpaid royalties shall be accelerated and shall become immediately due and payable.

C. Additionally, if, after five years of the initial intellectual property license, there are three consecutive years during which royalty payments to LICENSOR are less than one hundred thousand dollars ($100,000.00), LICENSOR has the option to cancel this Agreement in accordance with Section IX. TERMINATION, Para. A.

## X. POST TERMINATION RIGHTS

A. Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEE shall provide LICENSOR with a complete schedule of all inventory of Licensed Products then on hand or on order (the "Inventory").

B. Upon expiration or termination of this Agreement, LICENSEE shall be entitled, for an additional period of six (6) months, to continue to sell such Inventory. Such sales shall be made subject to all of the provisions of this Agreement and to an accounting for and the payment of a Royalty thereon. Such accounting and payment shall be due and paid within thirty (30) days of the quarterly calendar cited as the period basis for royalty calculation. LICENSEE shall have the right to continue the use of the name(s) associate with the products and articles that encompass this Agreement for so long as LICENSEE is actively selling its inventory of articles and products. At the conclusion of LICENSEE'S efforts in this regard, LICENSEE agrees to discontinue the use of names, trademarks, signs, advertising and anything else that might make it appear that the LICENSEE is still handling the articles and products of LICENSOR.

C. Upon the expiration or termination of this Agreement, all of the license rights of LICENSEE under this Agreement shall forthwith terminate and immediately revert to LICENSOR and LICENSEE, except as detailed above in Section (B) of the "Post Termination Rights" Section, shall immediately discontinue all use of the Licensed Property and the like, at no cost whatsoever to LICENSOR.

D. Upon termination of this Agreement for any reason whatsoever, LICENSEE agrees to immediately return to LICENSOR all material relating to the Licensed Intellectual Property. Furthermore, upon termination or expiration of this Agreement, LICENSEE agrees to immediately inform all of it's sub licensees regarding the said termination or expiration of this Agreement.

## XI. INFRINGEMENTS

A. During the Term of this Agreement and any and all option/renewal periods, LICENSEE shall have the sole right, in its discretion and at its expense, to take any and all actions against third persons to protect the Intellectual Property Rights licensed in this Agreement.

B. Upon request by either party to the other, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such lawsuit. Each party shall reimburse the other party for the expenses incurred as a result of such cooperation.

## XII. INDEMNITY

A. LICENSEE agrees to indemnify and hold harmless LICENSOR, its agents, heirs, assigns and representatives, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSOR based on product liability but excluding any claims based solely upon the use of the Licensed Intellectual Property or Licensed Trademarks by LICENSEE in accordance with the terms of this Agreement.



B.     LICENSOR agrees to indemnify and hold harmless LICENSEE, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSEE based on or arising from (i) any infringement, misappropriation or other related action involving the Licensed Intellectual Property or Licensed Trademarks; or (ii) any breach of LICENSOR's obligations, representations, warranties or duties under this agreement.

C.     With respect to any claims falling within the scope of the foregoing indemnifications: (i) each party agrees promptly to notify the other of and keep the other fully advised with respect to such claims and the progress of any suits in which the other party is not participating; (ii) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (iii) each party shall have the right to participate, at its sole expense, in any suit instituted against it; and (iv) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld or delayed.

## XIII. LIMITATION OF LIABILITY

A.     IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT (INCLUDING LOSS OF PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE), NO MATTER WHAT THEORY OF LIABILITY, EVEN IF THE EXCLUSIVE REMEDIES PROVIDED FOR IN THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE AND EVEN IF EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OR PROBABILITY OF SUCH DAMAGES. THE PROVISIONS OF THIS SECTION "LIMITATION OF LIABILITY" ALLOCATE THE RISKS UNDER THIS AGREEMENT BETWEEN LICENSOR AND LICENSEE AND THE PARTIES HAVE RELIED UPON THE LIMITATIONS SET FORTH HEREIN IN DETERMINING WHETHER TO ENTER INTO THIS AGREEMENT.

B.     EACH PARTY'S LIABILITY TO THE OTHER UNDER THIS AGREEMENT FOR CLAIMS RELATING TO THIS AGREEMENT, WHETHER FOR BREACH OF CONTRACT OR IN TORT, SHALL BE LIMITED TO THE AGGREGATE ROYALTY FEES PAID BY LICENSEE TO LICENSOR DURING THE TWELVE MONTH PERIOD PRECEDING THE CLAIM.

## XIV. INSURANCE

LICENSEE shall, throughout the Term of this Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business as required by state and federal law(s), standard Product Liability Insurance naming LICENSOR as an additionally named insured. Such policy shall provide protection against any and all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The amount of coverage shall be as specified in "Schedule A" attached hereto. LICENSEE agrees to furnish LICENSOR a certificate of insurance evidencing same within ninety (90) days after issuance of same, and, in no event, shall LICENSEE manufacture, distribute or sell the Licensed Products prior to receipt by LICENSOR of such evidence of insurance.

## XV. FORCE MAJEURE

LICENSEE shall not be liable for any failure of performance hereunder due to causes beyond its reasonable control, including but not limited to acts of God, fire, explosion, vandalism, strikes, lockouts, work stoppages, other labor difficulties, supplier failures, storm or other similar catastrophes, any law, order, regulation, direction, action or request of the state, local or federal government or of any government agency, commission, court, bureau, corporation or other instrumentality of any one or more of such governments, or of any civil or military authority, national emergencies, insurrections, riots, or wars.

7



## XVI. JURISDICTION AND DISPUTES

A. This Agreement shall be governed in accordance with the laws of the State of Florida without regard to its principles of conflicts of laws.

B. All disputes under this Agreement shall be resolved by the courts of the State of Florida including the United States District Court for Florida and the parties all consent to the jurisdiction of such courts, agree to accept service of process by mail, and hereby waive any jurisdictional or venue defenses otherwise available to it.

## XVII. AGREEMENT BINDING ON SUCCESSORS

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, successors and assigns.

## XVIII. WAIVER

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

## XIX. SEVERABILITY

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

## XX. NO JOINT VENTURE

Nothing contained herein shall constitute this arrangement to be employment, a joint venture or a partnership.

## XXI. ASSIGNABILITY

Neither party may assign by any act or operation of law the rights and obligations of this Agreement unless in connection with a transfer of substantially all of the assets of LICENSEE and/or with the consent of LICENSOR, which shall not be unreasonably withheld or delayed. By way of example and not limitation, LICENSEE may freely assign its rights and obligations under this Agreement to Stelor Productions, Inc.

## XXII. INTEGRATION

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may be in conflict with said Agreement.

## XXIII. RATIFICATION

The LICENSOR hereby agrees to the transfer of this License from the LICENSEE (The Aurora Collection, Inc.) to Stelor Productions, Inc. as contemplated by the Asset & Purchase Agreement, dated May 1st, 2002, and          executed          between          the          above          mentioned          parties





## "SCHEDULE A"

### LICENSED INTELLECTUAL PROPERTY

The following Licensed Intellectual Property forms part of this Agreement:  A License under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with a creative character known as Googles, anything that contains the letters GOO (in upper or lower case), together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the Planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

### LICENSED TRADEMARKS

The following Licensed Trademarks form part of this Agreement: (i) "The Googles" (word and design) Trademarks in International Class Code (016) of the U.S.P.T.O and the co-existent Trademarks Agreement with Ganz, Inc. of Canada in International Class Code (028) of the U.S.P.T.O., which is hereto attached and made a part of this "Schedule A" document, (ii) "Oogle", (iii) "Iggle", (iv) "Oggle", (v) "GooRoo", (vi) "Planet Goo", (vii) "GooMu", (viii) "GooToons", (ix) "GooStuff", (x) "GooKids", (xi) "GooStore" and (xii) any other trademarks, whether registered, pending or future or common law, used in connection with the Licensed Property, including , but not limited to, any trademark incorporating the phrase "Goo" currently in existence.

### LICENSED PRODUCTS

The following Licensed Products form part of this Agreement:  all products which comprise the likenesses, stories, ideas, concepts, or designs of the Licensed Property, including without limitation, stuffed toy figurines, videos, stickers, t-shirts or other clothing items, slides, movies, cartoons, books (comic and otherwise), posters, playing, trading and collector cards, CDs, cassette tapes, DVDs, TV programs, motion pictures, all other forms of communication and publication, programs, computer Web site(s), membership lists and clubs, and any other products.

### DERIVATIVES

A Derivative as defined in this agreement shall mean a product or service that is utilized by the LICENSEE and developed by a party other than the LICENSOR but is used in conjunction with licensed products, articles and /or services. It can be a product or service produced by the LICENSEE or a third party (inventor, sub licensor etc,) that in its use enhances the value of the Googles Universe but does not have a conflict with an already existing Googles product idea or concept as outlined in this agreement. It may not possess the "Googles" or "GOO" in it's name and would therefore fall under the LICENSOR'S exclusive ownership as defined in the amended agreement but can be used in conjunction with the "Goo" Universe by the LICENSEE.

### TERRITORY

The following countries shall constitute the Territory. Global/Worldwide rights.

### TERM

This Agreement shall commence on the date executed below by both parties and shall be for a thirty (30) year term  This Agreement shall automatically renew for one additional ten (10) year term on the same terms and conditions provided for herein ("Renewal Term"). Upon expiration of the first Renewal Term of ten (10) years, this Agreement shall automatically renew for a second ten (10) year  extended Term on the



same terms and conditions provided for herein, unless LICENSOR provides written notice of its intention to not to renew this Agreement within one hundred eighty (180) days prior to expiration of the Renewal Term.

## ROYALTY RATE

LICENSEE shall pay the following royalty rates: (i) SIX PERCENT (6%) of Net Sales of Licensed Products that are based solely on the Licensed Intellectual Property and (ii) THREE PERCENT (3%) of Net Sales of Licensed Products that are based solely on Derivative Products and (iii) In the case of Sub Licenses royalties will be TEN PERCENT (10%) of Net sales after subtracting licensing costs and royalties paid to third parties only.

## PRODUCT LIABILITY INSURANCE

Minimum Product Liability Insurance shall be Two Million U.S. dollars ($2,000,000.00) combined single limit for each single occurrence for bodily injury and/or for property damage.

*Succession*

*Rights of Survivor*

In the event of the Death of Licensor all of the Licensors rights under this agreement shall go to his heirs, assigns or legal representatives as he has lawfully designated in writing.

*Steven A. Silvers*
5/09/02

*Steven A. G.*
5/9/02

*Michael Ilum*
MICHAEL ILUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003
5/9/02          11

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his/her hand and seal the day indicated.

STEVEN A. SILVERS                          STELOR PRODUCTIONS, INC.

Steven A. Silvers                          By: _____
Title: Owner/LICENSOR                      Printed Name: _Steven A. Esrig_
Dated: _5/09/02_                           Title: _President_
                                           Dated: _5/9/02_

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003

5/9/02

# AMENDMENT
# TO
# LICENSE, DISTRIBUTION
# AND MANUFACTURING AGREEMENT

This AMENDMENT TO THE LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT between Steven A. Silvers and Aurora Collection is effective as of April 30, 2002. and is entered into by and between Steven A. Silvers (LICENSOR), an Individual, whose official address is 3741 NE 163rd Street, PMB #325, North Miami Beach, FL 33160. and The Aurora Corporation, Inc. (LICENSEE), a Florida corporation with its current offices located at 4651 SW 51st Street, Suite 806, Davie, FL 33314.

## WITNESSETH

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES characters identified more fully in "Schedule A" attached hereto (the "Licensed Property");

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES trademarks identified more fully in "Schedule A" attached hereto (the "Licensed Trademarks");

WHEREAS, LICENSOR has the power and authority to grant to LICENSEE the right, privilege and license to use, manufacture, distribute, and sell those types of products that incorporate or are otherwise based on the Licensed Property as identified in "Schedule A" attached hereto (the "Licensed Products") and to use the Licensed Trademarks on or in association with such Licensed Products;

WHEREAS, LICENSEE has or will have the ability to manufacture, have manufactured, have sub-manufactured, distribute and sell or have sold and distributed the Licensed Products in the Licensed Territory more clearly defined in Schedule A (the Territory) and to use the Trademark(s) on or in association with the Licensed Products;

WHEREAS, LICENSEE desires to obtain from LICENSOR an exclusive license to use, manufacture, have manufactured and sell Licensed Products in the Territory and to use the Licensed Trademarks on or in association with the Licensed Products;

WHEREAS, LICENSEE has agreed, pursuant to a letter agreement, to act as a consultant for LICENSOR; and

NOW, THEREFORE, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do hereby agree as follows:

## I. LICENSE GRANT

A.    LICENSOR hereby grants to LICENSEE, for the Term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use, reproduce, modify, create derivative works of, manufacture, have manufactured, market, advertise, sell, distribute, display, perform, and otherwise commercialize the Licensed Products and Licensed Properties in the Territory. The license includes a license under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with a creative characters known as Googles, anything that contains the letters GOO (in upper or lower case) together with any and all products, which comprise and which will comprise those characters, likenesses, which include iggle, Oogle, Oggle, Gooroo, Gootian(s), the planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational

2

# Exhibit 3

June 1, 2002

Mr. Steven Silvers
3741 N.E. 163rd Street
PMB # 324
North Miami Beach, FL 33160

Dear Steven:

   This letter agreement ("Agreement") will serve to memorialize the terms of the consultantcy arrangement between Stelor Productions, Inc. ("Company") and Steven A. Silvers ("Consultant").

   1.   **Engagement of Consultant.**

      a.   Company hereby engages Consultant as an independent contractor to the Company. Consultant's title shall be Executive Creative Consultant. Company is relying on Mr. Silvers to continue his role of "Papa Googles" and continue to offer his creative input to the Company.

      b.   In consideration for the covenants of Consultant contained herein, Company will pay Consultant the following: (i) a signing bonus of ten thousand dollars ($10,000) and (ii) a monthly consultancy fee of five thousand five hundred dollars ($5,500) beginning on June 1, 2002, and continuing each month thereafter for twelve (12) months. Company shall pay Consultant six thousand dollars ($6,000) monthly for a second 18-month period, beginning June 1, 2003.  All payments made to Consultant will not be offset against any royalties paid by the Company to Consultant pursuant to the License, Distribution and Manufacturing Agreement. Company will continue to reimburse The Aurora Collection, Inc. for the existing health plan if available, or if not available, will reimburse consultant $300 per month during the term of this Agreement. During the term of the Agreement, Company will reimburse The Aurora Collection, Inc. for, if available, the use of a leased company vehicle, with company to reimburse The Aurora Collection, Inc for insurance coverage. Consultant agrees to pay all costs of maintenance and upkeep. Stelor will write an agreement with Consultant granting him options for 1,000 shares of Stelor's stock under Stelor's stock option plan. If the number of options available under the Stelor Productions current plan is increased during the Consultant's service Company will issue an additional one thousand option shares (1,000)

      c.   It is agreed by company that in the event the Company fails to compensate the Consultant as outlined in this Agreement and in accordance with the terms of this Agreement (including all option periods surrounding same) for two consecutive months and if after thirty (30) days fails to cure alleged breach, then Consultant has the right (option) to terminate this Agreement and among other legal remedies afforded Consultant to seek redress before the Court, the License Agreement shall, likewise immediately terminate. This caveat shall exist only if Consultant is not paid for other than "good Cause" termination as outlined below at section five (5) b of this Agreement.

   2.   **Relationship of Parties.** The relationship of Company and Consultant established under this Agreement is of an independent contractor.  Nothing in this Agreement shall be construed to give any party the power to direct or control the daily activities of any of the other parties, or to constitute the parties as principal and agent, employer and employee, franchiser and franchisee, partners, joint venturers, co-owners, or otherwise as participants in a joint undertaking. The parties understand and agree that none of the parties grants any other party the power or authority to make or give any agreement, statement, representation, warranty, or other commitment on behalf of any other party, or to enter into any contract or otherwise incur any liability or obligation, express or implied, on behalf of any other party, or to transfer, release, or waive any right, title, or interest of any other party. Furthermore, during the term of

this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

3.    Duties of Consultant.    Consultant's duties hereunder are as follows:

a.    Consultant shall use his best efforts to perform such services as may be requested by Company from time to time consistent and commensurate with his position as Executive Creative Consultant, including, but not limited to, executing all papers, testifying on all Company related matters and otherwise cooperating in every way necessary and desirable to strengthen, establish or maintain any intellectual property right granted under this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant The Consultant shall make himself available to the Company by way of telephone, fax, email, video conferencing (if deemed necessary) on an as needed basis and during reasonable business hours Monday through Friday.  Consultant shall further make himself available, in person, if deemed necessary, to the Company so long as the Consultant is given a minimum of ten (10) days written notice if Consultant is, at the time of said request, residing outside of the Continental United States and three (3) days written notice by the Company if Consultant is residing, at the time of said request, within the Continental United States. In either case, Consultant must maintain a United States address for purposes of receiving correspondence, samples, checks etc. Written notice may also be deemed given if communicated via Consultant's personal email address or a fax number to be provided to the Company. Written notice must be sent via U.S. Mail certified, return receipt requested, or via a nationally recognized mail carrier service with "signature" required. Written notice may also be sent if communicated via Consultant's personal email address or a fax number to be provided to the Company. However, the latter shall not be used for any "official" notice purposes.

b.    During the term of this Agreement and for a period of (1) years after the termination or expiration of this Agreement, Consultant shall not, either individually or in conjunction with a third party, engage in any business, trade, or profession as owner, officer, manager, employee, consultant or otherwise if such business competes in any material way with Company's business of developing, creating, selling, manufacturing, distributing, or marketing products, media or materials for children.

c.    Consultant shall offer Company a right of first refusal to license, develop, manufacture, market or sell any and all children's characters or other products, ideas, inventions or creations created by Consultant that are not within the scope of this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant. If Consultant provides Company with any new idea's either relating to The Googles as well as anything entirely new that may not relate to the current universe of characters and /or idea's, that upon submission of such new idea or concept which shall be placed in writing Company shall have one hundred and twenty (120) days to accept and enter into an agreement for said property.

d.    Consultant agrees to hold harmless, defend and indemnify Company and its officers, directors, employees, agents and servants from and against any and all claims, damages and expenses, including reasonable legal fees and expenses, of whatever kind and nature directly or indirectly arising out of or on account of or resulting from the Consultant's activities (other than as expressly authorized by Company) including, without limitation, Consultant's failure to comply with his obligations under this Agreement, acts or omissions.

4.    Duties of Company.

a.      Company shall reimburse Consultant for all reasonable travel and living expenses that are deemed to be essential to Company's success and are pre-approved by an authorized officer of the Company and incurred as a direct result of Consultant's obligations under this Agreement such as attending tradeshows, board meetings, etc.  The Company shall, upon proper documentation having been presented to the Company, or its official/designated representative, within seven (7) days of receipt of same, reimburse Consultant said incurred expenses as approved by Company.

5.      <u>Term and Termination</u>.

a.      Subject to the provisions for termination as provided herein, this Agreement shall commence upon execution and shall have a term of thirty (30) months.

b.      Company may immediately terminate this Agreement upon the occurrence of any of the following: (i) a material breach of any provision of this Agreement by Consultant; (ii) a failure by Consultant, after written notice, to perform such duties required of Consultant as outlined in this agreement; (iii) the initiation of any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding by Consultant, or if any such proceeding is instituted against Consultant; (iv) the conviction of Consultant of any felony crime; (v) any use, sale or possession by Consultant of any illegal drug or controlled substance that is prosecutable under US Federal Laws. Written notice to mean by way of Certified mail, return receipt requested, or by way of a Nationally recognized mail service, Courier service etc.

c.      Upon termination or expiration of this Agreement by either party, Consultant shall immediately return to Company all Proprietary Information (as defined below) in Consultant's possession, custody or control in whatever form held (including copies, compilations, summaries, or embodiments thereof relating to Proprietary Information) and provide written certification that all such material has been returned.

d.      Company agrees to provide Consultant thirty (30) days Notice, from date of said written notice of termination by the Company, within which to cure any alleged breach it has made against the Consultant identified in paragraph three (3) under "Duties of Consultant".

6.      <u>Proprietary Information; Proprietary Rights</u>.

a.      In the course of performing his duties under this Agreement, Consultant may obtain information relating to Company and/or its customers, suppliers or other third parties that is of a confidential and proprietary nature ("Proprietary Information"). Such Proprietary Information may include, without limitation, trade secrets, research and development, customer lists, vendor lists, schedule of accounts, plans, programs, inventions, computer software, know-how, inventions, product information, techniques, processes, schematics, data, financial information and sales and marketing plans. Consultant shall, at all times, both during the term of this Agreement and for a period of two (2) years thereafter its termination, keep in trust and confidence all such Proprietary Information, and shall not use such Proprietary Information other than in the course of performing his duties as expressly provided in this Agreement, nor shall Consultant disclose any such Proprietary Information to any person without Company's prior written consent except as required or needed in any legal and/or Court action by Consultant against the Company or any other third party. This pertains to only that information not otherwise gathered from public sources, knowledge already in the public eye or a matter of public record, and/or any other third party other than Consultant.

b.    The Company acknowledges that the Consultant is not being hired as a work for hire but rather is being compensated, pursuant to this Consulting agreement, as a Consultant for the express purpose of advising, recommending, counseling, and otherwise utilizing Consultant's expertise in the decision making process as it pertains to the existing and "further development" of the Google's project only.

c.    The services and rights which Company is granting to Consultant hereunder are extraordinary and unique and cannot be replaced or adequately compensated in money damages, and any breach by Consultant of this Agreement will cause irreparable injury to Company. Therefore, Consultant agrees that in the event of a breach of this Agreement, Company, in addition to any other remedies that might be available to it, shall be entitled to bring suit at law or equity for money or other damages. Consultant shall not oppose such relief on the grounds that there is an adequate remedy at law, and such right shall be cumulative and in addition to any other remedies at law or in equity (including monetary damages) which Company may have upon the breach of the obligations of confidentiality hereunder.

7.    <u>Limitations of Liability</u>. TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, INDIRECT, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES) FOR ANY CLAIM BY ANY OTHER PARTY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

8.    <u>Miscellaneous</u>.

This Agreement is a legally binding agreement between Company and Consultant and shall be governed by and construed in accordance with the laws of the State of Florida. This Agreement may be executed in one or more counterparts, each of which shall be an original Agreement, and all of which taken together shall constitute one and the same instrument. This Agreement may not be assigned by consultant without the prior written consent of Company. This Agreement shall not be modified, amended, or in any way altered except by an instrument in writing signed by both Company and Consultant. Each party shall refrain from making or issuing any statements, disclosures, or other communications related to this Agreement, the subject matter of this Agreement, or the services provided hereunder. This Agreement constitutes the entire agreement between Company and Consultant with respect to the subject matter of this Agreement, and supersedes all prior agreements, whether written or oral, with respect to the subject matter contained in this Agreement.

Please indicate your acceptance of the terms of this Agreement by signing in the space indicated below.

STEVEN A. SILVERS    Date 5/09/02

Stelor Productions, Inc.

By: _____    Date 5/9/02
Name: Steven A. Esrig    Title: President

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003
5/9/02

4

# Exhibit 4



Tuesday, September 14, 2004

Memo: To Steve Silvers via FedEx

Dear Mr. Silvers:

My name is Marty Jeffery.  I am the V.P. of Marketing at Stelor Productions.  This position involves more than the challenge of getting the Googles to take their rightful place as icons of principle-centered learning.  I am also anxious to preserve the history of their creation and creator.  Please let me expand on this idea.

I believe that in the future we will be asked to tell the story of how the concept developed, and of the person responsible for the idea.  This is not unprecedented, as much has been said and reported about Walt Disney, for example. The creator's personal history enriches the story and animation by adding a human aspect to the mix.

I have, therefore, asked for authorization to get video footage of you answering questions about your inspiration to create this work.  As I have an extensive broadcasting background I will do the off-camera interview.  We would then keep this digital footage safe until it became a part of a documentary and/or would appear in web articles on the Googles.

It is my hope that this effort would be a significant part of the legacy that you have to share with the world as a result of creating the Googles.  I will follow this letter with a telephone call and if you agree with this concept, we can establish a time, place, and method for getting this very important information recorded.

Thank-you for your attention to this matter and I look forward to working on this project.


Sincerely Yours,


Marty Jeffery
Senior V.P. Marketing
Stelor Productions

# Exhibit 5

Laurence R. Hefter, esq.
Attorney at Law
Finnegan Henderson Farabow Garrett & Dunner, LLP
1300 I Street, NW
Washington, D.C. 20005-3315

October 5, 2004

Re:    Silvers Response To Your September 15, 2004 Letter

Dear Larry:

Allow me to apologize for not getting back to you sooner. However, as you very well know we sustained back-to-back hurricanes here in West Palm Beach and while I was fortunate to escape minimal damage with Frances, I wasn't as lucky with Jeanne.

Nevertheless, I would like to respond to your letter as follows:

1.    The Stelor Option shares were supposed to have been provided to me at a reasonable time after the signing of the original Agreements with Stelor. Not some 25 plus months later. Stelor has given me one excuse after another for not complying with its obligations under our current agreements. For instance: In Silvers Consulting Agreement executed on May 9, 2002 it states at [page 1, section 1 b.] "Stelor will write an agreement with Consultant granting him options for 1,000 shares of Stelor's stock under Stelor's stock option plan". This agreement was supposed to have been executed within a reasonable period of time. Not 27 months into the 30-month Consulting Agreement. I would say 27 months is rather unreasonable.

2.    Moving right along. The Consulting Agreement also states, and we've been over this more than once, that "Company (Stelor) will continue to reimburse the Aurora Collection, Inc. for the existing health plan if available, or if not available, will reimburse consultant $300.00 per month during the term of this Agreement". The Agreement doesn't state that Stelor will reimburse Aurora a specific amount of money toward the premium of the existing health insurance agreement. Since Aurora has had and continues to have, in place, an existing health plan, which has been the same exact "health plan" I've had since day one, then what ever the premium is for the said health plan should be entirely borne by Stelor. It's not my fault nor should I be penalized as such, that the health plan has increased its premiums over the course of the Consulting Agreement. The Consulting Agreement makes no mention whatsoever that I am to be responsible for any increases over and above what Stelor started out paying. My position has never wavered from day one on this issue. Aurora continues to have in place a health care plan that they have

maintained for me since June 2, 2002. Stelor was suppose to reimburse Aurora as called for by the Consulting Agreement each and every month for 30 consecutive months whatever the premium was that Aurora was being billed. That is what "continue to reimburse" means. I've incurred several thousands of dollars in contributory premiums that I should not have been required to pay. This is a breach of the agreement as far as I'm concerned. I've informed Stelor about this on numerous occasions and they've never agreed to remedy the situation. Your response to this issue is "unacceptable".

3.  As to domain name reimbursements. I have submitted to you a bill for the past two months of expenses that I've incurred to renew domain names in the months of August and September. I've informed you that in October and November there would be another some 26 plus names that are due to be auto renewed by me. I would prefer to submit to you every two months rather than every quarter my domain name invoices if you don't mind. I would expect payment to be made within (7) days from receipt of said invoice(s). I don't believe this request to be unreasonable.

4.  With regard to the last quarter royalty statement. I informed you in my last correspondence that the Royalty Statement for the period ending on June 30, 2004 was in error. I explained to you exactly what needed to be corrected. I informed you that the statement reads at the very top for the quarter April 1, 2004 through June 30, 2004. However, where the months are supposed to be listed and broken down as to sales, etc., it states the wrong months. The royalty statement was in error and needs to be corrected and resubmitted to me as I have informed Stelor on no less than (3) occasions already. Also, you have mentioned that for the 2nd quarter (April, May, & June) that there were no new sub-licensees. However, I would argue that I-Tunes was a new sub licensee that was added during this quarter since the Googles' music was being sold and downloaded during this period. They were not properly listed in this Royalty Statement nor was there any revenue listed for this period as well for this company.

5.  I informed you in my last correspondence that Stelor has once again failed to comply with the mandates set forth in our existing Licensing Agreement (LA) as it pertains to "Notices, Quality Control, and Samples". They did so when they failed to comply by going to the Licensing Show in June of this past year without properly following the requirements of the LA and they did so once again by not having complied with Section VI. C, when they began selling music downloads and music CD's through I-Tunes. Both of these examples are specific and undeniable breaches of the LA, which are inexcusable. Just another example of how Stelor has continued to disrespect the Licensor/Licensee relationship by doing what it chooses when it chooses and not following the LA as called for. I will, for the record once again quote from the LA: At VI. C.: "Prior to the commencement of manufacture and sale of the Licensed Products, Licensee shall submit to Licensor for his input, at no

cost to the Licensor, a reasonable number of samples of "ALL" Licensed Products which Licensee intends to manufacture and sell and of "ALL" promotional and advertising material associated therewith". As we both very well know, this has NEVER been adhered to nor complied with by Stelor. They failed to do so with the advertisements placed in the Licensing Show in 2003 and 2004. They failed to provide me with samples of their premium handout bags before the 2004 Licensing Show. They failed to provide me with other promotional pieces, which depicted my name in as small of print as could be seen by the naked eye on several promotional pieces that I would have certainly called to their attention had I had the benefit of seeing copies of the said advertisements prior to printing. I saw nothing and I was NEVER sent anything for my "input". Then, once again when it came time for executing an agreement with I-Tunes I was not provided, as required by the LA, any samples of the finished music CD's for my "input". There have been other instances of advertising and promotional pieces that I've never seen until after the fact. All of which are in violation of the LA. With all due respect, Larry, your response to this issue in your September 15, 2004 letter is unacceptable. An omission of wrong doing by Stelor would have been a far better approach to responding to this issue than how you chose to do so. Stelor had the duty, obligation and legal responsibility to adhere to this caveat from day one, not some 27 plus months into our Agreement with a statement from you that this will not happen again.

6.     You have wrongfully informed me and once again have obviously been misinformed by Stelor into believing that what they have told you was true as it pertained to them not having any domain names listed in Steven Esrig's name. I informed you, by raising my voice, at the meeting in New York, if you recall, that Mr. Esrig was not being candid with his remarks to everyone about NOT having any Googles or Googles related domain names listed in his name. He categorically informed everyone that I was lying and that he had NO domain names that were listed in his name. That meeting has long passed and you would have thought by now that the changes would have been made so that Mr. Esrig's remarks could have remained consistent with the truth. However, I am sorry to inform you that nothing could be further from the truth. If you go to: www.new.net and then type in the search bar the domain names listed below, you will quickly see who was not being truthful and why I am furious to this day as to what I've had to deal with all of this time and you wonder why I reacted the way I did during the NY meeting. I have records and copies of all of this from back during the NY meeting and copies once again several months later to prove that they were never changed. Here are some of the names registered to Steven Esrig as "Owner": 1). Googles.kids, 2). Googles.club, 3). Googles.shop, 4). Googles.game, 5). Googles.chat, 6). Googles.family, to name a few. I am sure there are others, perhaps many others. The point being is that you have misrepresented to me the truth as I know it and as you will soon

know it to be. Remember you must first go to: www.new.net. Once there you must then type in the search bar the names as I've noted and you will see for yourself that Steven A. Esrig is listed as the "Owner" of all of these names and underneath his name is his e-mail address, plus the company's address and phone number. All of these names were created on October 10, 2003 and due to be renewed in seven more days. I rest my case on this issue, which is another indication that Mr. Esrig has once again seriously violated the breath and width of our LA and once again disrespected the Licensor/Licensee relationship.

7.  I don't see the necessity of delving into the other unresolved matters at this time. There are enough unresolved matters listed above to deal with without having to discuss any more at this time, as far as I'm concerned.

8.  As to the issue of the domain name password. I've informed Stelor on numerous occasions as did my previous counsel, Larry Stumpf, that I have absolutely no intentions of turning over to Stelor the passwords of any of the Googles' and Googles' related domain names. I stated my reasons in many e-mails, and official letters of correspondences to Stelor and to Stelor's counsel over the last 18 plus months. I've made myself perfectly clear on this sensitive issue. I sent to Stelor's IT executive several months ago my response to his inquiry that you had forwarded to me. I've never heard back from anyone. I was willing to work with Stelor to accomplish their urgent needs as communicated to me via an e-mail that was forwarded to me by Stelor and I promptly responded and never heard another word. I guess it must not have been all that urgent. I've maintained the domain name renewals without losing a single name for lack of an untimely filing. Something Stelor cannot boast about. They cost me to lose several very important domain names that were mine and they failed to timely renew them and as a direct result of Stelor's failure to do so, I lost them forever. Once again, no excuse. Stelor had them in their possession and they chose not to renew them without even giving me the courtesy of letting me know so that I could have chosen to do so on my own and at my own expense. I never got so much as an apology for this screw up on Stelor's behalf. I do not wish for you to bring up this password issue again unless you determine that you wish to settle the matter in court because that is the only way that I'm going to turn the passwords over to Stelor is when a judge orders me to do so.

9.  I have received the Marty Jeffrey video. I will be returning it to you under separate cover. I enjoyed Marty's presentation and his impressive background. However, at this time I must respectfully decline his offer to conduct a video interview of me for reasons I shall further explain below. However, I wish to thank Marty for his introduction letter and I wish him all the luck in the world with his new position at Stelor.

10.  As to you asking me to "strongly" consider an arrangement to sell my rights in the Googles IP to Stelor at this time, I must, for many obvious reasons respectfully decline. Furthermore, I don't believe that Stelor could afford to pay me what I would ask them for. And to be quite frank

with you, after having read the recent documents that were sent to me from Bill Borchard's office on Friday of this past week, I would seriously doubt that I would entertain selling my rights to Stelor after reading about how much harm they have now caused me and will continue to cause me as a direct result of their actions and the actions of their trusted trademark counsel at the time, which now seems to have caused me "irreparable" harm.

In closing, I must inform you that I am terribly disappointed with all that has transpired these past several months. Especially after having read and reread the documents submitted to me by Bill this past week. They were disconcerting to say the least.

Now I find myself in a legal battle with one of the most powerful corporations in perhaps the world as a direct result of Stelor's counsel's ineptness, and Stelor's inability to have listened to me prior to going forward with their litigation plans against Google.com.

I was NEVER informed about any legal action being planned against Google.com. As a matter of fact Mr. Esrig told me just the opposite all along. I was informed that to sue Google.com would prove to be a disaster and that Stelor was planning to try and negotiate with them. I was further told and so informed by Bill Borchard during our NY meeting, where you, too, were present, that there were several telephone conversations that proved favorable and that Google was waiting to hear back from Stelor as to what they were looking for. Bill had informed everyone at the meeting that the conversations were favorable and things were looking up for a meeting with Google to work things out. Next thing I learn is Stelor sued Google.com without me, as the Licensor, ever being consulted nor asked about my opinion and to add insult to injury Stelor made the huge blunder of placing its name as the Party Plaintiff instead of mine, very well knowing or they should have been properly advised by Bill and perhaps you as well, that Stelor has NO standing to bring any such action against Google because Stelor does not possess any ownership rights to any of the Googles IP rights.

So I now find myself having to defend against the search engine giant in a "Cancellation" proceeding, directly against me, in the USPTO Administrative Court to defend against the very real possibility that I may wind up losing my Googles' trademark and my Googles' name when all is said and done. All of this due to Stelor's actions, not mine.

Furthermore, it certainly now is more apparent that ever that Stelor and Silvers now have severe "conflict of interest" issues. Bill is defending Stelor in two separate proceeding that Stelor cannot, in my personal and professional opinion prevail. They lack standing and as such the court will most likely dismiss the

proceedings against Google.com. Hopefully "without prejudice" and not "with prejudice".

I, on the other hand, am not in any position to retain counsel to defend myself against Google so I will be forced to go it alone and defend myself the best I can. Since I may very well find myself in a legal riff with Stelor in the very near future therein lies further conflicts of interest issues should Bill or someone he may recommend look to defend me against Google.com. It seems like a real mess to me and one that is only going to unravel more and more as the weeks unfold and things begin to get really sticky with discovery issues and depositions, etc.

I'm sorry it has all come down to this and even more sorry that it looks like neither myself nor Stelor is going to realize our dreams to have made something Goo come from my Googles' creation for all of us.

My plans are to confer with new counsel on a consulting basis only in order to further explore what my options are at this time. I will soon thereafter get back with both you and Bill to inform you as to what I plan to do in order to properly protect what little that is left for me to protect.

I assume that September's consulting fees and health insurance premium was already sent out. If not, please let me know what Stelor's position is going to be in this regard for September's obligations? Thank you!

No hard feelings, Larry, but in my opinion, things have gotten totally out of control. Accordingly, I can't afford to stand by on the sidelines and run the very real risk of losing all that I've worked so very hard to achieve for my family and loved ones.

Like I stated above, I will be back in touch with you within a week or so, once I've had the opportunity to confer with some legal advisors that I'm planning to begin a dialogue with shortly.

Respectfully submitted by,

Steven A. Silvers

Mailed Certified, Return Receipt Requested
Receipt Number: 7004 0550 0000 5867 9024

# Exhibit 6

# OGGLE

# Application Serial No. 75/655,709

OCT 21, 2004 12:47    7036835549    Page

eTeas Change of Correspondence                                              75655709

<SERIAL NUMBER>          75655709
<MARK>                   OGGLE
<LAW OFFICE ASSIGNED>    LAW OFFICE 107
<CONTACT TYPE>           Correspondent

<ORIGINAL ADDRESS>       BARRY L. HALEY
                         MALIN HALEY & DIMAGGIO, P.A.
                         1936 SOUTH ANDREWS AVENUE
                         FORT LAUDERDALE FL 33316

<NEW ADDRESS>
    <CORRESPONDENT>      Steven A. Silvers
    <ORGANIZATION>       Silvers Entertainment Group, Inc.
    <INTERNAL ADDRESS>   Ste. 202, PMB 203
    <STREET ADDRESS>     8983 Okeechobee Blvd.
    <CITY>               West Palm Beach
    <STATE>              FL
    <POSTAL CODE>        33411
    <PHONE>              954-445-6788
    <EMAIL>              gewrue@hotmail.com
    <EMAIL AUTHORIZED>   Y
    <SUBMIT DATE>        Aug 30, 2004

<BOILERPLATE>
    <EMAIL>              The USPTO is authorized to communicate with the applicant at the
                         listed email address.

<SIGNATURE>
    <SIGNATURE-NAME>     /sas/
    <SIGNATORY-DATE>     20040830
    <SIGNATORY-NAME>     Steven A. Silvers
    <SIGNATORY-POSITION> President/CEO

# ADDITIONAL

# ATTACHMENTS

# NOT

# SCANNED

## PLEASE REFER TO COURT FILE