FILED by _____ EG _____ D.C.
ELECTRONIC

**Nov 16 2004**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

STELOR PRODUCTION, INC.,

CASE NO. 04-80954-CIV-HURLEY
Magistrate Judge James M. Hopkins

     Plaintiff,

v.

STEVEN A. SILVERS,

     Defendant.
_____/

STEVEN A. SILVERS,

     Counter-Plaintiff,

v.

STELOR PRODUCTIONS, INC.

     Counter-Defendant.
_____/

## ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM

Defendant, Steven A. Silvers ("Silvers"), responds to the Complaint filed by Stelor Productions, Inc. ("Stelor") and states:

### ANSWER

1. In response to the allegations in paragraph 1 of the Complaint, Silvers admits that Stelor has breached the alleged two contracts. Silvers denies the remaining allegations in paragraph 1.

2. In response to the allegations in paragraph 2 of the Complaint, Silvers admits he authored a book entitled "Googles and the Planet of Goo" and that he initially had a relationship with Aurora Collection, Inc. Silvers denies the remaining allegations in paragraph 2.

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.
2800 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TEL. (305) 372-1800

Dockets.Justia.com

3.     In response to the allegations in paragraph 3 of the Complaint, Silvers admits that he and Stelor saw potential in developing the trademarks, copyrights and intellectual property for "The Googles." Silvers denies the remaining allegations in paragraph 3.

4.     In response to the allegations in paragraph 4 of the Complaint, Silvers admits that he and Stelor entered into a licensing, distribution, and manufacturing agreement ("Licensing Agreement") and a consulting agreement. As to the allegations in paragraph 4(a) through 4(d), Silvers states the referenced portions of the parties' agreements speak for themselves and therefore denies the allegations. Silvers denies the remaining allegations in paragraph 4.

5.     In response to the allegations in paragraph 5 of the Complaint, Silvers denies the allegations.

6.     In response to the allegations in paragraph 6 of the Complaint, Silvers admits that he has received some compensation from Stelor and some payment of his health insurance. Silvers also states that the power of attorney and the exclusive licensing rights set forth in the Licensing Agreement speak for themselves and therefore denies the allegations. Silvers denies the remaining allegations in paragraph 6.

7.     In response to the allegations in paragraph 7 of the Complaint, Silvers admits that Stelor hired counsel to bring an action against Google, Inc. in the USPTO. Silvers denies the remaining allegations in paragraph 7.

8.     In response to the allegations in paragraph 8, Silvers denies the allegations.

9.     In response to the allegations in paragraph 9, Silvers admits that Stelor operates a web site involving the "Googles" characters. Silvers denies the remaining allegations in paragraph 9.

2

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.
2800 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TEL. (305) 372-1800

2 of 30

10.    In response to the allegations in paragraph 10, Silvers denies the allegations.

11.    In response to the allegations in paragraph 11, Silvers states that the referenced provisions of the Licensing Agreement speak for themselves and therefore denies the allegations. Silvers denies the remaining allegations in paragraph 11.

12.    In response to the allegations in paragraph 12, Silvers denies the allegations.

13.    In response to the allegations in paragraph 13, Silvers is without knowledge sufficient to admit or deny the allegations.

14.    In response to the allegations of paragraph 14, Silvers admits the allegation that he is a resident of Palm Beach County, Florida.

15.    In response to the allegations in paragraph 15, Silvers denies the allegations.

16.    In response to the allegations in paragraph 16, Silvers denies that this Court has subject matter jurisdiction, and admits that he resides in this district and that venue is proper. Silvers states the contract at issue speaks for itself and therefore denies the allegations. Silvers denies the remaining allegations in paragraph 16.

17.    In response to the allegations in paragraph 17, Silvers admits that "The Googles" concept is designed to entertain and educate young children with positive messages and enjoyable storylines, and that Stelor operates the www.googles.com website.  Silvers denies the remaining allegations in paragraph 17.

18.    In response to the allegations in paragraph 18, Silvers admits that he is the owner of the Googles Intellectual Property, that he and Stelor entered into the Licensing Agreement on May 9, 2002, and that the provisions of the Licensing Agreement alleged in paragraph 18 speak for themselves.  Silvers denies the remaining allegations in paragraph 18.

3

19.    In response to the allegations in paragraph 19, Silvers admits that the licensed trademarks include GOOGLES, GOOROO, IGGLE, OGGLE, and OOGLE. Silvers is without sufficient information to admit or deny the remaining allegations alleged in paragraph 18.

20.    In response to the allegations in paragraph 20, admits that the license extends to use, but not ownership, of websites and domain names. Silvers is without sufficient information to admit or deny the specific allegations as to domain names and the specific quantity of domain names that are included in the license.

21.    In response to the allegations in paragraph 21, Silvers states the referenced provisions of the Licensing Agreement speak for themselves and therefore denies the allegations. Silvers denies the remaining allegations in paragraph 21.

22.    In response to the allegations in paragraph 22, Silvers states the referenced provisions of the Licensing Agreement speak for themselves and therefore denies the allegations. Silvers admits that Google, Inc. brought a cancellation proceeding at the TTAB against Silvers to cancel his trademark registration and that the proceeding is pending. Silvers denies the remaining allegations in paragraph 22.

23.    In response to the allegations in paragraph 23, Silvers admits that Stelor has applied for and maintains trademarks and service marks. Silvers is without information sufficient to admit or deny what specifications Stelor has made with the USPTO or whether Stelor properly filed registrations under Silvers' name. Silvers denies the remaining allegations in paragraph 23.

24.    In response to the allegations in paragraph 24, Silvers admits that Stelor filed a TTAB petition to cancel the trademark registration for GOOGLE by Google, Inc. and a Notice of Opposition against Google, Inc.'s application for GOOGLE and that the actions are pending

4

before the TTAB.  Silvers states that the referenced provisions of the Licensing Agreement speak for themselves and therefore denies the allegations.  Silvers denies the remaining allegations in paragraph 24.

25.    In response to the allegations in paragraph 25 of the Complaint, Silvers admits that he entered into a Consulting Agreement with Stelor.  Silvers states the referenced provisions of the Consulting Agreement speak for themselves and therefore denies the allegations.  Silvers denies the remaining allegations in paragraph 25.

26.    In response to the allegations in paragraph 26 of the Complaint, Silvers states that the referenced provisions of the Licensing Agreement and Consulting Agreement speak for themselves.  Silvers denies the remaining allegations in paragraph 26.

27.    In response to the allegations in paragraph 27 of the Complaint, Silvers states that the referenced provisions of the Licensing Agreement speak for themselves and therefore denies the allegations.  Silvers denies the remaining allegations in paragraph 27.

28.    In response to the allegations in paragraph 28, Silvers admits that he sent a letter to Stelor's counsel on or about October 5, 2004.  Silvers is without knowledge sufficient to admit or deny whether that law firm currently represents Stelor in the proceedings against Google, Inc.  Silvers denies the remaining allegations in paragraph 28.

29.    In response to the allegations in paragraph 29, Silvers denies the allegations.

30.    In response to the allegations in paragraph 30, Silvers admits that he has charged Stelor with breaching various provisions of the Licensing Agreement and Consulting Agreement.  Silvers denies the remaining allegations in paragraph 30.

31.    In response to the allegations in paragraph 31, Silvers denies the allegations.

32.    In response to the allegations in paragraph 32, Silvers denies the allegations.

5

33.    In response to the allegations in paragraph 33, Silvers denies the allegations.

34.    In response to the allegations in paragraph 34, Silvers denies the allegations.

35.    In response to the allegations in paragraph 35, Silvers denies the allegations.

36.    In response to the allegations in paragraph 36, Silvers denies the allegations.

37.    In response to the allegations in paragraph 37, Silvers denies the allegations.

38.    In response to the allegations in paragraph 38, Silvers denies the allegations.

39.    In response to the allegations in paragraph 39, Silvers re-alleges his responses set forth in paragraphs 1 through 38.

40.    In response to the allegations in paragraph 40, Silvers denies the allegations.

41.    In response to the allegations in paragraph 41, Silvers denies the allegations.

42.    In response to the allegations in paragraph 42, Silvers re-alleges his responses set forth in paragraphs 1 through 41.

43.    In response to the allegations in paragraph 43, Silvers denies the allegations.

44.    In response to the allegations in paragraph 44, Silvers denies the allegations.

45.    In response to the allegations in paragraph 45, Silvers denies the allegations.

46.    In response to the allegations in Stelor's prayer for relief, Silvers denies the allegations and the grounds for which the relief is sought.

## DEFENSES

### First Defense

Stelor's claims should be dismissed for lack of subject matter jurisdiction as diversity jurisdiction does not lie here. Stelor's claims do not support an amount in controversy in excess of $75,000.

6

### Second Defense

Stelor has materially breached the Licensing Agreement and, therefore, Silvers is excused from further performance under such agreement, and is entitled to terminate the agreement. Stelor's breach of the License Agreement is described with particularly in Silvers' counterclaim.

### Third Defense

Stelor has materially breached the Consulting Agreement, and therefore, Silvers is excused from further performance under such agreement. Stelor's breach of the Consulting Agreement is described with particularity in Silvers' counterclaim.

### Fourth Defense

Stelor's claims for damages for breach of Licensing Agreement are expressly limited to the terms of Section XIII of the Licensing Agreement.

### Fifth Defense

Stelor's claims for damages for breach of the Consulting Agreement are expressly limited pursuant to paragraph 7 of the Consulting Agreement.

### Sixth Defense

Stelor's claims for equitable and other relief are barred under the doctrine of unclean hands.

### Seventh Defense

Stelor is equitably estopped from asserting its claims because it, *inter alia*, has misrepresented to Silvers that it intended to, and is making reasonable efforts to promote, market and sell the Licensed Products, and Silvers has relied on such misrepresentations to his detriment by entering into and maintaining an exclusive licensing arrangement with Stelor.

### Eighth Defense

7

The Licensing Agreement has terminated, pursuant to the terms of the Consulting Agreement, as a result of Stelor's breach of the Consulting Agreement.

**WHEREFORE**, Silvers requests that the Stelor's claims be dismissed with prejudice and that the Court award Silvers attorneys' fees pursuant to the Consulting Agreement and section 57.105, Florida Statutes (2003), costs and such other relief as the Courts deems appropriate.

## COUNTERCLAIM

Counter-Plaintiff, Steven A. Silvers ("Silvers"), sues Stelor Productions, Inc., and alleges:

1.  Silvers is an individual residing in Palm Beach County, Florida with a business address at 8983 Okeechobee Blvd., #202, West Palm Beach, FL 33411.

2.  Counter-Defendant, Stelor Productions, Inc. ("Stelor") is a Delaware corporation with its place of business at 14701 Mockingbird Drive, Darneston, Maryland.

3.  Silvers is the author of the children's book "Googles and the Planet of Goo" and creator of numerous characters, illustrations and concepts based on the GOOGLES family of characters.

4.  Silvers is the owner of numerous trademarks, including the federally registered "The Googles and Design" mark, Registration No. 2,087,590.

5.  Silvers also own numerous copyrights and patents for the characters, illustrations and designs encompassed by the GOOGLES concept.

6.  Silvers has registered and owns numerous domain names related to the GOOGLES concept and characters, including "Googles.com." The trademarks, copyrights, patents, domain name registrations and related properties are collectively referred to as "GOOGLES Intellectual Property."

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.
2800 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TEL. (305) 372-1800

7. Effective June 1, 2002, Silvers entered into a License, Distribution and Manufacturing Agreement ("License Agreement") with Stelor by which he granted Stelor a license to use the GOOGLES Intellectual Property, and to manufacture and promote products and services based on the GOOGLES Intellectual Property ("Licensed Products").

8. Effective June 1, 2002, Silvers entered into a Consulting Agreement with Stelor, whereby Silvers agreed to act as Executive Creative Consultant and provide creative input and promote Stelor's use of the GOOGLES Intellectual Property, and Stelor agreed to compensate Silvers.

9. Silvers has performed all conditions precedent to bringing this action.

10. Silvers has retained undersigned counsel, and agreed to pay such counsel a reasonable fee.

### Count I
### Breach of License Agreement

11. This is a claim for breach of the License Agreement, copy attached as Exhibit "A."

12. Silvers realleges and incorporates the allegations set forth above in paragraphs 1 through 10.

13. The License Agreement requires Stelor to use commercially reasonable efforts to promote, market and sell the Licensed Products.

14. The License Agreement requires Stelor to manufacture, produce, sell and distribute the Licensed Products.

15. Stelor is also required, prior to selling any Licensed Products, to produce goods of high quality and provide samples of the goods to Silvers for his approval, so that Silvers may provide creative input and ensure quality control for the Licensed Products. Further, Stelor must

9

provide Silvers with samples of any promotional materials to be used with the Licensed Products.

16. The License Agreement provides that Stelor may obtain trademark, copyright and domain name registrations relating to the GOOGLES Intellectual Property but, as Silvers owns such rights, Stelor is required to obtain such registrations solely in Silvers' name.

17. The License Agreement requires Stelor to obtain insurance covering potential liability from sales of Licensed Products, and provide Silvers with a certificate of such insurance.

18. Stelor is obligated under the License Agreement to provide quarterly reports to Silvers detailing Stelor's marketing and sales of the Licensed Products, including the identity of any sub-licensees, and to pay royalties to Silvers based on such sales. Stelor is also required, upon Silvers' request, to make its records available for Silvers to audit Stelor's activity.

19. Stelor is obligated, on behalf of Silvers as owner of the GOOGLES Intellectual Property, to take all steps necessary to maintain and protect the Intellectual Property against infringement by third parties, including but not limited to contesting third parties using confusingly similar trademarks and domain names.

20. Stelor has breached the License Agreement by:

    a.    Failing to use commercially reasonable efforts to promote, market and sell the Licensed Products. According to incomplete quarterly reports Stelor has provided (the accuracy of which has yet to be verified), Stelor has not sold a single Licensed Product, or entered into any agreements to do so in the 30 months it has had the benefits of the License Agreement.

    b.    Failing to sell or distribute any Licensed Products, despite Silver's having developed the process for the manufacture and production of such products.

10

c.    Failing to include appropriate legal notices reflecting Silvers' ownership with respect to the GOOGLES Intellectual Property, Licensed Products and related promotional, packaging and advertising materials.

d.    Failing to maintain the high quality of Licensed Products; for example, Stelor's prototype stuffed GOOGLES characters are of poor quality, and Stelor's illustrations of the GOOGLES characters are not true to, and do not look like the original, copyrighted versions of the characters.

e.    Failing to provide Silvers with samples of Licensed Products and promotional materials used with the Licensed Products.

f. Failing to obtain registrations for the GOOGLES Intellectual Property in Silvers' name.  For example, Stelor has claimed and/or obtained copyrights in _its_ name.  Stelor and Stelor's President, Steven Esrig, have also obtained as many as 19 domain name registrations with the phrase "Goo" or "GOOGLES" in their names, not Silvers' name.

g.    Failing to, upon information and belief, obtain the requisite insurance or provide a certificate reflecting such insurance to Silvers.

h.    Failing to provide quarterly reports to Silvers; as of this date, Stelor has yet to provide proper reports covering the second and third quarters of 2004.

i.    Failing to pay royalties; while Silvers cannot verify the amount of sales and royalties due because Stelor has not provided the required reports and has refused Silvers' request for an audit, Silvers has information and belief that Stelor has offered for sale and/or sub-licensed music recordings encompassed by the GOOGLES Intellectual Property in connection with offering GOOGLES music compact discs through Apple Computer Company's I-Tunes program.

11

j.    Failing to allow Silvers access to Stelor's books and records for purposes of auditing Stelor's activities, despite Silvers' request.

k.    Failing to take reasonable steps to maintain and protect the GOOGLES Intellectual Property.  For example, Stelor allowed a third party to obtain a federal trademark registration for the "Googles" mark, and failed to renew numerous domain names using the phrase "Goo," allowing third parties to claim the domain names.  Stelor also allowed a third party to obtain the "Googles.org" domain name.

21. Stelor has also breached the License Agreement by acting beyond the authority granted by Silvers under the License Agreement.

a.    For example, Stelor created new characters for the GOOGLES concept, and used the phrase "Goo" to name these characters, without the authorization and consent of Silvers.

b.    Upon information and belief Stelor has formed affiliated companies and used the phrase "Goo" to name such companies, without Silvers' knowledge or consent.  Moreover, Stelor has failed to reveal or provide any information about these affiliated companies in the required quarterly reports.

c.    Stelor has also filed claims before the United States Patent and Trademark Office and ICANN's National Arbitration Forum purportedly on behalf of Silvers, and hired counsel for Silvers, without Silvers' knowledge and consent.

22. As a result of Stelor's breach of the License Agreement, Silvers has the right to terminate the Licensing Agreement.

**WHEREFORE**, Silvers requests that this Court enter judgment in his favor and against Stelor, and:

12

A.   Award compensatory damages;

B.   Award prejudgment interest;

C.   Permanently enjoin Stelor from using the GOOGLES Intellectual Property, or making, promoting or selling any Licensed Products; and

D.   Require Stelor to account for all sales of the Licensed Product;

E.   Require Stelor to transfer or assign all trademark, copyright and domain name registrations, now held in its name or the name of Steven Esrig, to Silvers; and

F.   Order that the License Agreement is terminated.

G.   Award Silvers' attorneys' fees pursuant to Florida Statutes Section 57.105; and

H.   Such other relief as the Court deems just and equitable.

## Count II
### Breach of Consulting Agreement

23. This is a claim for breach of the Consulting Agreement, copy attached as Exhibit "B."

24. Silvers realleges and incorporates the allegations set forth above in paragraphs 1 through 10.

25. Pursuant to the Consultant Agreement, Silvers has provided creative input and counseling to Stelor and assisted in promoting the GOOGLES Intellectual Property and the development and marketing of Licensed Products.

26. Stelor is required under the Consulting Agreement to pay Silvers a monthly consulting fee, independent of any royalties Stelor owes Silvers under the License Agreement.

27. Stelor is required to deliver a written stock option agreement, reflecting Silvers' entitlement to receive options for at least 1,000 shares of Stelor's stock.

13

28. Stelor is also required to pay Silvers' health insurance premiums and the lease payments for Silvers' car.

29. The Consulting Agreement further requires Stelor to reimburse reasonable expenses incurred by Silvers in the course of his performance as a consultant.

30. Stelor has breached the Consultation Agreement by, *inter alia*:

      a.      Failing to pay Silvers his monthly consulting fee.

      b.      Failing to deliver a written stock option agreement reflecting Silvers' entitlement to options on at least 1,000 shares of Stelor's stock.

      c.      Failing to pay Silvers for his reasonable expenses incurred in providing consulting services to Stelor.

      d.      Failing to pay Silvers' health insurance premiums.

31. As a result of breaching of the Consulting Agreement, as described above, the License Agreement has terminated.

**WHEREFORE**, Silvers requests that this Court enter judgment in his favor and against Stelor, and award the following relief:

      A.  Award compensatory damages;

      B.  Award prejudgment interest;

      C.  Order Stelor to provide the written stock option agreement;

      D.  Order that the License Agreement is terminated;

      E.  Award Silvers' attorneys' fees pursuant to the Consulting Agreement and Florida Statutes Section 57.105; and

      F.  Such further relief as the Court deems just and equitable.

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.

2800 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TEL. (305) 372-1800

Respectfully submitted,

DIMOND, KAPLAN & ROTHSTEIN, P.A.
Co-Counsel for Defendant/Counter-Plaintiff
200 S.E. First Street, Suite 708
Miami, FL 33131
Telephone: (305) 374-1961
Adam T. Rabin, Esq.
Florida Bar No. 985635
Email: arabin@dkrpa.com

KOZYAK TROPIN & THROCKMORTON, P.A.
Counsel for Defendant/Counter-Plaintiff
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
Fax: (305) 372-3508

By: _____

    Kenneth R. Hartmann
    Email: krh@kttlaw.com
    Florida Bar No: 664286
    Gail M. McQuilkin
    gam@kttlaw.com
    Florida Bar No. 969338

## CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via first class mail this 15th day of November, 2004, on the following:

    Stanley A. Beiley, Esq.
    Sacher Zelman Van Sant Paul Beiley Hartman Rolnick & Waldman, PA
    1401 Brickell Avenue, Suite 700, Miami, FL 33131
    Fax: 305-374-2605

    Laurence R. Hefter, Esq.
    Finnegan Henderson Farabow Garrett & Dunner, LLP
    1300 I Street, NW, Washington, DC 20005
    Fax: 202-408-4400

By: _____

    Kenneth R. Hartmann

3339/101//246131.1

15

# LICENSE, DISTRIBUTION
# AND MANUFACTURING AGREEMENT

This **LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT** between Steven A. Silvers and Stelor Productions, Inc. is effective as of June 1, 2002 and is entered into by and between Steven A. Silvers (**LICENSOR**), an Individual, whose official address is 3741 NE 163rd Street, PMB #325, North Miami Beach, FL 33160 and Stelor Productions, Inc. (**LICENSEE**), a Delaware corporation with its current offices located at: 14701 Mockingbird Drive, Darnestown, Maryland, 20874.

### WITNESSETH

**WHEREAS, LICENSOR** is the sole and exclusive owner of the **GOOGLES** characters identified more fully in "Schedule A" attached hereto (the "Licensed Property");

**WHEREAS, LICENSOR** is the sole and exclusive owner of the **GOOGLES** trademarks identified more fully in "Schedule A" attached hereto (the "Licensed Trademarks");

**WHEREAS, LICENSOR** has the power and authority to grant to **LICENSEE** the right, privilege and license to use, manufacture, distribute, and sell those types of products that incorporate or are otherwise based on the Licensed Property as identified in "Schedule A" attached hereto (the "Licensed Products") and to use the Licensed Trademarks on or in association with such Licensed Products;

**WHEREAS, LICENSEE** has or will have the ability to manufacture, have manufactured, have sub-manufactured, distribute and sell or have sold and distributed the Licensed Products in the Licensed Territory more clearly defined in Schedule A (the Territory) and to use the Trademark(s) on or in association with the Licensed Products;

**WHEREAS, LICENSEE** desires to obtain from **LICENSOR** an exclusive license to use, manufacture, have manufactured and sell Licensed Products in the Territory and to use the Licensed Trademarks on or in association with the Licensed Products;

**WHEREAS, LICENSEE** has agreed, pursuant to a letter agreement, to act as a consultant for **LICENSOR**; and

**NOW, THEREFORE**, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do hereby agree as follows:

## I. LICENSE GRANT

   A.      **LICENSOR** hereby grants to **LICENSEE**, for the Term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to **LICENSOR**), worldwide, sub licensable right and license to use, reproduce, modify, create derivative works of, manufacture, have manufactured, market, advertise, sell, distribute, display, perform, and otherwise commercialize the Licensed Products and Licensed Properties in the Territory. The license includes a license under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with the creative characters known as The Googles, anything that contains the letters GOO (in upper or lower case) together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

**EXHIBIT**

" A "

B.    LICENSOR hereby grants to LICENSEE for the term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use the Licensed Trademarks on or in association with the Licensed Products as well as on packaging, promotional, and advertising material associated therewith.

C.    LICENSEE shall have the right to sublicense LICENSEE's rights under this Agreement; provided that any and all such sublicenses shall be subject to the terms and conditions of this Agreement.

D.    No licenses will be deemed to have been granted by either party to any of its Intellectual Property Rights, except as otherwise expressly provided in this Agreement.

E.    LICENSEE agrees to place on all Licensed Products, where practicable, the phrase "created by Steven A. Silvers" or other similar wording.

## II. TERM OF THE AGREEMENT

This Agreement and the provisions hereof, except as otherwise provided, shall be in full force and effect commencing on the date of execution by both parties and shall extend for a Term as recited in "Schedule A" attached hereto (the "Term").

## III. COMPENSATION

A.    In consideration for the licenses granted hereunder, LICENSEE agrees to pay to LICENSOR, during the Term of this Agreement, a royalty in the amount recited in "Schedule A" attached hereto (the "Royalty") based on LICENSEE's Net Sales of Licensed Products. "Net Sales" shall mean the gross revenues on a cash basis (i.e., actually collected by LICENSEE but without counting any gross revenues twice) excluding shipping and handling charges, sales taxes, VAT, and other taxes imposed upon sales less (i) customary trade discounts, (ii) allowances actually shown on the invoice (except cash discounts not deductible in the calculation of Royalty) (iii) bona fide returns, charge backs, refunds or credits (net of all returns actually made or allowed as supported by memoranda actually issued to the customers), (iv) sales of remainder inventory made at less than the total of LICENSEE's actual cost of goods and actual direct selling costs solely for purposes of liquidation or close-out, (v) other uncollectible accounts, (vi) cooperative advertising allowances, (vii) sales commissions paid.

B.    The Royalty owed LICENSOR shall be calculated on a quarterly calendar basis on collected funds (the "Royalty Period") and shall be payable no later than thirty (30) days after the termination of the preceding full calendar quarter, i.e., commencing on the first (1st) day of January, April, July and October with the exception of the first and last calendar quarters which may be "short" depending upon the effective date of this Agreement.

C.    With each Royalty Payment, LICENSEE shall provide LICENSOR with a written royalty statement in a form acceptable to Licensor. Such royalty statement shall be certified as accurate by a duly authorized officer of Licensee, reciting on a country-by-country basis, the stock number, item, units sold, description, quantity shipped, gross invoice, amount billed to customers less discounts, allowances, returns and reportable sales for each Licensed Product. Such statements shall be furnished to Licensor whether or not any Licensed Products were sold during the Royalty Period. The LICENSEE hereby further agrees to provide the LICENSOR with a list of all of it's sub licensees added during the current royalty period.

D.    If LICENSEE sells any Licensed Products to any party affiliated with LICENSEE, or in any way directly or indirectly related to or under the common control with LICENSEE, at a price less than the average weighted price charged to other parties, the Royalty payable to LICENSOR shall be computed on the basis of the averaged weighted price charged to other parties if the Licensed Products are not ultimately resold to unaffiliated third parties.

E.    All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties and may offset or be offset from any other payments due to **LICENSEE** under this or any other agreement between the parties.

F.    Late payments shall incur interest at the rate of ONE PERCENT (1%) per month from the date such payments were originally due.

## IV. AUDIT

A.    **LICENSOR** shall have the right, at its own expense, to have a nationally recognized certified public accounting firm, upon at least thirty (30) days written notice and no more than twice per calendar year, to inspect during normal business hours, **LICENSEE's** books and records and all other documents and material in the possession of or under the control of **LICENSEE** with respect to the subject matter of this Agreement at the place or places where such records are normally retained by **LICENSEE**.

B.    In the event that such inspection reveals an underpayment discrepancy greater than 5% of the amount of Royalty owed **LICENSOR** from what was actually paid, **LICENSEE** shall have the opportunity to conduct its own audit. If **LICENSEE** agrees to the amount, if any, of any discrepancy, **LICENSEE** shall pay such discrepancy, plus interest, calculated at the rate of ONE AND ONE-HALF PERCENT (1 1/2%) per month. Upon settlement of any underpayment discrepancy, no further audit by **LICENSOR** shall be requested that year. That period end date shall represent the new period start date for future audits for underpayment discrepancies. In the event that such discrepancy is in excess of TEN THOUSAND UNITED STATES DOLLARS ($10,000.00), **LICENSEE** shall also reimburse **LICENSOR** for the cost of auditing fees in connection therewith.

C.    All books and records relative to **LICENSEE's** obligations hereunder shall be maintained and kept accessible and available to **LICENSOR** for inspection for at least three (3) years after the expiration of the initial or any subsequent term.

D.    In the event that an investigation of **LICENSEE's** books and records is made, certain confidential and proprietary business information of **LICENSEE** may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be held in confidence by **LICENSOR** and shall not be used by **LICENSOR** or disclosed to any third party for a period of two (2) years from the date of disclosure, or without the prior express written permission of **LICENSEE** unless required by law, except **LICENSOR** may not disclose at any time to any third party any such confidential and proprietary business information which are trade secrets of **LICENSEE**. It is understood and agreed, however, that such information may be used by **LICENSOR** in any proceeding based on **LICENSEE's** failure to pay its actual Royalty obligation.

## V. WARRANTIES AND OBLIGATIONS

A.    LICENSOR represents and warrants that:

(i)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of **LICENSOR** and this Agreement is a valid and binding obligation of **LICENSOR**, enforceable in accordance with its terms;

(ii)    the execution, delivery and performance by **LICENSOR** of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which **LICENSOR** is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on **LICENSOR**;

(iii)    **LICENSOR owns the exclusive rights in and to the Licensed Intellectual Property, Licensed Trademarks, Licensed Patents and Licensed Copyrights necessary to effectuate the granting of the Licensing Rights from the LICENSOR to the LICENSEE as contemplated herein.**

3

(iv)     the Licensed Intellectual Property and Licensed Trademarks do not infringe the rights, including without limitation, Intellectual Property Rights, of any third party; and

(v)     except as set forth in Schedule B attached hereto, **LICENSOR** has not received any notice from any third party of any alleged or actual infringement of the Licensed Intellectual Property or Licensed Trademarks and the Licensed Intellectual Property and/or Licensed Trademarks are not the subject, and has not been the subject, of any previous or pending litigation with the exception of the Ganz litigation which has been resolved.

B. **LICENSEE** represents and warrants that:

(i)     the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of **LICENSEE** and this Agreement is a valid and binding obligation of **LICENSEE**, enforceable in accordance with its terms;

(ii)     the execution, delivery and performance by **LICENSEE** of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which **LICENSEE** is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on **LICENSEE**; and

(iii)     it will use its commercially reasonable efforts to promote, market, sell and distribute the Licensed Products.

C.     <u>Disclaimer of Warranties</u>. EXCEPT AS EXPRESSLY PROVIDED ABOVE, NEITHER PARTY MAKES ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, REGARDING THIS AGREEMENT AS TO ANY MATTER INCLUDING, BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

D.     **LICENSEE** shall be solely responsible for the manufacture, production, sale and distribution of the Licensed Products or to have such Licensed Products manufactured, produced, sold and distributed, and will bear all related costs associated therewith.

## VI. NOTICES, QUALITY CONTROL, AND SAMPLES

A.     The Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices.

B.     The Licensed Products shall be of a high quality which is at least equal to comparable products manufactured and marketed by **LICENSEE** and in conformity with a standard sample provided by **LICENSEE**.

C.     Prior to the commencement of manufacture and sale of the Licensed Products, **LICENSEE** shall submit to **LICENSOR for his input**, at no cost to **LICENSOR**, a reasonable number of samples of all Licensed Products which **LICENSEE** intends to manufacture and sell and of all promotional and advertising material associated therewith.

## VII. NOTICES AND PAYMENT

A.     Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at the above-stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

B.     Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.

## VIII. INTELLECTUAL PROPERTY PROTECTION

A.      **LICENSOR** hereby grants **LICENSEE** all right, power and interest to seek, obtain and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Trademarks, Licensed Copyrights and any other Intellectual Property Rights granted herein. **LICENSOR** further agrees to assist **LICENSEE** as may be required to apply for and obtain recordation of and from time to time enforce, maintain and defend such Intellectual Property Rights. **LICENSOR** hereby grants **LICENSEE** an irrevocable power of attorney for the initial and any subsequent terms of this Agreement to act for and on **LICENSOR's** behalf and instead of **LICENSOR**, at **LICENSEE's** expense, to execute and file any such document(s) and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by **LICENSOR**.

B.      **LICENSOR** shall retain all rights, title and interest in the Licensed Intellectual Property and Licensed Trademarks and any modifications thereto based solely on such Licensed Intellectual Property. **LICENSEE** acknowledges **LICENSOR's** exclusive rights in the Licensed Intellectual Property and, further, acknowledges that the Licensed Intellectual Property and/or the Licensed Trademarks rights are unique and original to **LICENSOR** and that **LICENSOR** is the owner thereof. **LICENSEE** shall not, at any time during or after the effective Term of the Agreement, dispute or contest, directly or indirectly, **LICENSOR's** exclusive right and title to the Licensed Intellectual Property and/or the Licensed Trademarks(s) or the validity thereof.

C.      **LICENSEE** agrees that its use of the Licensed Intellectual Property and/or the Licensed Trademarks(s) inures to the benefit of **LICENSOR** and that the **LICENSEE** shall not acquire any rights in the Licensed Intellectual Property and/or the Licensed Trademarks(s) except for the license granted herein.

D.      **LICENSOR** shall retain all rights, title and interest in and to the Licensed Intellectual Properties. The LICENSOR owns the exclusive rights to the Licensed Intellectual Property. **LICENSOR** hereby waives and releases **LICENSEE** from any and all current or future claims or causes of actions by third parties, whether known or unknown, arising out of or relating to such Licensed Intellectual Properties including, but not limited to, any claim that Licensed Products violate, infringe on or misappropriate any of **LICENSOR's** Intellectual Property Rights.

E.      Each party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable to effect any of the provisions under this Section (Intellectual Property Protection). The party requesting such shall reimburse the other party for the expenses incurred as a result of such cooperation. The parties agree to take any actions or prepare or execute any documents reasonably requested by the other party. Furthermore, during the term of this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

## IX. TERMINATION

A .      **Right to Terminate on Notice**. This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party fails to cure such breach.

B. LICENSEE shall have the right to terminate this Agreement at any time on thirty (30) days written notice to LICENSOR. In such event, all moneys paid to LICENSOR shall be deemed non-refundable and LICENSEE's obligation to pay any unpaid royalties shall be accelerated and shall become immediately due and payable.

C. Additionally, if, after five years of the initial intellectual property license, there are three consecutive years during which royalty payments to LICENSOR are less than one hundred thousand dollars ($100,000.00), LICENSOR has the option to cancel this Agreement in accordance with Section IX. TERMINATION, Para. A.

## X. POST TERMINATION RIGHTS

A. Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEE shall provide LICENSOR with a complete schedule of all inventory of Licensed Products then on hand or on order (the "Inventory").

B. Upon expiration or termination of this Agreement, LICENSEE shall be entitled, for an additional period of six (6) months, to continue to sell such Inventory. Such sales shall be made subject to all of the provisions of this Agreement and to an accounting for and the payment of a Royalty thereon. Such accounting and payment shall be due and paid within thirty (30) days of the quarterly calendar cited as the period basis for royalty calculation. LICENSEE shall have the right to continue the use of the name(s) associate with the products and articles that encompass this Agreement for so long as LICENSEE is actively selling its inventory of articles and products. At the conclusion of LICENSEE'S efforts in this regard, LICENSEE agrees to discontinue the use of names, trademarks, signs, advertising and anything else that might make it appear that the LICENSEE is still handling the articles and products of LICENSOR.

C. Upon the expiration or termination of this Agreement, all of the license rights of LICENSEE under this Agreement shall forthwith terminate and immediately revert to LICENSOR and LICENSEE, except as detailed above in Section (B) of the "Post Termination Rights" Section, shall immediately discontinue all use of the Licensed Property and the like, at no cost whatsoever to LICENSOR.

D. Upon termination of this Agreement for any reason whatsoever, LICENSEE agrees to immediately return to LICENSOR all material relating to the Licensed Intellectual Property. Furthermore, upon termination or expiration of this Agreement, LICENSEE agrees to immediately inform all of it's sub licensees regarding the said termination or expiration of this Agreement.

## XI. INFRINGEMENTS

A. During the Term of this Agreement and any and all option/renewal periods, LICENSEE shall have the sole right, in its discretion and at its expense, to take any and all actions against third persons to protect the Intellectual Property Rights licensed in this Agreement.

B. Upon request by either party to the other, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such lawsuit. Each party shall reimburse the other party for the expenses incurred as a result of such cooperation.

## XII. INDEMNITY

A. LICENSEE agrees to indemnify and hold harmless LICENSOR, its agents, heirs, assigns and representatives, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSOR based on product liability but excluding any claims based solely upon the use of the Licensed Intellectual Property or Licensed Trademarks by LICENSEE in accordance with the terms of this Agreement.

6

B.    **LICENSOR** agrees to indemnify and hold harmless **LICENSEE**, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against **LICENSEE** based on or arising from (i) any infringement, misappropriation or other related action involving the Licensed Intellectual Property or Licensed Trademarks; or (ii) any breach of **LICENSOR**'s obligations, representations, warranties or duties under this agreement.

C.    With respect to any claims falling within the scope of the foregoing indemnifications: (i) each party agrees promptly to notify the other of and keep the other fully advised with respect to such claims and the progress of any suits in which the other party is not participating; (ii) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (iii) each party shall have the right to participate, at its sole expense, in any suit instituted against it; and (iv) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld or delayed.

## XIII.  LIMITATION OF LIABILITY

A.    IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT (INCLUDING LOSS OF PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE), NO MATTER WHAT THEORY OF LIABILITY, EVEN IF THE EXCLUSIVE REMEDIES PROVIDED FOR IN THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE AND EVEN IF EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OR PROBABILITY OF SUCH DAMAGES.  THE PROVISIONS OF THIS SECTION "LIMITATION OF LIABILITY" ALLOCATE THE RISKS UNDER THIS AGREEMENT BETWEEN LICENSOR AND LICENSEE AND THE PARTIES HAVE RELIED UPON THE LIMITATIONS SET FORTH HEREIN IN DETERMINING WHETHER TO ENTER INTO THIS AGREEMENT.

B.    EACH PARTY'S LIABILITY TO THE OTHER UNDER THIS AGREEMENT FOR CLAIMS RELATING TO THIS AGREEMENT, WHETHER FOR BREACH OF CONTRACT OR IN TORT, SHALL BE LIMITED TO THE AGGREGATE ROYALTY FEES PAID BY LICENSEE TO LICENSOR DURING THE TWELVE MONTH PERIOD PRECEDING THE CLAIM.

## XIV.  INSURANCE

**LICENSEE** shall, throughout the Term of this Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business as required by state and federal law(s), standard Product Liability Insurance naming **LICENSOR** as an additionally named insured. Such policy shall provide protection against any and all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The amount of coverage shall be as specified in "Schedule A" attached hereto. **LICENSEE** agrees to furnish **LICENSOR** a certificate of insurance evidencing same within ninety (90) days after issuance of same, and, in no event, shall **LICENSEE** manufacture, distribute or sell the Licensed Products prior to receipt by **LICENSOR** of such evidence of insurance.

## XV.  FORCE MAJEURE

**LICENSEE** shall not be liable for any failure of performance hereunder due to causes beyond its reasonable control, including but not limited to acts of God, fire, explosion, vandalism, strikes, lockouts, work stoppages, other labor difficulties, supplier failures, storm or other similar catastrophes, any law, order, regulation, direction, action or request of the state, local or federal government or of any government agency, commission, court, bureau, corporation or other instrumentality of any one or more of such governments, or of any civil or military authority, national emergencies, insurrections, riots, or wars.

## XVI. JURISDICTION AND DISPUTES

A. This Agreement shall be governed in accordance with the laws of the State of Florida without regard to its principles of conflicts of laws.

B. All disputes under this Agreement shall be resolved by the courts of the State of Florida including the United States District Court for Florida and the parties all consent to the jurisdiction of such courts, agree to accept service of process by mail, and hereby waive any jurisdictional or venue defenses otherwise available to it.

## XVII. AGREEMENT BINDING ON SUCCESSORS

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, successors and assigns.

## XVIII. WAIVER

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

## XIX. SEVERABILITY

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

## XX. NO JOINT VENTURE

Nothing contained herein shall constitute this arrangement to be employment, a joint venture or a partnership.

## XXI. ASSIGNABILITY

Neither party may assign by any act or operation of law the rights and obligations of this Agreement unless in connection with a transfer of substantially all of the assets of **LICENSEE** and/or with the consent of **LICENSOR**, which shall not be unreasonably withheld or delayed. By way of example and not limitation, **LICENSEE** may freely assign its rights and obligations under this Agreement to Stelor Productions, Inc.

## XXII. INTEGRATION

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may be in conflict with said Agreement.

## XXIII. RATIFICATION

The LICENSOR hereby agrees to the transfer of this License from the LICENSEE (The Aurora Collection, Inc.) to Stelor Productions, Inc. as contemplated by the Asset & Purchase Agreement, dated May 1st, 2002, and        executed        between        the        above        mentioned        parties



**IN WITNESS WHEREOF,** the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his/her hand and seal the day indicated.

STEVEN A. SILVERS                                  STELOR PRODUCTIONS, INC.

Steven A. Silvers                                  By:
Title:  Owner/LICENSOR                             Printed Name:  Steven A. Esrib
Dated:  5/09/02                                    Title:  President
                                                   Dated:  5/9/02

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003
                                    5/9/02

## "SCHEDULE A"

### LICENSED INTELLECTUAL PROPERTY

The following Licensed Intellectual Property forms part of this Agreement: A License under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with a creative character known as Googles, anything that contains the letters GOO (in upper or lower case), together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the Planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

### LICENSED TRADEMARKS

The following Licensed Trademarks form part of this Agreement: (i) "The Googles" (word and design) Trademarks in International Class Code (016) of the U.S.P.T.O. and the co-existent Trademarks Agreement with Ganz, Inc. of Canada in International Class Code (028) of the U.S.P.T.O., which is hereto attached and made a part of this "Schedule A" document, (ii) "Oogle", (iii) "Iggle", (iv) "Oggle", (v) "GooRoo", (vi) "Planet Goo", (vii) "GooMu", (viii) "GooToons", (ix) "GooStuff", (x) "GooKids", (xi) "GooStore" and (xii) any other trademarks, whether registered, pending or future or common law, used in connection with the Licensed Property, including , but not limited to, any trademark incorporating the phrase "Goo" currently in existence.

### LICENSED PRODUCTS

The following Licensed Products form part of this Agreement: all products which comprise the likenesses, stories, ideas, concepts, or designs of the Licensed Property, including without limitation, stuffed toy figurines, videos, stickers, t-shirts or other clothing items, slides, movies, cartoons, books (comic and otherwise), posters, playing, trading and collector cards, CDs, cassette tapes, DVDs, TV programs, motion pictures, all other forms of communication and publication, programs, computer Web site(s), membership lists and clubs, and any other products.

### DERIVATIVES

A Derivative as defined in this agreement shall mean a product or service that is utilized by the LICENSEE and developed by a party other than the LICENSOR but is used in conjunction with licensed products, articles and /or services. It can be a product or service produced by the LICENSEE or a third party (inventor, sub licensee etc,) that in its use enhances the value of the Googles Universe but does not have a conflict with an already existing Googles product idea or concept as outlined in this agreement. It may not possess the "Googles" or "GOO" in it's name and would therefore fall under the LICENSOR'S exclusive ownership as defined in the amended agreement but can be used in conjunction with the "Goo" Universe by the LICENSEE.

### TERRITORY

The following countries shall constitute the Territory: Global/Worldwide rights.

### TERM

This Agreement shall commence on the date executed below by both parties and shall be for a thirty (30) year term. This Agreement shall automatically renew for one additional ten (10) year term on the same terms and conditions provided for herein ("Renewal Term"). Upon expiration of the first Renewal Term of ten (10) years, this Agreement shall automatically renew for a second ten (10) year extended Term on the

10

same terms and conditions provided for herein, unless **LICENSOR** provides written notice of its intention to not to renew this Agreement within one hundred eighty (180) days prior to expiration of the Renewal Term.

## ROYALTY RATE

**LICENSEE** shall pay the following royalty rates: (i) SIX PERCENT (6%) of Net Sales of Licensed Products that are based solely on the Licensed Intellectual Property and (ii) THREE PERCENT (3%) of Net Sales of Licensed Products that are based solely on Derivative Products and (iii) In the case of Sub Licenses royalties will be TEN PERCENT (10%) of Net sales after subtracting licensing costs and royalties paid to third parties only.

## PRODUCT LIABILITY INSURANCE

Minimum Product Liability Insurance shall be Two Million U.S. dollars ($2,000,000.00) combined single limit for each single occurrence for bodily injury and/or for property damage.

*5/9/02*

*Succession*
*Rights of Survivor*

*In the event of the Death of Licensor all of the Licensor's rights under this agreement shall go to his heirs, assigns or legal representatives as he has lawfully designated in writing.*

*Steve A. Silvers*
*5/09/02*

*5/9/02*

*MICHAEL LUM*
*NOTARY PUBLIC STATE OF MARYLAND*
*My Commission Expires April 1, 2003*
*5/9/02*

June 1, 2002

Mr. Steven Silvers
3741 N.E. 163rd Street
PMB # 324
North Miami Beach, FL  33160

Dear Steven:

This letter agreement ("Agreement") will serve to memorialize the terms of the consultantcy arrangement between Stelor Productions, Inc. ("Company") and Steven A. Silvers ("Consultant").

1.    Engagement of Consultant.

a.    Company hereby engages Consultant as an independent contractor to the Company.  Consultant's title shall be Executive Creative Consultant. Company is relying on Mr. Silvers to continue his role of "Papa Googles" and continue to offer his creative input to the Company.

b.    In consideration for the covenants of Consultant contained herein, Company will pay Consultant the following: (i) a signing bonus of ten thousand dollars ($10,000) and (ii) a monthly consultancy fee of five thousand five hundred dollars ($5,500) beginning on June 1, 2002, and continuing each month thereafter for twelve (12) months. Company shall pay Consultant six thousand dollars ($6,000) monthly for a second 18-month period, beginning June 1, 2003.   All payments made to Consultant will not be offset against any royalties paid by the Company to Consultant pursuant to the License, Distribution and Manufacturing Agreement. Company will continue to reimburse The Aurora Collection, Inc. for the existing health plan if available, or if not available, will reimburse consultant $300 per month during the term of this Agreement. During the term of the Agreement, Company will reimburse The Aurora Collection, Inc. for, if available, the use of a leased company vehicle, with company to reimburse The Aurora Collection, Inc for insurance coverage. Consultant agrees to pay all costs of maintenance and upkeep. Stelor will write an agreement with Consultant granting him options for 1,000 shares of Stelor's stock under Stelor's stock option plan. If the number of options available under the Stelor Productions current plan is increased during the Consultant's service Company will issue an additional one thousand option shares (1,000)

c.    It is agreed by company that in the event the Company fails to compensate the Consultant as outlined in this Agreement and in accordance with the terms of this Agreement (including all option periods surrounding same) for two consecutive months and if after thirty (30) days fails to cure alleged breach, then Consultant has the right (option) to terminate this Agreement and among other legal remedies afforded Consultant to seek redress before the Court, the License Agreement shall, likewise immediately terminate. This caveat shall exist only if Consultant is not paid for other than "good Cause" termination as outlined below at section five (5) b of this Agreement.

2.    Relationship of Parties.  The relationship of Company and Consultant established under this Agreement is of an independent contractor.  Nothing in this Agreement shall be construed to give any party the power to direct or control the daily activities of any of the other parties, or to constitute the parties as principal and agent, employer and employee, franchiser and franchisee, partners, joint venturers, co-owners, or otherwise as participants in a joint undertaking. The parties understand and agree that none of the parties grants any other party the power or authority to make or give any agreement, statement, representation, warranty, or other commitment on behalf of any other party, or to enter into any contract or otherwise incur any liability or obligation, express or implied, on behalf of any other party, or to transfer, release, or waive any right, title, or interest of any other party. Furthermore, during the term of

EXHIBIT
"B"



this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

3.    <u>Duties of Consultant.</u>    Consultant's duties hereunder are as follows:

a.    Consultant shall use his best efforts to perform such services as may be requested by Company from time to time consistent and commensurate with his position as Executive Creative Consultant, including, but not limited to, executing all papers, testifying on all Company related matters and otherwise cooperating in every way necessary and desirable to strengthen, establish or maintain any intellectual property right granted under this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant The Consultant shall make himself available to the Company by way of telephone, fax, email, video conferencing (if deemed necessary) on an as needed basis and during reasonable business hours Monday through Friday. Consultant shall further make himself available, in person, if deemed necessary, to the Company so long as the Consultant is given a minimum of ten (10) days written notice if Consultant is, at the time of said request, residing outside of the Continental United States and three (3) days written notice by the Company if Consultant is residing, at the time of said request, within the Continental United States. In either case, Consultant must maintain a United States address for purposes of receiving correspondence, samples, checks etc. Written notice may also be deemed given if communicated via Consultant's personal email address or a fax number to be provided to the Company. Written notice must be sent via U.S. Mail certified, return receipt requested, or via a nationally recognized mail carrier service with "signature" required. Written notice may also be sent if communicated via Consultant's personal email address or a fax number to be provided to the Company. However, the latter shall not be used for any "official" notice purposes.

b.    During the term of this Agreement and for a period of (1) years after the termination or expiration of this Agreement, Consultant shall not, either individually or in conjunction with a third party, engage in any business, trade, or profession as owner, officer, manager, employee, consultant or otherwise if such business competes in any material way with Company's business of developing, creating, selling, manufacturing, distributing, or marketing products, media or materials for children.

c.    Consultant shall offer Company a right of first refusal to license, develop, manufacture, market or sell any and all children's characters or other products, ideas, inventions or creations created by Consultant that are not within the scope of this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant. If Consultant provides Company with any new idea's either relating to The Googles as well as anything entirely new that may not relate to the current universe of characters and/or idea's, that upon submission of such new idea or concept which shall be placed in writing Company shall have one hundred and twenty (120) days to accept and enter into an agreement for said property.

d.    Consultant agrees to hold harmless, defend and indemnify Company and its officers, directors, employees, agents and servants from and against any and all claims, damages and expenses, including reasonable legal fees and expenses, of whatever kind and nature directly or indirectly arising out of or on account of or resulting from the Consultant's activities (other than as expressly authorized by Company) including, without limitation, Consultant's failure to comply with his obligations under this Agreement, acts or omissions.

4.    <u>Duties of Company.</u>

2

a. Company shall reimburse Consultant for all reasonable travel and living expenses that are deemed to be essential to Company's success and are pre-approved by an authorized officer of the Company and incurred as a direct result of Consultant's obligations under this Agreement such as attending tradeshows, board meetings, etc. The Company shall, upon proper documentation having been presented to the Company, or its official/designated representative, within seven (7) days of receipt of same, reimburse Consultant said incurred expenses as approved by Company.

5.     Term and Termination.

a.     Subject to the provisions for termination as provided herein, this Agreement shall commence upon execution and shall have a term of thirty (30) months.

b.     Company may immediately terminate this Agreement upon the occurrence of any of the following: (i) a material breach of any provision of this Agreement by Consultant; (ii) a failure by Consultant, after written notice, to perform such duties required of Consultant as outlined in this agreement; (iii) the initiation of any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding by Consultant, or if any such proceeding is instituted against Consultant; (iv) the conviction of Consultant of any felony crime; (v) any use, sale or possession by Consultant of any illegal drug or controlled substance that is prosecutable under US Federal Laws. Written notice to mean by way of Certified mail, return receipt requested, or by way of a Nationally recognized mail service, Courier service etc.

c.     Upon termination or expiration of this Agreement by either party, Consultant shall immediately return to Company all Proprietary Information (as defined below) in Consultant's possession, custody or control in whatever form held (including copies, compilations, summaries, or embodiments thereof relating to Proprietary Information) and provide written certification that all such material has been returned.

d.     Company agrees to provide Consultant thirty (30) days Notice, from date of said written notice of termination by the Company, within which to cure any alleged breach it has made against the Consultant identified in paragraph three (3) under "Duties of Consultant".

6.     Proprietary Information; Proprietary Rights.

a.     In the course of performing his duties under this Agreement, Consultant may obtain information relating to Company and/or its customers, suppliers or other third parties that is of a confidential and proprietary nature ("Proprietary Information"). Such Proprietary Information may include, without limitation, trade secrets, research and development, customer lists, vendor lists, schedule of accounts, plans, programs, inventions, computer software, know-how, inventions, product information, techniques, processes, schematics, data, financial information and sales and marketing plans. Consultant shall, at all times, both during the term of this Agreement and for a period of two (2) years thereafter its termination, keep in trust and confidence all such Proprietary Information, and shall not use such Proprietary Information other than in the course of performing his duties as expressly provided in this Agreement, nor shall Consultant disclose any such Proprietary Information to any person without Company's prior written consent except as required or needed in any legal and/or Court action by Consultant against the Company or any other third party. This pertains to only that information not otherwise gathered from public sources, knowledge already in the public eye or a matter of public record, and/or any other third party other than Consultant.

3

b.    The Company acknowledges that the Consultant is not being hired as a work for hire but rather is being compensated, pursuant to this Consulting agreement, as a Consultant for the express purpose of advising, recommending, counseling, and otherwise utilizing Consultant's expertise in the decision making process as it pertains to the existing and "further development" of the Google's project only.

c.    The services and rights which Company is granting to Consultant hereunder are extraordinary and unique and cannot be replaced or adequately compensated in money damages, and any breach by Consultant of this Agreement will cause irreparable injury to Company. Therefore, Consultant agrees that in the event of a breach of this Agreement, Company, in addition to any other remedies that might be available to it, shall be entitled to bring suit at law or equity for money or other damages. Consultant shall not oppose such relief on the grounds that there is an adequate remedy at law, and such right shall be cumulative and in addition to any other remedies at law or in equity (including monetary damages) which Company may have upon the breach of the obligations of confidentiality hereunder.

7.    <u>Limitations of Liability</u>.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, INDIRECT, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES) FOR ANY CLAIM BY ANY OTHER PARTY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

8.    <u>Miscellaneous</u>.

This Agreement is a legally binding agreement between Company and Consultant and shall be governed by and construed in accordance with the laws of the State of Florida. This Agreement may be executed in one or more counterparts, each of which shall be an original Agreement, and all of which taken together shall constitute one and the same instrument. This Agreement may not be assigned by consultant without the prior written consent of Company. This Agreement shall not be modified, amended, or in any way altered except by an instrument in writing signed by both Company and Consultant. Each party shall refrain from making or issuing any statements, disclosures, or other communications related to this Agreement, the subject matter of this Agreement, or the services provided hereunder. This Agreement constitutes the entire agreement between Company and Consultant with respect to the subject matter of this Agreement, and supersedes all prior agreements, whether written or oral, with respect to the subject matter contained in this Agreement.

Please indicate your acceptance of the terms of this Agreement by signing in the space indicated below.

_____    Date _5/09/02_
STEVEN A. SILVERS

Stelor Productions, Inc.

By: _____ Date: _5/9/02_
Name: _Steven A Esrq_    Title: _President_

Received Ten Thousand Dollar signing bonus ($10,000.00)    _[signature]_

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003   _5/9/02_

4