UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-80954 -CIV-HURLEY/HOPKINS

STELOR PRODUCTIONS, INC.,
     Plaintiff,

vs.

STEVEN A. SILVERS
     Defendant.

_____



## PLAINTIFF'S REQUEST TO RECONSIDER AND VACATE THE NOVEMBER 4, 2004 ORDER DENYING EMERGENCY STATUS FOR PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION IN LIGHT OF NEW FACTS OR, <u>IN THE ALTERNATIVE, FOR A TEMPORARY RESTRAINING ORDER</u>

### INTRODUCTION

On October 25, 2004, Plaintiff Stelor Productions, Inc. ("Stelor") filed an Emergency Motion for Preliminary Injunction. On November 4, 2004, the Court denied Stelor's request for emergency relief and referred Stelor's motion for preliminary injunction to United States Magistrate Judge James Hopkins for a report and recommendation. The immediate fallout has been the shattering of the status quo Stelor's Motion aimed to preserve.

Accordingly, Stelor is compelled to request reconsideration based on emergent events that reveal the transparency of Defendant's previous attempt to paint Stelor's request for immediate relief as exaggerated and unwarranted.

809360v1

Dockets.Justia.com

First, with the threat of immediate judicial intervention averted by the Court's November 4 ruling, Defendant Steven A. Silvers ("Silvers" or "Defendant") submitted papers on November 11, 2004 with the National Arbitration Forum ("NAF") purporting to withdraw the UDRP[1] complaint properly and lawfully brought--at Defendant's insistence--against the search engine Google, Inc and its domain name google.com. Just days ago, Defendant used this Court's denial of emergency status for Stelor's preliminary injunction motion to urge dismissal of the UDRP complaint, telling the NAF "[a]ny interpretation of the rights conveyed or retained under [Stelor's Exclusive License] is the subject of a pending federal court action in Florida that will not be resolved anytime soon." (Ex. A, Reply to Response to Notice of Withdrawal of Complaint, November 15, 2004, emphasis added). Defendant further concedes that the UDRP's rules contain no mechanism for resolving Licensor/Licensee disputes over standing. *Id.* (stating "[i]t is not the province of the National Arbitration Forum to determine the rights of the parties under [Stelor's License]"). Thus, Defendant's opportunistic use of this Court's November 4, 2004 ruling leaves Stelor at the mercy of Defendant and has thrown the UDRP proceeding into limbo.[2]

---

[1]    The Uniform Dispute Resolution Panel (UDRP) is an administrative body that arbitrates disputes between domain name registrants. The Internet Corporation For Assigned Names and Numbers (ICANN) requires all domain name registrants to submit to arbitration by the UDRP in the event of a domain name dispute. The sole relief the UDRP may grant is transfer of the domain name.

[2]    Later on November 16, 2004, Stelor learned that the NAF will allow a revision of the UDRP complaint to identify Stelor as the complainant, as Defendant's

Second, Defendant has attempted to coerce Stelor's chosen counsel, Yano Rubinstein, Esq., into discontinuing trademark proceedings against Google Inc. before the United States Trademark Trial and Appeal Board by threatening him with a lawsuit and/or disciplinary proceedings with the California Bar merely for exercising rights Defendant plainly granted to Stelor.  On November 16, 2004, Defendant's counsel informed Mr. Rubinstein:  "Mr. Silvers intends to continue to negotiate with Google, and anyone else, interested in acquiring his rights.  In the meantime, since you have failed to heed our warnings, we are filing an action to enjoin you."  (Ex. B, November 16, 2004 letter from Gail A. McQuilken to Yano Rubinstein, Esq.).[3]  The License Agreement gives Stelor "the sole right, in it's discretion and expense, to take all action against third parties to protect" the Googles Trademarks and requires Defendant's cooperation "in every way necessary."  (Ex. C, License, Distribution, and Manufacturing Agreement, ¶ XI.A).  Those rights include an irrevocable power of attorney to act for and on behalf of Defendant, and the right to engage counsel to enforce and defend Defendant's trademarks.  Defendant's tactic of attacking counsel reveals Defendant's disregard for Stelor's rights and Defendant's obligations.  These and other actions imperil Stelor's future by stalemating Stelor's efforts to resolve the outstanding issues with Google Inc.  Indeed, the wedge Defendant has driven

---

exclusive licensee.  The damage already done by Defendant's submission, however, is incalculable.

[3]    In response, Mr. Rubinstein has withdrawn from the NAF and TTAB actions as counsel for Defendant.

between himself, Google Inc. and Plaintiff has brought settlement negotiations with Google Inc. to a standstill, and has cast a cloud over Stelor's ability to conduct its business.

In short, Defendant, a convicted felon, has shown himself eager to strike a deal with search engine Google Inc. and now seeks to thwart Stelor's legitimate defense of the Googles Intellectual Property and its rights under the License Agreement. Defendant's most recent actions have jeopardized Stelor's investment and future. For example, Stelor has received correspondence from one of its investors indicating that this dispute will prevent Stelor from bringing its product to market. (Ex. D, Letter from Michael A. DiMuccio to Steven A. Esrig). If Defendant's interference is permitted to continue, Stelor will have no redress for the loss of its company and assets, as Defendant is without means to make Stelor whole.

## DISCUSSION

In its November 2, 2004 filing opposing emergency status for Plaintiff's Motion For Preliminary Injunction, Defendant assured this Court that he posed no imminent threat to Plaintiff. Through counsel, he scoffed at the concerns set forth in Plaintiff's Motion for Preliminary Injunction, dismissing them as exaggerated and hypothetical.[4]

---

[4]    For example, Defendant characterized Stelor's Preliminary Injunction motion as "vaguely alleg[ing] a litany of misbehavior" and as "premised on Plaintiff's 'concern' that Silvers' *might"* breach the License agreement. Defendant's Motion To Extend Time To Respond To "Emergency" Motion For Preliminary Injunction And To Initiate Discovery, November 2, 2004. pp 1-2. (emphasis in original).

After receiving these representations, the Court denied "emergency" status for Plaintiff's pending Motion for Preliminary Injunction, through which Plaintiff sought, among other relief, an Order barring Defendant from interfering with ongoing legal proceedings that seek to enforce and defend the Googles Intellectual Property in proceedings brought by Plaintiff against the search engine Google Inc. and in a proceeding brought by Google Inc. against the Defendant. As detailed in Plaintiff's other pleadings and motions, the License Agreement gives Stelor the "the **sole right...**to take any and all actions against third persons to protect the Intellectual Property Rights." (Ex. C, ¶ XI.A, emphasis added). The License Agreement also provides Stelor with an irrevocable power of attorney to act on Defendant's behalf and *instead* of Defendant. *Id.* ¶ XIII.A (emphasis added).

Emboldened by the Court's denial of "emergency" status for Stelor's motion, Defendant accelerated his efforts to interfere with Stelor's rights. First, Defendant submitted papers purporting to withdraw a UDRP proceeding brought against Google Inc. pursuant to Stelor's irrevocable power of attorney and its rights under the License Agreement. (Ex. E, Notice of Withdrawal of Complaint, November 12, 2004). In his November 1, 2004 submission to the NAF, Defendant represents that "Stelor is not authorized to initiate proceedings on [his] behalf . . . except to fulfill its indemnification obligations to defend [him] in actions which do not relate to the licensed intellectual property." (Ex. F, Declaration of Steven A. Silvers supporting Notice of Withdrawal of Complaint, ¶ 4). This

representation, made under penalty of perjury, is plainly false in light of Stelor's

sole and exclusive rights under the License Agreement "to take any and all

actions against third persons." (Ex. C, ¶ XI.A).  To dispel any doubt as to who is

authorized to do what, the License Agreement spells out that Stelor's rights are

exclusive "even as to LICENSOR," and that Stelor may act "for and on

LICENSOR'S behalf and instead of LICENSOR." (*Id.*, ¶¶ I.A, VIII.A).

 Defendant has further told the NAF that he has no objection to the use of

the google.com URL by Google Inc. (Ex. E).  Again, this representation is

inimical to Stelor's interests and rights.  Defendant's disavowal undermines the

essence of the UDRP complaint, which is premised on allegations that Google

Inc.'s domain name google.com conflicts with the Googles Intellectual Property--

the legal and commercial foundation of Stelor's business.  Finally, as noted

above, Defendant has exploited the denial of emergency status for Stelor's

Preliminary Injunction Motion, telling the UDRP panel that it should deny the

UDRP complaint because this "federal court action . . . will not be resolved

anytime soon." (Ex. A).

 Second, Defendant also seeks to derail proceedings against Google Inc.

before the United States Trademark Trial and Appeal Board ("TTAB").  Through

his counsel Gail A. McQuilken (who also represents him here), Defendant on

November 11, 2004 threatened counsel (also Yano Rubinstein, Esq.) in the

TTAB case, with a "complaint with the California Bar [seeking] the highest

possible sanctions" merely for representing and defending Stelor's rights and

interests pursuant to the License Agreement and Stelor's irrevocable power of attorney to "act for and on [Defendant's] behalf and instead of [Defendant]". (Ex. G, November 11, 2004 letter from Gail A. McQuilkin, Esq. to Yano Rubinstein, Esq.; Ex. C, ¶ VIII.A).[5]

On November 16, 2004, Defendant ratcheted up his campaign by informing Mr. Rubinstein that "we are filing an action to enjoin you" from continuing to enforce and defend the Googles trademarks, notwithstanding the unequivocal provisions of the License Agreement noted above. (Ex. B).

These threats and actions, coming just days after Defendant assured this Court that Stelor's fears and concerns were exaggerated and misplaced, provide new facts and new grounds justifying this request for reconsideration. These new facts demonstrate the imminent danger that Defendant poses to the viability of Plaintiff's business. Already, the schism between Stelor and Defendant has thrown Stelor's proceedings against Google, Inc into disarray. Google Inc.'s present stance is that further settlement negotiations with Stelor would prove futile. (Ex. H, Declaration of William M. Borchard, Esq.).

Though Stelor has upheld its part of its bargain with Defendant--investing millions to transform Defendant's concept into the extraordinary Googles website[6]--Defendant appears intent upon destroying the viability of Stelor's

---

[5]     Florida Bar Rule 4-3.4(h) provides a lawyer shall not: "present, participate in presenting, or threaten to present disciplinary charges under these rules solely to obtain advantage in a civil matter."

[6]     www.googles.com

business and scuttling Stelor's investment in time, money and energy.

Defendant has also made false declarations before the NAF.  Such false

statements and representations are exemplified by the following:

1.     Defendant represents through counsel that he does not dispute
Google Inc.'s rights to its domain names  But in an e-mail dated
February 9, 2004, Defendant told Stelor "I can clearly show and
prove, convincingly, that I am the Senior Mark and that Google.com
has infringed on that mark."  (Ex. I).

2.     Defendant stated, under penalty of perjury, "that Stelor not
authorized to initiate proceedings on my behalf" (Ex. F) when not
only has he authorized Stelor to initiate proceedings in the
Agreement, but insisted that Stelor file a UDRP action against
google.com, demanding on March 1, 2004, that " . . . any and all
causes of action regarding the infringement of or the protection of
the Googles' IP shall be brought in my name and only my name. . .)
(Ex. J, ¶ 6).

3.     Furthermore, directly contravening Silvers' sworn statement that
"Stelor is not authorized to initiate proceedings on [his] behalf" (Ex.
F), Plaintiff expressly stated in his March 1, 2004 correspondence
that "You [Stelor] have the right to insure, as the licensee, that your
rights are properly protected and as such you have the right to
bring if you so choose, legal action against any and all potential
infringements or violators against the Googles' IP.  However, any
and all such causes of action shall be brought in my name as the
owner of the IP . . ." (Ex. J, ¶ 6).

Defendant's willingness to tamper with facts to suit his immediate ends and

shifting personal interest could not be more apparent.

Because of Defendant's recent opportunistic actions, Stelor respectfully

moves the Court to reconsider its denial of emergency relief and to schedule an

immediate hearing on Plaintiff's motion for preliminary injunction in advance of

any discovery.  Defendant's latest actions show that it has misused its opposition

to emergency relief and request for discovery as a stalling tactic that now has enabled Defendant to disrupt the proceedings at both the NAF and TTAB.

The License Agreement upon which Stelor has based its company is clear on its face. The harm already caused to Stelor will increase exponentially without this Court's immediate protection. Stelor's business relationships are already suffering and its financial footing is in immediate peril. (Ex. D). Defendant has taken this Court's denial of the "emergency status" of its injunction as a mandate to immediately begin its attack on the foundation of Stelor's company, leaving Stelor fighting for the life of its company.

Defendant's actions are based on the anticipation that this Court will not enter a ruling until it is too late. Immediate action is urgently needed to prevent further irreparable injury to Stelor and its multi-million dollar investment under its exclusive License Agreement with Defendant. Specifically, Stelor seeks an Order requiring Defendant to rescind his "Notice of Withdrawal of Complaint" before the NAF, blocking Defendant from taking any further action in either the NAF or TTAB proceedings involving Google Inc., and prohibiting Defendant from making any further representations or having any further communications with the NAF, the TTAB, Stelor's counsel, or Google Inc., and prohibiting Defendant from taking any other action with respect to the Googles Intellectual Property and Trademarks, until the Court can consider and rule upon Stelor's Motion for Preliminary Injunction. In the alternative, Stelor requests the entry of a temporary restraining order providing the above-requested relief.

This motion is supported by Stelor's memorandum in support of its motion for preliminary injunction and the declaration and exhibits submitted therewith. Stelor's present motion is also supported by the Memorandum and exhibits submitted in opposition to Defendant's November 2, 2004 motions, and by the additional exhibits accompanying this motion.

Dated:    11/18/04

Respectfully submitted,

_Laurence R. Hefter / pm_

Laurence R. Hefter
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, L.L.P.
1300 I Street, N.W.
Washington, DC  20005-3315
Telephone:  (202) 408-4000
Facsimile:    (202) 408-4400

Of Counsel:
Stanley A. Beiley
Florida Bar No. 004848
Alan H. Rolnick
Florida Bar No. 715085
SACHER ZELMAN VAN SANT PAUL
BEILEY, HARTMAN, ROLNICK &
WALDMAN P.A.
1401 Brickel Avenue, Suite 700
Miami, Florida  33131
Telephone:  (305) 371-8797
Facsimile:    (305) 374-2605

Attorneys for Stelor,
STELOR PRODUCTIONS, INC.

809360v1

10

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via U.S. Mail this _18th_ day of November, 2004, to: Kenneth R. Hartmann, Esq., Gail M. McQuilkin, Esq., Kozyak Tropin & Throckmorton, P.A., Counsel for Defendant/Counter-Plaintiff, 2525 Ponce de Leon Blvd., 9th Fl., Coral Gables, FL 33134 and Adam T. Rabin, Esq., Dimond, Kaplan & Rothstein, P.A., Co-Counsel for Defendant/Counter-Plaintiff, 200 S.E. First St., Suite 709 Miami, FL 33131.

> SACHER, ZELMAN, VAN SANT,
>   PAUL, BEILEY, HARTMAN,
>   ROLNICK & WALDMAN, P.A.
> Attorneys for Plaintiff/Counter-Defendant
> 1401 Brickell Ave., Suite 700
> Miami, FL 33131
> Telephone:   (305) 371-8797
> Facsimile:   (305) 374-2605
>
>
> By: _Christopher Bopst_
>   STANLEY A. BEILEY
>   Florida Bar No. 004848
>   CHRISTOPHER BOPST
>   Florida Bar No. 0144114

CASE No. 04-80954-CIV-HURLEY/HOPKINS

PLAINTIFF'S REQUEST TO RECONSIDER
AND VACATE THE NOVEMBER 4, 2004
ORDER DENYING EMERGENCY STATUS
FOR PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
IN LIGHT OF NEW FACTS OR, IN THE
ALTERNATIVE, FOR A
TEMPORARY RESTRAINING ORDER

# Exhibit A



NATIONAL

ARBITRATION

FORUM

| | | |
|---|---|---|
| Steven A. Silvers | ) | |
| 8983 Okeechobee Blvd. | ) | |
| Suite 202 | ) | |
| PMB 203 | ) | |
| West Palm Beach, FL 33411 | ) | **Domain Names In Dispute:** |
| | ) | google.com |
| **(Complainant)** | ) | googlesadsense.com |
| | ) | googlesadwords.com |
| v. | ) | googles-adwords.com |
| | ) | |
| Google Inc. | ) | |
| 2400 Bayshore Parkway, | ) | |
| Mountain View, California | ) | |
| | ) | |
| **(Respondent)** | ) | |

## REPLY TO RESPONSE TO NOTICE OF WITHDRAWAL OF COMPLAINT

Mr. Steven Silvers does not dispute Google, Inc.'s right to its domain names, and has not

authorized this Complaint. While it is true that a trademark license exists between Mr. Silvers

and Stelor - - who Mr. Rubinstein now claims to represent - - that license does not grant Stelor

the right to file this Complaint in Mr. Silvers name, or retain counsel for him, without his

consent. Any interpretation of the rights conveyed or retained under this license is the subject of

a pending federal court action in Florida that will not be resolved anytime soon. It is not the

province of the National Arbitration Forum to determine the rights of the parties under that

license in this proceeding.

If Stelor wants to dispute the domain names registered by Google, Inc, it may file the

action in its own name.    In fact, the only reason Stelor filed this Complaint in Mr. Silvers' name

rather than its own is that it wants to discredit Mr. Silvers with Google, and avoid direct liability

for filing a bad faith complaint.  Mr. Silvers did not retain Mr. Rubinstein, has not authorized this

proceeding, does not want to be involved in this proceeding, and demands that the complaint be

withdrawn, and all appropriate actions be taken against Mr. Rubinstein.

## CERTIFICATION

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via e-mail

and telecopy on this \15$^{th}$\ day of November, 2004, upon counsel for Complainant, Yano L.

Rubinstein, Esq. 580 California Street, 16th Floor, San Francisco, CA 94104.

Respectfully Submitted,

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor
Coral Gables, FL 33134
Tel:  (305) 372-1800
Fax:  (305) 372-3508

246396.1

CASE NO. 04-80954-CIV-HURLEY/HOPKINS

PLAINTIFF'S REQUEST TO RECONSIDER
AND VACATE THE NOVEMBER 4, 2004
ORDER DENYING EMERGENCY STATUS
FOR PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
IN LIGHT OF NEW FACTS OR, IN THE
ALTERNATIVE, FOR A
TEMPORARY RESTRAINING ORDER

# Exhibit B

## Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134

Gail A. McQuilkin                                                                    Telephone (305) 372-1800
gam@kttlaw.com                                                                            Fax (305) 372-3508

Via Fax: 415-651-9853

November 16, 2004

Yano Rubinstein, Esq.
Summers Rubinstein
580 California Street, 16th Floor
San Francisco, California 94104

Re:     Steven A. Silvers

Dear Mr. Rubinstein:

You fail to grasp the seriousness of what you are doing. There is no language anywhere in the License between Mr. Silvers and Stelor that permits Stelor to retain you as Mr. Silver's counsel, or to file actions in the name of Mr. Silvers. It is absurd to think otherwise. You need to read the License carefully because you are setting yourself up for serious consequences.

Paragraph VIII (A) of the License gives Stelor the right to file and execute documents to seek, maintain and obtain Intellectual Property Rights on behalf of Mr. Silvers. This does not give Stelor the right to file actions in the name of Mr. Silvers. You yourself make this point in your letter where you state that Silvers is not authorized to institute legal proceedings. If Stelor wants to file an action it deems appropriate to defend the Intellectual Property Rights licensed to it under the License it may do so, but only in its own name even if it brings the action "on behalf of" Mr. Silvers. Moreover, a domain name dispute not does require that a domain name registrant be the party that files a complaint. Anyone may bring a complaint to challenge a domain name. Stelor's decision to file a domain name dispute complaint in Mr. Silvers' name rather than its own is an obvious attempt to harass Mr. Silvers, and discredit him with Google. Unfortunately this ploy served only to further discredit Stelor, and alienate Google from any discussion to resolve the core trademark dispute pending in the USPTO.

Furthermore, you cannot respond to an action filed against Mr. Silvers personally under any circumstance without his express authorization. Paragraph XII(C) of the License acknowledges this. And, both you and Stelor have been told on numerous occasions that Mr. Silvers has retained his own counsel. Further, you must be aware by now that Stelor has sued Mr. Silvers. That makes Silvers and Stelor adverse. Please explain to me how you can hold yourself out as representing Mr. Silvers, and then send letters and contact third parties such as Google, Inc. claiming to be Stelor's attorney. That is a clear conflict of interest and a practice I am sure the California Bar prohibits. Frankly, it is beyond my ability to understand how any practitioner would consider it wise or appropriate to take any action in the name of someone who

Page 2

has not personally retained you, especially after learning he does not want you to represent him. Perhaps you should speak to your professional liability carrier to learn of the huge potential for incurring a malpractice claim under such circumstances.

Finally, there is absolutely nothing that prevents Mr. Silvers as the owner of all of the intellectual property relating to Googles from negotiating with a third party to sell his rights. Please read paragraphs VIII (B)(C) and (D) of the License where Stelor acknowledges the rights retained by Mr. Silvers. Mr. Silvers intends to continue to negotiate with Google, and anyone else, interested in acquiring his rights. In the meantime, since you have failed to heed our warnings, we are filing an action to enjoin you.

Sincerely,

Gail A. McQuilkin

/246352.1

CASE NO. 04-80954-CIV-HURLEY/HOPKINS

PLAINTIFF'S REQUEST TO RECONSIDER
AND VACATE THE NOVEMBER 4, 2004
ORDER DENYING EMERGENCY STATUS
FOR PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
IN LIGHT OF NEW FACTS OR, IN THE
ALTERNATIVE, FOR A
TEMPORARY RESTRAINING ORDER

# Exhibit C

# LICENSE, DISTRIBUTION
# AND MANUFACTURING AGREEMENT

This LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT between Steven A. Silvers and Stelor Productions, Inc. is effective as of June 1, 2002 and is entered into by and between Steven A. Silvers (LICENSOR), an Individual, whose official address is 3741 NE 163rd Street, PMB #325, North Miami Beach, FL 33160 and Stelor Productions, Inc. (LICENSEE), a Delaware corporation with its current offices located at: 14701 Mockingbird Drive, Darnestown, Maryland, 20874.

## WITNESSETH

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES characters identified more fully in "Schedule A" attached hereto (the "Licensed Property");

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES trademarks identified more fully in "Schedule A" attached hereto (the "Licensed Trademarks");

WHEREAS, LICENSOR has the power and authority to grant to LICENSEE the right, privilege and license to use, manufacture, distribute, and sell those types of products that incorporate or are otherwise based on the Licensed Property as identified in "Schedule A" attached hereto (the "Licensed Products") and to use the Licensed Trademarks on or in association with such Licensed Products;

WHEREAS, LICENSEE has or will have the ability to manufacture, have manufactured, have sub-manufactured, distribute and sell or have sold and distributed the Licensed Products in the Licensed Territory more clearly defined in Schedule A (the Territory) and to use the Trademark(s) on or in association with the Licensed Products;

WHEREAS, LICENSEE desires to obtain from LICENSOR an exclusive license to use, manufacture, have manufactured and sell Licensed Products in the Territory and to use the Licensed Trademarks on or in association with the Licensed Products;

WHEREAS, LICENSEE has agreed, pursuant to a letter agreement, to act as a consultant for LICENSOR; and

NOW, THEREFORE, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do hereby agree as follows:

## I. LICENSE GRANT

A.    LICENSOR hereby grants to LICENSEE, for the Term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use, reproduce, modify, create derivative works of, manufacture, have manufactured, market, advertise, sell, distribute, display, perform, and otherwise commercialize the Licensed Products and Licensed Properties in the Territory. The license includes a license under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with the creative characters known as The Googles, anything that contains the letters GOO (in upper or lower case) together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural



B.    LICENSOR hereby grants to LICENSEE for the term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use the Licensed Trademarks on or in association with the Licensed Products as well as on packaging, promotional, and advertising material associated therewith

C.    LICENSEE shall have the right to sublicense LICENSEE's rights under this Agreement; provided that any and all such sublicenses shall be subject to the terms and conditions of this Agreement

D.    No licenses will be deemed to have been granted by either party to any of its Intellectual Property Rights, except as otherwise expressly provided in this Agreement

E.    LICENSEE agrees to place on all Licensed Products, where practicable, the phrase "created by Steven A. Silvers" or other similar wording

## II.  TERM OF THE AGREEMENT

This Agreement and the provisions hereof, except as otherwise provided, shall be in full force and effect commencing on the date of execution by both parties and shall extend for a Term as recited in "Schedule A" attached hereto (the "Term")

## III.  COMPENSATION

A.    In consideration for the licenses granted hereunder, LICENSEE agrees to pay to LICENSOR, during the Term of this Agreement, a royalty in the amount recited in "Schedule A" attached hereto (the "Royalty") based on LICENSEE's Net Sales of Licensed Products. "Net Sales" shall mean the gross revenues on a cash basis (i.e., actually collected by LICENSEE but without counting any gross revenues twice) excluding shipping and handling charges, sales taxes, VAT, and other taxes imposed upon sales less (i) customary trade discounts, (ii) allowances actually shown on the invoice (except cash discounts not deductible in the calculation of Royalty) (iii) bona fide returns, charge backs, refunds or credits (net of all returns actually made or allowed as supported by memoranda actually issued to the customers), (iv) sales of remainder inventory made at less than the total of LICENSEE's actual cost of goods and actual direct selling costs solely for purposes of liquidation or close-out, (v) other uncollectible accounts, (vi) cooperative advertising allowances, (vii) sales commissions paid

B.    The Royalty owed LICENSOR shall be calculated on a quarterly calendar basis on collected funds (the "Royalty Period") and shall be payable no later than thirty (30) days after the termination of the preceding full calendar quarter, i.e., commencing on the first (1st) day of January, April, July and October with the exception of the first and last calendar quarters which may be "short" depending upon the effective date of this Agreement

C.    With each Royalty Payment, LICENSEE shall provide LICENSOR with a written royalty statement; in a form acceptable to Licensor. Such royalty statement shall be certified as accurate by a duly authorized officer of Licensee, reciting on a country-by-country basis, the stock number, item, units sold, description, quantity shipped, gross invoice, amount billed to customers less discounts, allowances, returns and reportable sales for each Licensed Product. Such statements shall be furnished to Licensor whether or not any Licensed Products were sold during the Royalty Period. The LICENSEE hereby further agrees to provide the LICENSOR with a list of all of it's sub licensees added during the current royalty period.

D.    If LICENSEE sells any Licensed Products to any party affiliated with LICENSEE, or in any way directly or indirectly related to or under the common control with LICENSEE, at a price less than the average weighted price charged to other parties, the Royalty payable to LICENSOR shall be computed on the basis of the averaged weighted price charged to other parties if the Licensed Products are not ultimately resold to unaffiliated third parties

2



E.    All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties and may offset or be offset from any other payments due to LICENSEE under this or any other agreement between the parties.

F.    Late payments shall incur interest at the rate of ONE PERCENT (1%) per month from the date such payments were originally due.

## IV. AUDIT

A.    LICENSOR shall have the right, at its own expense, to have a nationally recognized certified public accounting firm, upon at least thirty (30) days written notice and no more than twice per calendar year, to inspect during normal business hours, LICENSEE's books and records and all other documents and material in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

B.    In the event that such inspection reveals an underpayment discrepancy greater than 5% of the amount of Royalty owed LICENSOR from what was actually paid, LICENSEE shall have the opportunity to conduct its own audit. If LICENSEE agrees to the amount, if any, of any discrepancy, LICENSEE shall pay such discrepancy, plus interest, calculated at the rate of ONE AND ONE-HALF PERCENT (1 1/2%) per month. Upon settlement of any underpayment discrepancy, no further audit by LICENSOR shall be requested that year. That period end date shall represent the new period start date for future audits for underpayment discrepancies. In the event that such discrepancy is in excess of TEN THOUSAND UNITED STATES DOLLARS ($10,000.00), LICENSEE shall also reimburse LICENSOR for the cost of auditing fees in connection therewith.

C.    All books and records relative to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection for at least three (3) years after the expiration of the initial or any subsequent term.

D.    In the event that an investigation of LICENSEE's books and records is made, certain confidential and proprietary business information of LICENSEE may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be held in confidence by LICENSOR and shall not be used by LICENSOR or disclosed to any third party for a period of two (2) years from the date of disclosure, or without the prior express written permission of LICENSEE unless required by law, except LICENSOR may not disclose at any time to any third party any such confidential and proprietary business information which are trade secrets of LICENSEE. It is understood and agreed, however, that such information may be used by LICENSOR in any proceeding based on LICENSEE's failure to pay its actual Royalty obligation.

## V. WARRANTIES AND OBLIGATIONS

A.    LICENSOR represents and warrants that:

(i)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSOR and this Agreement is a valid and binding obligation of LICENSOR, enforceable in accordance with its terms;

(ii)    the execution, delivery and performance by LICENSOR of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSOR is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSOR;

(iii)    **LICENSOR owns the exclusive rights in and to the Licensed Intellectual Property, Licensed Trademarks, Licensed Patents and Licensed Copyrights necessary to effectuate the granting of the Licensing Rights from the LICENSOR to the LICENSEE as contemplated herein.**

2



(iv)          the Licensed Intellectual Property and Licensed Trademarks do not infringe the rights, including without limitation, Intellectual Property Rights, of any third party, and

(v)          except as set forth in Schedule B attached hereto, LICENSOR has not received any notice from any third party of any alleged or actual infringement of the Licensed Intellectual Property or Licensed Trademarks and the Licensed Intellectual Property and/or Licensed Trademarks are not the subject, and has not been the subject, of any previous or pending litigation with the exception of the Ganz litigation which has been resolved.

B.   LICENSEE represents and warrants that

(i)          the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSEE and this Agreement is a valid and binding obligation of LICENSEE, enforceable in accordance with its terms;

(ii)         the execution, delivery and performance by LICENSEE of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSEE is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSEE, and

(iii)        it will use its commercially reasonable efforts to promote, market, sell and distribute the Licensed Products.

C.   Disclaimer of Warranties  EXCEPT AS EXPRESSLY PROVIDED ABOVE, NEITHER PARTY MAKES ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, REGARDING THIS AGREEMENT AS TO ANY MATTER INCLUDING, BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

D.   LICENSEE shall be solely responsible for the manufacture, production, sale and distribution of the Licensed Products or to have such Licensed Products manufactured, produced, sold and distributed, and will bear all related costs associated therewith.

## VI.  NOTICES, QUALITY CONTROL, AND SAMPLES

A.   The Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices.

B.   The Licensed Products shall be of a high quality which is at least equal to comparable products manufactured and marketed by LICENSEE and in conformity with a standard sample provided by LICENSEE.

C.   Prior to the commencement of manufacture and sale of the Licensed Products, LICENSEE shall submit to LICENSOR for his input, at no cost to LICENSOR, a reasonable number of samples of all Licensed Products which LICENSEE intends to manufacture and sell and of all promotional and advertising material associated therewith.

## VII.  NOTICES AND PAYMENT

A.   Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at the above-stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

B.   Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.

4

## VIII. INTELLECTUAL PROPERTY PROTECTION

A.    LICENSOR hereby grants LICENSEE all right, power and interest to seek, obtain and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Trademarks, Licensed Copyrights and any other Intellectual Property Rights granted herein. LICENSOR further agrees to assist LICENSEE as may be required to apply for and obtain recordation of and from time to time enforce, maintain and defend such Intellectual Property Rights. LICENSOR hereby grants LICENSEE an irrevocable power of attorney for the initial and any subsequent terms of this Agreement to act for and on LICENSOR's behalf and instead of LICENSOR, at LICENSEE's expense, to execute and file any such document(s) and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by LICENSOR.

B.    LICENSOR shall retain all rights, title and interest in the Licensed Intellectual Property and Licensed Trademarks and any modifications thereto based solely on such Licensed Intellectual Property. LICENSEE acknowledges LICENSOR's exclusive rights in the Licensed Intellectual Property and, further, acknowledges that the Licensed Intellectual Property and/or the Licensed Trademarks rights are unique and original to LICENSOR and that LICENSOR is the owner thereof. LICENSEE shall not, at any time during or after the effective Term of the Agreement, dispute or contest, directly or indirectly, LICENSOR's exclusive right and title to the Licensed Intellectual Property and/or the Licensed Trademarks(s) or the validity thereof.

C.    LICENSEE agrees that its use of the Licensed Intellectual Property and/or the Licensed Trademarks(s) inures to the benefit of LICENSOR and that the LICENSEE shall not acquire any rights in the Licensed Intellectual Property and/or the Licensed Trademarks(s) except for the license granted herein.

D.    LICENSOR shall retain all rights, title and interest in and to the Licensed Intellectual Properties. The LICENSOR owns the exclusive rights to the Licensed Intellectual Property. LICENSOR hereby waives and releases LICENSEE from any and all current or future claims or causes of actions by third parties, whether known or unknown, arising out of or relating to such Licensed Intellectual Properties including, but not limited to, any claim that Licensed Products violate, infringe on or misappropriate any of LICENSOR's Intellectual Property Rights.

E.    Each party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable to effect any of the provisions under this Section (Intellectual Property Protection). The party requesting such shall reimburse the other party for the expenses incurred as a result of such cooperation. The parties agree to take any actions or prepare or execute any documents reasonably requested by the other party. Furthermore, during the term of this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

## IX. TERMINATION

A..    Right to Terminate on Notice. This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party fails to cure such breach



B.    LICENSEE shall have the right to terminate this Agreement at any time on thirty (30) days written notice to LICENSOR. In such event, all moneys paid to LICENSOR shall be deemed non-refundable and LICENSEE's obligation to pay any unpaid royalties shall be accelerated and shall become immediately due and payable.

C.    Additionally, if, after five years of the initial intellectual property license, there are three consecutive years during which royalty payments to LICENSOR are less than one hundred thousand dollars ($100,000.00), LICENSOR has the option to cancel this Agreement in accordance with Section IX. TERMINATION, Para. A.

## X.    POST TERMINATION RIGHTS

A.    Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEE shall provide LICENSOR with a complete schedule of all inventory of Licensed Products then on hand or on order (the "Inventory").

B.    Upon expiration or termination of this Agreement, LICENSEE shall be entitled, for an additional period of six (6) months, to continue to sell such Inventory. Such sales shall be made subject to all of the provisions of this Agreement and to an accounting for and the payment of a Royalty thereon. Such accounting and payment shall be due and paid within thirty (30) days of the quarterly calendar cited as the period basis for royalty calculation. LICENSEE shall have the right to continue the use of the name(s) associate with the products and articles that encompass this Agreement for so long as LICENSEE is actively selling its inventory of articles and products. At the conclusion of LICENSEE'S efforts in this regard, LICENSEE agrees to discontinue the use of names, trademarks, signs, advertising and anything else that might make it appear that the LICENSEE is still handling the articles and products of LICENSOR.

C.    Upon the expiration or termination of this Agreement, all of the license rights of LICENSEE under this Agreement shall forthwith terminate and immediately revert to LICENSOR and LICENSEE, except as detailed above in Section (B) of the "Post Termination Rights" Section, shall immediately discontinue all use of the Licensed Property and the like, at no cost whatsoever to LICENSOR.

D.    Upon termination of this Agreement for any reason whatsoever, LICENSEE agrees to immediately return to LICENSOR all material relating to the Licensed Intellectual Property. Furthermore, upon termination or expiration of this Agreement, LICENSEE agrees to immediately inform all of it's sub licensees regarding the said termination or expiration of this Agreement.

## XI.    INFRINGEMENTS

A.    During the Term of this Agreement and any and all option/renewal periods, LICENSEE shall have the sole right, in its discretion and at its expense, to take any and all actions against third persons to protect the Intellectual Property Rights licensed in this Agreement.

B.    Upon request by either party to the other, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such lawsuit. Each party shall reimburse the other party for the expenses incurred as a result of such cooperation.

## XII.    INDEMNITY

A.    LICENSEE agrees to indemnify and hold harmless LICENSOR, its agents, heirs, assigns and representatives, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSOR based on product liability but excluding any claims based solely upon the use of the Licensed Intellectual Property or Licensed Trademarks by LICENSEE in accordance with the terms of this Agreement.





**B.** LICENSOR agrees to indemnify and hold harmless LICENSEE, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSEE based on or arising from (i) any infringement, misappropriation or other related action involving the Licensed Intellectual Property or Licensed Trademarks; or (ii) any breach of LICENSOR's obligations, representations, warranties or duties under this agreement.

**C.** With respect to any claims falling within the scope of the foregoing indemnifications: (i) each party agrees promptly to notify the other of and keep the other fully advised with respect to such claims and the progress of any suits in which the other party is not participating; (ii) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (iii) each party shall have the right to participate, at its sole expense, in any suit instituted against it; and (iv) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld or delayed.

## XIII. LIMITATION OF LIABILITY

**A.** IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT (INCLUDING LOSS OF PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE), NO MATTER WHAT THEORY OF LIABILITY, EVEN IF THE EXCLUSIVE REMEDIES PROVIDED FOR IN THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE AND EVEN IF EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OR PROBABILITY OF SUCH DAMAGES. THE PROVISIONS OF THIS SECTION "LIMITATION OF LIABILITY" ALLOCATE THE RISKS UNDER THIS AGREEMENT BETWEEN LICENSOR AND LICENSEE AND THE PARTIES HAVE RELIED UPON THE LIMITATIONS SET FORTH HEREIN IN DETERMINING WHETHER TO ENTER INTO THIS AGREEMENT.

**B.** EACH PARTY'S LIABILITY TO THE OTHER UNDER THIS AGREEMENT FOR CLAIMS RELATING TO THIS AGREEMENT, WHETHER FOR BREACH OF CONTRACT OR IN TORT, SHALL BE LIMITED TO THE AGGREGATE ROYALTY FEES PAID BY LICENSEE TO LICENSOR DURING THE TWELVE MONTH PERIOD PRECEDING THE CLAIM.

## XIV. INSURANCE

LICENSEE shall, throughout the Term of this Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business as required by state and federal law(s), standard Product Liability Insurance naming LICENSOR as an additionally named insured. Such policy shall provide protection against any and all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The amount of coverage shall be as specified in "Schedule A" attached hereto. LICENSEE agrees to furnish LICENSOR a certificate of insurance evidencing same within ninety (90) days after issuance of same, and, in no event, shall LICENSEE manufacture, distribute or sell the Licensed Products prior to receipt by LICENSOR of such evidence of insurance.

## XV. FORCE MAJEURE

LICENSEE shall not be liable for any failure of performance hereunder due to causes beyond its reasonable control, including but not limited to acts of God, fire, explosion, vandalism, strikes, lockouts, work stoppages, other labor difficulties, supplier failures, storm or other similar catastrophes, any law, order, regulation, direction, action or request of the state, local or federal government or of any government agency, commission, court, bureau, corporation or other instrumentality of any one or more of such governments, or of any civil or military authority; national emergencies, insurrections, riots, or wars.



### XVI. JURISDICTION AND DISPUTES

A. This Agreement shall be governed in accordance with the laws of the State of Florida without regard to its principles of conflicts of laws.

B. All disputes under this Agreement shall be resolved by the courts of the State of Florida including the United States District Court for Florida and the parties all consent to the jurisdiction of such courts, agree to accept service of process by mail, and hereby waive any jurisdictional or venue defenses otherwise available to it.

### XVII. AGREEMENT BINDING ON SUCCESSORS

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, successors and assigns.

### XVIII. WAIVER

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

### XIX. SEVERABILITY

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

### XX. NO JOINT VENTURE

Nothing contained herein shall constitute this arrangement to be employment, a joint venture or a partnership.

### XXI. ASSIGNABILITY

Neither party may assign by any act or operation of law the rights and obligations of this Agreement unless in connection with a transfer of substantially all of the assets of LICENSEE and/or with the consent of LICENSOR which shall not be unreasonably withheld or delayed. By way of example and not limitation, LICENSEE may freely assign its rights and obligations under this Agreement to Stelor Productions, Inc.

### XXII. INTEGRATION

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may be in conflict with said Agreement.

### XXIII. RATIFICATION

The LICENSOR hereby agrees to the transfer of this License from the LICENSEE (The Aurora Collection, Inc.) to Stelor Productions, Inc. as contemplated by the Asset & Purchase Agreement, dated May 1ˢᵗ, 2002, and          executed          between          the          above          mentioned          parties





## "SCHEDULE A"

### LICENSED INTELLECTUAL PROPERTY

The following Licensed Intellectual Property forms part of this Agreement: A License under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with a creative character known as Googles, anything that contains the letters GOO (in upper or lower case), together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Grootian(s), the Planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

### LICENSED TRADEMARKS

The following Licensed Trademarks form part of this Agreement: (i) "The Googles" (word and design) Trademarks in International Class Code (016) of the U.S.P.T.O and the co-existent Trademarks Agreement with Ganz, Inc. of Canada in International Class Code (028) of the U.S.P.T.O., which is hereto attached and made a part of this "Schedule A" document. (ii) "Oogle", (iii) "Iggle", (iv) "Oggle", (v) "GooRoo", (vi) "Planet Goo", (vii) "GooMu", (viii) "GooToons", (ix) "GooStuff", (x) "GooKids", (xi) "GooStore" and (xii) any other trademarks, whether registered, pending or future or common law, used in connection with the Licensed Property, including , but not limited to, any trademark incorporating the phrase "Goo" currently in existence.

### LICENSED PRODUCTS

The following Licensed Products form part of this Agreement: all products which comprise the likenesses, stories, ideas, concepts, or designs of the Licensed Property, including without limitation, stuffed toy figurines, videos, stickers, t-shirts or other clothing items, slides, movies, cartoons, books (comic and otherwise), posters, playing, trading and collector cards, CDs, cassette tapes, DVDs, TV programs, motion pictures, all other forms of communication and publication, programs, computer Web site(s), membership lists and clubs, and any other products.

### DERIVATIVES

A Derivative as defined in this agreement shall mean a product or service that is utilized by the LICENSEE and developed by a party other than the LICENSOR but is used in conjunction with licensed products, articles and /or services. It can be a product or service produced by the LICENSEE or a third party (inventor, sub licensee etc.) that in its use enhances the value of the Googles Universe but does not have a conflict with an already existing Googles product idea or concept as outlined in this agreement. It may not possess the "Googles" or "GOO" in it's name and would therefore fall under the LICENSOR'S exclusive ownership as defined in the amended agreement but can be used in conjunction with the "Goo" Universe by the LICENSEE.

### TERRITORY

The following countries shall constitute the Territory. Global/Worldwide rights.

### TERM

This Agreement shall commence on the date executed below by both parties and shall be for a thirty (30) year term  This Agreement shall automatically renew for one additional ten (10) year term on the same terms and conditions provided for herein ("Renewal Term"). Upon expiration of the first Renewal Term of ten (10) years, this Agreement shall automatically renew for a second ten (10) year  extended Term on the



same terms and conditions provided for herein, unless LICENSOR provides written notice of its intention to not to renew this Agreement within one hundred eighty (180) days prior to expiration of the Renewal Term.

## ROYALTY RATE

LICENSEE shall pay the following royalty rates: (i) SIX PERCENT (6%) of Net Sales of Licensed Products that are based solely on the Licensed Intellectual Property and (ii) THREE PERCENT (3%) of Net Sales of Licensed Products that are based solely on Derivative Products and (iii) In the case of Sub Licenses royalties will be TEN PERCENT (10%) of Net sales after subtracting licensing costs and royalties paid to third parties only.

## PRODUCT LIABILITY INSURANCE

Minimum Product Liability Insurance shall be Two Million U.S. dollars ($2,000,000.00) combined single limit for each single occurrence for bodily injury and/or for property damage.

_5/9/02_

Succession
Rights of Survivor

In the event of the Death of Licensor all of the Licensor's rights under this agreement shall go to his heirs, assigns or legal representatives as he has lawfully designated in writing.

_Steven A. Silvers_          _Stan H. G_
5/09/02                       5/9/02

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003
5/9/02

11

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his/her hand and seal the day indicated.

STEVEN A. SILVERS                              STELOR PRODUCTIONS, INC.

Steven A. Silvers                              By: _____
Title: Owner/LICENSOR                          Printed Name: _Steven A. Esrig_
Dated: _5/09/02_                               Title: _President_
                                               Dated: _5/9/02_

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003

5/9/02

# AMENDMENT
## TO
## LICENSE, DISTRIBUTION
## AND MANUFACTURING AGREEMENT

This AMENDMENT TO THE LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT between Steven A. Silvers and Aurora Collection is effective as of April 30, 2002, and is entered into by and between Steven A. Silvers (LICENSOR), an Individual, whose official address is 3741 NE 163rd Street, PMB #325, North Miami Beach, FL 33160, and The Aurora Corporation, Inc. (LICENSEE), a Florida corporation with its current offices located at 4651 SW 51st Street, Suite 806, Davie, FL 33314.

### WITNESSETH

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES characters identified more fully in "Schedule A" attached hereto (the "Licensed Property");

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES trademarks identified more fully in "Schedule A" attached hereto (the "Licensed Trademarks");

WHEREAS, LICENSOR has the power and authority to grant to LICENSEE the right, privilege and license to use, manufacture, distribute, and sell those types of products that incorporate or are otherwise based on the Licensed Property as identified in "Schedule A" attached hereto (the "Licensed Products") and to use the Licensed Trademarks on or in association with such Licensed Products;

WHEREAS, LICENSEE has or will have the ability to manufacture, have manufactured, have sub-manufactured, distribute and sell or have sold and distributed the Licensed Products in the Licensed Territory more clearly defined in Schedule A (the Territory) and to use the Trademark(s) on or in association with the Licensed Products;

WHEREAS, LICENSEE desires to obtain from LICENSOR an exclusive license to use, manufacture, have manufactured and sell Licensed Products in the Territory and to use the Licensed Trademarks on or in association with the Licensed Products;

WHEREAS, LICENSEE has agreed, pursuant to a letter agreement, to act as a consultant for LICENSOR; and

NOW, THEREFORE, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do hereby agree as follows:

### I. LICENSE GRANT

   A.     LICENSOR hereby grants to LICENSEE, for the Term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use, reproduce, modify, create derivative works of, manufacture, have manufactured, market, advertise, sell, distribute, display, perform, and otherwise commercialize the Licensed Products and Licensed Properties in the Territory. The license includes a license under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with p creative characters known as Googles, anything than contains the letters GOO (in upper or lower case) together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational

CASE NO. 04-80954-CIV-HURLEY/HOPKINS

PLAINTIFF'S REQUEST TO RECONSIDER
AND VACATE THE NOVEMBER 4, 2004
ORDER DENYING EMERGENCY STATUS
FOR PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
IN LIGHT OF NEW FACTS OR, IN THE
ALTERNATIVE, FOR A
TEMPORARY RESTRAINING ORDER

# Exhibit D



**NIKKEN**
Independent Distributor

# *Good Vibrations International Inc.*

PORT ST. CHARLES, SUITE 329, ST. PETER, BARBADOS, WEST INDIES
Tel/Fax: (888) 267-5885     E-mail: goodvibes@5pillars.com     www.5pillars.com/goodvibes

Steve,

It has come to my attention that we are having more trouble with Mr. Silvers.
As you know, I have $600,000 invested in Stelor (the largest investor), not the least of which are
many hours of my personal time, and even though I am now on the board of directors, I am
extremely worried. This is beginning to seriously endanger mine and your future.

After the meeting in New York (June) with Silvers and his lawyers (Stumpf), and regardless of
what you told me, I knew that this matter wasn't over. Now you are confirming my worst fear, by
telling me that Silvers is destroying Stelor's ability to bring in the much needed capital - you
know we require, in order to bring googles.com to market.

I was certain that after the board instructed you to file the law suit against Silvers, this action
would legally protect my investment. However, now Silver's attorney has successfully defeated
the emergency nature of our suit and has, furthermore, set about negotiating with Google, Inc.!

I have seen countless and lengthy emails from Steven A. Silvers personally, that INSIST Stelor
enforces its legal rights and go after Google, Inc.; DEMANDING we file suit! And, now you tell
me that Silver's lawyer (expecting a piece of the settlement) has submitted a document stating
that "Mr. Steven Silvers does not dispute Google, Inc.'s right to its domain name…" How
convenient!

Steve! What the hell is going on? Are you on top of this? Is there a chance that I have been wrong
about you and that you don't know what you're doing? I am seriously considering action against
you personally. I hope I am making myself very clear. Do something about this! Protect our
investment! Protect our company from this despicable, conniving and crazed person… I would
hate to think of the consequences that would surely follow!

Regrettably yours,


Michael A. DiMuccio


c.c. Paul Hawa

P.S. I am emailing this to you for urgency sake, however, a registered original is following by
mail – take it seriously.

CASE NO. 04-80954-CIV-HURLEY/HOPKINS

PLAINTIFF'S REQUEST TO RECONSIDER
AND VACATE THE NOVEMBER 4, 2004
ORDER DENYING EMERGENCY STATUS
FOR PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
IN LIGHT OF NEW FACTS OR, IN THE
ALTERNATIVE, FOR A
TEMPORARY RESTRAINING ORDER

# Exhibit E

# III

## NATIONAL

## ARBITRATION

## FORUM

| | |
|---|---|
| Steven A. Silvers | ) |
| 8983 Okeechobee Blvd. | ) |
| Suite 202 | ) |
| PMB 203 | ) |
| West Palm Beach, FL 33411 | ) |
| | ) |
| **(Complainant)** | ) |
| | ) |
| v. | ) |
| | ) |
| Google Inc. | ) |
| 2400 Bayshore Parkway, | ) |
| Mountain View, California | ) |
| | ) |
| **(Respondent)** | ) |
| | ) |

**Domain Names In Dispute:**

google.com
googlesadsense.com
googlesadwords.com
googles-adwords.com

## NOTICE OF WITHDRAWAL OF COMPLAINT

Mr. Steven Silvers, Complainant, pursuant to Forum Supplemental Rule 12, files this

Notice Of Withdrawal Of Complaint and requests that all proceedings filed by Mr. Rubinstein on

behalf of Mr. Silvers be dismissed.  (A copy of Complaint is attached as Exhibit A).

As stated in the attached Declaration (attached as Exhibit B), Mr. Silvers has not retained

Mr. Rubinstein to represent him, has never heard of Mr. Rubinstein, and had no knowledge of

this Complaint until advised by Respondent Google, Inc., of the pendency of this action.  Mr.

Silvers does not dispute Google, Inc.'s right to use the domain name Google.com, and

246302_1.DOC

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.
2525 PONCE DE LEON, 9TH FLOOR, CORAL GABLES, FLORIDA 33134-8037 · TEL. (305) 372-1800

respectfully requests that this action be dismissed, and that the Forum sanction Mr. Rubinstein

for initiating this unauthorized action.

## CERTIFICATION

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via e-mail

and telecopy on this 12th day of November, 2004, upon counsel for Complainant, Yano I.

Rubinstein, Esq. 580 California Street, 16th Floor, San Francisco, CA 94104.

Respectfully Submitted,

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor
Coral Gables, FL 33134
Tel: (305) 372-1800
Fax: (305) 372-3508

*Exhibits attached herein. ICANN Rule 3(b)(xv).*

246302.1

CASE NO. 04-80954-CIV-HURLEY/HOPKINS

PLAINTIFF'S REQUEST TO RECONSIDER
AND VACATE THE NOVEMBER 4, 2004
ORDER DENYING EMERGENCY STATUS
FOR PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
IN LIGHT OF NEW FACTS OR, IN THE
ALTERNATIVE, FOR A
TEMPORARY RESTRAINING ORDER

# Exhibit F

# DECLARATION OF STEVEN A. SILVERS

I, Steven Silvers, declare as follows:

1.      My name is Steven A. Silvers. I am the owner of the domain name registration for "Googles.com," having registered the name on July 17, 1997.

2.      I have been advised that an attorney, Yano Rubenstein, claims to represent me and, purportedly on my behalf, has filed an action against Google, Inc. challenging the "Google.com" domain name.

3.      I have never met or spoken with Yano Rubenstein. I have not retained him to act on my behalf in any manner, including providing legal services for me. I have not authorized him to initiate any proceedings on my behalf, nor to file the above-described action. In fact, Mr. Rubenstein filed the action without my knowledge.

4.      It is my understanding that Mr. Rubenstein may have been retained by Stelor Productions ("Stelor"). Stelor is a licensee of the intellectual property described above. While the license granted Stelor allows it, in certain cases, to take steps to enforce the licensed intellectual property as to third parties, Stelor is not authorized to initiate proceedings on my behalf, nor is Stelor authorized to hire counsel on my behalf, except to fulfill its indemnification obligations to defend me in actions which do not relate to the licensed intellectual property.

5.      In fact, I advised Stelor's lawyers, well before Stelor hired Yano Rubenstein to file the above-described action purportedly on my behalf, that Stelor had no authority to file legal actions on my behalf. As I told Stelor in an email to its counsel dated October 5, 2004 (attached as Exhibit "A,"

11-12-04; 7:21PM;KEROX 220ST                                          ;5019803696        # 5/ 7

"... I am putting Stelor on official notice through you, as their counsel, that you are to cease and desist any further representation of me in the ongoing litigation with Google, Inc., that is to include any pending, existing or future challenges you may have contemplated.

"... (U)nder no circumstances are you to initiate any proceedings on my behalf regarding the now pending administrative proceeding initiated by Google, Inc. against me.

6.    To further ensure Stelor did not take any unauthorized action, purportedly on "my" behalf, I again advised Stelor's counsel on October 15, 2004 that I would be retaining my own lawyers or representing myself in any legal proceedings. (Exhibit "B").

7.    I find it offensive that Stelor has hired a lawyer to represent me and that this lawyer filed a legal action on "my" behalf without my knowledge or consent. Stelor is in breach of its license agreement with me, and I am in the process of terminating Stelor's license. Apparently as a preemptive maneuver to delay termination, Stelor has sued me for breaching the license agreement. Stelor is adverse to me in light of its breach of our license agreement and the lawsuit it filed against me. It is egregious for Stelor, under these circumstances, to hire a lawyer to represent "my" interests. It is equally incomprehensible that a lawyer would represent me at Stelor's direction (and payment) under these circumstances.

**I HEREBY DECLARE** under penalty of perjury that I have read the foregoing Declaration and that the facts stated in it are true.

_Steve A. Silvers_
Steven A. Silvers        11/10/04

9699/599/246016.3

2

CASE NO. 04-80954-CIV-HURLEY/HOPKINS

PLAINTIFF'S REQUEST TO RECONSIDER
AND VACATE THE NOVEMBER 4, 2004
ORDER DENYING EMERGENCY STATUS
FOR PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
IN LIGHT OF NEW FACTS OR, IN THE
ALTERNATIVE, FOR A
TEMPORARY RESTRAINING ORDER

# Exhibit G

**Kozyak Tropin & Throckmorton, P.A.**
2525 Ponce de Leon, 9ᵗʰ Floor
Coral Gables, Florida 33134

Gail A. McQuilkin
gam@kttlaw.com

Telephone (305) 372-1800
Fax (305) 372-3508

Via Fax: 415-651-9853

November 11, 2003

Yano Rubinstein, Esq.
Summers Rubenstein
580 California Street, 16ᵗʰ Floor
San Francisco, California 94104

Re.     Steven A. Silvers

Dear Mr. Rubinstein·

This firm represents Mr. Steven A. Silvers. We have been informed once again that you continue to hold yourself out as representing Mr. Silvers when you have not been retained by him, have no authorization to speak on his behalf, and in fact, have been told by us that you are expressly unauthorized to do anything on his behalf.

Unless within 24 hours you file a notice of withdrawal in the proceedings before the United States Patent and Trademark Office TTAB Proceeding, and the National Arbitration Forum, and provide us with written notice that you have ceased all communications with anyone on behalf of Mr. Silvers, we will file an emergency motion in federal court and a complaint with the California Bar to prevent you from continuing to make these false statements, and seek the highest possible sanctions against you for this conduct.

Sincerely,

Gail A. McQuilkin

/2462341 1

CASE NO. 04-80954-CIV-HURLEY/HOPKINS

PLAINTIFF'S REQUEST TO RECONSIDER
AND VACATE THE NOVEMBER 4, 2004
ORDER DENYING EMERGENCY STATUS
FOR PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
IN LIGHT OF NEW FACTS OR, IN THE
ALTERNATIVE, FOR A
TEMPORARY RESTRAINING ORDER

# Exhibit H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 04-80954 –Civ – HURLEY/HOPKINS

| | |
|---|---|
| STELOR PRODUCTIONS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| STEVEN A. SILVERS, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DECLARATION OF WILLIAM M. BORCHARD

I, WILLIAM M. BORCHARD, declare as follows:

1.    I am a partner in the law firm of Cowan, Liebowitz & Latman, P.C.  I make this declaration in support of Stelor Productions, Inc. ("Stelor").  My firm has been retained to represent Stelor in its disputes with Google Inc. ("Google").

2.    I attended the 2004 Leadership Meeting of the International Trademark Association which was held in Phoenix, Arizona, from November 10 through November 13, 2004.  On Friday, November 12, 2004, Rose Hagan, Trademark Counsel for Google, was on a panel of speakers.  After her presentation, I had a short conversation with her.  I told her that our client wished to renew its earlier effort to arrange for a meeting of business representatives to try to resolve all pending disputes between Stelor and Google.  She responded that, before any such meeting could take place, Google would have to be satisfied that it was dealing with the appropriate representatives on the other side.  She said that there seemed to be confusion on that

point and that our side "appeared to be in a mess." I understood her to be referring to the recent activities of Kozyak Tropin & Throckmorton, P.A.

I HEREBY DECLARE under penalty of perjury that I have read the foregoing Declaration and that the facts stated in it are true, and that the facts stated on information and belief are believed to be true.

Dated: November **16**, 2004

WILLIAM M. BORCHARD

2

25702/000/653731.2

CASE NO. 04-80954-CIV-HURLEY/HOPKINS

PLAINTIFF'S REQUEST TO RECONSIDER
AND VACATE THE NOVEMBER 4, 2004
ORDER DENYING EMERGENCY STATUS
FOR PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
IN LIGHT OF NEW FACTS OR, IN THE
ALTERNATIVE, FOR A
TEMPORARY RESTRAINING ORDER

# Exhibit I

**Subject: Feb. 9, 2004 5: 30 p.m.  WIPO and UDRP Issues**
**Date:** Monday, February 9, 2004 11:25 PM
**From:** Steven Silvers <gewrue@hotmail.com>
**To:** <sesrig@stelorproductions.com>

February 9, 2004

To:  Steven Esrig, CEO of Stelor Productions, Inc.

Re:  WIPO and UDRP Position and Info For Your Review And Considerations

Ok, Steve, as promised here are some thoughts as to why I believe we need to
file a WIPO and UDRP proceeding against not only google.com, .net, etc., but
also the googles.org, booble.com, domain name owners as well:

To begin with any swift and inexpensive challenge against Google.com,
Booble.com, and/or Googles.org, must first be established via a WIPO
proceeding in conjunction with a Uniform Domain Name Dispute Resolution
Policy filing also known as a UDRP proceeding.

There are very few lawyers in the US today that are astute and up to date on
this type of legal litigation and usually when someone, whether it be a
lawyer or doctor or any other professional specialist is not knowledgeable
about a specific area or field of expertise they usually follow the rule of
thumb and that is to sway away or try to persuade another seeking counsel or
sound advice from proceeding not to do so because they don't want their
client to think that they are ignorant about what they are being asked to
offer advice or counsel about.

Cutting to the chase Steve, this WIPO/UDRP litigation is specific and
unique. Unless Ira and his firm are knowledgeable in this arena it will be a
disaster for us to have them performing this sort of challenge on our
behalf.  Having said this let me also inform you that the only sure fire way
you are going to make any waves at all with Google.com is to institute, if
it's not already to late, a legal campaign via a WIPO/UDRP proceeding to
once and for all set the record straight as to who has the rights to use the
"Googles" or "Google" name on the WWW.

The record clearly shows that I was first to market via the WWW in July of
1997 and several months later along came "Google.com" and they filed in
September of 1997.  They never took the time to read the fine print of the
registration process to determine that there was no existing name that was
either similar or confusing similar to their name at the time the chose to
register.  At this time, way back in the dark ages of 1997, there was NO
WIPO organization governing these sort of issues nor any rules or policy and
procedures to follow via a UDRP proceeding.  Internic was the governing body
back in the day and they were only interested in getting as many people to
sign up on the WWW as they possibly could and to insure that no one had the
"exact" same name operating on the Internet.  There was no similar or
confusingly similar language back then.  Thus Google.com snuck through the
crack without using the "exact same name" as mine and just conveniently
dropped the "s" at the end.  Had they done their homework and perhaps they
did, they would have not only noted that I was on the WWW before them with
not only an "exact" sounding name as theirs but also an "exact" spelling of
their name in the plural format.
As of this day there has NEVER been a WIPO or UDRP proceeding instigated
against google.com or google.net or any of the other google registered names
and there are many, or for that matter against the latest villain to be
using our name at www.googles.org.  The "exact" spelling of Googles.

Also, you may want to note that not only was I registered prior to
Google.com and Googles.org but I also owned the "Registered" trademark with
the USPTO as early as 1996 and for which I applied for the mark in 016 Intl.
class code back in 1994, way before Google.com was even thought of by Larry

Page and Sergia Brin (the Google.com founders from Stanford University).

So the two test questions for a WIPO/UDRP challenge is 1). Is the name similar in sound and/or likely to cause confusion among those surfing the Internet by the party bringing the action? 2). Does the name infringe upon an already existing Trademark that was, in fact, a previously registered mark prior to the registration of the challenged domain name?  In the first question the answer is yes and yes.  Yes that the name is almost identical in sound and spelling and yes that it is likely to and in fact has and continues to be confusing to those surfing the Internet.

Second question is also a yes in that I was first to register the mark way before Google.com was even thought of.  I have copyright registrations dating back as early as the late 1980's and an original Googles prototype called: Googles "the purrfect pet" that I copyrighted back in the late 70's early 80's.  I have copyrights for the names Googles, Giggles, and Goggles. I have the story copyrights for:  Googles and the Planet of Goo, and Googles and the Return Flight to Goo.

I can clearly show and prove, convincingly, that I am the Senior Mark and that Google.com has infringed on that mark.

I started out with a book concept and later expanded my audience to include a web site that promoted the concept and the characters and the planet of Goo.  I later licensed the project to Aurora and created a line of plush toys for sale and music and GooTunes that was my creation and idea for KMTV (Kids Music Television Videos).  We created several.

Then Stelor came along and picked up the ball and we expanded even further with redesigning the web site, and creating more music and then doing the music in Spanish, and then creating more GooTunes to add to the already existing collection to someday launch the broadband 24-7 GooZicle Musical Revue for kids around the world with the launching of our very own Googles MTV type music video and educational cable station.

We then planned, in our business plan, to start our very own Googles.com search engine dedicated strictly for kids and their caregivers from around the globe.  This search engine would be a vehicle for children of all ages to stay in tune with the news around the world and environmental issues, ecological issues, lost and found, missing kids, homework helper, idea workshops, polling issues, and so much more.  A place with companies like National Geo, and Discovery Channel, Disney, Warner Bros., and all sorts of children,s advertisers would be proud to steer some of their adv. dollars to our children,s search engine with the understanding that a portion of their dollars would go to a charity of their choice and you get the picture, Steve.

What about a consumers' guide to safe and sound toys for tots and young kids. A sort of watch dog news alert on our search engine for parents to view before they are about to go out and purchase a toy for their child or loved ones?  It's endless what we could come up with. It would be greater and warrant more advertising dollars then Google.com ever dreamed of.  We could get Disney and Warner Bros. and Nicks Kids, and all the rest of the big child related advertisers to come on board. I have a game plan for all of this to come to fruition.

And last but certainly not least, we would launch our very own kids hotmail and call it say:  GooMail or Googlesmail for kids or GooKidsmail, or something like that and every kid around the world could acquire their very own "free" e-mail/pen pal address.  It would take off like wild fire.

So as you can see we are now a multi-billion dollar entity strictly dedicated for children around the world.  What court in this land is going to deny us the exclusive rights to the "Googles" name and perhaps even go so far as to force Google.com to change theirs.  Think about it, Steve. It's worth the publicity and at the very worst we still have "Oogle, Iggle, and Oggle from the Planet of Goo" And their new name would be The Oogles from

Goo! Which reminds me, we MUST have Ira get on this as well. We need to
reestablish the Oogles name ASAP with the USPTO and get it out of
abandonment status.

So, as to the filing NOW a WIPO challenge against Google.com and
Googles.org, etc., I think we need to be aggressive and do so right away.
Ira may not be the firm to perfect this litigation as I informed you it is a
specialty area. You may need to speak with a Kenneth Bass and see what his
take is on this matter. It may be worth a visit to his firm when I come up
and pay him for an hour of his time to get his opinion. We can't linger on
this, Steve. I've given you fair warning that we must do something NOW and
not wait any longer. I've been very patient with holding off on doing
something on my own and pay the consequences in order to protect my IP. I
know what I'm doing and while I'm not an attorney I have an awful lot of
knowledge about this sort of litigation and how we need to go about
attacking these issues. We can't afford to dilly dally around any longer.

You have the upcoming licensing show in just a few more months. It's right
around the corner. How are you going to handle all this once we debut the
characters and we get an audience with Good Morning America or CNN on our
characters who I'm sure will be the talk of the show with the music playing
and the colorful character costumes and all? We need to be prepared for all
of this hoopla now.

Let me give you a few ground rules taken directly from the Internet
regarding WIPO and UDRP proceedings: What types of disputes are covered by
the Administrative Procedure of a UDRP complaint? Ans:  According to
Paragraph 4(a) of the UDRP Policy, the UDRP Adm. Procedure is only available
for disputes concerning an alleged abusive registration of a domain name;
that is, which meet the following criteria:  (i) the domain name registered
by the domain name registrant is identical or confusingly similar to a
trademark or service mark in which the complainant (the person or entity
bringing the complaint) has rights; and (ii) the domain name registrant has
no rights or legitimate interests in respect of the domain name in question;
and (iii) the domain name has been registered and is being used in bad
faith.

I'm not sure if one needs to prove all three challenges or any one of the
three, in which case for purposes of our challenge we would seek redress as
to (i) above.

A WIPO challenge does not preclude us from bringing the action to federal
court if we should not prevail and the good thing is that it only takes
40-50 days to be resolved one way or the other. Once a panel convenes it
takes about 17 days for a response.

A WIPO proceeding may be held between one or 3 panelists. One panel
proceeding involving 1-5 domain names, which is where we'll fit in, cost
$1,500 and for a 3 panel proceeding it cost $4,000. So if we choose to
bring a WIPO proceeding against google.com, booble.com, googles.com it will
cost $4,000 for a (3) panel proceeding and I believe it takes a majority of
(2) for us to prevail.

Remember, if we prevail in a WIPO proceeding it doesn't preclude Google.com
from seeking a federal court to challenge the ruling of the WIPO committee
but it works both ways for us as well. During the process we'll have a lot
of free publicity and I have a feeling that Google.com will soon realize
that we mean business and that we are the Senior Mark and that their mark is
confusingly similar and that we were first to reap a Registered Trademark
from the USPTO and they may find themselves in a real jam once the wheels of
justice start to move against them.

Here's the GooNews about such a filing. If we lose we can still bring an
action in federal court within 10 days and all adm. proceedings and
sanctions by the WIPO Adm. Board are suspended until a final ruling is made
by the courts and all appeal processes have been denied. This we all know
could take years to perfect all the way to the US Supreme Court. Also,

during the process we can arbitrate directly with Google.com to work out a
mutual deal with them. At least they will know of our existence and that we
are not playing games.

It is my opinion that if they knew they had a solid case against us they
would have come at us long before now. They are holding their breathe, in
my opinion that we don't file against them before they go public.

Yes, it's a chance and a roll of the dice, and yes, we could possibly lose
but it is doubtful and that is why we need to solicit now for some
professional opinions as to the likely outcome of such a filing by a
competent legal advisor such as Ken Bass.   We can't afford to linger with
this any longer, Steve. The showdown is inevitable. We are the senior mark
and we are in the drivers' seat and I think Google.com knows this.
If you feel you can get to them first and have our counsel speak with them
on amiable terms first prior to filing such a complaint then I would urge
that you make this a Number one priority and do so right away. At least
we'll know how they stand and on what scale from 1—10 are they concerned.

I don't see us losing and in federal court we'll have a very strong case
against them for at the very least the "confusion" issue and like you said,
we've been around for as long as they have and longer and we were first to
market and I can surely prove that with no problems.

My trademark for Googles predates any trademarks that they have sought and
they have crossed over the threshold by filing for trademarks in all sorts
of Int'l. class codes including but not limited to 016 (text books,
stickers, written word, etc., and 028 (push toys).

I'll close for now and let you digest all of this but now you are fully
aware and apprised of my position and how I think we MUST proceed and
remember timing is everything. I am at your disposal and would like to firm
up Stelor's position by the time I arrive in Maryland on the 18th of this
month and I will look to get with you, Henry, and any other member or
members of the Stelor Board to further discuss my position.

Respectfully submitted by: Steven A. Silvers (Licensor)

---

Click here for a FREE online computer virus scan from McAfee.
http://clinic.mcafee.com/clinic/ibuy/campaign.asp?cid=3963

CASE NO. 04-80954-CIV-HURLEY/HOPKINS

PLAINTIFF'S REQUEST TO RECONSIDER
AND VACATE THE NOVEMBER 4, 2004
ORDER DENYING EMERGENCY STATUS
FOR PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
IN LIGHT OF NEW FACTS OR, IN THE
ALTERNATIVE, FOR A
TEMPORARY RESTRAINING ORDER

# Exhibit J

Stelor Productions, Inc.
Attn: Steve Esrig, President/CEO & Stelor Board of Directors
14701 Mockingbird Drive
Darnestown, Maryland 20874

March 1, 2004

Re:    Formal Notice & Request For Action & Written Dispositions

Dear Steve:

I would like to preface this letter by informing you that I would not be a responsible
Licensor if I didn't choose to address, at this time, the issues you are about to read.
Kindly review them in an unbiased manner. Thank you!

This letter shall serve as a formal notice to Stelor, in accordance with our existing
Licensing Agreement, regarding certain issues that have yet to be resolved to my
satisfaction.

I know that you and I have spoken several times on the issues that I'm about to
formally address, however, as I have recently placed in writing to you via an e-mail
that was addressed to Julie on Wednesday, February 25, 2004, I had explained
therein that I would be sending Stelor a formal notice outlining the issues that I
believe are still in need of resolving so that we may move forward in a non-
adversarial manner.

IRRELEVANT MATERIAL REDACTED

6).    Last but not least, I want to spend a little time on my concerns regarding the issues of the pending Google.com and other similar potentially infringing parties surrounding the Googles' IP. First of all I want to make myself perfectly clear so that there are no misunderstandings. I have heard you repeat to me on more than one occasion about my having granted Stelor the "exclusive" power of attorney as it appears in our existing Licensing Agreement. I've read and reread this clause and while I fully acknowledge that this is the case, I do not subscribe to your theory or what your lawyers are supposedly informing you, as you've recently indicated to me, that in the event of any litigation on behalf of protecting the Googles' IP that such causes of action shall be brought on behalf of Stelor with Stelor's name at all. If you read the agreement properly you will note that I am the "exclusive" IP owner. And while Stelor may have the power of attorney or in essence the exclusive right to sign my name to legal papers as if I was personally present, nevertheless, that right only exists as it pertains to signing "MY" name and not Stelor's. Thus, any and all causes of action regarding the infringement of or the protection of the Googles' IP shall be brought in my name and only my name and anything to the contrary will ultimately wind both of us in a serious adversarial role. You have the right to insure, as the Licensee, that your rights are properly protected and as such you have the right to bring if you so choose, legal action against any and all potential infringements or violators against the Googles' IP. However, any and all such causes of action shall be brought in my name as the owner of the IP and since there is NO mention in any of our Agreements that speaks to the issue of settlement from such violators and/or infringement, (which was most likely an oversight on both of our parts) we will have to, as I now see it, go back to the drawing board and eke out a fair and equitable arrangement that we can both live with regarding dispersement of any and all compensation whether monetary or otherwise, should a settlement, compromise, an award or arbitration/mediation take place that results in a favorable outcome for me as the Licensor from any litigation(s) that are now evident and for which we must now vigorously pursue. You have recently apprised me of your dilemma regarding pursuing such litigations and the sending of cease and desist letters and/or initiating any WIPO/UDRP proceedings against existing offenders that I have brought to your attention such as: Google.com, Googles.org, and those that you have brought to my attention such as: Zoogles, Boobie, etc. And I'm sure that as time goes by there will be others we'll need to go after. However, you have also made it equally clear to me that at this time Stelor is not in any position to champion an attack against any of these infringers, esp. that of Google.com due to the financial hardship this could potentially cost Stelor. While I can certainly appreciate Stelor's position in this regard, as the Licensor you must equally appreciate my position in trying to maintain a sense of balance between your needs and those of the Googles' trademark(s) and all those who have seen fit to infringe upon my IP rights. I can not afford to stand by and wait much longer as to whether or not Stelor is going to opt to go after most importantly the Google.com search engine and the Googles.org entities. I informed you on several occasions, both verbally and via e-mails, about the legal position of "laches", the untimely

filing and unreasonable delay "legal defenses" that are likely to be raised by the defendants that we will have to overcome. The more time that goes by the weaker our position becomes in this regard. It would be patently unfair for me to stand by and wait until Stelor is in a better financial position to litigate these matters only to learn that I may have lost the opportunities to do so based upon unreasonable delays. I told you that I strongly disagree with the advice you have informed me that your counsel has given you regarding the filing of a WIPO/UDRP proceeding against the Google.com giant and the other immediate infringer Googles.org. I explained to you about the issue of "confusion" in the market place. About the fact that I don't believe we have any strong trademark infringement case against Google.com, but clearly we could make a case based upon confusion, especially as it pertains to the Internet. I have urged you many times to try and seek an audience with Google's executives so that we can advise them of our position and we could perhaps learn more about theirs. Then we'd have a much better understanding as to how we should proceed against them. You have chosen to seek interest from MicroSoft and Yahoo and while I believe this may be a sound strategy, I also believe these are long shots at best. Much better to go directly to the horse's mouth and seek an audience NOW with Google.com and see how receptive or non-receptive they may be in wanting to cut a deal with us. I doubt seriously if MicroSoft or Yahoo will act swiftly in cutting us a deal, regardless of their interest levels. Approaching Google.com NOW is the only way I see for us to nip this in the butt once and for all. Either they agree to play ball with us or we will seek redress before the federal courts and they in turn will know we mean business one way or the other. So here is my proposal on this matter. As it now stands Google seemingly has pushed their IPO release for sometime in mid-September, and that is still very speculative. The trade show for us is rapidly approaching in June, only a few short months away. I am formerly requesting a disposition as to whether or not Stelor is prepared to move forward against both the Google.com search engine and the Googles.org, at the very least, entities with the filing of either a WIPO/UDRP and/or a simultaneously filed cease and desist letter within the next (30) thirty-days from the receipt of this letter or give me, in writing, Stelor's position as to why they are not prepared to do so and what course of action you are planning to execute to properly protect the Googles' trademark and its intellectual property rights on behalf of the Licensor? Just so you know, I am fully prepared to go this alone if need be based upon the strategy I outlined to you when we last met. I am fully confident that I can properly prepare and subsequently file a motion in federal court to at least start the ball rolling against both of these infringers and then eventually seek competent counsel to further champion the cause to seek redress before the courts. As a responsible Licensor, if I don't take this position I could run the risk of losing my opportunity to bring a cause of action in a timely fashion to protect my Googles' IP rights. I'm certain that no court in the land would rule otherwise. Not having proper funding to pursue these matters is not going to be a viable position for you to take when push comes to shove. I have been preaching to Stelor this issue and my position for quite some time now. I also know that doing so, on Stelor's behalf, shall require a strong financial commitment that you may not be in a position to timely execute. But like I stated above, this is not a defense that I

can unfortunately accept. We must strike timely while the iron is hot. Waiting too much longer could prove a disaster for all parties concerned. I will expect to hear from you or your counsel, in writing, within the reasonable timeframe granted and set forth above.

IRRELEVANT MATERIAL REDACTED

# IRRELEVANT MATERIAL REDACTED

Respectfully submitted by,

Steven A. Silvers

P.S.  I'm still waiting to speak with Henry, as you indicated to me we would speak via a conference call on two separate occasions last week.  What happened?

P.S.S.  Thanks for sending my  December 2003 Consulting Fee Check, I received it on February 27, 2004  along with  my 1099 for year ending December 2003.

SENT VIA FEDEX ON March 1, 2004 USING AIRBILL
TRACKING NUMBER:  842190092158