FILED by ___ D.C.
ELECTRONIC

**Dec 20 2004**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

STELOR PRODUCTION, INC.,                    CASE NO. 04-80954-CIV-HURLEY
                                            Magistrate Judge James M. Hopkins
     Plaintiff,

v.

STEVEN A. SILVERS,

     Defendant.

_____

STEVEN A. SILVERS,

     Counter-Plaintiff,

v.

STELOR PRODUCTIONS, INC.

     Counter-Defendant.

_____

## SILVERS' MEMORANDUM IN OPPOSITION TO STELOR'S MOTION FOR PRELIMINARY INJUNCTION

     Steven A. Silvers ("Silvers") opposes the request of Stelor Productions, Inc. ("Stelor") for

entry of a preliminary injunction. As explained below, the requested relief borders on the frivolous

and lacks a legal or factual basis because Stelor wants to compel Silvers to specifically perform acts

he is not contractually required to do. Essentially, Stelor wants to rewrite the license agreement that

governs its relationship with Silvers to gain rights it does not have. Moreover, Stelor is not facing

any "irreparable harm," but rather bases its injunction request on speculation rather than evidence.

And, Stelor's delay in bringing the case back then precludes injunctive relief now. Furthermore,

there is no subject matter jurisdiction for Stelor's claim because it cannot meet the $75,000

threshold for damages in a diversity action.

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor ■ Coral Gables, Florida 33134 ■ 305-372-1800

Dockets.Justia.com

34pp

## BACKGROUND

Silvers is the creator of the GOOGLES family of characters, which came to fruition in 1991 with the creation of his book, "Googles and the Planet of Goo."[1]  The GOOGLES concept further developed in drawings, music, plush toys and internet activities.  Since then, Silvers has obtained federally registered trademarks, copyrights, patents and domain name registrations for the GOOGLES name and characters (child friendly alien creatures), related products and music. Silvers promoted the GOOGLES book and concept through bookstores, magazine and newspaper articles, and the entertainment industry.

### The License and Consulting Agreement

In May 2002, Silvers licensed most of the GOOGLES Intellectual Property ("GOOGLES IP") to Stelor, after the previous licensee became insolvent.  Pursuant to the License, Distribution and Manufacturing Agreement, effective June 1, 2002, ("License Agreement") attached as Exhibit "A," Silvers allowed Stelor to use his trademarks and some other intellectual property in return for royalty payments. The "license" granted to Stelor was exclusive.  *See* Exhibit A, Article I(A), "License Granted."  The License Agreement also gave Stelor the ***non-exclusive*** right to maintain and defend the GOOGLE IP.  *See* Exhibit "A," Article VIII (A), "Intellectual Property Protection."

To keep Silvers involved in the creative development of  the GOOGLES concept, Stelor contracted with Silvers to have him serve as Stelor's Executive Creative Consultant under a separate letter agreement attached as Exhibit "B."  The letter agreement required Silvers to "offer his creative input" to Stelor and help "strengthen, establish or maintain" the GOOGLES IP.

---

[1]    Silvers authored the book while serving time for a federal conviction in an effort to reach out to his son, to whom the book is dedicated.  In an attempt to slime Silvers, Stelor gratuitously refers to Silvers' conviction in pleadings, declarations, depositions, etc., while failing to mention the conviction was later overturned. Silvers' past, while interesting, is a red herring and has no bearing on any issue in the case or preliminary injunction matter.

### **The Trademark Dispute With Google, Inc.**

In July, 2004 Stelor filed in the United State Patent and Trademark Office ("USPTO") an opposition to Google, Inc.'s application to federally register the name "Google" in connection with children's books, and a cancellation proceeding to cancel the "Google" trademark. Silvers is not named in either of these two proceedings, and has had no involvement. Google, Inc., however, shortly thereafter filed a separate proceeding in the USPTO against Silvers (but not Stelor) to cancel Silvers' federal registration for his "GOOGLES" trademark. Silvers filed an Answer in that proceeding, and is defending himself.

During this flurry of back and forth USPTO proceedings, Stelor filed this "breach of contract" lawsuit against Silvers seeking to enjoin him from participating in the USPTO actions between Stelor and Google, Inc., communicating with the USPTO about his trademarks, defending himself against, or communicating with, Google, Inc., and to compel him to "cooperate with" Stelor, all of which has little to do with the contractual obligations under the License Agreement.

### **THE HIGHTENED STANDARD FOR PRELIMINARY INJNCTION**

Stelor's very vague and general allegations are that by virtue of the USPTO actions, Silvers has or may breach his agreements with Stelor, and therefore Stelor asks the Court to compel Silvers to perform his obligations under the agreements. As put by Stelor:

> Stelor accordingly respectfully requests that, during the pendency of this action, the Court preliminary enjoin Defendant. . . . and also order the Defendant to specifically perform his contractual obligations . . . .

Emergency Motion for Preliminary Injunction ("Injunction Motion") at p. 2.

Under the familiar preliminary injunction standard, to obtain injunctive relief a movant must show: (1) a substantial likelihood of success on the merits of the underlying claim; (2) substantial threat of irreparable injury; (3) the threatened injury to movant outweighs whatever damages the

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor ■ Coral Gables, Florida 33134 ■ 305-372-1800

injunction may cause the opposer; and (4) if issued, the injunction would not be adverse to the

public interest. *Chandnani v. Secret Catalogue*, 2001 WL 586692 (S.D. Fla. March 19, 2001).

While Stelor's request to enjoin Silvers is fatally flawed for numerous reasons set forth

below, as a threshold matter, Stelor's request for "specific performance" faces a higher standard

than the typical request for injunctive relief. "A mandatory preliminary injunction requiring

defendant to take affirmative action is proper only in 'rare circumstances.'" *Burgos v. University of*

*Central Florida Board of Trustees,* 283 F. Supp. 2d 1268, 1271 (M.D. Fla. 2003) (quoting *Harris v.*

*Witters*, 596 F.2d 678 (5th Cir. 1979).[2]

A preliminary injunction is "prohibitory" if it bars conduct that would alter the status quo

before a court or arbitrator has an opportunity to resolve the merits of the action. *See Tom Doherty*

*Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 34 (2d Cir. 1995) (citing *Abdul Wali v.*

*Couthlin,* 754 F.2d 1015, 1025 (2d Cir. 1985)). By contrast, a "mandatory" injunction

"command[s] some positive act." *Id.* In the latter case, a heightened burden of proof attaches, and

the injunction may issue "'only upon a clear showing that the moving party is entitled to the relief

requested, or where extreme or very serious damage will result from a denial of preliminary relief.'"

*Id.* (quoting *Abdul Wali,* 754 F.2d at 1025); *accord Koppell v. New York State Bd. Of Elections,* 8

F. Supp. 2d 382, 384 (S.D.N.Y.), *aff'd,* 153 F.3d 95 (2d Cir. 1998) (per curiam).

> The injunctive relief sought by Norcom is mandatory rather than
> prohibitory: it would require CIM to undertake positive action by
> selling machines and parts to Norcom. *See New Pacific Oversees*
> *Group (USA), Inc. v. Excal Int'l Dev. Corp.,* No. 99 Civ. 2436, 1999
> WL 285493, at *4 (S.D.N.Y. May 6, 1999).

*Norcom Elec. Corp. v. CIM USA, Inc.,* 104 F. Supp. 2d 198, 207 (S.D.N.Y. 2000). *See also,*

*Cornell v. Sachs*, 99 F. Supp. 2d 695, 704 (mandatory injunction requires clear and convincing

probability of success). Stelor's request for a preliminary injunction is subject to this high hurdle because, at bottom, it seeks to alter the status quo by compelling Silvers to act, or requiring Silvers to take steps he is not obligated to do.

## ARGUMENT

### I.  <u>Stelor Cannot Prevail on Its Breach of Contract Claim</u>

Stelor's request cannot meet the heightened standard because it is built on a house of cards - - two contracts that do not require Silvers to do what Stelor wants ordered.

The consulting agreement (Exhibit "B") has expired by its terms. Silvers has no obligations under this agreement (other than a non-compete covenant which is irrelevant). He cannot be compelled to specifically perform this agreement, as it is old news. <u>If</u> Silvers breached the agreement before it expired (which he did not), Stelor's remedy is to sue him for damages. This agreement provides no basis for injunctive relief.

The License Agreement (Exhibit "A") is intact for now, although Silvers has put Stelor on notice that he will terminate Stelor due to a variety of breaches. *See* Letter dated November 17, 2004, attached as Exhibit "C." Stelor's problem in seeking to make Silvers specifically perform this agreement is that it simply does not require Silvers to do most of what Stelor is requesting.[3] The Injunction Motion is directed at two subjects: (A) USPTO proceedings against Google, Inc.; and (B) communications with Google Inc.

---

[2]  Decisions of the Fifth Circuit prior to October 1, 1981 are binding on this Court. *Bower v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

[3]  The one exception is Request E of the Injunction Motion, which seeks to make Silvers provide evidence to support Stelor in the USPTO cases Stelor initiated against Google, Inc. Silvers has always been prepared to provide Stelor with any evidence it requests and remains willing to do so, subject to the qualification that he must protect his interests as to Stelor, with whom Silvers is adverse.

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor ■ Coral Gables, Florida 33134 ■ 305-372-1800

### A.     The Three USPTO Proceedings

Google, Inc., now a popular Internet search engine, was unknown when Silvers first developed his GOOGLES characters.  Silvers obtained the GOOGLES trademark and registered the GOOGLES.com domain before Google, Inc. obtained similar rights to "Google."  As the GOOGLES IP developed with the GOOGLES.com website attracting more and more visitors, and the Google search engine gained popularity, it became apparent the two were on a collision course over trademarks and domain names.  When Stelor obtained the license from Silvers in 2002, the question of this inevitable collision, and how it might be resolved, was a topic of discussion between Silvers and Stelor, with no consensus being reached.

In July, 2004, the USPTO published Google, Inc.'s application to expand its trademark to *inter alia*, children's books, children's clothing, stickers and electronic retail services, all of which intrudes on the GOOGLES IP.  Without advising Silvers, Stelor filed an opposition to Google, Inc.'s application with the USPTO, and a proceeding to cancel Google Inc.'s registered trademark.  Silvers is not a party in the two *Stelor v. Google, Inc.* USPTO actions.  Stelor has also filed a domain name dispute against Google with the National Arbitration Forum ("NAF") established by ICANN.  Even though ICANN rules expressly allow a domain name dispute to be filed by any person, Stelor inexplicably listed Silvers as the petitioner.  Stelor  has since changed the complaint to reflect that it is brought by Stelor "on behalf of Silvers, despite being adverse to Silvers in this action.  That action was commenced by NAF and a briefing schedule issued requiring Google to respond.

This started an all out war with Google, Inc.  It filed a separate action with the USPTO to cancel Silvers' GOOGLES trademark, naming Silvers (not Stelor) as the respondent.  Since Silvers owns the mark Google, Inc. seeks to cancel, he is the only possible defendant in that case.  Without consulting Silvers, Stelor retained counsel for Silvers and filed an Answer and Counterclaim against

6

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor ■ Coral Gables, Florida 33134 ■ 305-372-1800

Google, Inc. Stelor then filed a motion to intervene in that proceeding. Silver moved to strike the Answer filed by Stelor's prior counsel, and filed his own Answer. Silver did not oppose Stelor's request to intervene.

The USPTO proceedings are central to Stelor's requested injunction. In addition to trying to make Silvers change the correspondent of record with the USPTO (Injunction Motion, ¶A), Stelor apparently contends the License Agreement does not allow Silvers to defend himself in the action filed against him by Google, and requests that this Court strip him of that right. (Injunction Motion, ¶C). Stelor further claims Silvers is "interfering" with the actions Stelor filed against Google, and seeks an order preventing it. (Injunction Motion, ¶D). Stelor also wants to gag Silvers from any communications with USPTO. (Injunction Motion, ¶B). Finally, Stelor asks the Court to make Silvers cooperate with Stelor in the actions by Stelor against Google, Inc. by providing evidence. (Injunction Motion, ¶E).

**(1)    Silvers Has The Right to Defend Himself as the Trademark Owner**

It is ludicrous to prohibit Silvers from defending himself in an action seeking to cancel his trademark when he is the named defendant. Indeed the License Agreement, in the event it even applies to this issue, specifically <u>allows</u> it. While the License Agreement allows Stelor to <u>use</u> the GOOGLES IP, it specifically provides that Silvers maintains exclusive <u>ownership</u>. *See* Exhibit "A", Article VIII(B-D), and Recitals. Google's attack of the GOOGLES trademark, seeking to cancel the mark, is an attack on Silvers' ownership rights, not the manner in which the mark is used. Thus, the Google cancellation proceeding directly involves Silvers' rights, not Stelor's, and only Silvers is legally capable of defending the action.

And, while Silvers gave Stelor the right to defend the GOOGLE IP, that right is <u>not</u> exclusive to Stelor. Moreover, the applicable provision of the License Agreement specifies that "each party shall have the right to participate, at his sole expense, in any suit instituted against it."

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor ■ Coral Gables, Florida 33134 ■ 305-372-1800

*See* Exhibit "A", Article XII (C)(iii).  Stelor's request to keep Silvers from defending himself seeks to have the Court rewrite the License Agreement, as well as deny Silvers' due process rights. Stelor's apparent claim that Stelor should defend the Google cancellation action on behalf of Silvers is particularly disingenuous in that Stelor is adverse to Silvers and cannot be counted on to protect Silvers interests.

    (2)    **Silvers Has Not Participated In The Stelor  v. Google, Inc. Proceedings**

Silvers has done nothing to "interfere" with Stelor's trademark opposition and cancellation actions against Google, and Stelor has not offered a single shred of credible evidence to support this allegation.  Silvers is not a party, has not filed a notice of appearance, and has not sought to intervene in either proceeding.  In fact, he has not filed a pleading or communicated with anyone relating to these matters.  When we asked Stelor's principal, Steven Esrig, in deposition how Silvers had "interfered" he could not give a definite answer.  Instead he referred loosely to a letter that Silvers sent that purported to fire Stelor's counsel.   *See* Deposition of Steven Esrig, at  p. 231, l. 19 to p. 238, l. 15., attached as Exhibit D and hereinafter referred to "Esrig Depo.")

The Silver's letter cited by Esrig is attached as Exhibit "E" and contains nothing of what Esrig represented it to be.  This sole example of interference that Stelor bases its need for "emergency injunctive relief" reflects only that Silvers had doubts about Stelor's strategy and his admonition that given his adverse situation with Stelor, he did not want Stelor's counsel, Mr. Borchard, to act as counsel for <u>himself</u>, not Stelor as Esrig represented.  There is nothing about "firing" Mr. Borchard as counsel for Stelor.  In fact, Mr. Borchard was never hired or fired by Silvers; he continues to represent Stelor in the USPTO proceedings.  *See* Esrig Depo at p. 234, l. 15 – 20.  This is hardly "interference" that could possibly harm Stelor.  As Esrig admits, he is unaware of anything that Silvers has ever done in either proceed which has prejudiced Stelor's position on the merits. *See* Esrig Depo. at  p. 238, l. 9 - 15.

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor ■ Coral Gables, Florida 33134 ■ 305-372-1800

### (3)    Stelor Has No Evidence That Silvers Has Not Cooperated

Stelor alleges that Silvers has refused to cooperate with Stelor's efforts in the USPTO actions, and a little more specifically that Silvers "may" have evidence vital to Stelor's actions that he refuses to give Stelor. But again, Stelor offers <u>no</u> evidence to support these allegations. There is nothing attached to Stelor's motion other than Esrig's unsupported and self-serving declaration. That being the case, we asked Esrig in deposition to tell us exactly how Silvers has failed to cooperate with Stelor. Esrig admitted that Silvers <u>has not been asked to testify</u> in either proceeding. It is rather difficult to not cooperate when you have not been asked to do anything.

Then when we asked Esrig to identify any evidence that Silvers has refused to provide to Stelor, Esrig again cited to a letter (that is all) in which Stelor's counsel asked Silvers for evidence Stelor "thought" Silvers had, and according to Esrig, Silvers responded by refusing to give the evidence to Stelor. That letter was not attached to Stelor's motion, but we attach it as Exhibit "F." This letter - - and more important the response from Silvers on page 5 to the request for "evidence" - - shows clearly that Silvers was fully responsive to Stelor's request, but that Stelor was mistaken that he had such evidence, or such evidence simply was no longer available. There is not one word that can be construed as a refusal to cooperate with Stelor in any way. Stelor's claim to the contrary is complete rubbish.

### (4)    Silvers Has The Right To Correspond With The USPTO

Stelor complains that Silvers instructed the USPTO to record his name as the correspondent of record for the GOOGLES trademark, and seeks to require Silvers to make Stelor's attorney the correspondent. But the License Agreement does not limit this, and Silvers had to take this step to protect his trademarks due to Stelor's omissions.

As the trademark owner, Silvers is entitled to name himself as correspondent. After

Stelor entered the picture, Silvers instructed the USPTO to correspond with Stelor's then counsel, Ira Edell, Esq.  A copy of the USPTO records reflecting Mr. Edell as correspondent is attached as Exhibit "G."  Mr. Edell was fired or withdrew from representing Stelor in early 2004, yet Stelor failed to replace him as correspondent for the GOOGLES mark.  See Esrig Depo. at p. 199, l. 8 to p. 200, l. 14.  When Silvers discovered this omission, he changed the correspondent of record back to himself to ensure notices relating to the mark went to him, the owner, rather to Stelor's former counsel.

Silvers' action was justified, indeed necessary, in light of Stelor's negligence[4].  And, the License Agreement does not preclude Silvers from naming the correspondent given Silvers' ownership status, and his corresponding ability to act consistent with these ownership rights (as opposed to use rights granted to Stelor).  In fact, Esrig admits that by going online, Stelor can easily access and monitor any activity relating to Silvers' trademarks, including seeing all notices or correspondence sent by the USPTO.  See Esrig Depo. at p. 195, l.9-16.  Even so, Silvers has offered to provides copies of USPTO communications to Stelor, and Stelor has refused the offer.

Nothing in the License Agreement precludes Silvers from being the filing correspondent for his trademarks or communicating with the USPTO about his trademark.  Since Silvers retains all ownership of the mark, he also retains all incidents of ownership such as communicating with the USPTO.  Moreover, Stelor can point to no communication Silvers has sent to or received from the USPTO, and cannot show how such hypothetical communications would harm Stelor.  See Esrig Depo. at p. 205, l. 19 to p. 206, line 4.;  p. 209, l. 4 to p. 214, l. 8.

In summary, Stelor has no evidence at all to show that Silvers is precluded from defending himself in the action filed against him by Google, Inc., or that he intends to participate in

---

[4] Stelor's failure to protect the GOOGLES IP is widespread, but that is a subject for the case at large, not the preliminary injunction.

the Stelor v. Google, Inc. matters, or has refused to cooperate with Stelor in any way.  Thus, Stelor has no basis in law or fact to request that the Court enjoin or compel Silvers from doing or not doing anything.

       **B.**        **Communications With Google, Inc.**

Stelor not only also seeks to preclude Silvers from communications with Google, Inc. regarding the Google cancellation proceeding, but "for any reason."  Again, nothing in the License Agreement precludes such communications.

Silvers, as owner of the GOOGLES, IP, is free to communicate or negotiate with anyone as to his ownership rights (as opposed to Stelor's use of the GOOGLES, IP).  For example, Silvers could sell his rights to a third party, and even assign his rights and obligations under the License Agreement.  *See* Exhibit "A," Article XXI.  Furthermore, Stelor has provided <u>no</u> evidence that Silvers has communicated with Google, Inc. about using the GOOGLES, IP.  In fact, Esrig testified that Silvers' only contacts with Google (which were rebuffed) occurred <u>prior</u> to the date of the License Agreement. *See*  Esrig Depo p. 156, l. 19.

Silvers, as the owner of the GOOGLES, IP is clearly allowed to participate in the Google cancellation proceeding, as well as the Stelor v. Google proceedings.  Any participation would be meaningless without the ability to "communicate" with Google as to those matters.

**II.**      <u>**There is No Irreparable Harm**</u>

In addition to being unable to prove, by clear and convincing evidence, that it will prevail on the merits of its contract claims, Stelor does not allege, much less demonstrate irreparable harm.  Because a preliminary injunction is an extraordinary remedy, Stelor must demonstrate it will suffer irreparable harm unless the injunction issues.  *Seiko Kuboshiki KAISHA d/b/a Seiko Corp. v. Swiss Watch Int'l, Inc.,* 188 F. Supp. 2d 1350, 1355 (S.D. Fla. 2002).  Stelor cannot do this, because its alleged "harm" (and we mean alleged) is merely speculative and, if it occurred, can be redressed by money.

Perhaps because Stelor cannot point to any harm it has suffered by anything Silvers has or has not done relating to the USPTO actions, in his declaration attached to the motion for injunction,

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor ■ Coral Gables, Florida 33134 ■ 305-372-1800

Esrig describes in very general terms relating to the business of Stelor how Silvers is causing irreparable harm.

> Silvers' actions in breach of the License Agreement and Consulting Agreement have caused Stelor incalculable damage. His actions have required several members of Stelor's Board of Directors, several of Stelor's limited staff and me, Stelor's President and CEO, to spend innumerable hours dealing with, and attempting to correct, the problems caused by Silvers' actions. This time should have been spent advancing the business of Stelor and has resulted in considerable delay in Stelor being able to complete tasks necessary for it to become a viable business. His actions also have caused Stelor to spend considerable money in attorneys' fees dealing with the actions and threats of Mr. Silvers.

Declaration of Steven Esrig, ¶20. Esrig echoed this in his deposition. See Esrig Depo. at p. 89, l. 9 to p. 90, l. 6.

Since Esrig does not really identify the "actions" or "problems" caused by Silvers, we cannot determine if they have anything to do with the USPTO, or what is alleged to be the basis for injunctive relief. That aside, Esrig admits, in both his declaration and deposition, that the alleged "harm" is quantifiable. The "hours spent dealing with dealing with, and attempting to correct the problems cursed by Silvers' actions" can be added up, a value ascribed, and a dollar figure reached; attorney's fees paid by Stelor can be added up. *See* Esrig Depo at p. 90, l. 4 – 18. "Financial damage alone is insufficient to warrant injunctive relief." *Id.* Similarly, Stelor's claim of wasted time and energy is no help. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of stay, are not enough . . ." *Seiko*, Supra 188 F-Supp 2d. at 1355.

What is obvious from the Injunction Motion is that Stelor's concerns arise from what it perceives Silvers <u>may</u> do or not do. Stelor fears Silvers <u>may</u> communicate with Google, <u>may</u> interfere with Stelor's actions against Google, <u>may</u> not provide evidence. Esrig's Declaration repeatedly refers to "threats", not actual conduct. This is mere speculation, apparently based on

12

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor ■ Coral Gables, Florida 33134 ■ 305-372-1800

Stelor's displeasure with Silvers' desire to stay on top of what Stelor has been doing over the last 2 ½ years.  Entry of an preliminary injunction, however, cannot be based on a speculative threat of harm.  *Angram Business Services, Inc. v. City of Waterbury,* 250 B.R. 144 (S.D. Fla 2000).

**III.    The Balance Of Hardship Favors Denial of An Injunction**

Stelor has asked this Court to grant a mandatory injunction that will handcuff Silvers from protecting and preserving his trademark rights, and defending himself in an action brought against him as the owner of the GOOGLES IP.  The balance of harm clearly tips in favor of Silvers, especially considering the lack of evidence Stelor has produced to show any harm to it to support injunctive relief.

**IV.    Stelor  Delayed In Bringing This Motion**

Delay in seeking an injunction, by itself, justifies the denial of a preliminary injunction.  *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).  Here, most of the "conduct" Stelor complains of occurred years ago.  As described by Esrig, Silvers has been interfering with Stelor's business since 2002, the "onset" of the relationship.  *See* Esrig Depo at p. 20, l. 2 to p. 21, l. 6.  Esrig's Declaration is full of references to the trade shows, disputes of domain name passwords, and other matters that go back years.  Even the "recent" actions by Silvers that Stelor points to are months old.  Silvers replaced Stelor's former attorney as correspondent with the USPTO in July or August.  *See* Esrig Declaration, ¶11.

Stelor has long been aware of the very conduct it now claims must be treated as an "emergency."  *See* Esrig Depo p. 30, l. 6 to p. 31, l. 15; p. 267, l. 25 to 268 l. 13.  Stelor's "executive decision" not to act, or even provide notice of its position to Silvers, "undercuts any sense of urgency" and "vitiates the irreparable harm."  *Seiko, supra* 188 F. Supp. 2d at 1356.  *See also, Citibank, supra*, 756 F.2d at 276 (ten week delay excessive); *Lanvin, Inc. v. Colonia Inc.*, 739

F. Supp. 182, 192 (S.D.N.Y. 1990) (seven month delay excessive); *Comic Strip v. Fox Television Stations, Inc.*, 710 F. Supp. 976, 981 (S.D.N.Y. 1989) (seven month delay excessive).

**V.      Stelor Cannot Show Damages That Support Subject Matter Jurisdiction**

This case does not belong in federal court because it is virtually impossible for Stelor's claim to amount to $75,000, the monetary requirement for diversity jurisdiction. 28 U.S.C. §1332.

Stelor's claim for breach of the License Agreement cannot support a claim for $75,000, because the Agreement expressly limits damages. Stelor, apparently trying to strip Silvers of any meaningful remedy for breach, drafted the agreement and inserted the following provision:

LIMITATION OF LIABILITY

EACH PARTY'S LIABILITY TO THE OTHER UNDER THIS AGREEMENT FOR CLAIMS RELATING TO THIS AGREEMENT, WHETHER FOR BREACH OF CONTRACT OR IN TORT, SHALL BE LIMITED TO THE AGGREGATE ROYALTY FEES PAID BY LICENSEE TO LICENSOR DURING THE TWELVE MONTH PERIOD PRECEDING THE CLAIM.

License Agreement (Exhibit "A") ¶XIII(B).

It is undisputed that Stelor has not paid a penny in royalties to Silvers in the 2½ years of the License Agreement. *See* Esrig's Depo at p. 175, l. 16-21. Thus, Stelor's maximum potential damages for breach of the License Agreement amount to zero ($0.00). There is no diversity jurisdiction, nor could there be, and this case should be dismissed for lack of subject matter jurisdiction.

**CONCLUSION**

For all the reasons stated above, Stelor's Injunction Motion should be denied.

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor ■ Coral Gables, Florida 33134 ■ 305-372-1800

Respectfully submitted this 20th day of December, 2004.

           **s/ Gail A. McQuilkin**
           Gail A. McQuilkin  (FBN: 969338)
           Kenneth R. Hartmann  (FBN: 664286)
           KOZYAK TROPIN & THROCKMORTON, P.A.
           2525 Ponce de Leon, 9th Floor
           Coral Gables, Florida 33134
           T: 305-372-1800 / F: 305-372-3508

===============================================================

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served this 20th day of December, 2004, via U.S. mail and electronic mail on the following:

        Yano Rubinstein, Esq.
        Summers Rubinstein, P.C.
        580 California Street, 16th Floor, San Francisco, California 94104
        E-mail: yano@sumrub.com

           **s/ Gail A. McQuilkin**

3339/101/247601.1

15

Kozyak Tropin & Throckmorton, P.A.
**15 of 39**    2525 Ponce de Leon, 9th Floor ■ Coral Gables, Florida 33134 ■ 305-372-1800

# Exhibit A

## LICENSE, DISTRIBUTION
## AND MANUFACTURING AGREEMENT

This LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT between Steven A. Silvers and Stelor Productions, Inc. is effective as of June 1, 2002 and is entered into by and between Steven A. Silvers (LICENSOR), an individual, whose official address is 3741 NE 163rd Street, PMB #323, North Miami Beach, FL 33160 and Stelor Productions, Inc. (LICENSEE), a Delaware corporation with its current offices located at: 14701 Mockingbird Drive, Darnestown, Maryland, 20874.

### WITNESSETH

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES characters identified more fully in "Schedule A" attached hereto (the "Licensed Property");

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES trademarks identified more fully in "Schedule A" attached hereto (the "Licensed Trademark/s");

WHEREAS, LICENSOR has the power and authority to grant to LICENSEE the right, privilege and license to use, manufacture, distribute, and sell those types of products that incorporate the Licensed Property as identified in "Schedule A" attached hereto (the "Licensed Product/s") and to use the Licensed Trademarks on or in association with such Licensed Products;

WHEREAS, LICENSEE has or will have the ability to manufacture, have manufactured, have sub-manufactured, distribute and sell or have sold and distributed the Licensed Products in the Licensed Territory more clearly defined in Schedule A (the Territory) and to use the Trademark(s) on or in association with the Licensed Products;

WHEREAS, LICENSEE desires to obtain from LICENSOR an exclusive license to use, manufacture, have manufactured and sell Licensed Products in the Territory and to use the Licensed Trademarks on or in association with the Licensed Products;

WHEREAS, LICENSEE has agreed, pursuant to a letter agreement, to act as a consultant for LICENSOR; and

NOW, THEREFORE, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do hereby agree as follows:

### I. LICENSE GRANT

A.      LICENSOR hereby grants to LICENSEE, for the Term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use, reproduce, modify, create derivative works of, manufacture, have manufactured, advertise, sell, distribute, display, perform, and otherwise commercialize the Licensed Products and Licensed Properties in the Territory. The license includes a license under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with the creative characters known as The Googles, anything that contains the letters GOO (in upper or lower case) together with any and all products, which comprise those characters, likenesses, which will comprise service site(s), membership include logo's, Oogle, Oogle, Googol, Googles(s), the planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith, whether in singular or plural

EXHIBIT
A

---

"Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use the Licensed Trademarks in the Territory, in or in association with the Licensed Products as well as on packaging, promotional, and advertising material associated therewith.

C.      LICENSEE shall have the right to sublicense LICENSEE's rights under this Agreement, provided that any and all such sublicenses shall be subject to the terms and conditions of this Agreement.

D.      No licenses will be deemed to have been granted by either party to any of its intellectual Property Rights, except as otherwise expressly provided in this Agreement.

B.      LICENSEE agrees to place on all Licensed Products, where practicable, the phrase "created by Steven A. Silvers" or other similar wording.

### II. TERM OF THE AGREEMENT

This Agreement and the provisions hereof, except as otherwise provided, shall be in full force and effect commencing on the date of execution by both parties and shall extend for a Term as recited in "Schedule A" attached hereto (the "Term").

### III. COMPENSATION

A.      In consideration for the licenses granted hereunder, LICENSEE agrees to pay to LICENSOR, during the Term of this Agreement, a royalty in the amount recited in "Schedule A" attached hereto (the "Royalty") based on LICENSEE's Net Sales of Licensed Products. "Net Sales" shall mean the gross revenues on a cash basis (i.e., actually collected by LICENSEE but without counting any gross revenues twice) excluding shipping and handling charges, sales taxes, VAT, and other taxes imposed upon sales (ies (i) customary trade discounts, (ii) allowances actually shown on the invoice (except cash discounts not deductible in the calculation of Royalty) (iii) bona fide returns, charge backs, refunds or credits (net of all returns actually made or allowed as supported by memoranda actually issued to the customer), (iv) sales or remainder inventory made at less than the total of LICENSEE's actual cost of goods and actual direct selling costs related to such sales for purposes of liquidation or close-out, (v) other uncollectible accounts, (vi) cooperative advertising allowances, (vii) sales commissions paid.

B.      The Royalty owed LICENSEE (the "Royalty Period") and shall be payable no later than thirty (30) days after the termination of the preceding full calendar quarter, i.e., commencing on the first (1st) day of January, April, July and October with the exception of the first and last calendar quarters which may be "short" depending upon the effective date of this Agreement.

C.      With each Royalty Payment, LICENSEE shall provide LICENSOR with a written royalty statement in a form acceptable to Licensor. Such royalty statement shall be certified as accurate by a duly authorized officer of Licensee, reciting on a country-by-country basis, the stock number, item, units sold, description, quantity shipped, gross invoice, amount billed to customers less discounts, allowances, returns and reportable sales for each Licensed Product. Such statements shall be furnished to Licensor whether or not any Licensed Products were sold during the Royalty Period. The LICENSEE hereby further agrees to provide the LICENSOR with a list of all of it's sub licensees added during the current royalty period.

D.      If LICENSEE sells any Licensed Products to any party affiliated with LICENSEE, or in any way directly or indirectly related to or under the common control with LICENSEE, at a price less than the average weighted price charged to other parties, the Royalty payable to LICENSOR shall be computed on the basis of the averaged weighted price charged to other parties if the Licensed Products are not ultimately resold to unaffiliated third parties.



E. _____ All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties and may offset or be offset from any other payments due to LICENSEE under this or any other agreement between the parties.

F. _____ Late payments shall incur interest at the rate of ONE PERCENT (1%) per month from the date such payments were originally due.

## IV. AUDIT

A. _____ LICENSOR shall have the right, at its own expense, to have a nationally recognized certified public accounting firm, upon at least thirty (30) days written notice and no more than twice per calendar year, to audit in the normal business hours, LICENSEE's books and records to the subject documents located in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

B. _____ In the event that such inspection reveals an underpayment discrepancy greater than 5% of the amount of Royalty owed such audit. If LICENSEE agrees to the amount, if any, of any discrepancy, the opportunity to conduct its own audit. In the event of any underpayment discrepancy, LICENSEE shall have the opportunity to conduct its own audit. In the event of any underpayment discrepancy, LICENSOR shall pay such discrepancy, plus interest, calculated at the discrepancy, no further audit by LICENSEE. PERCENT (1 1/2%) per month. Upon settlement of any underpayment discrepancy, no further audit for that LICENSOR shall be requested that year. That period end date shall represent the new period start date for future audits for underpayment discrepancies. In the event that such discrepancy is in excess of TEN THOUSAND UNITED STATES DOLLARS ($10,000.00), LICENSEE shall also reimburse LICENSOR for the cost of auditing fees in connection therewith.

C. _____ All books and records relative to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection for at least three (3) years after the expiration of the initial or any subsequent term.

D. _____ In the event that an investigation of LICENSEE's books and records is made, certain confidential and proprietary business information of LICENSEE may necessarily be made available to the person or persons conducting such investigation. It is agreed that any and all such confidential and proprietary business information of LICENSEE shall not be used by LICENSOR or disclosed information that had been in the confidence by LICENSOR and shall not be used by LICENSOR or its express information that had been in the confidence by LICENSOR, or without the prior express written permission of LICENSEE unless required by law, except LICENSOR may not disclose at any time to any third party for a period of two (2) years from the date of disclosure, or trade secrets of LICENSEE. It is understood and agreed, however, that such information may be used by LICENSOR in any proceeding based on LICENSEE's failure to pay its actual Royalty obligation.

## V. WARRANTIES AND OBLIGATIONS

A. _____ LICENSOR represents and warrants that:

(i) _____ the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSOR and this Agreement is a valid and binding obligation of LICENSOR, enforceable in accordance with its terms;

(ii) _____ the execution, delivery and performance by LICENSOR of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSOR is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSOR;

(iii) _____ LICENSOR owns the exclusive rights in and to the Licensed Intellectual Property, Licensed Patents and Licensed Copyrights Property, Licensed Trademarks, and to effectuate the granting of the Licensing Rights from the LICENSOR to the LICENSEE as contemplated herein.

(iv) _____ the Licensed Intellectual Property and Licensed Trademarks do not infringe the rights, including without limitation, Intellectual Property Rights, of any third party; and

(v) _____ except as set forth in Schedule B attached hereto, LICENSOR has not received any notice from any third party of any alleged or actual infringement of the Licensed Intellectual Property or Licensed Trademarks and the Licensed Intellectual Property and/or Licensed Trademarks are not the subject, and has not been the subject, of any previous or pending litigation with the exception of the Ganz litigation which has been resolved.

B. LICENSEE represents and warrants that:

(i) _____ the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSEE and this Agreement is a valid and binding obligation of LICENSEE, enforceable in accordance with its terms;

(ii) _____ the execution, delivery and performance by LICENSEE of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSEE is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSEE; and

(iii) _____ it will use its commercially reasonable efforts to promote, market, sell and distribute the Licensed Products.

C. Disclaimer of Warranties. EXCEPT AS EXPRESSLY PROVIDED ABOVE, NEITHER PARTY MAKES ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, REGARDING THIS AGREEMENT AND/OR AS TO ANY MATTER INCLUDING, BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

D. _____ LICENSEE shall be solely responsible for the manufacture, production, sale and distribution of the Licensed Products or to have such Licensed Products manufactured, produced, sold and distributed, and will bear all related costs associated therewith.

## VI. NOTICES, QUALITY CONTROL, AND SAMPLES

A. _____ The Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices.

B. _____ The Licensed Products shall be of a high quality which is at least equal to comparable products manufactured and marketed by LICENSEE and in conformity with a standard sample provided by LICENSEE.



C. _____ Prior to the commencement of manufacture and sale of the Licensed Products, LICENSEE shall submit to LICENSOR for his input, at no cost to LICENSOR, a reasonable number of samples of all Licensed Products which LICENSEE intends to manufacture and sell and of all promotional and advertising material associated therewith.

## VII. NOTICES AND PAYMENT

A. _____ Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at the above-stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

B. _____ Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.

## VIII. INTELLECTUAL PROPERTY PROTECTION

A.   LICENSOR hereby grants LICENSEE all right, power and interest to seek, obtain and maintain all Intellectual Property associated with the Licensed Intellectual Property and Licensed Trademarks, Licensed Copyrights and any other Intellectual Property Rights granted herein. LICENSOR further agrees to assist LICENSEE as may be required to apply for and obtain recordation of and from time to time enforce, maintain and defend such Intellectual Property Rights. LICENSOR hereby grants LICENSEE an irrevocable power of attorney for the initial and any subsequent terms of this Agreement to act for and on LICENSOR's behalf and instead of LICENSOR, at LICENSEE's expense, to execute and file any such document(s) and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by LICENSOR.

B.   LICENSEE shall retain all rights, title and interest in the Licensed Intellectual Property and Licensed Trademarks and any modifications thereto based solely on such Licensed Intellectual Property. LICENSEE acknowledges LICENSOR's exclusive rights in the Licensed Trademarks rights Property, and, further, acknowledges that the Licensed Intellectual Property and/or LICENSOR is the owner thereof. LICENSEE shall not, are unique and original to LICENSOR and that LICENSEE, during the quarterly calendar cited at any time during or after the effective Term of the Agreement, dispute or contest, directly or indirectly, LICENSOR's exclusive right and title to the Licensed Intellectual Property and/or the Licensed Trademark(s) or the validity thereof.

C.   LICENSEE agrees that its use of the Licensed Intellectual Property and/or the Licensed Trademark(s) inures to the benefit of LICENSOR and that the LICENSEE shall not acquire any rights in the Licensed Intellectual Property and/or the Licensed Trademark(s) except for the license granted herein.

D.   LICENSOR shall retain all rights, title and interest in and to the Licensed Intellectual Properties. The LICENSOR owns the exclusive rights to the Licensed Intellectual Property and/or actions by hereby waives and releases LICENSEE from any and all current or future claims or causes of actions by third parties, whether known or unknown, arising out of or relating to such Licensed Intellectual Properties including, but not limited to, any claim that Licensed Products violate, infringe on or misappropriate any of LICENSOR's Intellectual Property Rights.

E.   Each party shall execute all papers, testify on all matters, and otherwise cooperate in. every way necessary and desirable to effect any of the provisions under this Section (Intellectual Property Protection). The party requesting such shall reimburse the other party for the expenses incurred as a result of such cooperation. The parties agree to take any actions or prepare or execute any documents reasonably requested by the other party. Furthermore, during the term of this agreement, LICENSOR shall not. initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, customers or strategic partnership relationships with the media (press etc.) without the prior express written request by LICENSEE.

## IX. TERMINATION

A.   Right to Terminate on Notice. This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party fails to cure such breach.

B.   LICENSEE shall have the right to terminate this Agreement at any time on thirty (30) days written notice to LICENSOR. In such event, all moneys paid to LICENSOR shall be deemed non-refundable and LICENSEE's obligation to pay any unpaid royalties shall be accelerated and shall become immediately due and payable.

C.   Additionally, if, after five years of the initial intellectual property license, there are three consecutive years during which royalty payments to LICENSOR are less than one hundred thousand dollars ($100,000.00), LICENSOR has the option to cancel this Agreement in accordance with Section IX.

## X. POST TERMINATION RIGHTS

A.   Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEE shall provide LICENSOR with a complete schedule of all inventory of Licensed Products then on hand or on order (the "Inventory").

B.   Upon expiration or termination of this Agreement, LICENSEE shall be entitled, for an additional period of six (6) months, to continue to sell such Inventory. Such sales shall be made subject to all of the provisions of this Agreement and to an accounting for and the payment of a Royalty thereon. Such accounting and payment shall be due and paid within thirty (30) days of the quarterly calendar as the period basis for royalty calculation. LICENSEE shall have the right to continue the use of the name(s) associate with the products and articles that encompass this Agreement for so long as LICENSEE is actively selling its inventory of articles and products. At the conclusion of LICENSEE'S efforts in this regard, LICENSEE agrees to discontinue the use of names, trademarks, signs, advertising and anything else that might make it appear that the LICENSEE is still handling the articles and products of LICENSOR.

C.   Upon the expiration or termination of this Agreement, all of the license rights of LICENSEE under this Agreement shall forthwith terminate and immediately revert to LICENSOR and LICENSEE, except as detailed above in Section (B) of the "Post Termination Rights" Section, shall immediately discontinue all use of the Licensed Property and the like, at no cost whatsoever to LICENSOR.

D.   Upon termination of this Agreement for any reason whatsoever, LICENSEE agrees to immediately return to LICENSOR all material relating to the Licensed Intellectual Property. Furthermore, upon termination or expiration of this Agreement, LICENSEE agrees to immediately inform all of it's sub licenses regarding the said termination or expiration of this Agreement.

## XI. INFRINGEMENTS

A.   During the Term of this Agreement and any and all option/renewal periods, LICENSEE shall have the sole right, in its discretion and at its expense, to take any and all actions against third persons to protect the Intellectual Property Rights licensed in this Agreement.

B.   Upon request by either party to the other, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such lawsuit. Each party shall reimburse the other party for the expenses incurred as a result of such cooperation.

## XII. INDEMNITY

A.   LICENSEE agrees to indemnify and hold harmless LICENSOR, its agents, heirs, assigns and representatives, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSOR based on product liability but excluding any claims based solely upon the use of the Licensed Intellectual Property or Licensed Trademarks by LICENSEE in accordance with the terms of this Agreement.



B.    LICENSEE agrees to indemnify and hold harmless LICENSEE, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSEE based on or arising from (i) any infringement, misappropriation or other related action involving the Licensed Intellectual Property or Licensed Trademarks; or (ii) any breach of LICENSOR's obligations, representations, warranties or duties under this agreement.

C.    With respect to any claims falling within the scope of the foregoing indemnifications: (i) each party agrees promptly to notify the other of and keep the other fully advised with respect to such claims and the progress of any suits in which the other party is not participating; (ii) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (iii) in any suit instituted against it, each party shall not settle such claim or suit (iv) a party assuming the defense of a claim or suit against the other party shall have the right to participate in the defense of the same, and, in no event, shall LICENSEE manufacture, distribute or sell the without the prior written approval of the other party, which approval shall not be unreasonably withheld or delayed.

## XIII. LIMITATION OF LIABILITY

A.    IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT (INCLUDING LOSS OF PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE), NO MATTER WHAT THEORY OF LIABILITY, EVEN IF THE EXCLUSIVE REMEDIES PROVIDED FOR IN THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE AND EVEN IF EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OR PROBABILITY OF SUCH DAMAGES.  THE PROVISIONS OF THIS SECTION "LIMITATION OF LIABILITY" ALLOCATE THE RISKS UNDER THIS AGREEMENT BETWEEN LICENSOR AND LICENSEE AND THE PARTIES HAVE RELIED UPON THE LIMITATIONS SET FORTH HEREIN IN DETERMINING WHETHER TO ENTER INTO THIS AGREEMENT.

B.    EACH PARTY'S LIABILITY TO THE OTHER UNDER THIS AGREEMENT FOR CLAIMS RELATING TO THIS AGREEMENT, WHETHER FOR BREACH OF CONTRACT OR IN TORT, SHALL BE LIMITED TO THE AGGREGATE ROYALTY FEES PAID BY LICENSEE TO LICENSOR DURING THE TWELVE MONTH PERIOD PRECEDING THE CLAIM.

## XIV. INSURANCE

LICENSEE shall, throughout the Term of this Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business as required by state and federal law(s), standard Product Liability Insurance naming LICENSOR as an additionally named insured. Such policy shall provide protection against any and all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof.  The amount of coverage shall be specified in "Schedule A" attached hereto. LICENSEE agrees to furnish LICENSOR a certificate of insurance evidencing same within ninety (90) days after issuance of the same, and, in no event, shall LICENSEE manufacture, distribute or sell the Licensed Products prior to receipt by LICENSOR of such evidence of insurance.

## XV. FORCE MAJEURE

LICENSEE shall not be liable for any failure of performance hereunder due to causes beyond its reasonable control, including but not limited to acts of God, fire, explosion, vandalism, strikes, lockouts, work stoppages, other labor difficulties, supplier failures, storm or other similar catastrophes, any law, order, regulation, direction, action or request of the state, local or federal government or of any government agency, commission, court, bureau, corporation or other instrumentality of any one or more of such governments, or by civil or military authority, national emergencies, insurrections, riots, or wars.

## XVI. JURISDICTION AND DISPUTES

A. This Agreement shall be governed in accordance with the laws of the State of Florida without regard to its principles of conflicts of laws.

B. All disputes under this Agreement shall be resolved by the courts of the State of Florida including the United States District Court for Florida and the parties all consent to the jurisdiction of such courts, agree to accept service of process by mail, and hereby waive any jurisdictional or venue defenses otherwise available to it.

## XVII. AGREEMENT BINDING ON SUCCESSORS

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, successors and assigns.

## XVIII. WAIVER

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

## XIX. SEVERABILITY

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

## XX. NO JOINT VENTURE

Nothing contained herein shall constitute this arrangement to be employment, a joint venture or a partnership.

## XXI. ASSIGNABILITY

Neither party may assign by any act or operation of law the rights and obligations of this Agreement unless in connection with a transfer of substantially all of the assets of LICENSEE and/or with the consent of LICENSOR, which shall not be unreasonably withheld or delayed.  By way of example and not limitation, LICENSEE may freely assign its rights and obligations under this Agreement to Stolor Productions, Inc.

## XXII. INTEGRATION

This Agreement constitutes the entire understanding of the parties, and supersedes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may be in conflict with said Agreement.

## XXIII. RATIFICATION

The LICENSOR hereby agrees to the transfer of this License from the LICENSEE (The Aurora Collection, Inc.) to Stolor Productions, Inc. as contemplated by the Asset & Purchase Agreement, dated May 1st, 2002, executed    and    between    the    above    mentioned    parties



## "SCHEDULE A"

### LICENSED INTELLECTUAL PROPERTY

The following Licensed Intellectual Property forms part of this Agreement: A License under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with a creative character known as Googles, anything that contains the letters GOO (in upper or lower case), together with any and all products, which comprise and which will comprise those characters, likenesses, which include Igg64, Ogg64, Ogg6, Goog6, Goorso, Grostier(s), the Planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

### LICENSED TRADEMARKS

The following Licensed Trademarks form part of this Agreement: (i) "The Googles" (word and design) Trademarks in International Class Code (016) of the U.S.P.T.O. and the co-existent Trademarks Agreement with Ganz, Inc. of Canada in International Class Code (028) of the U.S.P.T.O., which is herein attached and made a part of this "Schedule A" document, (ii) "Google" (iii) "Iggle", (iv) "Oggle" (v) "GooRoo", (vi) "Planet Goo", (vii) "GooMa", (viii) "GooTomi" (ix) "GooStuff", (x) "GooStore" and (xi) any other trademarks, whether registered, pending of future or common law, used in connection with the Licensed Property, including , but not limited to, any trademark incorporating the phrase "Goo" currently in existence.

### LICENSED PRODUCTS

The following Licensed Products form part of this Agreement: all products which comprise the likenesses, stories, ideas, concepts, or designs of the Licensed Property, including without limitation, stuffed toy figurines, videos, stickers, t-shirts or other clothing items, slides, movies, cartoons, books (comic and otherwise), posters, playing, trading and collector cards, CDs, cassette tapes, DVDs, TV programs, motion pictures, all other forms of communication and publication, programs, computer Web site(s), membership lists and clubs, and any other products.

### DERIVATIVES

A Derivative as defined in this agreement shall mean a product or service that is utilized by the LICENSEE and developed by a party other than the LICENSOR but is used in conjunction with licensed products, articles and / or services. It can be a product or service produced by the LICENSEE or a third party (inventor, sub licensee etc.) that (i) it uses enhance the value of the Googles Universe but does not have a ~~conflict with an already existing Googles product idea or concept~~ as outlined in this agreement. It may not possess the "Googles" or "GOO" in it's name and would therefore fall under the LICENSOR'S exclusive ownership as defined in the amended agreement but can be used in conjunction with the "Goo" Universe by the LICENSEE.

### TERRITORY

The following countries shall constitute the Territory: Global/Worldwide rights.

### TERM

This Agreement shall commence on the date executed below by both parties and shall be for a thirty (30) year term. This Agreement shall automatically renew for one additional ten (10) year term on the same terms and conditions provided for herein ("Renewal Term"). Upon expiration of the first Renewal Term of ten (10) years, this Agreement shall automatically renew for a second ten (10) year  extended Term on the

in

---

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his/her hand and seal the day indicated.

STEVEN A. SILVERS                                    STELOR PRODUCTIONS, INC.

_[signature]_                                        By: _[signature]_
Steven A. Silvers                                    Printed Name: Steven A. Silvers
Title: Owner/LICENSOR                                Title: President
Dated: 5/9/02                                        Dated: 5/9/02
                                                     _[signature]_

Received Ten Thousand Dollar signing bonus ($10,000.00)

_[signature]_

MICHAEL IUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003

5/9/02

same terms and conditions provided for herein, unless LICENSOR provides written notice of its intention to not to renew this Agreement within one hundred eighty (180) days prior to expiration of the Renewal Term.

## ROYALTY RATE

LICENSEE shall pay the following royalty rates: (i) SIX PERCENT (6%) of Net Sales of Licensed Products that are based solely on the Licensed Intellectual Property and (ii) THREE PERCENT (3%) of Net Sales of Licensed Products that are based solely on Derivative Products and (iii) In the case of Sub Licenses royalties will be TEN PERCENT (10%) of Net sales after subtracting licensing costs and royalties paid to third parties only.

## PRODUCT LIABILITY INSURANCE

Minimum Product Liability Insurance shall be Two Million U.S. dollars ($2,000,000.00) combined single limit for each single occurrence for bodily injury and/or for property damage.

SUCCESSION
Rights of Survivor

In the event of the Death of Licensor all of the Licensor's rights under this agreement Shall go to his heirs, assigns or legal representatives as he has lawfully designated in writing

5/9/02

5/9/02

5/9/02

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003    5/9/02

11

# Exhibit B

June 1, 2002

Mr. Steven Silvers
1741 N.E. 165ᵗʰ Street
PMB # 324
North Miami Beach, FL 33160

Dear Steven:

This letter agreement ("Agreement") will serve to memorialize the terms of the consultancy arrangement between Stelor Productions, Inc. ("Company") and Steven A. Silvers ("Consultant").

## 1.   Engagement of Consultant.

a.   Company hereby engages Consultant as an independent contractor to the Company. Consultant's title shall be Executive Creative Consultant. Company is relying on Mr. Silvers to continue his role of "Papa Googles" and continue to offer his creative input to the Company.

b.   In consideration for the covenants of Consultant contained herein, Company will, as Consultant the following: (i) a signing bonus of ten thousand dollars ($10,000) and (ii) a monthly consultancy fee of five thousand five hundred dollars ($5,500) beginning on June 1, 2002, and continuing each month thereafter for twelve (12) months. Company shall pay Consultant six thousand dollars ($6,000) monthly for a second 18-month period, beginning June 1, 2003. All payments made to the Consultant will not be offset against any royalties paid by the Company to the Consultant pursuant to the Consultant will continue to reimburse The Aurora License, Distribution and Manufacturing Agreement. Company will continue to reimburse The Aurora Collection, Inc. for the existing health plan if available, or if not available, will reimburse consultant $300 per month during the term of this Agreement. During the term of the Agreement, Company will reimburse The Aurora Collection, Inc. for, if available, the use of a leased company vehicle, with company to reimburse The Aurora Collection, Inc. for insurance coverage. Consultant agrees to pay all costs of maintenance and upkeep. Stelor will write an agreement with Consultant granting him options for 1,000 shares of Stelor's stock option plan. If the number of options available under the Stelor Productions current plan is increased during the Consultant's service Company will issue an additional one thousand option shares (1,000)

c.   It is agreed by company that in the event the Company fails to compensate the Consultant as outlined in this Agreement and in accordance with the terms of this Agreement (including all option periods surrounding same) and if after thirty (30) days fails to cure any alleged breach, then Consultant shall have the right (option) to terminate this Agreement and among other legal remedies afforded Consultant to seek redress before the Court, the License Agreement shall, likewise immediately terminate. This caveat shall exist only if Consultant is not paid for other than "good Cause" termination as outlined below at section five (5) of this Agreement.

## 2.   Relationship of Parties.

The relationship of Company and Consultant established under this Agreement is that of an independent contractor. Nothing in this Agreement shall be construed to give any party the power to direct or control the daily activities of any of the other parties, or to constitute the parties as principal and agent, employer and employee, franchiser and franchisee, partners, joint venturers, co-owners, or otherwise as participants in a joint undertaking. The parties understand and agree that none of the parties grants any other party the power or authority to make or to enter into any statement, representation, warranty, or other commitment on behalf of any other party, or to contract or otherwise incur any liability or obligation, express or implied, on behalf of any other party, or to transfer, release, or waive any right, title, or interest of any other party. Furthermore, during the term of

---

this Agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

## 3.   Duties of Consultant.

Consultant's duties hereunder are as follows:

a.   Consultant shall use his best efforts to perform such services as may be requested by Company from time to time consistent and commensurate with his position as Executive Creative Consultant, including, but not limited to, executing all papers, testifying on all Company related matters and otherwise cooperating in every way very necessary and desirable to strengthen, establish or maintain any intellectual property right granted under this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant The Consultant shall make himself available to the Company by way of telephone, fax, email, video conferencing (if deemed necessary) on an as needed basis and during reasonable business hours Monday through Friday. Consultant shall further make himself available, in person, if deemed necessary, to the Company so long as the Consultant is given a minimum of ten (10) days written notice if Consultant is, at the time of said request, residing outside of the Continental United States and three (3) days written notice by the Company if Consultant is residing, at the time of said request, within the Continental United States. In either case, Consultant must maintain a United States address for purposes of receiving correspondence, samples, checks etc. Written notice may also be deemed given if communicated via Consultant's personal email address or a fax number to be provided to the Company. In addition, if a recognized mail carrier service with "signature" required. Written notice requested, or via a nationally recognized mail carrier service is used a personal email address or a fax number to be provided may also be sent if communicated via Consultant's personal email address or a fax number to be provided to the Company. However, the latter shall not be used for any "official" notice purposes.

b.   During the term of this Agreement and for a period of (1') years after the termination or expiration of this Agreement, Consultant shall not, either individually or in conjunction with a third party, engage in any business, trade, or profession as owner, officer, manager, employee, consultant or otherwise if such business competes in any material way with Company's business of developing, creating, selling, manufacturing, distributing, or marketing products, media or materials for children.

c.   Consultant shall offer Company a right of first refusal to license, develop, manufacture, market or sell any and all client's characters or other products, ideas, inventions or creations created by Consultant The Agreement (as amended) between Company and Consultant. If Distribution and Manufacturing Agreement. The ~~Company may toy with any new idea's either relating to The Googles as well as anything~~ Consultant provides ~~entirely new that may yet relate to the current universe of characters and/or idea's, that upon submission~~ of such new ideas or concept which shall be placed in writing Company shall have one hundred and twenty (120) days to accept and enter into an agreement for said property.

d.   Consultant agrees to hold harmless, defend and indemnify Company and its officers, directors, employees, agents and servants from and against any and all claims, damages and expenses, including reasonable legal fees and expenses, of whatever kind and nature directly or indirectly arising out of or on account of or resulting from the Consultant's activities (other than as expressly authorized by Company) including, without limitation, Consultant's failure to comply with his obligations under this Agreement, acts or omissions.

## 4.   Duties of Company.

a.    Company shall reimburse Consultant for all reasonable travel and living expenses that are deemed to be essential to Company's success and are pre-approved by an authorized officer of the Company and incurred as a direct result of Consultant's obligations under this Agreement such as attending tradeshows, board meetings, etc. The Company shall, upon proper documentation having been presented to the Company, or its official/designated representative, within seven (7) days of receipt of same, reimburse Consultant said incurred expenses as approved by Company.

**5.    Term and Termination.**

a.    Subject to the provisions for termination as provided herein, this Agreement shall commence upon execution and shall have a term of thirty (30) months.

b.    Company may immediately terminate this Agreement upon the occurrence of any of the following: (i) a material breach of any provision of this Agreement by Consultant; (ii) a failure by Consultant, after written notice, to perform such duties required of Consultant as outlined in this agreement; (iii) the initiation of any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding by Consultant, or if any such proceeding is instituted against Consultant; (iv) the conviction of Consultant of any felony crimes; (v) any use, sale or possession by Consultant of any illegal drug or controlled substance that is prosecutable under US Federal Laws. Written notice to mean by way of Certified mail, return receipt requested, or by way of a Nationally recognized mail service, Courier service etc.

c.    Upon termination or expiration of this Agreement by either party, Consultant shall immediately return to Company all Proprietary Information (as defined below) in Consultant's possession, custody or control in whatever form held (including copies, compilations, summaries, or embodiments thereof relating to Proprietary Information) and provide written certification that all such material has been returned.

d.    Company agrees to provide Consultant thirty (30) days Notice, from date of said written notice of termination by the Company, within which to cure any alleged breach it has made against the Consultant identified in paragraph three (3) under "Duties of Consultant".

**6.    Proprietary Information; Proprietary Rights.**

a.    In the course of performing his duties under this Agreement, Consultant may obtain information relating to Company and/or its customers, suppliers or other third parties that is of a confidential and proprietary nature ("Proprietary Information"). Such Proprietary Information may include, without limitation, trade secrets, research and development, customer lists, vendor lists, schedule of accounts, plans, programs, inventions, computer software, know-how, inventions, product information, techniques, processes, schematics, data, financial information and sales and marketing plans. Consultant shall, at all times, both during the term of this Agreement and for a period of two (2) years thereafter its termination, keep in trust and confidence all such Proprietary Information, and shall not use such Proprietary Information other than in the course of performing his duties as expressly provided in this Agreement, nor shall Consultant disclose any such Proprietary Information to any person without Company's prior written consent except as required in any legal and/or Court action by Consultant against the Company or any other third party. This pertains to only that information not otherwise gathered from public sources, knowledge already in the public eye or a matter of public record, and/or any other third party other than Consultant.

b.    The Company acknowledges that the Consultant is not being hired as a work for hire but rather is being compensated, pursuant to this Consulting agreement, as a Consultant for the express purpose of advising, recommending, counseling, and otherwise utilizing Consultant's expertise in the decision making process as it pertains to the existing and "further development" of the Google's project only.

c.    The services and rights which Company is granting to Consultant hereunder are extraordinary and unique and cannot be replaced or adequately compensated in money damages, and any breach by Consultant of this Agreement will cause irreparable injury to Company. Therefore, Consultant agrees that in the event of a breach of this Agreement, Company, in addition to any other remedies that might be available to it, shall be entitled to bring suit at law or equity for money or other damages. Consultant shall not oppose such relief on the grounds that there is an adequate remedy at law, and such right shall be cumulative and in addition to any other remedies at law or in equity (including monetary damages) which Company may have upon the breach of the obligations of confidentiality hereunder.

**7.    Limitations of Liability.** TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, INDIRECT, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES) FOR ANY CLAIM BY ANY OTHER PARTY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**8.    Miscellaneous.**

This Agreement is a legally binding agreement between Company and Consultant and shall be governed by and construed in accordance with the laws of the State of Florida. This Agreement may be executed in one or more counterparts, each of which shall be an original Agreement, and all of which taken together shall constitute one and the same instrument. This Agreement may not be assigned by consultant without the prior written consent of Company. This Agreement shall not be modified, amended, or in any way altered except by an instrument in writing signed by both Company and Consultant. Each party shall refrain from making or issuing any statements, disclosures, or other communications related to this Agreement, the subject matter of this Agreement, or the services provided hereunder. This Agreement constitutes the entire agreement between Company and Consultant with respect to the subject matter of this Agreement, and supersedes all prior agreements, whether written or oral, with respect to the subject matter contained in this Agreement.

Please indicate your acceptance of the terms of this Agreement by signing in the space indicated below.

STEVEN SILVERS    Date: 5/6/02

By: _____  Date: 5/9/02  Title: President

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND

LAW OFFICES
## KOZYAK TROPIN & THROCKMORTON, P.A.
2525 PONCE DE LEON • 9TH FLOOR
CORAL GABLES, FLORIDA 33134-6037

# Exhibit C

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

November 12, 2004

Via Federal Express
AWB#7921-7742-7745

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

We represent Steven Silvers, Licensor under that License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement"). Pursuant to paragraph IX-A of the Agreement, this serves as notice that Stelor has breached the Agreement and that Mr. Silvers will exercise his right to terminate the Agreement unless Stelor cures the following breaches within 60 days:

a.    Failure to pay royalties under paragraph III (A);

b.    Failure to provide a written certified royalty statement under paragraph III (C);

c.    Failure to provide a list of all sub licenses under paragraph III (C);

d.    Failure to use commercially reasonable efforts to promote, market, sell and distribute the Licensed Products under paragraph V (B)(iii);

e.    Failure to accommodate Licensor's request to audit the books and records of Stelor made under paragraph IV (A) and (C);

f.    Failure to provide samples of all Licensed Products you intend to manufacture and sell, and all promotional and advertising materials associated with those products under paragraph VI (C);

g.    Failure to include appropriate legal notices with the Licensed Products under paragraph VII(A);

h.    Failure to maintain the requisite level of quality for the Licensed Products under paragraph VI (B);

Page 2

i.    Failure to maintain Licensor's Intellectual Property Rights, namely failure to maintain the domain names googlegame.com, googlesgames.com, and googlegame.com, under paragraph VIII;

j.    Failure to register Licensor's Intellectual Property Rights in the name of Licensor, and instead registering copyrights and trademarks in Stelor's name;

k.    Failure to oppose trademark applications for the name Googles, and the domain name registration googles.org, and otherwise protect the Licensed Intellectual Property; and

l.    Unlawful use of the limited power of attorney granted under the Agreement, namely retaining counsel for Mr. Silvers without his knowledge or consent, filing an action in the name of Mr. Silvers to dispute Google, Inc.'s right to use the domain name google.com, and filing an answer in the name of Mr. Silvers in Cancellation Proceeding 92043737.

This also serves as notice under the Letter Agreement dated June 1, 2002, that Stelor has breached the Letter Agreement by its:

a.    Failure to pay Mr. Silvers consultancy fees and expenses;

b.    Failure to provide Mr. Silvers with an agreement granting him stock options for 1,000 shares of Stelor's stock;

c.    Making unauthorized statements and representations on behalf of Mr. Silvers; and

d.    Attempting to transfer, release and waive Mr. Silvers right, title, and interest in his intellectual property.

Pursuant to paragraph 1 of the Letter Agreement, Mr. Silvers will exercise his right to terminate the License, Distribution and Manufacturing Agreement unless Stelor cures these breaches within 30 days.

Very truly yours,

Gail A. McQuilkin

cc:    Steven A. Silvers
Laurence Hefter

734561.1

# Exhibit D

```
                    EXHIBITS

    Exhibit                                   Page

    No. 1                                      12
                                               38
                                               77
                                               144
                                               156
                                               201
                                               214
                                               231
                                               260
```

COPY

---

**Page 1**

```
            UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA

            CASE NO. 04-80954-CIV-HURLEY
            Magistrate Judge James M. Hopkins

STOLER PRODUCTIONS, INC.,
a Delaware corporation

        Plaintiff,

vs.

STEVEN A. SILVERS,
a resident of Palm Beach
County, Florida,

        Defendant.
_____/
                            2525 Ponce DeLeon Boulevard
                            9th Floor
                            Coral Gables 33134
                            Monday, December 13, 2004
                            9:32 a.m.

        VIDEOTAPED DEPOSITION OF STEVEN BERIG

    Taken on behalf of the Defendant, before Debbie
    Oates, RPR, Notary Public in and for the State of
    Florida at Large, pursuant to Second Re-Notice of
    Taking Videotaped Deposition filed in the above cause.
```

**Page 2**

```
APPEARANCES:

    EDWARD B. RUBINSTEIN, ESQ.
    BY:  YANO J. RUBINSTEIN, ESQ.
    309 Collins Road
    Suite 1600
    San Francisco, California  94104
        on behalf of the Plaintiff.

    KOZYAK, TROPIN & THROCKMORTON
    BY:  KENNETH HARTMANN, ESQ.
    2525 Ponce DeLeon Boulevard
    9th Floor
    Miami, Florida  33134
        on behalf of the Defendant.

    DIMOND, KAPLAN & ROTHSTEIN, P.A.
    BY:  ADAM T. RABIN, ESQ.
    525 South Flagler Street
    Suite 798
    Miami, Florida  33131
        on behalf of the Defendant.

ALSO PRESENT:
    Bowen Ehlers
    Jay Murray, Stoler Representative

                    INDEX

                        Direct    Cross
Witness
Steven Berig
    (By Mr. Hartmann)      4
```

**Page 4**

```
1         THE VIDEOGRAPHER:  We are now on the video
2   record.  The time is 9:32 a.m.
3         THE COURT REPORTER:  We are here in the case
4   of Stoler Productions versus Steven A. Silvers,
5   with us, S., Case Number 04-80954, on Monday,
6   December 13, 2004 at the Law Offices of Kozyak,
7   Tropin and Throckmorton at 2525 Ponce DeLeon,
8   Coral Gables.  My name is Debbie Oates, I'm the
9   court reporter.
10        Will counsel make their appearance, please.
11        MR. RUBINSTEIN:  Yano Rubinstein appearing
12  for plaintiff Stoler Productions, Inc.
13        MR. HARTMANN:  Ken Hartmann on behalf of
14  the defendant and counter-plaintiff Steven
15  Silvers.
16        THE COURT REPORTER:  Will you raise your
17  right hand, please.
18  THEREUPON,
19        STEVEN BERIG
20  having first been duly sworn and responded, "I do,"
21  was examined and testified as follows:
22        DIRECT EXAMINATION
23        MR. HARTMANN:  Are you going to do your
24  video thing?  Usually the videographer comes in.
25        MS. MCQUILKEN:  Can you put us on the
```

---

**Page 17**

```
1   manufacturing of the licensed products.
2       A.  Mr. Silvers has interfered in Stoler's
3   ability to run its business, to utilize its personnel
4   and its -- and its assets effectively so that we can
5   in fact commercialize the intellectual properties and
6   bring them to market.  That would include
7   manufacturing products as well.
8       Q.  I appreciate that.  I -- I understand that
9   you think he's interfered.  What I'm asking is a very
10  specific question relating to Stoler's manufacturing
11  of licensed goods.  Tell me everything that Mr. -- you
12  need to be specific here because when you go to court,
13  the judge is going to be interested in specific facts
14  not simply generalizations.  So I need to know
15  every instance of Mr. Stoler's interfering with
16  Stoler's manufacturing of the licensed goods.  I need
17  specifics.  Please, if -- if any.
18      A.  Since I've made the statement that as of
19  today Stoler has not yet manufactured anything --
20  products, my answer to you remains the same.  Mr.
21  Silvers has interfered with Stoler's efforts to get to
22  the manufacturer of those products by interfering with
23  the business of Stoler.  I don't think I can be
24  anymore specific.
25      Q.  Tell me each manufacturer that Mr. Silvers
```

**Page 18**

```
1   interference has involved?
2       A.  I understand the word manufacturer to mean
3   to create and produce.  As I stated earlier, Stoler
4   has not engaged in the manufacturing, which would
5   denote a manufacturer, to date.  We are a company that
6   is in the business of growing intellectual property,
7   doing the research, doing development, creating
8   additional creativity.  If you will, and it is to that
9   end that since the onset of the project Mr. Silvers
10  has interfered with.
11      Q.  All right.  So let's -- there are -- there
12  are no specific manufacturing agreements that Mr.
13  Silvers has interfered with, correct?
14      MR. RUBINSTEIN:  Objection.  Calls for a
15  legal conclusion.
16      THE WITNESS:  Can you restate that
17  question, please.
18  BY MR. HARTMANN:
19      Q.  There's no specific manufacturing
20  arrangements that Mr. Silvers has interfered with,
21  correct?
22      A.  As I've answered now several times, we have
23  not entered into any manufacturing because Mr. Silvers
24  manufacturer as of today.  Mr. Silvers has interfered
25  with our efforts to get the manufacturing process
```

**Page 19**

```
1   started so that we could bring those products to
2   market.
3       Q.  All right.  Let's take that statement and
4   break it down.  What efforts has Stoler made to make
5   the manufacturing -- get the manufacturing process
6   started?
7       A.  Those efforts might include growing
8   characters, adding additional characters, adding
9   additional music, changing the existing website,
10  adding additional story line, dealing potentially with
11  vendors such as our musicians who would be working on
12  those story lines.  Is there areas that Stoler
13  contends Mr. Silvers has interfered with.
14      Q.  And so which -- which licensed manufactured
15  products -- which licensed products that you're trying
16  to manufacture has Mr. Silvers prevented you from
17  manufacturing?
18      MR. RUBINSTEIN:  Objection.  Vague and
19  compound.  It calls for a legal conclusion.
20      MR. HARTMANN:  You can answer.
21      THE WITNESS:  I'm going to have to ask you
22  to restate the question.
23      MR. Enrig's your testimony.
24      Mr. Enrig's your testimony.
25
```

**Page 20**

```
1   BY MR. HARTMANN:
2       Q.  Which licensed products has Mr. Silvers
3   interfered?  Which specific products that Mr.
4   Silvers interfered with Stoler's efforts to
5   manufacture?
6       A.  As of today Stoler Productions has not
7   manufactured a complete licensed product.  Mr. Silvers
8   has interfered with that process so that Stoler could
9   get to the manufacturing of those products.
10      Q.  He's interfered with the process.  Okay.
11  What I'm trying to understand what specific licensed
12  products the interference in the process has
13  prohibited or kept Stoler from manufacturing.  Are
14  there any?  Any specific licensed products?
15      A.  The product that Stoler is in, we speak,
16  is intellectual property, music, video, books, toys, all
17  of the items that deal with commercializing and
18  bringing to market the property Google and the Planet
19  of Ozo.
20  of Ozo.
21      Q.  Okay.  So let's take toys.  That -- that
22  would be a licensed product.  What specific things has
23  Mr. Silvers done to disrupt or interfered with
24  Stoler's efforts to bring toys to market?
25      A.  Stoler's efforts to bring toys to market?
```

Vertext/Florida Reporting Co., LLC - 19 West Flagler Street - Miami, Florida - (305) 376-8800
Benowitz - Berman - Cook - Florida Keys - Matz Traktman - Ivy

## Page 21

1 by lasting himself from the onset of the company
2 into company's business by interfering with
3 relationship the company has, by interfering with
4 employees of the company, by interfering with the
5 company's ability to continue to grow the business in
6 an unfettered fashion.
7   Q.  Okay.  What employees has Mr. Silvers
8 interfered with?  Which ones?  Can you name those,
9 please.
10  A.  Mr. Silvers has interfered with a variety of
11 We could list all the early days of Stelor who
12 are no longer with this company.  Up through I would
13 say June of last year Mr. Silvers, to name one
14 example, interfered with Julie DePue, the production
15 coordinator of our Stelor Productions, and her ability
16 to continue efficiently grow.
17  Q.  All right.  Julie DePue is she no longer
18 with Stelor?
19  A.  She is currently with Stelor.
20  Q.  She's currently with Stelor.  And Her
21 position is what?
22  A.  Production coordinator.
23  Q.  And how did Mr. Silvers interfere with Julie
24 DePue's ability to further Stelor's business?
25  A.  Mr. Silvers took it upon himself to sell

## Page 22

1 and e-mail incessantly multiple e-mails on how the
2 licensing should build a website for the customers
3 would be involved, what type of builds would be at
4 the show, what type of cage - He wanted to approximately
5 30 percent of her time that was devoted to the show
6   Q.  All right. So other than e-mails on the show
7 which Stelor does dailyjob?
8   A.  All right.  I'm going to ask you letters that
9 with Stelor?  With Mr. DePue?
10   MR. RUBINSTEIN: Objection.  Vague and
11 ambiguous.
12   THE WITNESS:  What's your question?
13 BY MR. HARTMANN:
14   Q.  I want to know what Mr.
15 Silvers did that interfered with Julie DePue, Aside from
16 sent an to the e-mails to Julie DePue.  Aside from
17 sending the e-mails, what else did he do?
18   A.  Well the incessant e-mails and harangue
19 that about what Stelor was wanting in regards to the
20 licensing show.
21   Q.  All right.  And how did this keep Stelor
22 from doing what it wanted to do in the licensing show?
23   A.  You asked me to give you an example of how
24 DePue was interfered.
25   Q.  All right.  We're going back to go back.

## Page 23

1   A.  Mr. Silver's interference in the staffing of
2 our business within it has made it more difficult, made the
3 days that much longer ... insured that much overhead to
4 that it made it that much more difficult for Stelor to
5 do its job.
6   Q.  All right.  So other than the fact that in
7 the early e-mails... and make a phone calls, there
8 was nothing else that he did that interfered with
9 Julie DePue's daily job as product
10 coordinator?
11   A.  I can't recall it at this time.
12   Q.  Okay.  Besides Ms. DePue, what other
13 employees were interfered with by Mr. Stelor?  Because
14 when giving this orders, correct?
15   A.  Peter Seifert.
16   Q.  You want to define employees?  Full-time,
17 outsourced?
18   A.  I'm using your 4-year interest; i'm
19 asking you did not full numbers we're numerous employees
20 that Mr Silvers had interfered with in the process so
21 that used to know who those particular people are.
22   MR. RUBINSTEIN: Objection the extent that
23 in assuming Mr. Fred's prior testimony.
24 BY MR. HARTMANN:
25   Q.  So you can answer.  Who are they?  Who are

## Page 24

1 these other employees?
2   A.  Stelor Itd consists of this project Mr. Silvers
3 has interfered with a variety of the employees at
4 Stelor Productions that are building an individual overhead and
5 cost and making it more consistent from the
6 onset of the project and I make an executive
7 decision that bringing this product to market and
8 at the times questioned with the world as well as
9 helping me build a profit for Stelor with partners and
10 question in who are those employees?  I need you to
11   A.  Mr. Silvers interfered with Stelor.  Mr. Silvers
12 interfered with as well -- are you wanting relative to
13 that date or from the time -- from the beginning?
14   Q.  Any time.
15   A.  Mr. Silvers interfered with Michael Shepard,
16 with Mr. Fred Hildebrand.
17   Q.  What was his position?
18   A.  What was his position?
19   A.  Mr. Hildebrand was also a business manager.
20   Mr. Silvers interfered with the.  Mimi Lipp,
21 in her ability.  As are the employees.  There are
22 consultants and other -- that's why I asked you to
23 define.
24   Q.  All right.  We're going back to go back.
25   A.

## Page 29

1   Q.  I asked him, Mr. Silvers repeatedly and finally
2 found myself having to ask him to leave the booth.
3   Q.  Did you tell Mr. Qnall that you were giving
4 the orders and not Mr. Silvers?
5   A.  Absolutely.
6   Q.  So certainly at that point any interference
7 would have stopped?
8   A.  It would have but Mr. Silvers does what Mr.
9 Silvers wants to do invariably.
10   Q.  But the effect on Stelor stopped when you
11 advised your -- these employees that Mr. Silvers
12 wasn't giving this orders, correct?
13   MR. RUBINSTEIN: Objection.  No question.
14 BY MR. HARTMANN:
15   Q.  You -- you can answer.
16   A.  What was the question?
17   Q.  The -- the effect on Stelor, whatever it Mr
18 and I still can't understand what you're saying
19 about, stopped when you told this orders; that's
20 orders from Mr. Silvers, I give this orders; that's
21 when it stopped, correct?
22   A.  No, because Mr. Silvers did not leave the
23 vicinity of the booth until he was physically
24 asked by me to leave.  Interacting with customers now
25 whittling Mr. Silvers' interference; Mr. Silvers

## Page 30

1 stood there and said that he was the creator of the
2 project and informed them that he was in charge of
3 the booth.  No, that interference was ongoing.
4   Q.  This is at the entire show in 2003?
5   A.  That's correct.
6   Q.  Okay.  Why didn't Stelor did Mr. Silvers
7 hands in 2003 when all this still happening?
8   MR. RUBINSTEIN: Objection.  Calls for a
9 narrative?
10   THE WITNESS: You could not advise the people
11 as I answered.  You'd been extremely
12   A.  I can Defue, our product still was a project and Mr.
13 Silvers' behavior did have been consistent from the
14 onset of the project and I made an executive
15 decision that bringing this product to market and
16 the times questioned with the world as well as
17 providing a profit for Stelor with partners and
18 because we had gotten very yield to the pattern of
19 Mr. Silvers' interference, I thought something that
20 breath of part of my daily responsibilities to
21 contend with.
22   MR. RUBINSTEIN: Objection.  Misstates prior
23 testimony.
24   A.  I appreciate that but my question is if this
25 was such a problem in 2003 why did Stelor wait until

## Page 31

1 I hear this thing?
2   A.  Because up until October of 2004 it was my
3 job to babysit Mr. Silvers, run interference and
4 allow Stelor Productions to finish its appointed task.
5 By October of 2004 Mr. Silvers' behavior and the
6 contract and interference to our ability to run our
7 business had become so egregious that we had no other
8 recourse.  We had attempted to, from the onset of this
9 relationship, negotiate with Mr. Silvers directly and
10 through many different counsel to try to have an
11 amicable and reasonable working relationship but
12 ultimately it always came back to Mr. Silvers'
13 perception that he in fact was running this project
14 ...  and he calls the shots in all regards relative to the
15 commercializing of the product.
16   Q.  And so because he said that it was true?
17   A.  Because who said what?
18   Q.  Because Mr. Silvers said that he was running
19 everything that made it true?
20   A.  No, it made it very difficult to run Stelor
21 because of his level of interference.
22   Q.  Because you could not advise the other --
23 employees of Stelor like -- that you were running
24 things?
25   MR. RUBINSTEIN: Objection.  To the extent

## Page 32

1 that there's no question preferred.
2   THE WITNESS: It's very difficult to run a --
3 business concern when you've got an outside
4 individual who believes and claims in to
5 that calls a consistent relationship to all of --
6 licensees and that individuals and brand vendors
7 everybody can do that individuals all and are under --
8 claiming from one page to do pages.  Usually one
9 defining authority nil ... in form the process --
10 system of that is identical to the employees about --
11 the outside employees in which it a place where they
12 are still produce it is very expensive and so for
13 Stelor by October 2004 it becomes untenable to
14 have we could no longer expend resources to
15 provide Mr. Silvers with something to do in his
16 spare time.
17 BY MR. HARTMANN:
18   Q.  All right.  So since in 2003 you said that Mr.
19 Silvers' interference has detrimental effect on
20 licensees and vendors.
21   MR. RUBINSTEIN:
22   Q.  Tell me who all the licensees were that were

## Pages 153–156

**Page 153**

1  Silvers for his opinion on what that dollar figure
2  should look like.
3      Q.  Okay. I'm asking you whether or not you
4  asked for his opinion on what the dollar figure was.
5  What -- as presented to Google.
6      A.  Again, I --
7      Q.  Let me backtrack. Did Stelor ever make a
8  proposal with a price tag on it?
9      A.  Stelor's lawyers did, yes.
10     Q.  Okay. What were the price tags?
11     A.  Again, as I said --
12     Q.  You don't remember?
13     A.  Right.
14     Q.  Okay.
15  or the proposals to Google with a price tag, was that
16  information provided to Mr. Silvers? That
17  information.
18     A.  At that -- I -- I don't remember at that
19  point because the attorneys were making those offers
20  to Google.
21     Q.  So you don't know whether or not Mr. Silvers
22  knew that there were proposals going to Google with
23  specific dollar figures?
24     A.  Again, our attorneys were speaking to Mr.
25  Silvers' attorney Mr. Stumpf so I -- I can't really

**Page 154**

1  answer that.
2      Q.  So the answer is no you don't know.
3      A.  I don't know. Yes, that's right.
4      Q.  Fine. Okay. Stelor can't sell any of the
5  Googles IP to Google, can it?
6      A.  Absolutely not. Mr. Silvers is the owner:
7      Q.  So what does Stelor have to offer Google
8  since it's a mere licensee of the Googles IP?
9      A.  Stelor can offer Google its rights as the
10  exercise trademark or get involved with a company that
11  will in the largest citizen's company of its kind
12  in relation to the Internet out there. We can sell the
13  IP -- the Internet is the owner. We wouldn't attempt to
14  sell the IP because we are very clear everything we've
15  done, every benefit inures to Mr. Silvers as the
16  owner, but Stelor has the rights as the exclusive
17  worldwide licensee to offer Google a relationship that
18  benefits not only Mr. Silvers but Stelor as well as
19  far as commercializing the property.
20     Q.  All right. So has Stelor ever offered to
21  sell any Googles IP to Google?
22     A.  No.
23     Q.  Has Stelor ever offered to sell the
24  Googles.com domain name to Google?
25     A.  No.

**Page 155**

1      Q.  Have you personally had any conversations
2  with anybody about -- at Google about having a
3  relationship between Google and Stelor?
4      A.  Have I had a conversation with someone at
5  Google, Inc.. No, I testified earlier that I've never
6  had a conversation with anyone at Google, Inc.
7      Q.  All right. So in this article where
8  you've -- you mentioned that you -- you and others
9  have called since 2001 as a result of those contacts,
10  you've never had any -- you yourself have never had
11  any conversations with Google, Inc.?
12     A.  Correct.
13     Q.  And other than your lawyers nobody else at
14  Stelor has either?
15     A.  Correct.
16     Q.  Okay. What -- other than the conversations
17  that you told me about that Mr. Silvers -- the
18  contacts that Mr. Silvers had back in 2001, are you
19  aware of any other conversations or communications
20  that Mr. Silvers has had with Google, Inc.?
21     A.  Only the -- the conversations that Mr. Silvers
22  verbally shared with me when he would try to call or
23  email Google. Beyond that, no.
24     Q.  And when -- when -- what was the time frame
25  for those conversations when Mr. Silvers told you?

**Page 156**

1      A.  It's hard -- it's -- because there were so
2  many hundreds and hundreds of e-mails from Mr. Silvers
3  I don't remember which one when or which conversation
4  when.
5      Q.  All right. So any time Mr. Silvers would
6  have contacted Google, Inc. your knowledge of that
7  would be based on an e-mail that he provided to you?
8      A.  Or conversations that he had with me.
9      Q.  All right. So -- has your knowledge those
10  recollection as to the time period where these
11  communications were taking place?
12     A.  I do. I recall that it was all prior to May
13  of 2002 before Stelor got involved. There
14  were the things that Mr. Silvers told me he did prior
15  to when or when he was with the Acorn Collection.
16     Q.  So after the June 2002 license agreement
17  you're unaware of any contacts that Mr. Silvers has
18  had with Google, Inc, correct?
19     A.  Correct.
20     Q.  All right. I wanted to not you -- let's
21  mark this.
22          (Document was marked as Exhibit No. 5
23  for identification.)
24  BY MR. HARTMANN:
25     Q.  Five?

Veritext/Florida Reporting Co., LLC - 19 West Flagler Street - Miami, Florida - (305) 376-8800
Benowitz - Berman - Cook - Florida Keys - Matz Trakhman - Ivy

39 (Pages 153 to 156)

## Pages 89–92

**Page 89**

1  notwithstanding that fact that Mr. Silvers tried to
2  fire him.
3      Q.  So -- so there's been no effect whatsoever
4  on Stelor in the PTO proceedings. Mr. Silvers did not
5  fire Stelor's lawyer, correct?
6      A.  Again, I --
7          MR. RUBINSTEIN: Objection to the extent
8  that it calls for a legal conclusion.
9  BY MR. HARTMANN:
10     Q.  I'm trying to understand what the effect
11     A.  It's -- it has a cost Stelor Productions
12  additional dollars and additional time because yet
13  again Mr. Silvers has interfered with and by way of
14  it and the document breached his contract with us and so,
15  yes, there has been damage.
16     Q.  All right. So by saying that he doesn't
17  want Mr. Borchard to represent him that's a breach of
18  the contract, is that what I understand your testimony
19  to be?
20     A.  No, by sending a letter releasing Mr.
21  Borchard, which he has no authority to do, I believe
22  that is a material breach of the contract, yes.
23     Q.  Releasing Mr. Borchard was a breach of the
24  contract?
25     A.  Releasing and/or firing any lawyer that

**Page 90**

1  Stelor has because of our irrevocable power of
2  attorney and our sole right to do so, yes, I believe
3  that Mr. Silvers breached that contract.
4      Q.  Okay. And the fact on Stelor has been
5  that is cost them money?
6      A.  And time.
7      Q.  And time.
8      A.  And by the way if -- if you've spent time on
9  something that results from Mr. Silvers' breaching the
10  contract, you can quantify what that time is worth,
11  correct?
12     A.  I'm sorry? Tell me the --
13     Q.  Can't you quantify -- if you have an
14  employee that has to spend ten hours because of
15  something Mr. Silvers did, can we --
16     A.  Yes, that would be correct.
17     Q.  We can quantify that?
18     A.  The cost of it and --
19     Q.  We're going to come back to this a little
20  bit more later but you mentioned that registrations in which Mr. Silvers
21  obtained trademark registrations in which Mr. Silvers
22  is noted as the owner of the trademark, correct?
23     A.  Correct.
24     Q.  And the same applies to domain names?
25     A.  Yes.

**Page 91**

1      Q.  And have all the domain names that Stelor
2  has acquired have they been noted as being owned by
3  Mr. -- or the registrar on them would be Mr. Silvers?
4      A.  To the best of my knowledge, yes.
5      Q.  And the domain names that we're talking
6  about would be anything with the element Goo?
7      A.  Yes.
8      Q.  And the same thing with trademarks?
9      A.  Yes.
10     Q.  All right. How else has Mr. Silvers'
11  breached the contracts, and I'm using both, referring
12  to Exhibit 1 and Exhibit 2, as alleged in your
13  emergency motion which is Exhibit 37. We're going to
14  get to the second part which -- which is the impeding
15  your performance and jeopardizing your business but
16  right now I just want to know the string of material
17  breaches. And we've got the failure to do the video
18  time capsule history, we've got the trademark office
19  matters of diverting from your counsel any
20  correspondence, we've got the domain name password
21  issue, and we have the fact that Mr. Silvers asked --
22  requested that Mr. Borchard not represent Mr. Silvers
23  Next. What else? What other conduct?
24          MR. RUBINSTEIN: Objection to the last
25  question. It is complex, compound, and calls for

**Page 92**

1  legal conclusion. You may answer if you can.
2  BY MR. HARTMANN:
3      Q.  Is there anything in that summary that's
4  wrong?
5      A.  Would you state it --
6      Q.  Anything in that summary that I just gave you as to
7  the breach points.
8      A.  Would you restate those, please.
9      Q.  We have not -- failing -- part of failing
10  to do the video time capsule history, right?
11     A.  Right.
12     Q.  The trademark office --
13     A.  Right.
14     Q.  Okay. The diversion from Stelor's counsel with
15  respect to correspondence with the trademark office.
16  That's failing to provide passwords to Stelor
17  with respect to the domain names. That's three.
18  for domain names. That's was three.
19  And the -- Silvers firing Mr. Borchard was
20  Number 4.
21     A.  Okay. What's next?
22     Q.  Mr. Silvers entering into discussions with
23  Google, Inc.
24     A.  All right. That's a breach of the
25  agreement?

Veritext/Florida Reporting Co., LLC - 19 West Flagler Street - Miami, Florida - (305) 376-8800
Benowitz - Berman - Cook - Florida Keys - Matz Trakhman - Ivy

23 (Pages 89 to 92)

27 of 39

---

**Page 173**

```
 1     A.  Yes, I'm sorry.  RedRower Creations is one
 2  of the outside income sources.  The lovely...
 3     Q.  That's good.  That's fine.  You can
 4  interrupt me for that kind of stuff.  RedRower.  Is
 5  that different than Charles Bernel --
 6     A.  No.
 7     Q.  -- and Mike Warren?
 8     A.
 9  full-time employees at Steler?
10     A.  How many artists are there on staff
11
12     A.  All right.  Which -- and is there actual
13  tangible graphic work and drawings that Steler has as
14  a result of spending this money for the artists?
15     A.  Yes.
16     Q.  And do you have an idea of how much money
17  has been spent by Steler out of the $5 million set out
18  in your affidavit in Paragraph 8 on art?
19     A.  Okay.  Which leads to overhead.  What is
20  the overhead for Steler?  Buy -- say, per month.
21     A.  It's been growing so rapidly over the last
22  four months because we've been staffing up and -- I
23  would say down where we've been several hundred thousand
24  dollars a month at this point.  That would be the burnt
25  rate, overhead, outside sources, somewhere in there.
```

**Page 174**

```
 1  Again, I'd have to check my ledger.
 2     Q.  Well, you're including outside sources that
 3  we've already discussed in the overhead?
 4     A.  Outside consultants, overhead? --
 5  yes, that -- that would all be my overhead --
 6     Q.  That original source outside or --
 7  outsourced consultants that you've told me about --
 8  before in connection with your business?
 9     And what is the fabric of Steler's business?  Does
10  Steler -- before breaking down:  Does Steler pay rent
11  to you to locate him office at your business?
12     A.  Yes.
13     Q.  How much rent a month?
14     A.  Approximately $5,000.
15     Q.  All right.  And of course you receive a
16  salary?
17     A.  Yes.
18     Q.  And how much is that?
19     A.  $59,000.
20     Q.  A month?
21     A.  Yes.
22     Q.  All right.  Anyone in your family receive a
23  salary?
24     A.  No.
25     Q.  Are there any other significant overhead
```

**Page 175**

```
 1  items besides the items you've told me about so far?
 2     A.  Mainly salaries and -- and kind of just
 3  general operations costs.
 4     Q.  All right.  In Paragraph 9 of your affidavit
 5  that we've marked as Exhibit 5.  Well, let -- let me
 6  go up to Paragraph 8.  You talk about the employees
 7  have devoted themselves to making Steler and the
 8  Googles successful and profitable.  Do you see when I
 9  say?
10     A.  Yes.
11     Q.  Is Steler profitable?
12     A.  No.
13     Q.  Has it ever made a profit since it started
14  in the middle of 2002?
15     A.  No.
16     Q.  Has Steler ever paid any royalty money to
17  Mr. Silvers?
18     A.  No.
19     Q.  Does Steler owe any royalties to Mr. Silvers
20  as of today to your knowledge?
21     A.  Not to my knowledge.
22     Q.  All right.  In Paragraph 9, toward the --
23  the last part of it, you say that Silvers commenced a
24  campaign to hijack and extricate himself from the very
25  fabric of Steler's business.  Do you see that
```

**Page 176**

```
 1  sentence?
 2     A.  Yes.
 3     Q.  Now this morning we discussed the contention
 4  that Silvers has, you know, interfered with Steler --
 5  Is there anything in addition to what you told this
 6  morning by which Mr. Silvers has injected and extricated
 7  himself into the very fabric of Steler's business?
 8     A.  No, I think I covered it all this morning.
 9     Q.  And what is the fabric of Steler's business?
10     A.  Commercializing Googles and the fabric of --
11     Q.  Commercializing Googles is really
12     A.  It's marketed ...
13     Q.  ... worldwide?
14     A.  Yes.
15     Q.  And in fact the major way that you've
16  commercialized it from 2002 to the present is really
17  through the website, is it?
18     A.  Yes.
19     Q.  You don't have any manufactured products,
20  correct?
21     A.  Correct.
22     Q.  We're not selling anything?
23     A.  Correct.
24     Q.  So the website is pretty much the commercial
25     A.  The website and now our presence on i-Tunes,
```

---

**Page 193**

```
 1  the lies and deceit that Mr. Silvers practices in his
 2  day-to-day business activities all of which, many of
 3  which are documented in his e-mails, some of which
 4  I've mentioned earlier.  I have no reason to as the
 5  CEO and president of Steler Productions given Mr.
 6  Silvers' track record with Steler, not his prior
 7  record or his past, just his track record dealing with
 8  Steler today.  I have absolutely no confidence, zero,
 9  in Mr. Silvers' ability to practice anything in
10  integrity and so I'm looking to the court to make that
11  determination.
12     Q.  So the reason you filed this lawsuit in
13  Federal court was because you're afraid in -- in
14  general -- in general principle based on things that
15  Mr. Silvers has suggested years ago that Mr. Silvers won't comply
16  with the agreement?
17     A.  --
18     MR. RUBINSTEIN:  Objection.  Mistakes prior
19  testimony.
20     THE WITNESS:  No, I filed this lawsuit
21  because Mr. Silvers --
22     MR. HARTMANN:  Okay.  I just want to --
23     THE WITNESS:  -- has breached his contract
24  in several areas.
25
```

**Page 194**

```
 1  BY MR. HARTMANN:
 2     Q.  I think we've been through all of that.
 3     A.  Thank you.
 4     Q.  And we'll let the court decide that and
 5  that's really the larger case, but this specific issue
 6  is going to be heard by the judge and I just want to
 7  need to have the evidence that would rule in why
 8  Steler needs its lawyer as the correspondent
 9  of record with the PTO.  That's what I only want to
10  focus on; not, you know, I'm afraid he's going to
11  breach the contract because of other things he's done.
12  I want to know in particular why
13  Mr. Heller hasn't gotten all the
14  information he needs from the Patent and Trademark
15  Office regarding the Googles trademarks?
16     A.  As I said earlier, I can only rely on my
17  experience with Mr. Silvers and, again --
18     Q.  -- Is all due respect --
19     A.  I'll have to depose Mr. Heller then.
20     Q.  Absolutely.
21     A.  So well have to talk to him about being
22  deposed since you don't have any knowledge that
23  relates to this.  As I'm hearing.  I haven't heard one
24  fact.
25
```

**Page 195**

```
 1     A.  I've answered your questions to the best of
 2  my ability, counselor.
 3     Q.  Okay.
 4     MR. RUBINSTEIN:  You may want to try asking
 5  him why Steler needs Mr. Heller to receive
 6  correspondence from the trademark office.
 7  BY MR. HARTMANN:
 8     Q.  I've asked him that a different ways.
 9  Now are you aware that a lot of the
10  trademark office communications are a matter of public
11  record?
12     A.  Yes.
13     Q.  And in fact your lawyers can go on-line and
14  get that?
15     A.  As can Mr. Silvers.
16     Q.  That's right.
17     A.  And so there really would be no need, would
18  there, for your lawyers to be the correspondent of
19  record with the Patent and Trademark Office if they
20  can access all that information on-line?
21     A.  No, I disagree.  I think there is a
22  need that --
23     Q.  Why is that?
24     A.  Because I have a contract too between myself
25  and Mr. Silvers in which Steler has the sole right, it
```

**Page 196**

```
 1  doesn't say Steler has some rights, it says sole and
 2  my understanding of that term sole means -- and by the
 3  way it says sole exclusive -- it says absolutely
 4  exclusive even for Mr. Silvers it says that we have
 5  those rights and not that Mr. Silvers has these
 6  rights.  The way I read the language when it says that
 7  Steler has the sole right exclusive even to the
 8  licensor, no, I don't think that it is incumbent upon
 9  Steler or Steler's counsel to ask Steler can incur
10  additional legal fees for them to go on-line to start
11  tracking down correspondence that should be mailed or
12  sent or e-mailed or however it's done as a matter of
13  appropriate business course.
14     Q.  The sole rights that Steler has are simply
15  to use the IP, correct?
16     A.  Not correct.  I would -- I would beg to
17  differ.
18     Q.  Who owns the IP?
19     A.  Mr. Silvers is the intellectual property
20  owner.  Mr. Silvers entered into a contract to which
21  Silvers -- to which Steler not only paid considerable
22  and I'm going to pay considerable consideration, but
23  I'm going to align myself with you in that when Mr.
24  Silvers granted Steler Productions the sole right
25  exclusive even to himself that I think I'm going to
```

**197**

1 depend on the judge's interpretation of that language
2 such that Mr. Silvers has no right to interfere, take
3 previously and you weren't here. Does that refresh
4 your recollection --
5 Q. -- interfere with Stoler's business to effectively
6 commercialize and bring the Googles from Goo to
7 market.
8 interfere with Stoler's business?
9 Q. Yeah, I'm just trying to understand how that
10 abilities --
11 A. He explained it to the best of my
12 You have. I appreciate that.
13 Q. The -- have -- have you ever asked Mr.
14 from the PTO?
15 A. No.
16 Q. Do you know who customarily for the
17 correspondent at the USPTO with respect to a
18 trademark?
19 A. In my experience it usually is the trademark
20 or the IP counsel.
21 Q. Right. And is a counsel of who? The
22 owner or the licensee?
23 A. Traditionally my understanding is unless the
24 owner has granted those rights and, again, has granted
25 those sole rights exclusive even to him or herself,

**198**

1 traditionally it would be the owner but in this case
2 based on the context language, it absolutely is clear
3 that those rights belongs to the licensee, Stoler.
4 Q. ... lawyer at the ... traffic ...?
5 A. ... But realistic to that case -- all this
6 language that says Silvers shall interact the USPTO to
7 name Stoler as correspondent of record of course
8 belongs only to Stoler's representative --
9 THE WITNESS: What's the question?
10 BY MR. HARTMANN:
11 Q. ... is it up to him to reach out because he
12 content, Exhibit 11, in which Silvers correspondent with the
13 repeatedly says -- is a lawyer at the ...
14 USPTO?
15 A. I've referred you to two sections of the
16 contract that I think in fact make that point.
17 Q. I just want to make sure that we're on the
18 same page --
19 Now, the lawyer at that was -- was listed as the
20 to correspondent -- by the way your affidavit says it
21 was two months ago that -- it's at the Paragraph 11
22 think. Paragraph 11 of your affidavit, Exhibit 5 --
23 A. Yes.
24 Q. Just referring him to that before I ask

**199**

1 the question.
2 A. -- Within the past two months -- You had
3 previously and you weren't here. Does that refresh
4 your recollection --
5 Q. -- that you swore in this affidavit?
6 A. Yes.
7 Q. Yes.
8 Q. It was within the last two months of October
9 21st, 2004 that Silvers unilaterally without --
10 A. Yes.
11 all correspondence for each of the Googles
12 applications and registrations to Steven Silvers. See
13 that?
14 A. Yes.
15 Q. Instead of Stoler's (sic) -- Stoler's duly
16 appointed attorneys. At the bottom of Paragraph 11.
17 A. Yes.
18 Q. All right. Who -- who two months ago who were
19 Stoler's duly appointed attorneys?
20 A. As of the date of this.
21 Q. Two months ago from October?
22 A. I'm sorry. The question for?
23 Q. Well, the affidavit is dated October and
24 you're saying --
25 A. So within the past two months that would

**200**

1 mean September and August said during that time that
2 would be Flurman/Henderson, Paradone/Garrett and
3 Dinner and/or Cowen, Liebowitz and Kaufman.
4 Q. All right?
5 A. But realistic to that case -- all this --
6 Henkman and Henderson?
7 A. But in my event it certainly was not the --
8 Stoler, correct?
9 A. Correct.
10 Q. He was long gone?
11 A. -- He had been fired. No, I think you said he
12 withdrew.
13 Q. Withdrew.
14 A. Yes.
15 Q. And the reason he withdrew is that he didn't
16 want to work with Steven Silvers as you told us?
17 A. I don't know, would it?
18 Q. -- is the reason at the time Mr. Silvers
19 correspondent of record at the time. Mr. Silvers
20 changed the name, wouldn't that have been the best
21 approach to keep the trademark registration?
22 A. Its legal conclusion: You can answer if you know the
23 answer.
24 THE WITNESS: I do know the answer to this.

50 (Pages 197 to 200)

Veritext/Florida Reporting Co., LLC-19 West Flagler Street - Miami, Florida - (305) 376-8800
Benowitz -- Berman -- Cook -- Florida Keys -- Matz Traktman -- Ivy

**205**

1 A. By both Stoler as well as by Mr. Heller.
2 Q. When was that?
3 A. That was -- at least one time that I'm aware
4 of at the meeting with Heller, Borchard, Silvers,
5 Stumpf, Borg, DiMuccio and the other attorneys that
6 I'm not aware of from the New York law firm.
7 Q. Okay. And that's roughly, when, July of
8 2004?...
9 A. -- That was within the last two months of October
10 whether or not we are in our right--
11 Q. Okay. Let's talk about Part B. I'm -- I'm
12 counsel --has Stoler's counsel requested that the PTO
13 list them as correspondent on the Google IP ...
14 A. Yes, I believe --
15 Q. And -- when did the PTO respond?
16 A. I'm unaware of how they responded to counsel
17 having not been in the conversation between counsel
18 and the USPTO...
19 Q. But as we all know you can't tell me
20 any specific information from the PTO, the affiant your
21 no matter from the PTO that has had any effect on your
22 business; any specific information?
23 A. No.
24 Q. You can tell me?
25 A. Violate and I cannot.

**206**

1 Q. You cannot. You agree with that? --
2 A. Did you say you cannot or you can?
3 Q. Chanted?
4 A. I cannot tell you that which I'm unaware of.
5 Q. Okay. And would all this -- all this --
6 Federal lawsuit and affidavit you filed, all that all be
7 as the facts contained within the PTO; would that all be
8 mitigated if Mr. Silvers simply said if I, I send
9 send any copies of whatever I got or whatever I send
10 to it?
11 MR. RUBINSTEIN: Objection. Vague and I
12 ask again.
13 MR. RUBINSTEIN: Calls for a legal
14 Q. My understanding that your lawyer advised as
15 to all PTO actions?
16 A. I don't know, would it? How would I know
17 that if I did advise us the ability to manage and
18 19 correspondent of record as to do both of those things?
19 20 a weakening of our ability to do both of those things?
20 21 Q. But the answer is you don't know?
21 22 Steven Silvers sending copies to his counsel --
22 23 A. I don't have to keep him informed about anything
23 24 happening with those trademarks?
24 25 A. Based on Mr. Silvers' track record we do not

**207**

1 I have that confidence.
2 Q. I'm asking you if you have the confidence.
3 A. I'm asking you from an informational standpoint
4 whether that would be sufficient. You don't know?
5 A. No, I am answering it that I believe that
6 Mr. Silvers' interference in this trademark office or
7 any phase else that diminishes or weakens our ability
8 to protect our investment and the property is not
9 allowable and we are looking to the court to determine
10 whether or not we are in our right--
11 -- Q. Okay. Let's talk about Part B. I'm -- I'm
12 really kind of interested in showing what you did to
13 determine whether you were in your right before you
14 filed this lawsuit because that may have serious
15 repercussions for your company down the road, but I
16 guess -- let me ask you about Part D or Page 2, 40 --
17 Exhibit 5 where you are asking the court to order Mr.
18 Silvers to cease and desist from communicating with
19 the USPTO regarding the Googles trademarks. Do you
20 see that part?
21 A. Yes.
22 Q. And the Google trademarks are the ones that
23 are owned by Mr. Silvers, correct?
24 A. Yes.
25 Q. And you're asking the court to basically put

**208**

1 a gag on Mr. Silvers about communicating with the
2 USPTO? Is that how I understand that? ...
3 MR. RUBINSTEIN: Objection. The document
4 speaks for itself --
5 BY MR. RUBINSTEIN: Calls for a legal
6 MR. HARTMANN:
7 A. Is that what you want the judge to do?
8 A. I agree the document does speak for itself.
9 We want Mr. Silvers to cease and desist from --
10 communicating with the trademark office, regarding the
11 Google trademarks because that weakens our ...
12 Mr. Silvers is prohibited from communicating with the
13 trademark office regarding the Google trademarks. --
14 MR. RUBINSTEIN: Can you read my earlier answer
15 about intellectual property protection in Section
16 A in Infringement in Section 11. In Paragraph
17 A in Infringement in Section 11. In Paragraph
18 18 Section A. Duties of Consultant, it uses
19 19 Agreement, I believe that -- and, again, I speak
20 20 as a layman so I'm not entirely certain that
21 21 understanding of those clauses leads me to --
22 22 believe that Mr. Silvers needs to abide by the --
23 23 keep us informed about anything
24 24 terms of the contract and cease and desist from --

52 (Pages 205 to 208)

Veritext/Florida Reporting Co., LLC-19 West Flagler Street - Miami, Florida - (305) 376-8800
Benowitz -- Berman -- Cook -- Florida Keys -- Matz Traktman -- Ivy

**213**

```
 1  I grant Stoler Productions the, quote, sole right even
 2  unto himself as far as the behalf and instead of in
 3  regard to this intellectual property. Therefore, we
 4  contend in our action that Mr. Silvers both cease and
 5  desist from communicating with the USPTO regarding the
 6  Google trademark.
 7         MR. RUBINSTEIN: Madam Court Reporter, did
 8  you get all of that?
 9  BY MR. HARTMANN:
10     Q. Yeah, I sure could have saved you a lot of
11  time if I'd known you were going to write all this.
12  If this is what we'll do. Since my question was the
13  interpretation of the agreement, so I'm going to
14  PTO, I'm going to circle this in red and I'll give it
15  back to you and hand pen and I want you to circle
16  to decide whether you're right or wrong, just get
17  for identification...Could you...my...
18  the previous communication that I asked you about
19  and I'll ask you again, would you just go and write
20  I mean. I can't tell you what to do.
21     A.  Okay.
22         MR. RUBINSTEIN: Steve, it's up to you if
23  you want to write anything more. You can -- this
24  BY MR. HARTMANN:
25     Q. So I've asked you to circle any
```

**214**

```
 1  communications in red and let the record reflect that
 2  the defendant -- or the witness has declined to do so.
 3  I guess that's where we'll have to leave it.
 4         MR. RUBINSTEIN: Can I get a copy of this?
 5         MR. HARTMANN: Yeah, when we're done.
 6     Q. Did you mind that? Could you do...
 7     (The document was marked as Exhibit No. 7
 8  for identification.)
 9  BY MR. HARTMANN:
10     Q. Okay. Let's go on C here on this
11  preliminary injunction. Maybe we'll do a little bit
12  better with that one. In this one you're asking the
13  judge to enjoin Mr. Silvers not to take any action in
14  the pending cancellation proceeding Google, Inc. has
15  filed to cancel the registration for Google and
16  Design. Do you see that?
17     A. Yes.
18     Q. Now, just so the record is clear and it says
19  in number...matters pending in the trademark office
20  between Stoler and Google, right?
21     Q. I'm asking him for the contractual basis
22  that they're going to present to the judge as to why
23  Mr. Silvers to talk about somebody besides Google
24  against Mr. Silvers individually, correct?
25     A. No.
```

**215**

```
 1     Q. Okay. What am I missing?
 2     A. I believe by definition if it involves the
 3  Googles and Design that which -- that which Stoler has
 4  the exclusive rights to protect and defend instead of
 5  on behalf of Mr. Silvers that Stoler has a commitment
 6  based on some of the previous quoted paragraphs from
 7  the license to defend that action. And by definition
 8  that Steven Silvers not take the action because in his
 9  contract and license to Stoler he has granted Stoler
10  the sole rights even unto himself to protect and
11  defend this intellectual property.
12     Q. Mr. Barig, I really appreciate hearing your
13  interpretation of the agreement, and we're going to
14  deal with that and the judge is certainly going to
15  decide whether you're right or wrong, but just we get
16  to later and carefully to my question and my question
17  is this the action that Googles Inc. filed against
18  Mr. Silvers individually?
19     A. That was not your question.
20     Q. -- not all the various areas that we've --
21  discussed about the other cases involving selling
22  Stoler and Google. I don't want an -- I want to talk
23  those out. I want to make sure we know what cases
24  we're talking about in Part C. What you're asking the
25  judge to do relates to the action that Google, Inc.
```

**216**

```
 1  I filed against Mr. Silvers individually. That was my
 2  question -- is that your understanding?
 3     A. Yes.
 4     Q. So Mr. Silvers is an individual defendant in
 5  a case brought by Google against him, right? That's
 6  the case we're talking about.
 7     A. Yes.
 8     Q. And you want the judge to prevent him from
 9  taking any action in that case, correct?
10     A. No.
11     Q. -- Where in the contract does it say he's
12  prohibited from defending himself when he gets sued?
13         MR. RUBINSTEIN: Argumentative. The...
14  definition speaks for itself.
15  BY MR. HARTMANN:
16     Q. I don't see it there so I'm just, you know,
17  inviting you to, you know, help me figure it out.
18         MR. RUBINSTEIN: Are you asking for his
19  interpretation of the contract?
20  BY MR. HARTMANN:
21     A. Yes.
22         MR. RUBINSTEIN: You can answer to the
23  extent of your abilities.
```

54 (Pages 213 to 216)

Veritext/Florida Reporting Co., LLC - 19 West Flagler Street - Miami, Florida - (305) 376-8800
Benowitz - Berman - Cook - Florida Keys - Matz Traktman - Ivy

**229**

```
 1  trademarks for example; wanted to sell those to a
 2  third party?
 3         MR. RUBINSTEIN: Objection. Calls for
 4  speculation.
 5  BY MR. HARTMANN:
 6     Q. He can do that, didn't he? He doesn't need
 7  your permission, does he?
 8         MR. RUBINSTEIN: Argumentative.
 9         THE WITNESS: If I understand my -- the
10  contract -- your question, Mr. Silvers is the
11  owner of the intellectual property. I -- I can't
12  imagine that if Mr. Silvers wanted to sell his
13  property as long as it wasn't adverse or didn't
14  violate our contract, I couldn't imagine that
15  that would be problematic.
16  BY MR. HARTMANN:
17     Q. So you're fine taking the judge that to --
18  this action for speaking to Google about
19  selling -- selling this property?
20         MR. RUBINSTEIN: Objection. Vague and
21  ambiguous. That lawsuit speaks for itself --
22         THE WITNESS: May I answer? --
23         MR. RUBINSTEIN: If you can, please.
24         THE WITNESS: I certainly would because he
25  I just answered you by definition Mr. Silvers I
```

**230**

```
 1  believe is prohibited from speaking with Google
 2  who is adverse. As stated discussing with, those
 3  discussions may be a settlement partnership, joint
 4  venture, wealthy, either based on the --
 5  contract very specified to that. By Mr.
 6  Silvers they would be bringing potential of some
 7  evidence his rank in that case --
 8         MR. HARTMANN: I've minutes here --
 9  asking any action in that case, correct?
10  BY MR. HARTMANN: When he's done.
11     Q. Okay, correct -- I want to ask if it
12     A. This is a sideline thing. At side all "it"
13  the sidelines, the two-minute clock is down.
14     Q. No, really it was that -- most of the
15  time he's been adversarial to Google and he wanted to
16  take them on an insertion. During a brief amount of
17  time, agreed that Stoler should in fact negotiate and
18  filed and then there's a separate action to oppose
19  Google and some use of cancel Google trademark that
20  have the right to enter into discussions with Google,
21  Inc.
22     Q. -- All right. So to summarize this. It's okay
23  for Mr. Silvers to talk about somebody besides Google
24  about selling his IP but in your view the contract
25  prohibition from talking to Google about selling his
```

**231**

```
 1  PP?
 2         MR. RUBINSTEIN: Object to the extent it
 3  misstates --
 4         MR. HARTMANN: Fair? --
 5         MR. RUBINSTEIN: -- the prior testimony.
 6  BY MR. HARTMANN:
 7     Q. Is that fair -- a fair summary?
 8     A. Yes
 9     Q. Okay. We better take a break here for the
10  stops.
11         THE VIDEOGRAPHER: This is the end of Tape
12  Number 5. The time is 3:48.
13         (There was a break taken after which the
14  following proceedings were held.)
15         THE VIDEOGRAPHER: We're now back on the
16  video record. This is Tape Number 6. The time
17  is 4:0 -- 4:01 p.m.
18  BY MR. HARTMANN:
19     Q. All right. Let's look at Exhibit A.
20  paragraph D which is your Emergency Motion for
21  Preliminary Injunction. And it's on Page 3 of the
22  motion.
23     A. Oh, thank you --
24     Q. All right. Here you're asking the court to
25  prohibit Mr. Silvers from, quote, interfering in the
```

**232**

```
 1  proceeding Stoler has brought at the TTAB against
 2  Google, right?
 3     A. -- Actually, that's -- this is a reiteration of it.
 4     Q. All right. This has -- this is a reiteration --
 5  Mr. Silvers is not a party meaning definition
 6  against the defendant in this proceeding or a petitioner
 7  to cancel Google trademark that Stoler
 8  has against his entities --
 9         MR. RUBINSTEIN: Objection. Calls for a
10  legal conclusion. You can answer if you know.
11         THE WITNESS: I think that section might
12  have -- or --
13  BY MR. HARTMANN:
14     Q. Yeah. This may -- that is a section on --
15         Okay. And -- and there's -- there's one --
16  well, usually tied it out in front of the -- there's
17  application to cancel Google trademark that Stoler
18  understanding?
19     A. Yes.
20     Q. So I'll call those proceedings one
21  and Proceeding One would be to cancel Google's
22  trademark. Proceeding Two will be to oppose their new
23  trademark. With me?
```

58 (Pages 229 to 232)

Veritext/Florida Reporting Co., LLC - 19 West Flagler Street - Miami, Florida - (305) 376-8800
Benowitz - Berman - Cook - Florida Keys - Matz Traktman - Ivy

**233**

```
 1    A.  Yes.
 2    Q.  All right.  Just trying to simplify this.
 3  Have you asked the court to prohibit Mr.
 4  Silvers from interfering.  Now has Mr. Silvers done
 5  anything to interfere with the proceedings that Stohr
 6  brought against Google, either one or two?
 7    A.  Yes.
 8    Q.  Has he written any letters to
 9  the PTO in either of these cases?
10    A.  I'm unaware of letters.  Other than --
11    Q.  In either of these cases?
12    A.  I'm unaware; if he has.
13    Q.  All right.  So has he -- how has he
14    A.  -- every time Mr. Silvers interferes in this
15  instance with the cases that Stohr brought in front
16  of the PTO, either one of the cases against Google?
17  our counsel who we pay for his interference.  We
18  discharge Cowan, Liebowitz, Latman who is our attorney
19  of record for bringing these actions forward.
20    Q.  Well, then you can hire them, can't you?
21    MR. RUBINSTEIN:  Argumentative.
22  BY MR. HARTMANN:
23    Q.  I don't understand.
24    A.  Well --
25    Q.  You hired the Cowan, Latman firm, right?
```

**234**

```
 1    A.  Yes.
 2    Q.  So what does it matter what Mr. Silvers does
 3  as far as whether he fires them or not?
 4    A.  That's what I'm looking to the court to
 5  determine.  If we hired them under our rights, under
 6  the license agreement and the letter agreement, then
 7  it would be my reasonable conclusion that Mr. Silvers
 8  does not have the right to interfere with the and/or
 9  interest with those attorneys in a deleterious fashion
10  and so we would like the court to order Mr. Silvers to
11  cease and desist from interfering in those proceedings
12  and as a general rule by hiring and firing counsel.
13  I point to you is that --
14    Q.  And proceedings in my mind as a
15    Q.  So how has Stohr been effected by Mr.
16  Borchard?
17    A.  Mr. Borchard --
18    Q.  He's hired by Mr. Silvers and the no
19  longer represents Stohr.
20    A.  No.  He represents Stohr.
21    Q.  So how has Stohr been effected if Mr.
22  Silvers, quote, firing him?
23    A.  Well, Stohr pays every minute of legal
24  expense that is generated by Mr. Silvers' continued
25  interference and so by definition if Cowan, Liebowitz
```

**235**

```
 1  has to engage in additional letter writing or spend
 2  additional time researching because of Mr. Silvers'
 3  actions, then Stohr has to pay that and unfortunately
 4  Silvers from interfering.  Now has Mr. Silvers done
 5  Stohr is looking to the court so that we can, I
 6  guess, cauterize this wound.
 7    Q.  All right.  Let me see if I can understand
 8  what the wound is.  Stohr is paying money to Mr.
 9  Borchard because Mr. Silvers fired him from
10  representing Mr. Silvers, is that what you're saying?
11  I'm sorry, I'm really having trouble following you.
12    A.  What I'm saying is that --
13    Q.  It's been a long day.
14    A.  -- every time Mr. Silvers interferes in this
15  instance your example is with our cancellation
16  proceeding in the USPTO, and he involves himself with
17  our counsel who we pay for his interference.  We
18  expensive, we have to pay for his interference.  We
19  have to pay for their reactions and so we'd like the
20  court to have Mr. Silvers adhere to his contract and
21  stop interfering with our abilities to protect and
22  defend the IP.
23    Q.  So specifically what is it that he's doing
24  that's interfering?  I'm really honestly asking
25  trouble with this.  He fired Mr. Borchard, that's one
```

**236**

```
 1  thing, from being his lawyer into Stohr's lawyer.
 2    A.  No.
 3    Q.  Correct?
 4    A.  Not correct.
 5    Q.  Okay.  Who did he -- who did the fire Mr. --
 6    A.  Stohr Productions.
 7    Q.  Stohr Productions.
 8    Q.  All right.  So how did Mr. Silvers fire him
 9  then if you hired him?
10    A.  Erm, it's not correspondence demanding that
11  he disbursed withdraw and cancel the proceedings with
12  Stohr Productions and the trademark office and my
13  point to you is that --
14    Q.  And you ignored him, right?
15    MR. RUBINSTEIN:  Please let him finish the
16  question.
17    THE WITNESS:  I was in the middle of an
18  answer.
19    MR. RUBINSTEIN:  I mean let him finish the
20  answer.
21    THE WITNESS:  Oh.
22  BY MR. HARTMANN:
23    Q.  It's just that we've heard that before.  I'm
24  just trying to make it quicker.  Okay.
25    So he sent a letter making demands, okay, we
```

**237**

```
 1  got that far.  And how did that effect Stohr?
 2    A.  It cost us money --
 3    Q.  Okay.  Other than costing you money, has it
 4  had any effect?
 5    A.  It makes it more difficult for me to be
 6  proactive in my job and grow the IP when I'm spending
 7  my time dealing with Mr. Silvers' behavior.
 8    Q.  I'm not.  Now yes or no, Mr. Silvers has
 9  put in any pleadings in the proceeding that Stohr
10  brought against Google?
11    A.  No.
12    Q.  He has not made any formal appearance in
13  either of the actions that Stohr has filed against
14  Google?
15    A.  Correct.
16    Q.  So he has done nothing that effects the
17  merits of Stohr's claim against Google in either
18  proceeding?
19    MR. RUBINSTEIN:  Objection.  Calls for
20  speculation.
21    THE WITNESS:  I can't speculate.
22  BY MR. HARTMANN:
23    Q.  You can't/don't travel anything he's done
24  that has prejudiced Stohr in its proceeding that
25  claims that its brought in those cases?
```

**238**

```
 1    A.  I can't speculate on --
 2    A.  No.
 3    Q.  I'm not asking you to speculate.  I'm asking
 4  you if you know anything to speculate.  I'm asking
 5  you if you know anything to tell me.  If you don't
 6  know anything, say I don't know anything.  That's
 7  fine.
 8    A.  I can answer that if you will restate the
 9  question so I can answer whether I understand know.
10    Q.  Sure.  Do you know of anything that Mr. Silvers has
11  done in either of the two proceedings in front of the
12  PTO that we're discussing now, Stohr versus Google,
13  that has prejudiced Stohr in either proceeding?
14    A.  I'm unaware of anything he has done or may
15  have done.
16    Q.  All right.  In fact it's then you're asking
17  the court to order Mr. Silvers not to do anything in
18  connection with Stohr in the above-mentioned
19  proceedings.  Those are the two proceedings that we
20  just discussed when Stohr is taking on Google,
21  right?
22    A.  Yes.
23    Q.  How have you ever -- is Mr. -- what has Mr.
24  Silvers done -- well, first of all let me ask you
25  this.  Where in this -- never mind.  I'm going to get
```

**239**

```
 1  the same answer.
 2    Q.  How has Mr. Silvers failed to cooperate with
 3  Stohr in the above-mentioned proceeding?
 4    A.  I can only answer your question -- you've
 5  taken a piece of the sentence, but I'll complete it
 6  for you.  It says in order the defendant to cooperate
 7  immediately and fully with Stohr in the
 8  above-mentioned proceedings -- here's a I think the
 9  important part of this sentence -- consistent with
10  Silvers' contractual obligations, including providing
11  any evidence in the form of documentation, testimony
12  or otherwise, in Mr. Silvers' possession that Stohr
13  finds is necessary to prevail in these proceedings and
14  protect the Google intellectual property rights.
15    Q.  All right.  What evidence in defendant's
16  possession does Stohr feel is necessary to prevail in
17  your proceeding? (phonetic)
18    A.  Silvers possessed Mr. Silvers through --
19  counsel and asked him questions and asked him to
20  provide from his records evidence relative to Stohr
21  proceedings and Mr. Silvers has either refused and/or
22  lied and said he doesn't have the specific documents
23  and does, of course, correspondence from Mr. Silvers
24  earlier that said in fact that he plays the
25  evidence and so in this particular piece we are asking
```

**240**

```
 1  the court to have him cooperate and provide for us the
 2  evidence that at one time he said he had and when he was
 3  asked now says he does not that we feel it necessary
 4  so we can prevail in our proceedings so that we can
 5  proceeds the Google intellectual property rights.
 6    Q.  I appreciate that and you are read the -- they
 7  you said the paragraph all you want, but my
 8  question is what evidence is it that you want him to
 9  give you that you weren't already him to provide.
10    A.  I can give you one example.  There --
11    Q.  I can --and can cite one example.  There
12  are -- there is several things that couldn't be specific-
13    Q.  Give me the several things --
14    A.  Specific to what was the particulars in the
15  Google proceedings, Mr. Silvers had a specific
16  knowledge of our site at one point in time that he had.
17  I told us about prior to the contract taking place and
18  the license taking place that he had referred to in
19  e-mails to us and -- but had not provided us the --
20  actual evidence -- except me --
21    Q.  You specifically --
22    MR. RUBINSTEIN:  Bless you.
23    THE WITNESS:  Excuse me.
24  BY MR. HARTMANN:
25    Q.  All right.  Who specifically asked Mr.
```

60 (Pages 237 to 240)

Veritext/Florida Reporting Co., LLC - 19 West Flagler Street - Miami, Florida - (305) 376-8800
Benowitz - Berman - Cook - Florida Keys - Matz Traktman - Ivy

31 of 39

265

1 lawyers than who are having the conversations not Mr.
2 Silvers.
3    MR. RUBINSTEIN: Calls for speculation.
4 BY MR. HARTMANN:
5    Q. I'm asking what you know, sir. I thought
6 we already went through this.
7    A. I know. No, no, I know -- again, it's a
8 different question. I know that through you
9 representing Silvers -- Kozyak, Tropin -- that Silvers
10 has approached Google, Inc.
11    Q. How do you know that?
12    A. Because my attorneys tell me so.
13    Q. Okay. So you don't -- I mean -- okay.
14    A. And you don't know whether your attorneys
15 are speaking or not? --
16    A. I actually would say on the record that
17 Larry Hefter doesn't guess.
18    Q. Okay. Right. So are you telling me that
19 Stelor is unable to raise capital because Mr.
20 Stelor -- Silvers' lawyers have talked to Google? Is
21 that what --how I'm reading this?
22    A. I would say that's Mr. DiMuccio's contention
23 and I am telling you that it is not a part of Mr.
24 Silvers' behavior that inhibits and makes our job to
25 promote and commercialize the IP that more difficult.

266

1 By the way that sentence reads in order to bring
2 Google.com to market. That is part and parcel of
3 why, to quote you earlier, we have filed this
4 litigation against your client to have the court
5 compel Mr. Silvers to adhere to the license so that we
6 could go ahead and make this the world acclaimed
7 success that all agree that it could be and that we know
8 it will be and here you've got -- I would think Mr.
9 DiMuccio is the biggest investor, $600,000. I think
10 that this is -- a reasonable concern he has.
11    Q. So if the court doesn't enter an injunction
12 on A, B, C, D and E here, it's going to be impossible
13 for you to bring Google to market?
14    MR. RUBINSTEIN: Calls for speculation.
15    THE WITNESS: Yeah, I -- I can't speculate
16 on that
17 BY MR. HARTMANN:
18    Q. There's still a chance even if the court
19 doesn't enter the gag orders and the other things that
20 you want that Google -- that Stelor could bring
21 Google.com to -- or Googles in general to market?
22    A. Again, I -- I can't speculate on --
23    Q. All right. So first of all I mean you filed
24 a lawsuit against Mr. Silvers. That's not what I'm
25 asking about. I'm asking about what Silvers is doing

267

1 to destroy Stelor's ability to bring in the much
2 needed capital.
3    A. Well --
4    Q. Can you name a particular investor who has
5 chosen not to invest because Mr. Silvers or anything
6 he's done?
7    A. I'd have to check our records of -- of who's
8 been in the process.
9    Q. You can't [tell] me any as you sit here today?
10    MR. RUBINSTEIN: Asked and answered.
11 BY MR. HARTMANN:
12    Q. Without checking your records.
13    A. I'd have to check those records.
14    Q. All right. It says that the board
15 instructed you to file the lawsuit, is that true?
16    A. Yes.
17    Q. And that would be reflected in the minutes?
18    A. Yes.
19    Q. That was a formal board meeting?
20    A. Yes.
21    Q. Why?
22    MR. RUBINSTEIN: Calls for a narrative. You
23 can answer.
24 BY MR. HARTMANN:
25    Q. Why did the board instruct you to file the

268

1 lawsuit?
2    A. The board is actually -- has been asking for
3 me for the last two years to take an action to stop
4 Mr. Silvers' interference and I have for two years
5 because of the nature of my relationship with Mr.
6 Silvers on his behalf certainly has been a low-state
7 relationship tried to put off being adversarial
8 throughout this entire time. My purpose has been from
9 the beginning to bring this -- to give birth to this
10 brilliant intellectual property and the board finally
11 got fed up based on Mr. Silvers' continued actions and
12 behavior and gave type a direct dictate as the chief
13 executive officer to have counsel file suit.
14    Q. And did the board dictate the notion that
15 once Stelor filed suit against Silvers and created an
16 adverse situation it was more likely that Silvers
17 would lose situation with Google? Was that
18 discussed with the board? --
19    A. There was a great amount of discussion.
20 There -- there was a part or not.
21 I recall if that was a part or not.
22    Q. All right. Now, Mr. DiMuccio further in the
23 third paragraph down complains that Silvers has
24 furthermore set about negotiating with Google, Inc.
25 reclamation point. What's wrong with Steve Silvers

67 (Pages 265 to 268)

Veritext/Florida Reporting Co., LLC - 19 West Flagler Street - Miami, Florida - (305) 376-8800
Benowitz - Berman - Cook - Florida Keys - Metz Traktman - Ivy

32 of 39

# Exhibit E

E-mail Sent On October 5, 2005 To Bill Borchard
(I had to copy and paste this to a Word Doc. because I couldn't get my printer to print the entire page for some reason).

Hi Bill: I am in receipt of your documents and I plan to respond to you by not later than Friday of this week barring any unforeseen circumstances beyond my control.

I also am aware that you have equally been in receipt of my response to your last e-mail to me. I trust that you will review my response and respond accordingly.

Lastly, I am putting Stelor on official notice through you, as their counsel, that you are to cease and desist any further representation of me in the ongoing litigation with Google Inc, that is to include any pending, existing or future challenges you may have contemplated.

I will be sending you, as called for in the existing Licensing Agreement, an Official Notice outlining to you my reasons for my actions.

However, under no circumstances are you to initiate any proceedings on my behalf regarding the now pending administrative proceeding initiated by Google Inc. against me.

Furthermore, you should immediately inform Google Inc. that serving you with papers will be considered by me as improper service. Kindly inform Google Inc. of my official mailing address so that they may properly serve me with a proper copy of their complaint.

Also, I do not wish for you to initiate any WIPO/UDRP proceeding against Google Inc., on my behalf. I shall further outline the reasons for my request in the forthcoming Official Notice to you. If you have already started or commenced filing such procedures, I would respectfully ask that you file a withdrawal, "without prejudice", immediately before the WIPO International Court.

Accordingly, While this is not considered official notice as to my demands as noted above, nevertheless, since we have agreed to correspond via the Internet, this e-mail shall serve as placing Stelor on notice and that an Official Notice as to the reasoning behind my actions is forthcoming.

I felt it best to alert you via this e-mail first so as to avoid any unnecessary embarrassment for all parties concerned.

The matters now at hand are extremely serious ones and potentially equally damaging to me with "irreparable harm" fallout as far as I'm concerned.

In the meantime, I would welcome your response to my previously submitted correspondence at your earliest convenience. Thank you!

---

MSN Home | My MSN | Hotmail | Shopping | Money | People & Chat        [Sign Out]   Web Search:

*Hotmail*

gewroe@hotmail.com

Send | Save Draft | Attach ▾ ! ↓ | Tools ▾ | Cancel                Today | Mail | Calendar | Contacts

To:    wmb@cll.com

Cc:

Bcc:

Subject: October 5, 2004 Update

Hi Bill: I am in receipt of your documents and I plan to respond to you by not later than Friday of this week barring any unforeseen circumstances beyond my control.

I also am aware that you have equally been in receipt of my response to your last e-mail to me. I trust that you will review my response and respond accordingly.

Lastly, I am putting Stelor on official notice through you, as their counsel, that you are to cease and desist any further representation of me in the ongoing litigation with Google Inc., that is to include any pending, existing or future challenges you may have contemplated.

I will be sending you, as called for in the existing Licensing Agreement, an Official Notice outlining to you my reasons for my actions.

However, under no circumstances are you to initiate any proceedings on my behalf regarding the now pending administrative proceeding initiated by Google Inc. against me.

☑ Copy Message to Sent Folder

Get the latest updates from MSN

MSN Home | My MSN | Hotmail | Search | Shopping | Money | People & Chat
© 2004 Microsoft Corporation. All rights reserved. TERMS OF USE  Advertise  TRUSTe Approved Privacy Statement  Anti-Spam Policy

Favorite Con

Ana MBE
Anderson, Ba
Anderson, Ba
Angela Bank
Anthony DbAs
Anthony Digij
Aunt Effie
Barry Anderso
Bartel, Muriel
Barton Trenk
Beer Pokhal
Beer Pokhal
Bill Ardy of P.
BMI Nashville
Bob Rochister
Borchard, Wil
Show All

# Exhibit F

William M. Borchard, esq.
Attorney at Law
Cowan, Liebowitz & Latman, P.C.
1133 Avenues of the Americas
New York, NY 10036-6799

September 29, 2004

Re: Silvers Official Reply to Borchard's September 14, 2004 e-mail
   Sent Certified, Return Receipt Number: 7004 0550 0000 5867 9031

Hi Bill:

Attached is a copy of the document I've already submitted to you via e-mail on September 29, 2004.

This is just a hard copy to keep in compliance with official correspondence mailings as required by Silvers/Stelor Licensing Agreement.

Kindly send a hard copy of your reply should you choose to initiate an e-mail response first. Thank you!

Sincerely,

Steven A. Silvers

---

September 29, 2004

Hi Bill: Kindly accept this response as my "official" reply to your September 14, 2004 e-mail. I'm sorry for the delay but as you may or may not know it's been very hectic here in West Palm Beach these past few weeks with Hurricanes Frances and Ivan having caused much damage to the area I live and Hurricane Jeanne hit us again this past weekend.

Having said this, let me respond to your reply in "italics" below. One thing I would like to address right off the bat. I noticed that one of the most important inquiries I made and asked that you respond to, you've neglected to address. That has to do with my inquiry as to how, and why you, on behalf of Stelor, chose to bring an action against Google.com without my being named as "the" plaintiff or at the very least "a" plaintiff. I found this very confusing since I am the "exclusive owner" of the Google's intellectual property rights, to include: "trademarks, copyrights, patents, and domain names" while Stelor is strictly the "exclusive Licensee" with NO intellectual property rights whatsoever, other than the right to use them within the spirit and framework of our existing Licensing Agreement, that you would have brought an action against Google.com in Stelor's name rather than my name or at the very least Stelor's name on my behalf, or perhaps both Stelor and myself as joint Plaintiffs in the proceedings now before the USPTO Administrative Court? I'd like for you to kindly address this issue at your earliest convenience.

Now let me address your other issues as noted, in italics, below:

Dear Mr. Silvers,

This is in response to your emails to me dated August 13, 2004, which arrived while I was away from the office on vacation, and dated September 13, 2004, which arrived yesterday just after I got through the material that accumulated during my absence. I apologize for the delay in my getting back to you.

1. I agree that it is best that we correspond by email. One question: In your address, is PMB 203 correct or should it be POB 203?

REPLY: P.M.B. 203, is correct.

2. Please let me know what concerns you have regarding the initial filings against Google Inc. in the USPTO. The USPTO proceedings are not litigations per se--they are administrative proceedings relating solely to trademark registration rights. There is a very limited time period during which Stelor can object to, and prevent Google from, registering GOOGLE. Stelor still prefers to negotiate with Google, but it believes that these proceedings are necessary to protect your and Stelor's rights. We prefer and intend to continue negotiations with Google, but it takes two sides to have a conversation.

REPLY: I addressed this issue above and would like to further expand upon it here. If my memory strikes me correctly, Stelor was granted by me the irrevocable power of attorney to "act in and on my behalf" not theirs, in properly protecting "my" intellectual property rights as if it was me that was executing any and all documents to properly protect same. The fact that you proceeded to file a

3. With respect to our statement in the letter dated July 7, 2004 to Larry Stumpf, that we were "looking into the matter" of the incorrect statement as to the ownership of the Googles rights that appeared in The Wall Street Journal article, we were unable to pinpoint who was responsible for the error other than to say we are certain it did not come from us or from anyone at Stelor. I understand that Stelor and its representatives have told you many times orally and in writing, that Stelor is very aware that you own the rights to the GOOGLES FROM GOO trademarks and that Stelor is the exclusive licensee. As to your contacting the reporter, I refer you to your contracts with Stelor, which preclude such contacts. Specifically, I refer you to Paragraph 2 in the Consulting Agreement and Paragraph VIII E in the License, Distribution and Manufacturing Agreement, both of which specifically address this situation. Stelor has told me that any violation of these provisions will be considered serious. Please understand that Stelor has and will continue to comply with its contractual obligations and expects the same from you.

REPLY: First of all, Bill, and once again no disrespect intended, I don't take very well to threats. I fully understand the breath and width of the existing Licensing Agreement between the Licensor and owner of the "Googles' IP that I'm being deceived, in any manner whatsoever, or perhaps not told the whole story as I expect Stelor to perfect, I will do whatever necessary to get to the bottom of the truth and I don't believe any court of law would rule against me for doing so.

4. I have seen a transcript of the Bullseye Interview on CNBC-TV. There were no misstatements by Mr. Esrig, who was introduced as "President and CEO of Stelor Productions an exclusive licensee of the "Googles" product". Nothing in the interview should have said "the exclusive licensee," and this is what I was trying to explain in the context of an oral TV interview. Again, I refer you to your contractual obligation not to contact the press. (See Paragraph 3 above.)

REPLY: Once again I will refer you to my comments as noted in (Item #5) above. All throughout the interview, with the exception of one time, the narrator mentioned that Stelor Productions was the owner of the "Googles' IP, that Stelor Productions was the owner of the domain name and of the Googles' IP. The only way he could have read/said those comments was having heard it either from Steve Esrig, someone online who owned the Googles domain name, or the Googles' IP rights. He is a reporter, and reporters like to base their comments on "facts" and not "suppositions". It is my opinion that either Steve or someone else in his organization must of informed the narrator that Stelor is the owner of the Googles' domain name and of the Googles' IP rights. You threatening me by stating should I decide to contact the bottom of this issue and learn that what my prior attorney, Mr. Mark Steinberg told me is not accurate and I learn otherwise to be the case, then I will no longer be bound by the existing Agreement is ludicrous. You promised me that my prior attorney would look into the situation regarding the erroneous information that was disseminated to the press when all this "Googles vs. Googles" stories first hit the news media and now you are telling me that "we are certain that it didn't come from us or anyone at Stelor". I'm sorry, Bill, but that's not good enough for me. And if I should find out that this was not the case then I will no inform you and we shall revisit this issue, and if it ever becomes disrespected, and I'm tired of the games that are being played. It is my belief that Stelor starts treating me like their "Licensor". After all, without the exclusive licensing rights that I have granted them via our Agreement, there would be no Stelor Productions. Furthermore, as to this issue, all Steve had to say when he first was contacted by Bullseye and their staff was that Stelor Productions is the exclusive licensee of the "Googles" entity. And if he

---

"trademark" action against Google for infringement of my intellectual property rights, not Stelor's name as the "official" plaintiff, when, in fact, Stelor has no ownership rights to my trademarks other than those granted to them by me in our existing Licensing Agreement, which is clearly outlined therein and is specific as to "licensing" rights not ownership rights. I find it strange that an action would have been brought against Google with Stelor and not Silvers being a proper plaintiff. So, unless you can explain to me how you are legally able to have filed such a proceeding against Google.com, I would strongly suggest that you amend the existing complaint to reflect Steven A. Silvers as the proper party to the suit and if necessary, I have no problem with Stelor being added as a second party plaintiff as my exclusive "Licensee". However, I now realize that this may cause some problems due to the fact that you can not represent me as the Licensor and exclusive owner of the Googles' Intellectual property rights and the legal owner of the "Googles" trademarks, while at the same time represent Stelor as my exclusive Licensee, but that is not my problem nor my fault since no one at Stelor thought it necessary to contact me to discuss a strategy for this action prior to initiating it. I don't believe that Stelor, by itself, can be a legal party to any action surrounding my Googles' trademarks against a third party without my being a proper party to the said action or actions. That's my position! I also believe, that if Google.com's attorneys do their homework they will raise this issue as a proper defense against Stelor because no where on any of the Googles' Trademarks does it reflect Stelor as having any ownership rights to my Googles' trademarks and as such, regardless of the irrevocable power of attorney issue, they may lack standing. Accordingly, Stelor would have no standing to bring such a cognizable cause of action on my behalf unless somewhere in the body of the initial complaint, I am listed as the proper plaintiff. If your position is somewhere in the body of the initial complaint, I'd like to hear from you at your earliest convenience.

I assure you that we have not intentionally shown you disrespect. The exclusive license agreement you entered into with Stelor provides specifically that Stelor has the exclusive right and power to take all actions to enforce, maintain and defend your intellectual property rights, at its expense. We believe that, as your exclusive licensee, it was appropriate for Stelor to assert the claims against Google in the USPTO proceedings.

REPLY: Bill, without sounding disrespectful toward you, I believe your position is misplaced in this regard. Exclusive Licensee, does not give Stelor any ownership rights as clearly defined in the Agreement. Licensee rights are a far cry from ownership rights. Furthermore, while I may-have-unwilling-granted Stelor "irrevocable" power of attorney rights to certain aspects of our Agreement in order that they may take any and all actions as necessary, on my behalf, to enforce, maintain, and properly defend against any and all third party infringements of my IP rights, and at its sole expense, nevertheless, I believe as the exclusive owner of the Googles' IP rights that I should have been listed as a proper plaintiff to the said causes of action and any and all other such causes of action(s) that Stelor should decide to bring in the future against any and all other third parties it determines has trampled on the Googles' entity as well as "my" IP rights so as to properly defend against such rights in order to protect their interest, and vested rights as well as mine.

was asked by the narrator who "owns" the Googles.com domain name, he could have very easily informed the narrator that the domain name and all the IP rights associated with the Googles project are owned by its creator, Steven A. Silvers, our Licensor. Period! That would have resolved this issue. And while I'm not a betting man, I assure you that this was not the case. So much for this issue for the time being.

We have several questions for you, the answers to which may help us in dealing with Google:

A. We understand from Stelor that your early records were lost in a flood but that you started your Googles website at about the same time as those indicated earlier in this response, the your Googles.com> which was on July 18, 1997. Can you please confirm for us the date when your website first appeared on the Internet? Are there any documents, which support these facts?

REPLY: First allow me to set the record straight about your question as noted in "A" above. To begin with, I have no idea where you got the information that my records were lost in a flood? There was no flood, I don't know where you got this info from but I suspect Steve Esrig told you this. He will unabashedly say that I told him this which I'd assure you was not the case. I cannot confirm one way or the other when my website first appeared on the Internet. My best recollection is that shortly after I registered the name, perhaps a few months later, I had a simple web site up and running. I'm sure that Network Solutions would have this information better than me. I believe they were the hosting company when I first registered my "googles.com" domain name back in 1987. I don't have any documents that support this fact other than to state that on July 18, 1997 I registered my googles.com domain with Network Solutions and I believe it wasn't too much later during that summer that I had launched my official Googles.com web site. That's all I have to say on this issue. Sorry I couldn't have been more helpful in this regard.

B. We understand from Stelor that Google Inc. started to show an animated strip of green aliens called "Googles" on a website–possibly emanating from the UK–until you objected and they stopped without ever contacting you about it. This seems to be a separate occurrence from the appearance of aliens stealing the GOOGLE logo on the google.com website. Can you also give us more details about how you learned of this activity, whether the aliens looked like the GOOGLES FROM GOO, to whom you made your objection, how the objection was communicated, how long the aliens were on the website, and whether you have any documents about this?

REPLY: Once again your information is misplaced and your source has once again misinformed you. Google.com once again showed an animated strip of "green aliens" called Googles on a website possibly emanating from the UK–until I objected and they stopped without every contacting me about it. This is not so. What happened was that one day while I was working for Aurora I decided to access the google.com web site, which was something I found compelled to do on a regular basis. I always knew in my heart that we were on a collision course and that one-day our paths would cross. I wanted to monitor their progress and keep an eye on what they were doing from time to time. On this particular occasion I noticed on their homepage something about aliens coming to earth and to tell you the truth I forgot what they called them but I am certain that it was not Googles and when I went to access the

characters I noticed a slew of flash animation episodes that were created by some outfit out of England that somehow got Google.com to allow them to host their cartoon animations on their site. It took offense to it because they portrayed these alien creatures in a space ship like the Jetsons coming to Earth. There was really no content and it was just a spoof that Google.com, at the time, went for. Why, I haven't a clue. I can't recall precisely what happened to cause them to discontinue hosting the episodes but I don't believe it was through anything that I did to push the issue. I can't recall if I sent them an e-mail or not. I believe it got old, there must not have been a lot of hits to warrant Google.com to continue to host the animators work and so they just stopped production. As I stated earlier in this response, the info you received from Google.com's owners and that was the animators weren't able to strike a deal with Google.com for some reason, end of that marriage. I have no other records on this issue nor are more insight as to any documents that may be floating around out as well. Sorry!

We understand that you have requested many times that a UDRP proceeding be commenced against the domain name google.com through WIPO or a similar organization. After much consideration, we now believe that the time is about right for this to be done, and Stelor is preparing to have such a proceeding instituted in Virginia. Your answers to the foregoing questions will help in the preparation of the UDRP complaint. This information also will help us to complete the discovery requests we are preparing for Google Inc, in the Trademark Office proceedings.

REPLY: This is a very sore subject you have informed me about. Let me explain. Not only have I, on many occasions, informed Stelor, Steve Esrig and other board members, as well as Stelor's counsel at the time, that more than a year ago, that it was imperative that we immediately initiate a WIPO, UDRP complaint/proceeding against Google.com for possible domain name infringement, but I did extensive research and submitted it to Steve Esrig, personally, along with a detailed letter informing him as to why he needed to immediately commence these proceedings and after several weeks had passed I was informed one day by Steve Esrig that after containing with his counsel and other independent counsel in the industry, all of which had much more knowledge about this matter than me, it was a unanimous decision that filing a WIPO/UDRP proceeding against Google.com was not only very unwise but an absolute NO! NO! I informed Steve Esrig that this time was running out. Google.com could raise the issue of "laches" citing "undue delay" in filing, etc. I was told once again that the decision was "final" and that filing a WIPO/UDRP proceeding would not be in Stelor's best interest and they were not going to heed my advice. Now some twelve plus months later you are writing to inform me that in your considered opinion, you now believe that the time is about right for this to be done." I believe that your 11th hour decision to do so now may be too late.

As far as you having a conflict of interest preventing a single attorney from representing both parties (Stelor and myself), I believe your assessment maybe right. You also argue that this very argument could be made for the trademark proceedings as well. You see, Bill, in both instances the plaintiff is not Stelor, since Stelor, in my opinion has no standing in either instance. This result obtains since Stelor is not the owner of any of the

IP lights associated with the Googles' IP... Stelor is the Licensee and I don't think, and I could be mistaken, but I'm doing my due diligence and research into these issues as we speak, Stelor cannot bring an action on behalf of Stelor in either a WIPO/UDRP proceeding or a trademark proceeding as it pertains to the Googles IP rights. I believe Stelor has the "power of attorney" to bring such causes of action against infringing third parties "on my behalf" as the plaintiff in these actions of law and equity but not solely in their name as the primary plaintiff. I further believe that by you claiming that you believe that a conflict of interest may surround any WIPO/UDRP proceedings filed on my behalf by Stelor, I would go so far as to state that in my opinion, for what it's worth, if Stelor plans to secure an attorney on my behalf to represent me in a WIPO/UDRP proceeding, challenging google.com as to their ownership of their google.com domain name, and at Stelor's expense, under the present conditions that exist between Stelor and myself, a "conflict of interest" may still exist. I believe the more prudent way to handle this matter to inform me about what you are planning to do, seek my opinion, as the Licensor, and exclusive owner of the Googles' IP rights, and then allow me to choose a lawyer to represent my interests in the said proceedings who I would then make certain would work with you, on behalf of Stelor, to our mutual benefits. To think that you are now going to choose a lawyer for me, Stelor is going to pay that lawyer, and I'm once again going to have no say in any of these proceedings, is not only of much concern to me but I believe will be frowned upon by the courts and the WIPO/UDRP board members. You very well know as an experienced lawyer in these matters and one who has been in the profession for a long time what problems can surface when there are potential conflicts of interest challenges. You very well know that by Stelor hiring a lawyer to represent my interests, not theirs, in these proceedings, and that such counsel is being paid by Stelor, and the said lawyer representing my vested interests is being secured by your law firm or by someone that you may recommend would surely fall into this category and quite frankly, I will have no part of this scenario.

If Stelor is looking to file a WIPO/UDRP proceeding at this late stage of the game when they had over two years since June 2, 2002, within which to do so, I'm afraid it will be a complete waste of time, effort, and money. WIPO challenges should be filed when a party believes an infringement may have occurred regarding a domain name likeness/challenge. My excuse for not filing up until the time that Stelor acquired the Licensing Rights to Googles was due to the fact that Internet Law on this subject matter was still evolving. However, during the last two years it has become very defined and specific. The time for Stelor to have properly and timely filed a WIPO/UDRP proceeding on "MY" behalf was several months after they acquired the Googles' asset from Aurora, as I had on many occasions informed Steve Esrig to perfect before it was to late to perfect a successful challenge. I wish you GooLuck with these proceedings. I'll be very interested to learn how they turn out, especially if they are filed on my behalf, by counsel that I don't even know, never met or spoken with, chosen by Stelor's counsel or recommended by Stelor's counsel, and paid for by Stelor's.

In view of the possibility that you and Stelor may come to have conflicting interests preventing a single attorney from representing both parties, Stelor has retained the services of another attorney to bring the UDRP proceeding in your name. Stelor is acting pursuant to Paragraph VIII A of the License, Distribution and Manufacturing Agreement which gives it your irrevocable power of attorney to act for and on your behalf, at Stelor's expense, and to execute and file documents as if executed by you.

*This issue has been addressed in the aforecaptioned paragraph.

I look forward to receiving your reply email.

Bill, I'm sorry that my reply may not have been what you were anticipating. However, I can no longer just stand by and allow what is taking place to transpire without properly defending myself. I trust that you fully understand my position.

Accordingly, I am about to respond to a letter I received from Larry Heffter last week. I've been delayed in responding due to back to back hurricanes that I've had to endure, with no internet power nor Internet capabilities, curfews, etc., over the past several weeks. Depending on what transpires between Larry and myself over the ensuing next few weeks could seriously affect the way you may wish to respond to this correspondence. Therefore, I would respectfully suggest that you get with Larry for updates before doing so.

Sincerely,

Steven A. Silvers

# Exhibit G



## ICANN

# Rules for Uniform Domain Name Dispute Resolution Policy

Policy Adopted: August 26, 1999
Implementation Documents Approved: October 24, 1999

Note: These rules are now in effect. See www.icann.org/udrp/udrp-schedule.htm for the implementation schedule.

# Rules for Uniform Domain Name Dispute Resolution Policy
## (the "Rules")

### (As Approved by ICANN on October 24, 1999)

Administrative proceedings for the resolution of disputes under the Uniform Dispute Resolution Policy adopted by ICANN shall be governed by these Rules and also the Supplemental Rules of the Provider administering the proceedings, as posted on its web site.

### 1. Definitions

In these Rules:

**Complainant** means the party initiating a complaint concerning a domain-name registration.

**ICANN** refers to the Internet Corporation for Assigned Names and Numbers.

**Mutual Jurisdiction** means a court jurisdiction at the location of either (a) the principal office of the Registrar (provided the domain-name holder has submitted in its Registration Agreement to that jurisdiction for court adjudication of disputes concerning or arising from the use of the domain name) or (b) the domain-name holder's address as shown for the registration of the domain name in Registrar's Whois database at the time the complaint is submitted to the Provider.

**Panel** means an administrative panel appointed by a Provider to decide a complaint concerning a domain-name registration.

**Panelist** means an individual appointed by a Provider to be a member of a Panel.

**Party** means a Complainant or a Respondent.

on the earliest date that the communication is deemed to have been made in accordance with Paragraph 2(f).

(h) Any communication by

    (i) a Panel to any Party shall be copied to the Provider and to the other Party;

    (ii) the Provider to any Party shall be copied to the other Party; and

    (iii) a Party shall be copied to the other Party, the Panel and the Provider, as the case may be.

(i) It shall be the responsibility of the sender to retain records of the fact and circumstances of sending, which shall be available for inspection by affected parties and for reporting purposes.

(j) In the event a Party sending a communication receives notification of non-delivery of the communication, the Party shall promptly notify the Panel (or, if no Panel is yet appointed, the Provider) of the circumstances of the notification. Further proceedings concerning the communication and any response shall be as directed by the Panel (or the Provider).

### 3. The Complaint

(a) Any person or entity may initiate an administrative proceeding by submitting a complaint in accordance with the Policy and these Rules to any Provider approved by ICANN. (Due to capacity constraints or for other reasons, a Provider's ability to accept complaints may be suspended at times. In that event, the Provider shall refuse the submission. The person or entity may submit the complaint to another Provider.)

(b) The complaint shall be submitted in hard copy and (except to the extent not available for annexes) in electronic form and shall:

    (i) Request that the complaint be submitted for decision in accordance with the Policy and these Rules;

    (ii) Provide the name, postal and e-mail addresses, and the telephone and telefax numbers of the Complainant and of any representative authorized to act for the Complainant in the administrative proceeding;

    (iii) Specify a preferred method for communications directed to the Complainant in the administrative proceeding (including person to be contacted, medium, and address information) for each of (A) electronic-only material and (B) material including hard copy;

    (iv) Designate whether Complainant elects to have the dispute