# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, INC.,
a Delaware corporation,

      Plaintiff,

v.

STEVEN A. SILVERS,
a resident of Palm Beach County, Florida,

      Defendant.

_____

CASE NO. 04-80954-CIV-HURLEY
Magistrate Judge James M. Hopkins

FILED by _____ D.C.

JAN 2 7 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

## NOTICE OF FILING
## VIDEOTAPED DEPOSITION TRANSCRIPT OF STEVEN ESRIG

    Defendant, Steven Silvers, hereby gives notice of filing the attached deposition transcript of

Steven Esrig with exhibits.

Respectfully submitted,

Adam T. Rabin
DIMOND KAPLAN & ROTHSTEIN, PA
200 S.E. First Street, Suite 708
Miami, FL 33131
Telephone: (305) 374-1920
Co-Counsel for Defendant

Kenneth R. Hartmann
Florida Bar No. 664286)
Gail A. McQuilkin
Florida Bar No. 969338)
KOZYAK TROPIN & THROCKMORTON, PA
Counsel for Defendant
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
Fax: (305) 372-3508

3339/101/249144.1

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.
2525 PONCE DE LEON, 9TH FLOOR, CORAL GABLES, FLORIDA 33134-6037 • TEL. (305) 372-1800

Dockets.Justia.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was hand-delivered with attachments this 29th day of January, 2005, to: **Yano L. Rubinstein, Esq.,** Summers Rubinstein, P.C., 580 California Street, 16th Floor, San Francisco, CA 94101; and faxed w/o attachments to: **Kevin C. Kaplan, Esq.,** Burlington Weil Schwiep Kaplan & Blonsky, 2699 S. Bayshore Drive, Penthouse, Miami, Florida 33133.

By: _____

Kenneth R. Hartmann

3339/101/249144.1

**Page 1**

```
          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA

          CASE NO. 04-80954-CIV-HURLEY
          Magistrate Judge James M. Hopkins


STELOR PRODUCTIONS, INC.,
a Delaware corporation,

          Plaintiff,

vs.

STEVEN A. SILVERS,
a resident of Palm Beach
County, Florida,

          Defendant.
_____/




          2525 Ponce DeLeon Boulevard
          9th Floor
          Miami, Florida  33134
          Monday, December 13, 2004
          9:33 a.m.


     VIDEOTAPED DEPOSITION OF STEVEN ESRIG
  Taken on behalf of the Defendants, before Debbie
L. Oates, RPR, Notary Public in and for the State of
Florida at Large, pursuant to Second Re-Notice of
Taking Videotaped Deposition filed in the above cause.
```

**Page 3**

E X H I B I T S

| Exhibit No. | Page |
| --- | --- |
| 1 | 12 |
| 2 | 38 |
| 3 | 77 |
| 4 | 144 |
| 5 | 156 |
| 6 | 201 |
| 7 | 214 |
| 8 | 251 |
| 9 | 260 |

**Page 2**

```
APPEARANCES:
SUMMERS, RUBINSTEIN
BY: YANO L. RUBINSTEIN, ESQ.
580 California Street
Suite 1600
San Francisco, California 94104
  on behalf of the Plaintiff.

KOZYAK, TROPIN & THROCKMORTON
BY: KENNETH HARTMANN, ESQ.
and GAIL MCQUILKIN, ESQ.
2525 Ponce DeLeon Boulevard
9th Floor
Miami, Florida 33134
  on behalf of the Defendant.

DIMOND, KAPLAN & ROTHSTEIN, P.A.
BY: ADAM T. RABIN, ESQ.
200 Southeast 1st Street
Suite 708
Miami, Florida 33131
  on behalf of the Defendant.
ALSO PRESENT:
  Raul Ospina, Videographer
  Steven Silvers
  Amy Warren, Stelor Representative

          I N D E X
Witness              Direct  Cross
Steven Esrig
  (By Mr. Hartmann)      4
```

**Page 4**

```
 1     THE VIDEOGRAPHER:  We are now on the video
 2 record.  The time is 9:32 a.m.
 3     THE COURT REPORTER:  We are here in the case
 4 of Stelor Productions versus Steven A. Silvers,
 5 with an S, Case Number 04-80954, on Monday,
 6 December 13, 2004 at the Law Offices of Kozyak,
 7 Tropin and Throckmorton at 2525 Ponce DeLeon,
 8 Coral Gables.  My name is Debbie Oates, I'm the
 9 court reporter.
10     Will counsel make their appearances, please.
11     MR. RUBINSTEIN:  Yano Rubinstein appearing
12 for the plaintiff Stelor Productions, Inc.
13     MR. HARTMANN:  Ken Hartmann on behalf of
14 the defendant and counter-plaintiff Steven
15 Silvers.
16     THE COURT REPORTER:  Will you raise your
17 right hand, please.
18 THEREUPON,
19          STEVEN ESRIG
20 having first been duly sworn and responded, "I do,"
21 was examined and testified as follows:
22          DIRECT EXAMINATION
23     MR. HARTMANN:  Are you going to do your
24 video thing?  Usually the videographer comes in.
25     MS. MCQUILKIN:  Can you put us on the
```

1 (Pages 1 to 4)

Veritext/Florida Reporting Co., LLC - 19 West Flagler Street - Miami, Florida - (305) 376-8800
Benowitz - Berman - Cook - Florida Keys - Matz Traktman - Ivy

5

```
 1  appearance. We're not miked so.
 2      MR. HARTMANN: All right. Also appearing
 3  here with me today is Steven Silvers, and Gail
 4  McQuilkin of Kozyak, Tropin and Throckmorton and
 5  our co-counsel Adam Rabin.
 6      You don't want to -- I mean typically the
 7  videographer does -- that's okay. It's okay with
 8  me.
 9      Have you sworn the witness?
10      THE COURT REPORTER: Yes.
11 BY MR. HARTMANN:
12  Q.  Okay.
13      Good morning, Mr. Esrig, how are you?
14  A.  Good morning. Fine, sir.
15  Q.  All right. As I said before, I'm Ken
16 Hartmann and I will be doing your deposition today in
17 connection with the order of the court which allows us
18 to take discovery which would not otherwise be
19 permissible directed at matters raised in the Motion
20 for Preliminary Injunction that Stelor has filed.
21      Before we start asking questions, I think we
22 need to make a couple of things clear on the record.
23 First of all as to Mr. Rubinstein's appearance here,
24 we have issues with that which we will be addressing
25 with the court but we object to you representing
```

6

```
 1 Stelor in light of your previous representation of Mr.
 2 Silvers in a separate proceeding and we think it's
 3 improper for you to be acting in a manner which is
 4 adverse to Mr. Silvers after having previously
 5 purported to represent him. So we're going to object
 6 to your presence here at the deposition. We're not
 7 going to put off the deposition, but I just wanted to
 8 put that out on the table.
 9      Furthermore, we're going to be very narrow
10 in our scope of this deposition. We are not going to
11 go into issues relating to the overall lawsuit. That
12 is as to the Complaint that was filed or the
13 counterclaim that was filed. Leaving that discovery
14 for another day. We are going to act in accordance
15 with the court's order which specifically permits us
16 to take discovery relating to preliminary injunction
17 issues so my questions will be directed at those
18 particular issues that have been raised by Stelor for
19 the preliminary injunction. And we assume that the
20 scope of tomorrow's deposition will be consistent with
21 that. And as a matter of forewarning, if it's not
22 consistent with that, then there will be issues.
23      That being said, could you tell us -- could
24 you spell your name for us, please.
25  A.  Steven. S-T-E-V-E-N. Middle name Alan.
```

7

```
 1 A-L-A-N. Last name Esrig. E-S-R-I-G.
 2  Q.  And where do you live?
 3  A.  In Darnestown, Maryland.
 4  Q.  Could you give us a specific address?
 5  A.  14701 Mockingbird Drive, Darnestown,
 6 Maryland 20874.
 7  Q.  What is your social security number?
 8      MR. RUBINSTEIN: Objection. Personal and
 9      outside the scope.
10 BY MR. HARTMANN:
11  Q.  You can answer.
12  A.  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.
13  Q.  Have you ever used any other names?
14  A.  No.
15  Q.  What is Stelor Productions?
16  A.  Stelor Productions is a company that was
17 formed to commercialize a property called Googles and
18 the Planet of Goo.
19  Q.  And when was it formed?
20  A.  Stelor Productions was formed in early 2002.
21  Q.  And does Stelor have a place of business?
22  A.  It does.
23  Q.  Where is that?
24  A.  At Darnestown, Maryland.
25  Q.  What kind of entity is Stelor?
```

8

```
 1  A.  Stelor was formed as a C Corp. under the
 2 State of Delaware.
 3  Q.  A C Corporation. And is it still a C
 4 Corporation today?
 5  A.  It is.
 6  Q.  Who formed Stelor? Who were the
 7 incorporators?
 8  A.  It was formed by the law firm at that time
 9 which was I believe Akin, Gump.
10  Q.  All right. I appreciate that but I'm really
11 looking at the -- the individuals who were behind
12 forming the company. Not the law firm that did the
13 paperwork.
14      MR. RUBINSTEIN: Objection. Vague and
15      ambiguous. Can you please restate the question.
16 BY MR. HARTMANN:
17  Q.  Who formed the company?
18  A.  Myself and counsel at Akin, Gump.
19  Q.  Okay. So other than counsel, you were the
20 only incorporator of the company?
21  A.  Yes.
22  Q.  Do you -- what is your position with Stelor?
23  A.  I am the CEO and president of the company.
24  Q.  And do you have a written agreement with
25 Stelor as to your employment?
```

2 (Pages 5 to 8)

9

1    A.  I do.
2    Q.  Is there a shareholder agreement that Stelor
3 has?
4    A.  I don't understand your question.
5    Q.  Does -- is there any -- are you a
6 shareholder in Stelor?
7    A.  I am.
8    Q.  Are there other shareholders?
9    A.  There are.
10    Q.  Is there any written agreement vis-a-vis the
11 shareholders and Stelor?
12        MR. RUBINSTEIN:  Objection.  Vague and
13    ambiguous.
14        THE WITNESS:  I'm not understanding --
15 BY MR. HARTMANN:
16    Q.  Is there -- is there any written agreement
17 between the Stelor shareholders relating to Stelor?
18    A.  Yes, there's a subscription agreement
19 relating to their shares of stock in the company.
20    Q.  Other than a subscription agreement, are
21 there any other agreements among the shareholders of
22 Stelor?
23        MR. RUBINSTEIN:  Objection.  Broad.
24        THE WITNESS:  Yes.
25

10

1 BY MR. HARTMANN:
2    Q.  What are they?
3    A.  Documents relating to the subscription
4 agreement of -- for investors in the company.
5    Q.  Okay.  What type of other agreements are
6 there besides the subscription agreement?
7    A.  There's a -- there are investor
8 questionnaires relative to an individual's accrediting
9 status, other documents I don't recall right now.
10    Q.  What is Stelor's address?
11    A.  14701 Mockingbird Drive, Darnestown,
12 Maryland 20874.
13    Q.  Is that the same address as your home?
14    A.  It is.
15    Q.  How many employees does Stelor have?
16    A.  Stelor currently has full-time 14 employees,
17 several more have been hired and will be starting and
18 about another dozen more that are outsourced employees
19 so a total of about just under 30 total.
20    Q.  How many full-time employees does Stelor
21 have?
22    A.  Approximately 14 as of today.
23    Q.  And they would all be working out of your
24 house?
25    A.  They work out of a separate wing that is

11

1 attached to the home that is strictly the business.
2    Q.  Aside from -- and we're going to go into
3 this in more detail -- the -- the Googles intellectual
4 property project I'll call it, does Stelor have any
5 other business?
6    A.  No.  Stelor is only at this time
7 commercializing that intellectual property.
8    Q.  How about you.  Are you engaged in any other
9 business beyond Stelor?
10        MR. RUBINSTEIN:  Objection.  Vague and
11    ambiguous.
12 BY MR. HARTMANN:
13    Q.  You can answer.
14    A.  In licensing?
15    Q.  In any other business.  Do you have any
16 other business concerns -- and I'm not talking about
17 investing in the stock market or buying real estate,
18 but are you -- you an employee -- let me ask it this
19 way.  Are you an employee of any other companies?
20    A.  No, I'm not.
21    Q.  Are you -- do you spend any time devoted to
22 business that relates to something other than Stelor?
23    A.  No, I do not.
24    Q.  What is the business of Stelor?
25    A.  Stelor's business is to grow the

12

1 intellectual property known as Googles and the Planet
2 of Goo and bring it to market.
3    Q.  Let me -- let's mark this as Exhibit 1.
4        While she's doing that, off the record.
5 What I'm going to do is -- what I'm going to -- I'm
6 going to mark a series of exhibits.  I would suggest
7 that we have continuing exhibits here so that when you
8 -- if I do 20 exhibits today and you guys start on 21
9 tomorrow and hopefully we can avoid repetition that
10 way because you can use what's already been marked.
11        MR. RUBINSTEIN:  That's fine.
12        MR. HARTMANN:  But it's up to you.  I can't
13    force you to do that, but I find that that works
14    easier for everybody if we can get it going that
15    way.
16        (The document was marked as Exhibit No. 1
17    for identification.)
18 BY MR. HARTMANN:
19    Q.  Okay.  Let me show you what's been marked
20 as Exhibit 1 which is titled the License, Distribution
21 and Manufacturing Agreement.  Are you familiar with
22 that document?
23    A.  I am.
24    Q.  And is this the document which memorializes
25 the agreement with Steven Silvers as to the use of the

3 (Pages 9 to 12)

13

1 Googles IP I think you called it?
2    A.   It does.
3    Q.   All right. I want to just get into a little
4 bit more as to what Stelor is doing. And I'm looking
5 at the paragraph one at the bottom of Exhibit 1 where
6 it says License Grant. You see where I am? 1A.
7    A.   Yes.
8    Q.   On the first page.
9        And this -- this license says that it's --
10 that Silvers is -- is granting to Stelor -- Silvers is
11 a licensor, correct?
12   A.   Correct.
13       MR. RUBINSTEIN: Objection. Calls for a
14 legal conclusion.
15 BY MR. HARTMANN:
16   Q.   And the licensee is Stelor, correct?
17   A.   Right.
18       MR. RUBINSTEIN: Objection. Calls for a
19 legal conclusion.
20 BY MR. HARTMANN:
21   Q.   All right. And we see here that the
22 license is to use -- I'm on the third line. To use,
23 reproduce, modify. Do you see where I am?
24   A.   Uh-huh.
25   Q.   Create derivative works, manufacture, have

14

1 manufactured, market, advertise, sell, distribute,
2 display, perform, and otherwise commercialize the
3 licensed products. Do you see where I am?
4    A.   I do.
5    Q.   Would you agree that that is the basic
6 business of Stelor?
7    A.   You left out a critical word called the
8 exclusive rights.
9    Q.   Thank you. Would you agree that what I
10 just said was the -- the basic business of Stelor?
11   A.   It describes what Stelor does, yes.
12   Q.   All right. So would you tell me then --
13 well, let's go back up to the whereases and you'll see
14 there's a term here in the third whereas that defines
15 something called licensed products. And those are
16 those types -- those types of products that
17 incorporate or are otherwise based on the licensed
18 property. Do you see that?
19   A.   Uh-huh.
20   Q.   Okay. Would you tell me all the licensed
21 products that Stelor has manufactured or sold?
22   A.   As of this date Stelor has not manufactured
23 and sold any products to date.
24   Q.   Okay. So would you tell me all the licensed
25 products that Stelor has marketed?

15

1    A.   As of this date Stelor has not marketed any
2 licensed products.
3    Q.   All right. Now, it also in Paragraph 1A
4 talks about sublicensing. It says the sublicensable
5 right. Has Stelor entered into any sublicenses with
6 respect to the Googles intellectual property?
7    A.   No.
8    Q.   All right. Now in terms of commercializing
9 the licensed product. Has Stelor commercialized the
10 licensed product in any way?
11   A.   Could you define commercialized?
12   Q.   I'm just using the term that's -- that's in
13 the agreement here.
14   A.   I don't understand the context that you're
15 using the word commercialized.
16   Q.   All right. So other than what we've already
17 talked about, is there anything in addition to that
18 that would fall into commercializing as you understand
19 this agreement?
20   A.   As I understand commercialize, it is a term
21 that describes our efforts to bring the intellectual
22 property in its various manifestations to the
23 marketplace.
24   Q.   In order to make money?
25   A.   In order to make money.

16

1    Q.   In those efforts have you reached any
2 agreements that would create the possibility of Stelor
3 making money, any contracts?
4    A.   As of this date Stelor Productions has not
5 entered into any contracts with any entity in this
6 regard.
7    Q.   Okay. So I want to now go back to some of
8 the allegations in the lawsuit. Can you tell me
9 whether Steven Silvers has manufactured -- excuse me.
10 Let me start that one over.
11       Has Steven Silvers interfered in any way
12 with Stelor's manufacturing the licensed products?
13       MR. RUBINSTEIN: Objection. Calls for a
14 legal conclusion.
15 BY MR. HARTMANN:
16   Q.   You can answer.
17   A.   It is our contention that Steven Silvers has
18 interfered with the business of running Stelor
19 including our efforts to begin manufacturing licensed
20 products.
21   Q.   I understand that's your contention but the
22 reason we're taking your deposition today is I need to
23 know what facts there are that support that
24 contention, so tell me everything that Steven Silvers
25 has done that has interfered with Stelor's

4 (Pages 13 to 16)

17

1 manufacturing of the licensed products.
2   A.  Mr. Silvers has interfered in Stelor's
3 ability to run its business, to utilize its personnel
4 and its -- and its assets effectively so that we can
5 in fact commercialize the intellectual properties and
6 bring them to market.  That would include
7 manufacturing products as well.
8   Q.  I appreciate that.  I -- I understand that
9 you think he's interfered.  What I'm asking is a very
10 specific question relating to Stelor's manufacturing
11 of licensed goods.  Tell me everything that Mr. -- you
12 need to be specific here because when you go to court,
13 the judge is going to be interested in specific facts
14 not simply general statements.  So I need to know
15 every instance of Mr. Stelor's interfering with
16 Stelor's manufacturing of the licensed goods.  I need
17 specifics.  Please, if -- if any.
18   A.  Since I've made the statement that as of
19 today Stelor has not yet manufactured licensed
20 products, my answer to you remains the same.  Mr.
21 Silvers has interfered with Stelor's efforts to get to
22 the manufacturer of those products by interfering with
23 the business of Stelor.  I don't think I can be
24 anymore specific.
25   Q.  Tell me each manufacturer that Mr. Silvers'

18

1 interference has involved?
2   A.  I understand the word manufacturer to mean
3 to create and produce.  As I stated earlier, Stelor
4 has not engaged in the manufacturing, which would
5 denote a manufacturer, to date.  We are a company that
6 is in the business of growing intellectual property,
7 doing the research and development, creating
8 additional creativity, if you will, and it is to that
9 end that since the onset of the project Mr. Silvers
10 has interfered with.
11   Q.  All right.  So it's -- there are -- there
12 are no specific manufacturing arrangements that Mr.
13 Silvers has interfered with, correct?
14       MR. RUBINSTEIN:  Objection.  Calls for a
15 legal conclusion.
16       THE WITNESS:  Can you restate that
17 question, please.
18 BY MR. HARTMANN:
19   Q.  There's no specific manufacturing
20 arrangements that Mr. Silvers has interfered with,
21 correct?
22   A.  As I've answered now several times, we have
23 not entered into any manufacturing agreements with
24 manufacturers as of today.  Mr. Silvers has interfered
25 with our efforts to get the manufacturing process

19

1 started so that we could bring those products to
2 market.
3   Q.  All right.  Let's take that statement and
4 break it down.  What efforts has Stelor made to make
5 the manufacturing -- get the manufacturing process
6 started?
7   A.  Those efforts might include growing
8 characters, adding additional characters, adding
9 additional music, changing the existing website,
10 adding additional story line, dealing potentially with
11 vendors such as our musicians who would be working on
12 those story lines.  It is those areas that Stelor
13 contends Mr. Silvers has interfered with.
14   Q.  And so which -- which licensed manufactured
15 products -- which licensed products that you're trying
16 to manufacture has Mr. Silvers prevented you from
17 manufacturing?
18       MR. RUBINSTEIN:  Objection.  Vague and
19 compound.  It calls for a legal conclusion.
20       MR. HARTMANN:  You can answer.
21       MR. RUBINSTEIN:  To the extent it misstates
22 Mr. Esrig's prior testimony.
23       THE WITNESS:  I'm going to have to ask you
24 to restate the question.
25

20

1 BY MR. HARTMANN:
2   Q.  Which licensed products has Mr. Silvers
3 interfered?  Which specific licensed products has Mr.
4 Silvers interfered with Stelor's efforts to
5 manufacture?
6   A.  As of today Stelor Productions has not
7 manufactured a complete licensed product.  Mr. Silvers
8 has interfered with that process so that Stelor could
9 get to the manufacturing of those products.
10   Q.  He's interfered with the process.  Okay.
11 I'm just trying to understand what specific licensed
12 products the interference in the process has
13 prohibited or kept Stelor from manufacturing.  Are
14 there any?  Any specific licensed products?
15   A.  The product that Stelor is in, as we speak,
16 is the business of producing range from additional
17 intellectual property, music, video, books, toys, all
18 of the items that deal with commercializing and
19 bringing to market the property Googles and the Planet
20 of Goo.
21   Q.  Okay.  So let's take toys.  That -- that
22 would be a licensed product.  What specific things has
23 Mr. Silvers done to disrupt or interfered with
24 Stelor's efforts to bring toys to the market?
25   A.  Mr. Silvers has interfered with the process

5 (Pages 17 to 20)

21

```
 1  by inserting himself from the onset of the company
 2  into the company's business by interfering with
 3  relationships the company has, by interfering with
 4  employees of the company, by interfering with the
 5  company's ability to continue to grow the business in
 6  an unfettered fashion.
 7      Q.  Okay.  What employees has Mr. Silvers
 8  interfered with?  Which ones?  Can you name those,
 9  please.
10      A.  Mr. Silvers has interfered with a variety of
11  the early employees in the early days of Stelor who
12  are no longer with the company.  Up through I would
13  say June of last year Mr. Silvers, to name one
14  example, interfered with Julie DePue, the production
15  coordinator for Stelor Productions, and her ability to
16  bring us to the licensing show.
17      Q.  All right.  Julie DePue is she no longer
18  with Stelor?
19      A.  She is currently with Stelor.
20      Q.  She's currently with Stelor.  And her
21  position is what?
22      A.  Production coordinator.
23      Q.  And how did Mr. Silvers interfere with Julie
24  DePue's ability to further Stelor's business?
25      A.  Mr. Silvers took it upon himself to call
```

22

```
 1  and e-mail incessantly making demands on how the
 2  licensing show booth would be run, how the characters
 3  would be presented, what type of shirts would be at
 4  the show, what type of caps.  He wasted approximately
 5  30 percent of her time that was devoted to the show
 6  which Stelor has to pay for.
 7      Q.  All right.  So by sending her letters and
 8  e-mails he wasted her time.  How else did he interfere
 9  with Stelor?  With Ms. DePue.
10      MR. RUBINSTEIN:  Objection.  Vague and
11  ambiguous.
12      THE WITNESS:  What's your question?
13  BY MR. HARTMANN:
14      Q.  I'm asking -- I want to know what Mr.
15  Silvers did that interfered and you told me that he
16  sent a lot of e-mails to Julie DePue.  Aside from
17  sending the e-mails, what else did he do?
18      A.  He would call her incessantly and harangue
19  her about what Stelor was doing in regards to the
20  licensing show.
21      Q.  All right.  And how did this keep Stelor
22  from doing what it wanted to do at the licensing show?
23      A.  You asked me to give you an example of how
24  Mr. Silvers interfered.
25      Q.  Yeah.
```

23

```
 1      A.  Mr. Silver's interference in the running of
 2  our business made it that more difficult, made the
 3  days that much longer, incurred that much overhead so
 4  that it made it that much more difficult for Stelor to
 5  do its job.
 6      Q.  All right.  So other than the fact that he
 7  sent these e-mails and made these phone calls, there
 8  was nothing else that he did that interfered with
 9  Julie DePue's ability to do her job as product
10  coordinator?
11      A.  I can't recall at this time.
12      Q.  Okay.  Besides Ms. DePue, what other
13  employees were interfered with by Mr. Sellers?  Excuse
14  me.  Mr. Silvers.
15          Peter Sellers.
16      A.  You want to define employee?  Full-time,
17  outsourced?
18      Q.  I'm using your -- your -- your answer, sir.
19  I mean you told me that there were numerous employees
20  that Mr. Silvers had interfered with in the process so
21  I just need to know who those particular people are.
22      MR. RUBINSTEIN:  Object to the extent that
23      it misstates Mr. Esrig's prior testimony.
24  BY MR. HARTMANN:
25      Q.  So you can answer.  Who are they?  Who are
```

24

```
 1  these other employees?
 2      A.  Since the onset of the project Mr. Silvers
 3  has interfered with a variety of the employees at
 4  Stelor Productions incurring additional overhead and
 5  cost and making it more difficult for Stelor to do its
 6  job.
 7      Q.  I appreciate that.  You've said that before.
 8  My question is who are those employees?  I need you to
 9  name them.
10      A.  Mr. Silvers interfered with the ability of
11  Dean DePue, our director of IT.  Mr. Silvers
12  interfered with as well -- are you asking relative to
13  that date or from the time -- from the beginning?
14      Q.  Any time.
15      A.  Mr. Silvers interfered with Michael Shepard,
16  at that time business manager.  Mr. Silvers interfered
17  with Mr. Fred Hildebrand.
18      Q.  What was his position?
19      A.  Mr. Hildebrand was also a business manager.
20          Mr. Silvers interfered with Ms. Mimi Lipp,
21  her ability.  Ms. Minel Nunez, her ability.  Those
22  are -- and those are the employees.  There are
23  consultants and other -- that's why I asked you to
24  define.
25      Q.  All right.  We're going back to go back.
```

6 (Pages 21 to 24)

25

1 The Mimi Lipp is an outsourced employee?
2    A.   She was an employee at the time.
3    Q.   She was a full-time --
4    A.   Office manager.
5    Q.   -- Stelor employee?
6         She was the office manager.
7         And is -- is she still with Stelor?
8    A.   She is not.
9    Q.   When did she leave?
10   A.   I don't recall.
11   Q.   Okay.  So any interference that Mr. Silvers
12 had with Mimi Lipp stopped at -- on the date that she
13 left the company?
14   A.   Correct.
15   Q.   All right.  How about Minel Nunez.  What was
16 her position?
17   A.   Minel was a marketing -- in a marketing
18 position.
19   Q.   Is she still with the company?
20   A.   She is not.
21   Q.   Okay.  Do you know when she left?
22   A.   I don't recall.
23   Q.   How long ago, just generally?
24   A.   Sometime I believe last year.  I can't
25 recall exactly.

26

1    Q.   All right.  What did -- how did Mr. Silvers
2 interfere with Fred Hildebrand?
3    A.   By way of example Mr. Silvers at the time
4 was interfering with Mr. Hildebrand's ability to
5 manage the domain names that Silver -- that Stelor
6 manages on behalf of Silvers.  Mr. Silvers on an
7 average day during Mr. Hildebrand's tenure would call
8 up to seven times a day, would send anywhere between
9 one to six e-mails a night to Mr. Hildebrand about
10 moving domains from place to place, about access to
11 websites and so on and so forth.  Mr. Hildebrand that
12 particular year was involved in the licensing show.
13 Mr. Silvers, not unlike Ms. DePue, made it almost
14 impossible for Mr. Hildebrand to carry on his duties
15 throughout that.
16         Another full-time employee is a man named
17 Johnny Gnall.  Mr. Gnall has been with the company
18 since the onset, the formation of Stelor Productions.
19 Mr. Silvers has over the course of the relationship
20 just by the volume of his phone calls made it very
21 difficult, especially in regard to dealing with Mr.
22 Gnall to just put in a normal day of work.
23   Q.   And what is his position?  Mr. Gnall.
24   A.   Mr. Gnall is one of the writers with Stelor
25 Productions.

27

1    Q.   All right.  So with Mr. Gnall the phone
2 calls were interfering -- interference by Mr. Silvers.
3 Any -- anything other than the phone calls that were
4 interference?
5    A.   At that licensing show which was '03 I
6 believe again Mr. Silvers seemed to be under the
7 impression that he was running the company and came to
8 the licensing show and was directing Stelor employees,
9 primarily Mr. Gnall, to carry on what he in his
10 perception was necessary to run the booth at the show
11 and so on and so forth.
12   Q.   So Mr. Silvers made suggestions to Mr. Gnall
13 at the licensing show in 2003?
14   A.   No, he did not make suggestions.  He gave
15 orders.
16   Q.   He gave orders.  Okay.  And of course Mr.
17 Gnall followed out those -- carried out those
18 orders or --
19   A.   No, Mr. Gnall came to me and said why is
20 this fellow interfering with our ability to do this.
21   Q.   And what -- what specifically was it
22 that -- the ability to do what?
23   A.   Not unlike our ability to run a business and
24 try to commercialize this product --
25   Q.   No.  Wait.  I want to go back to Mr. Gnall's

28

1 statement to you --
2    A.   I was answering that.
3    Q.   -- why is Mr. Silvers interfering with our
4 ability to do this.  What are you referring to?  What
5 does that mean?
6    A.   Not unlike --
7         MR. RUBINSTEIN:  Objection.  Vague.
8    Ambiguous.
9         THE WITNESS:  Not unlike Mr. Silvers'
10   interference with our ability to run our business
11   the licensing show and Stelor's running a booth
12   and setting up a booth was a microcosm, if you
13   will, of that business.  Mr. Silvers in person
14   did what Mr. Silvers did when he was not actually
15   in the office.  He interfered with the employees'
16   ability to effectively commercialize, represent
17   and go about the business of Stelor Productions.
18 BY MR. HARTMANN:
19   Q.   And he did this by making suggestions or
20 orders as you put it as to what could be done?
21   A.   Mr. Silvers gave orders to the staff at that
22 booth making it difficult and confusing to have a
23 harmonic -- harmonious show experience.
24   Q.   And didn't you straight -- didn't you do
25 anything to straighten out that confusion?

7 (Pages 25 to 28)

29

1     A.   I asked Mr. Silvers repeatedly and finally
2 found myself having to ask him to leave the booth.
3     Q.   Did you tell Mr. Gnall that you were giving
4 the orders and not Mr. Silvers?
5     A.   Absolutely.
6     Q.   So certainly at that point any interference
7 would have stopped?
8     A.   It would have but Mr. Silvers does what Mr.
9 Silvers wants to do invariably.
10    Q.   But the effect on Stelor stopped when you
11 advised your -- these employees that Mr. Silvers
12 wasn't giving the orders, correct?
13        MR. RUBINSTEIN:  Objection.  No question.
14 BY MR. HARTMANN:
15    Q.   You -- you can answer.
16    A.   What was the question?
17    Q.   The -- the effect on Stelor, whatever it is
18 and I still don't quite understand what you're saying
19 there, stopped when you told the employees don't take
20 orders from Mr. Silvers, I give the orders; that's
21 when it stopped, correct?
22    A.   No, because Mr. Silvers did not leave the
23 vicinity of the booth and so we had prospective
24 licensees, prospective vendors, interested parties now
25 witnessing Mr. Silvers' interference.  Mr. Silvers

30

1 stood there and said that he was the creator of the
2 project and inferred that in fact he was in charge of
3 the booth.  No, that interference was ongoing.
4     Q.   This is at the trade show in 2003?
5     A.   That's correct.
6     Q.   Okay.  Why didn't Stelor sue Mr. Silvers
7 back in 2003 when all this was happening?
8        MR. RUBINSTEIN:  Objection.  Calls for a
9 narrative.
10       THE WITNESS:  We did not sue Mr. Silvers at
11 that point because we have been adamantly
12 attempting to commercialize this project and Mr.
13 Silvers' behavior has been consistent from the
14 onset of the project and I made an executive
15 decision that bringing this product to market and
16 helping the children of the world as well as
17 creating a profit for Stelor was paramount and
18 because we had gotten very used to the pattern of
19 Mr. Silvers' interference, it was something that
20 became a part of my daily responsibilities to
21 contend with.
22 BY MR. HARTMANN:
23    Q.   I appreciate that but my question is if this
24 was such a problem in 2003 why did Stelor wait until
25 October of 2004 to file suit against Mr. Silvers for

31

1 these things?
2     A.   Because up until October of 2004 it was my
3 job to baby-sit Mr. Silvers, run interference and
4 allow Stelor Productions to finish its appointed task.
5 By October of 2004 Mr. Silvers' breaches of the
6 contract and interference in our ability to run our
7 business had become so egregious that we had no other
8 recourse.  We had attempted to, from the onset of this
9 relationship, negotiate with Mr. Silvers directly and
10 through many different counsel to try to have an
11 amicable and nonadversarial working relationship but
12 ultimately it always came back to Mr. Silvers'
13 perception that he in fact was running this project
14 and calling the shots in all regards relative to the
15 commercializing of the product.
16    Q.   And so because he said that it was true?
17    A.   Because who said what?
18    Q.   Because Mr. Silvers said that he was running
19 everything that made it true?
20    A.   No, it made it very difficult to run Stelor
21 because of his level of interference.
22    Q.   Because you could not advise the other
23 employees of Stelor that -- that you were running
24 things?
25       MR. RUBINSTEIN:  Objection.  To the extent

32

1 that there's no question presented.
2        THE WITNESS:  It's very difficult to run a
3 business concern when you've got an outside
4 individual who has an intimate relationship, in
5 this case a contractual relationship as a
6 licensor, and that individuals calls and sends
7 anywhere from one to eight e-mails a night
8 bearing from one page to ten pages.  Usually one
9 sentence just running run on for nine pages.  The
10 amount of time it takes to contend with, answer,
11 spend time with, speak to the employees about,
12 keep the employees in a -- in a place where they
13 are still productive is very expensive and so for
14 Stelor by October of 2004 a decision was made
15 that we could no longer expend resources to
16 provide Mr. Silvers with something to do in his
17 spare time.
18 BY MR. HARTMANN:
19    Q.   At this trade show in 2003 you said that Mr.
20 Silvers' presence had a detrimental effect on
21 licensees and vendors.
22       MR. RUBINSTEIN:  Objection.  Misstates prior
23 testimony.
24 BY MR. HARTMANN:
25    Q.   Tell me who all the licensees were that were

8 (Pages 29 to 32)

33

1 effected by Mr. Silvers.
2    A.  I believe I used the word potential
3 licensees but if I did not --
4    Q.  Okay.  That's good.  You don't have any
5 licensees so it had to be potential.
6    A.  That's right potential.
7    Q.  Who are the potential licensees?
8    A.  Music companies, toy companies, apparel
9 companies.
10    Q.  No, I need specifics.  I don't need
11 generics.
12    A.  I can't give you specifics.  People that
13 came around our booth that Mr. Silvers would get to
14 first in his representation as being both the creator
15 of and the responsible party.  In many cases I never
16 even got a business card or a name.  I simply was made
17 aware of it by the employee saying Mr. Silvers had a
18 meeting with that person.  I would say who was that
19 person.  We don't know.  Mr. Silvers took them outside
20 of the booth.
21        We had our neighbor in the booth, another
22 property, express sympathy because she had dealt with
23 and knew Mr. Silvers over the years and told us that
24 earlier in her career Mr. Silvers had attempted to in
25 fact "steal her property".

34

1    Q.  All right.  So there's -- you can't tell me
2 one potential licensee that was effected by the
3 interference of Mr. Silvers at the 2003 trade show?
4    A.  I only can answer your question which is to
5 say that Mr. Silvers interfered with the flow of
6 traffic.  By definition that flow our potential
7 licensees, vendors based on his behavior at that show,
8 not unlike Mr. Silvers showing up at the show the year
9 prior having been told not to by Stelor Productions,
10 having solicited a badge illegally in the name of
11 Stelor Productions as an employee and representing
12 himself at that show to be -- and not only an employee
13 of Stelor but the person responsible for the Googles
14 from Goo project.
15    Q.  All right.  I appreciate all that.  My
16 question is can you tell me one potential licensee
17 that was effected by Mr. Silvers' interference at the
18 2003 trade show?
19    A.  It would be --
20    Q.  Just one.
21    A.  It would be speculation on my part.
22    Q.  All right.  So you don't -- were you there?
23    A.  I was.
24    Q.  Did you see all this?
25    A.  I did.

35

1    Q.  Now how about vendors.  Tell me one vendor
2 that was effected by Mr. Silvers' "interference" at
3 the 2003 trade show?
4        By the way you don't have any vendors so
5 let's use the word potential vendors?
6    A.  Thank you.
7    Q.  Okay.
8    A.  If Mr. Silvers had not been doing what he
9 was doing, it's very likely that I could give you the
10 name of relationships we might have entered into but
11 again that flow of traffic which was potential
12 licensees, potential vendors, potential clients
13 because Mr. Silvers inserted himself I am unable to
14 give you the name of any of those people because I am
15 not sure what transpired -- excuse me -- between Mr.
16 Silvers and those parties.
17    Q.  All right.  So we know your testimony is
18 that Mr. Silvers inserted himself but you can't tell
19 us with whom he inserted himself, correct?
20    A.  Correct.
21    Q.  Now you also mentioned that there was a
22 neighbor at the 2003 trade show.  Who was the -- that
23 neighbor?
24    A.  I don't recall her name.
25    Q.  What was the product that she was marketing?

36

1    A.  It was an -- it was an animal product.  I'd
2 have to look at my records.
3    Q.  But she certainly would have observed all
4 this inference?
5    A.  Absolutely.
6    Q.  Okay.  Who else was at the Stelor booth at
7 the 2003 trade show that would have observed all this
8 inference?
9    A.  Johnny Gnall, Fred Hildebrand, Bridget
10 Hildebrand.  I can't think of her last name but there
11 was a woman named Gloria something, I can't -- I can't
12 remember her last name.  As well as one of my
13 directors who worked the booth who was a direct
14 witness to Mr. Silvers not only interfering but when
15 someone would come to the booth, taking that person
16 away from the booth.  In fact this director reported
17 to us that he overheard Mr. Silvers saying I'm Mr.
18 Steven Silvers the creator of this project and I can
19 talk to you about any licensing opportunities.  That
20 director's name is Steven Weinstein.
21    Q.  And did he tell you who Mr. Silvers said
22 that to?
23    A.  He was unaware of who the individual was.
24    Q.  By the way -- by the way Mr. Silvers is the
25 creator --

9 (Pages 33 to 36)

37

```
 1    A.  He is.
 2    Q.  -- of the Googles, correct?
 3    A.  Yes, correct.
 4    Q.  So that's absolutely true?
 5    A.  Absolutely true.
 6    Q.  And in fact wasn't Mr. Silvers -- didn't he
 7  hold a position with Silvers -- with Stelor?
 8    A.  Mr. Silvers had a consulting contract that
 9  named him as executive consultant -- executive
10  creative consultant but never lived up to, never --
11  refused to work with or provide the services that he
12  was paid for but Mr. Silvers in my recent memory was
13  never in charge of the company and in these agreements
14  never had the right to solicit a potential licensee or
15  vendor.  In fact I believe there's language that
16  speaks to in both this agreement and his consulting
17  agreement the fact that he would not maintain, set up,
18  start any relationship with vendors, licensees,
19  clients, et cetera, et cetera without our express
20  written permission.
21    Q.  All right.  So to answer my question then
22  Mr. Silvers did have a title with Stelor, correct?
23    A.  I don't understand your question.  What type
24  of title?
25    Q.  I think you -- you described it as executive
```

38

```
 1  vice president of -- when you -- when you say the
 2  agreement, you're talking about the consulting
 3  agreement; correct?
 4    A.  Yes, the letter agreement.
 5    Q.  Yeah, the letter agreement.
 6    A.  And Mr. Silvers was a consultant never a
 7  vice president.
 8    Q.  He was the executive creative consultant for
 9  Stelor, correct?
10    A.  Correct.
11    Q.  That was his title.
12      MR. RUBINSTEIN:  Objection.  Calls --
13  misstates prior testimony.  And if you guys could
14  not speak over each other, it'll be easier for
15  madam court reporter.
16      MR. HARTMANN:  Let's go ahead and mark this
17  as Number 2.
18      (The document was marked as Exhibit No. 2
19  for identification.)
20  BY MR. HARTMANN:
21    Q.  All right.  I'm showing you what we've
22  marked as Exhibit 2 and this is the letter agreement
23  as we call it.  Correct?
24    A.  Yes.
25    Q.  And in Paragraph 1A, Engagement of
```

39

```
 1  Consultant, it says that the company -- and that would
 2  be Stelor -- engages consultant -- that would be Mr.
 3  Silvers -- whose title shall be executive creative
 4  consultant.  Do you see that?
 5    A.  Yes.
 6    Q.  All right.  So would you agree that Mr.
 7  Silvers had the title with Stelor of executive
 8  creative consultant?
 9      MR. RUBINSTEIN:  Objection.  Document
10  speaks for itself.
11  BY MR. HARTMANN:
12    Q.  That was your understanding?
13    A.  Yes.
14    Q.  And so it would not be interference with
15  Stelor's business for Mr. Silvers to advise somebody
16  that he had that title with Stelor, would it?
17    A.  I would think it would because the same
18  agreement and the contract says that Mr. Silvers shall
19  not initiate or maintain any relationship or
20  conversation with a current or a prospective vendor, a
21  prospective client, a prospective licensee or any
22  company relationships without our prior express
23  written request.
24    Q.  Okay.  Let's talk about that.  Tell me all
25  of the potential licensees that Mr. Silvers spoke with
```

40

```
 1  without your permission.
 2    A.  As I stated earlier, Mr. Silvers'
 3  conversations at the various trade shows with
 4  prospective licensees, many of whom because they were
 5  prospective by definition, I did not have the
 6  opportunity to meet with, establish a relationship
 7  with because of Mr. Silvers' interference because Mr.
 8  Silvers was violating in these contracts this very
 9  specific clause about him not initiating any
10  conversation with any of those individuals and so I am
11  unable to tell you the specificity of those
12  individuals because by definition Mr. Silvers'
13  injection and interference between the CEO of Stelor
14  and those individuals made it impossible for me to
15  find out who those individuals were.
16    Q.  So you can't tell me one?
17      MR. RUBINSTEIN:  Objection.  What's the
18  question?
19  BY MR. HARTMANN:
20    Q.  You can't tell me one of those individuals?
21    A.  Should I restate my answer?
22    Q.  No, I'm asking you can you tell me one.  And
23  the answer is no.  I just want -- I want to take your
24  answer and boil it down to what my question was and
25  that is rather than all the language about him
```

10 (Pages 37 to 40)

41

1 violating the agreements and all that stuff. I
2 understand you have your stock responses to all of
3 these but I just want the facts.
4        MR. RUBINSTEIN: Objection. Misstates prior
5    testimony.
6 BY MR. HARTMANN:
7    Q.   And the fact is you don't know one potential
8 licensee that Mr. Silvers -- you can't tell me one
9 that Mr. Silvers had any discussions with whatsoever,
10 correct?
11    A.   The fact is I was unable to find out the
12 name of any of those because of Mr. Silvers'
13 interference with and in that specific example his
14 intentional interference with keeping them away from
15 myself and/or my employees at the booth.
16    Q.   I know you want to tell me why but I don't
17 care why. I just want to know -- I want the record to
18 show that you can't tell me one potential licensee
19 that he had any discussions with whatsoever.
20    A.   I am unable to tell you one.
21    Q.   And the same thing would apply to the
22 vendors?
23    A.   As stated earlier.
24    Q.   Okay. Now you also mentioned that Mr.
25 Silvers had inserted himself into -- in addition to

42

1 bothering all these employees -- and by the way before
2 we leave the employees. Is there anything other than
3 sending letters, writing e-mails or making phone calls
4 that Mr. Silvers did to interfere with any of the
5 employees you told me about?
6        MR. RUBINSTEIN: Objection. Complex,
7    compound, vague and ambiguous. Can you please
8    restate the question?
9 BY MR. HARTMANN:
10    Q.   You can answer.
11    A.   Could you please restate the question?
12    Q.   Is there anything other than the e-mails and
13 phone calls and letters that you previously described
14 that Mr. Silvers did to interfere with any of the
15 employees you mentioned?
16    A.   Yes.
17    Q.   What?
18    A.   He threatened various actions against the
19 employees and the company.
20    Q.   He threatened various actions. Okay. What
21 actions did he threaten?
22    A.   Mr. Silvers threatened Stelor employees that
23 he was going to shut down the single most important
24 source of Stelor's business and market presence the
25 website Googles.com.

43

1    Q.   Okay. We're going to come back to the
2 threats. I want to know anything that he did that
3 interfered.
4    A.   Mr. Stelors -- Mr. Stelors. Mr. Silvers
5 withheld not only passwords but Mr. Silvers did not
6 renew domain names on time, Mr. Silvers in working
7 with Stelor employees who beseeched him to renew so
8 that we didn't have waste additional Stelor time
9 playing this game of keeping the passwords and whatnot
10 current, it -- it just was such an enormous
11 interference in Stelor's ability to commercialize and
12 bring to market this property.
13    Q.   Okay. So besides withholding passwords and
14 failing to renew domain names, anything else that he
15 did to interfere?
16    A.   Mr. Silvers interfered at the trademark
17 office by removing Stelor's name, Stelor's counsel
18 name and having all correspondence diverted to him.
19 Mr. Silvers spent from the onset of this, actually
20 prior to our agreement, hundreds and hundreds of
21 e-mail and letter correspondences laying out the
22 groundwork for a legal action with Stelor/Silvers
23 against Google, Inc. hundreds of times and then Mr.
24 Silvers turned around and said that he had no problem
25 with Google.com and that he had no problem with their

44

1 domain and so directly went back on three and a half
2 years of instructions to us as a company in an effort
3 to undermine and interfere with our business.
4    Q.   We're going to talk about that in more
5 detail but just to clear that up. The statement that
6 you're referring to was made by Mr. Silvers' lawyers
7 after you filed this lawsuit, correct?
8    A.   I'm not aware of that.
9    Q.   Nobody told you that?
10    A.   I'm aware only of what I know from Mr.
11 Silvers by way of correspondence and from my counsel.
12    Q.   All right. Now --
13    A.   Excuse me. Can we take a little bathroom
14 break?
15    Q.   Sure. No problem.
16    A.   Great.
17        THE VIDEOGRAPHER: We are now going off the
18    video record. The time is 10:20.
19        (There was a break taken after which the
20 following proceedings were held:)
21        THE VIDEOGRAPHER: We're now back on the
22    video record. This is Video Tape Number 2 of the
23    videotaped deposition. The time is 10:26 a.m.
24 BY MR. HARTMANN:
25    Q.   All right. I want to pin down some of the

11 (Pages 41 to 44)

45

```
 1 dates of these employees that suffered from the
 2 interference that you described to Mr. Silvers. Fred
 3 Hildebrand. Is he still with the company?
 4    A.  No, he is not.
 5    Q.  When did he leave?
 6    A.  I can't recall.
 7    Q.  2003?
 8    A.  I can't recall.
 9    Q.  Is it safe to say that Mr. Silvers has not
10 interfered with anything Mr. Hildebrand is doing since
11 his departure from Stelor?
12       MR. RUBINSTEIN: Objection. There's no
13    question contained in that last statement.
14 BY MR. HARTMANN:
15    Q.  You can answer.
16    A.  I didn't hear a question.
17    Q.  Is it safe to say that Mr. Hildebrand is not
18 experiencing any interference from Mr. Silvers since
19 his departure from Stelor?
20       MR. RUBINSTEIN: Objection. Calls for
21    speculation.
22       THE WITNESS: Based on your conclusion that
23    Mr. Hildebrand is not there, I would say that's
24    correct.
25
```

47

```
 1    A.  I can't recall.
 2    Q.  No idea.
 3       All right. How about Dean DePue?
 4    A.  How about him?
 5    Q.  Is he still with Stelor?
 6    A.  Yes.
 7    Q.  When did he join?
 8    A.  Can't recall.
 9    Q.  How about Mimi Lipps? Mimi Lipp. Is she
10 still with Stelor?
11    A.  No, she is not.
12    Q.  When did she leave?
13    A.  I can't recall.
14    Q.  Who is Stelor's office manager now?
15    A.  Michael Sagan.
16    Q.  When did he come on board?
17    A.  Michael has been there about a month I
18 think.
19    Q.  All right. How much of a hiatus was there
20 between Ms. Lipps leaving Stelor and Mr. Sagan coming
21 to Stelor?
22    A.  There was no hiatus.
23    Q.  All right. So when did Ms. Lipp leave?
24    A.  I can't recall.
25    Q.  But he left -- Ms. Lipps left the day before
```

46

```
 1 BY MR. HARTMANN:
 2    Q.  He's not there, correct? He isn't there.
 3 Didn't you just tell me he's not there?
 4    A.  That is correct, he's not there.
 5    Q.  So -- so in connection with interference
 6 with Mr. Hildebrand, Stelor is not experiencing any
 7 problems since the time that Mr. Hildebrand left,
 8 correct?
 9       MR. RUBINSTEIN: Objection. Compound.
10       THE WITNESS: Correct.
11 BY MR. HARTMANN:
12    Q.  We're just trying to get a time frame on
13 this, sir. We need to have specific facts. That's
14 how the court is going to decide your --
15    A.  I understand.
16    Q.  -- preliminary injunction motion.
17       All right. Michael Shepard, the business
18 manager. Is he still with Stelor?
19    A.  No.
20    Q.  When did he leave?
21    A.  I can't recall.
22    Q.  Okay. Months, a year ago?
23    A.  I'm sorry, I couldn't hear you Mr. Silvers
24 was saying something.
25    Q.  Months, a year ago?
```

48

```
 1 Mr. Sagan came on board?
 2    A.  No.
 3    Q.  All right. So was there a hiatus between
 4 the two?
 5    A.  Would you define hiatus?
 6    Q.  A break in time.
 7    A.  Was there a break in time between Ms. Lipp
 8 leaving and Mr. Sagan coming? Yes.
 9    Q.  How big of a break?
10    A.  At least a year plus.
11    Q.  Okay. That helps.
12       I think you already told us about Minel
13 Nunez. How about Johnny Gnall. Is he still with
14 Stelor?
15    A.  Yes.
16    Q.  And Gloria without the last time. Is she
17 still with Stelor?
18    A.  She was not with Stelor.
19    Q.  She was an outsourced --
20    A.  Yes.
21    Q.  -- consultant?
22    A.  No, no, no, she was not a consultant.
23    Q.  All right. She was an outsourced employee?
24    A.  No.
25    Q.  What was Gloria's job?
```

12 (Pages 45 to 48)

49

1     A.   She was sharing the booth with us.  She had
2 a product that she was interested in doing a joint
3 venture with the Googles and her product.
4     Q.   That was at the '03 trade show?
5     A.   Yes.
6     Q.   When was that?
7     A.   June of '03.
8     Q.   And where was that?
9     A.   At the Jacob Javits Center in Manhattan.
10    Q.   And what about the '02 trade show.  Where
11 was that?
12    A.   Jacob Javits Center also in June.  The
13 international licensing show is held in the same month
14 and the same place.  It has been for years.
15    Q.   All right.  You had said before that the
16 form of Mr. Silvers' interference related to the
17 process that Stelor was trying to commercialize the
18 licensed products.
19        MR. RUBINSTEIN:  Objection.
20        MR. HARTMANN:  And then you --
21        MR. RUBINSTEIN:  Misstates prior testimony.
22 BY MR. HARTMANN:
23    Q.   And then you told me that he had been
24 inserting himself into Stelor -- within Stelor's
25 employees and with Stelor's relationships.  We talked

50

1 about the employees.  Now I want to talk about the
2 relationships that you mentioned.
3        MR. RUBINSTEIN:  Objection.  Continues to
4    misstate prior testimony.
5 BY MR. HARTMANN:
6    Q.   Let's start with the relationships.  Tell me
7 exactly every relationship that Mr. Silvers interfered
8 with.
9        MR. RUBINSTEIN:  Objection.  Vague and
10   ambiguous.
11       THE WITNESS:  Could you restate that
12   question?
13 BY MR. HARTMANN:
14    Q.   I can't because it's your term.  You used
15 the word relationship and I --
16    A.   I don't -- can I restate every -- I'm sorry,
17 just could you repeat it?
18    Q.   What relationships that Stelor had with
19 others did Mr. Silvers interfere with?
20       MR. RUBINSTEIN:  Objection.  Vague and
21   ambiguous.
22       THE WITNESS:  Mr. Silvers interfered with
23   the relationship between the president of the
24   Aurora Collection, Jack Maitland and Stelor
25   Production.

51

1        Do you want me to go the whole list or --
2 BY MR. HARTMANN:
3    Q.   I didn't realize you -- you meant this for
4 people, but if that's what you meant, that's --
5    A.   Then I'm sorry --
6    Q.   -- what I want.
7    A.   I don't understand your question.  If not
8 people, who -- then who are you --
9    Q.   Well, isn't Stelor in business?
10    A.   Yes.
11    Q.   And wouldn't it have business relationships?
12    A.   With people.
13    Q.   Okay.  No companies?
14    A.   Yes, companies who have people running their
15 companies.
16    Q.   All right.  Well, let's do it either way you
17 want.  Let's talk about Aurora.  What's the name of
18 the person there?
19    A.   Talk about a what?
20    Q.   Aurora.
21    A.   Oh, Aurora, I'm sorry.
22    Q.   You just mentioned that.
23    A.   Jack Maitland.
24    Q.   Jack Maitland, okay.
25        What did Mr. Silvers do to interfere --

52

1 well, first of all what is Stelor's relationship with
2 Aurora?
3    A.   Aurora -- the Aurora Collection is the
4 company that Mr. Silvers had previously licensed the
5 intellectual property to and was an employee of.  The
6 Aurora Collection entered into an asset purchase sale
7 with Stelor Productions to sell their rights in that
8 property and assign that license to Stelor through
9 that sale at which time Mr. Silvers entered into a
10 direct licensor relationship with Stelor Productions.
11 The Aurora Collection will be the recipient based on
12 the commercialization of the property to an income
13 stream derived from royalties.
14    Q.   So the present relation -- is there any
15 present working relationship between Stelor and Aurora
16 other than Aurora's expectation of some compensation
17 based on Stelor's efforts?
18    A.   Up until recently Stelor Productions
19 reimbursed the Aurora Collection based on the
20 consulting contract with Mr. Silvers for his health
21 insurance.  In addition the Aurora Collection through
22 some of its associates, shareholders from time to time
23 will either make introductions or bring people to the
24 table potentially that could be a potential licensor,
25 vendor and Mr. Maitland, although no longer an officer

13 (Pages 49 to 52)

53

1 of the company, is a significant shareholder in that
2 company and stays in -- in touch on a fairly regular
3 basis.
4    Q.   All right. So what has Mr. Silvers done to
5 interfere with Stelor's relationship with Aurora?
6    A.   Mr. Silvers' interference takes pretty much
7 the same shape through all of the -- the individuals
8 that I will name for you in that the same e-mails,
9 phone calls and intervention in that he alleged that
10 he was beyond the creator as the executive creative
11 consultant, he inferred, he implied that he had more
12 responsibilities and authority vis-a-vis Stelor than
13 he actually had and so there was a great deal of time
14 spent clearing up with the various individuals who
15 we'll discuss his actual ability and rights to be
16 involved in the project.
17       In Mr. Maitland's regard, and it's a good
18 example because it demonstrates that this has been
19 going on since literally the day that Stelor came in.
20 Stelor Productions entered into a contract, as I
21 mentioned, an asset purchase contract with the Aurora
22 Collection. Entered into a consulting agreement and a
23 license, which you've labelled as Exhibits 1 and 2,
24 and on the night of that transfer of the intellectual
25 property asset probably one of the best examples of

54

1 Mr. Silvers' interference was after Mr. Silvers'
2 entering into these contracts, after accepting $10,000
3 in consideration in a, quote, signing bonus, Mr.
4 Silvers showed up at the door of that meeting with the
5 Aurora Collection and Stelor Productions with a flier
6 in an effort to undermine the purchase and sale
7 letting the shareholders of Aurora know that he had in
8 fact as the, quote, owner/creator cut another deal
9 that was a better deal and that the Aurora Collection
10 should not do business with us. Mr. Silvers was
11 unanimously voted out by the Aurora Collection that
12 evening. But by way of example and metaphor that is
13 the type of interference that Mr. Silvers has
14 attempted to perpetrate from the onset of this
15 relationship.
16    Q.   Well, let's talk about your example. That
17 was before the agreements that we've marked as Exhibit
18 1 and Exhibit 2, correct?
19    A.   No, his interference was -- again, he had
20 taken a check that was dated prior to the agreement
21 and cashed that check so in my mind that was when our
22 relationship started, when he took consideration.
23 After we had effected that contract, Mr. Silvers then
24 attempted to torch it, if you will.
25    Q.   All right. So the contract is effective

55

1 June 1, 2002, correct?
2       MR. RUBINSTEIN: Objection. Calls for a
3 legal conclusion.
4 BY MR. HARTMANN:
5    Q.   Go ahead and look if you want.
6    A.   Yes, these contracts are effective -- this
7 contract was signed by Mr. Silvers May 9th. So it was
8 actually May 9th. And prior to May 9th Mr. Silvers
9 had received the $10,000 check I believe and prior to
10 May 9th Mr. Silvers had entered into other contract
11 negotiations. Mr. Silvers was a party to the asset
12 purchase sale. Mr. Silvers was also a shareholder at
13 Aurora and so our relationship contractually as far as
14 I understand started prior to this actual signed
15 exhibit.
16    Q.   But both of those agreements that I've
17 marked Exhibit 1 and Exhibit 2 are effective by their
18 terms on June 1, 2002, would you agree?
19       MR. RUBINSTEIN: Objection. Calls for a
20 legal conclusion.
21 BY MR. HARTMANN:
22    Q.   Going to the first page, sir. Look at
23 Exhibit 1. This agreement is effective as of June 1,
24 2002 --
25    A.   Yes.

56

1    Q.   -- do you see that?
2       All right. And the meeting that you're
3 referring to with the Aurora board was prior to June
4 1, 2002, correct?
5    A.   That's correct.
6    Q.   All right. Now, are you a shareholder of
7 Aurora as well?
8    A.   I am.
9    Q.   And is there a written agreement that
10 relates to the acquisition of Aurora's assets by
11 Stelor?
12    A.   There is.
13    Q.   All right. So we have the Aurora
14 relationship that Mr. Stelor, you contend, inter -- I
15 mean Mr. Silvers interfered with.
16       MR. RUBINSTEIN: Objection. Misstates prior
17 testimony.
18 BY MR. HARTMANN:
19    Q.   What other relationships that Stelor has has
20 Mr. Silvers interfered with?
21       MR. RUBINSTEIN: Objection. Complex.
22 Compound. Ambiguous. Vague. Unintelligible.
23       THE WITNESS: The next relationship that
24 Mr. Silvers has interfered with from the onset is
25 that between Stelor Productions and its primary

14 (Pages 53 to 56)

57

```
 1      musicians Alon Eisenberg the invidual, whose
 2   company is Double ee Productions and Johnny
 3   Elkins.
 4 BY MR. HARTMANN:
 5      Q. Okay. Can you spell the lady with Double
 6 ee Productions? Could you spell her name?
 7      A. It -- it is a gentleman.
 8      Q. A gentleman, okay.
 9      A. And he's changed his name legally a few
10 times. I believe the current spelling is A-L-O-N. My
11 contract with him I believe is E-L-O-N. Eisenberg I
12 believe is E-I-S-E-N-B-E-R-G. Double E -- two little
13 Es but the word double in front of it -- Productions I
14 believe is the company. And his partner is Johnny
15 Elkins. E-L-K-I-N-S.
16      Q. And you mentioned your contract with Double
17 ee Productions. Is there a written agreement?
18      A. There is.
19      Q. Okay. How has Mr. Silvers interfered with
20 the two musicians that you described?
21      MR. RUBINSTEIN: Objection. Calls for a
22   legal conclusion.
23      THE WITNESS: Mr. Silvers would go through
24   his same process of telephone conversations,
25   e-mail correspondence but in this case
```

58

```
 1      specifically through e-mail correspondence and
 2   letters Mr. Silvers would demand that Mr. Elkins
 3   do things relative to Stelor decisions in regard
 4   to the music, the voices, components of the
 5   creative process and which would result in Mr.
 6   Eisenberg being distraught, coming to us saying
 7   he couldn't work, it was interrupting and
 8   interfering with his ability to produce what we
 9   wanted to produce because Mr. Silvers was giving
10   him such a hard time.
11 BY MR. HARTMANN:
12      Q. All right. So Mr. Elkins could tell us all
13 the --
14      A. Eisenberg.
15      Q. No, Mr. -- oh, okay, Mr. Eisenberg, okay.
16 And he can tell us all the problems that Stelor had of
17 producing music based on Mr. Silvers' e-mails, phone
18 calls and letters that were sent?
19      MR. RUBINSTEIN: Objection. Calls for
20   speculation.
21 BY MR. HARTMANN:
22      Q. Correct?
23      A. Could you ask it again?
24      Q. He would have personal knowledge of that?
25      A. Yes, he would.
```

59

```
 1      Q. Can you give me any specific songs that
 2 weren't produced because of Mr. Silvers' interference?
 3      A. Yes.
 4      Q. Okay. What?
 5      A. There was a song done by the name of Ig Og
 6 Oog that Mr. Silvers had been involved with that
 7 musician whose name is Marilyn Shockey, S-C -- S --
 8 S-H-O-C-K-E-Y. I'm not sure how to spell it. But the
 9 song line, the melody was almost identical to a song
10 called -- I think called the Witch Doctor Song. And
11 our attorneys at the time came to us and said it's
12 infringing, this is another song. And when we spoke
13 to Mr. Eisenberg, he said, well, Steve just wanted to
14 have -- Mr. Silvers wanted to have more music and he
15 was notified that in fact the melody was the same and
16 Silvers said it's just a filler song, nobody will
17 notice, use it anyway. We had to scrap the song.
18      Q. All right. So this is -- this is the
19 interference with Stelor's business that we had to
20 scrap the song because there was a disagreement as to
21 whether it should be used or not?
22      MR. RUBINSTEIN: Objection. Calls for a
23   legal conclusion.
24      MR. HARTMANN: I'm just trying to
25   understand. We're in Federal Court. You
```

60

```
 1      filed --
 2      MR. RUBINSTEIN: Please let me make my
 3   objection, sir.
 4      MR. HARTMANN: Sure. Go ahead.
 5      MR. RUBINSTEIN: It calls for a legal
 6   conclusion as to what constitutes interference.
 7 BY MR. HARTMANN:
 8      Q. Here -- here's my problem. We're --
 9 we're -- you filed a Federal lawsuit, okay. We're in
10 Federal court because of all this interference that --
11 that you're alleging and I'm just -- I need to get the
12 specific facts on this.
13      So there's one song that was not brought to
14 market because of Mr. Silvers. How did that interfere
15 with Stelor's business? I'm not sure.
16      A. You asked me for an example and if there was
17 any songs and I provided you with one so I'm -- I'm
18 not trying to be difficult.
19      Q. I'm trying --
20      A. I'm trying to understand your question.
21      Q. I'm trying to understand how Stelor has been
22 effected by Mr. Silvers' phone calls and e-mails and
23 letters that --
24      A. Sure.
25      Q. -- you've complained about.
```

15 (Pages 57 to 60)

61

1    By the way what did you think Mr. Silvers
2  was supposed to do in his capacity as creative --
3  executive creative consultant?  What was he supposed
4  to do?
5    A.  He was supposed to do that which Stelor
6  asked him to do in that capacity as a paid consultant.
7    Q.  What did Stelor ask him to do?
8    A.  Stelor asked him to help create additional
9  characters, help create additional story lines, to be
10 involved with the musical process, be involved with
11 the process bringing it to television.  We had Mr.
12 Silvers in our offices on numerous occasions.  We had
13 him on telephone calls with production companies that
14 we were involved in.  And through Mr. Silvers'
15 performance and behavior on those calls and in those
16 situations, we were unable to do business.  We were
17 told in one case specifically that they were unwilling
18 to work with us if Mr. Silvers was involved because he
19 was so difficult.
20   Q.  Who told you that?
21   A.  That would be Nine Story Productions.
22   Q.  Nine Story?
23   A.  Yes.
24   Q.  And what were they doing to work with
25 Stelor?

62

1    A.  They were -- they had come to Stelor to
2  produce what we call Goosicals, musical videos.
3    Excuse me.  It's not me.  Oh, no, it's not
4  me.  Sorry.
5    MS. WARREN:  Oh, it's me.  Sorry.
6    THE WITNESS:  Slide this little gray button.
7  BY MR. HARTMANN:
8    Q.  Is that a Goosical?
9    A.  It will be in about a week.  Goosicals are
10 musical videos using animation and one of our original
11 songs and they were putting together a pilot of these
12 Goosicals for the purpose of bringing in network
13 and/or licensees and so on and so I invited Mr.
14 Silvers to the office so that we could have a
15 conference call to speak about the contents, how that
16 was going to be framed.  Mr. Silvers spent almost the
17 entirety of the conversation criticizing another
18 property that this company had successfully brought to
19 market and had on the air at I think WGBS in Boston
20 for a good 20 minutes.  The rest of the conversation
21 was -- was marginally polite on their half and then
22 when they spoke with me the next day they said, given
23 of course that Mr. Silvers was as I introduced him, I
24 introduced him as Papa Googles, the creator of the
25 property and the executive creative consultant.  They

63

1  said in their experience it wouldn't be a good fit, a
2  good marriage for us to go forward.
3    Q.  So you didn't go forward with Nine --
4    A.  Nine Story.
5    Q.  -- Story Production.  And who -- can you
6  tell me the name of somebody there?  Who -- who were
7  you dealing with?  What individuals at Nine Story
8  Production?
9    A.  I can't recall the name of the fellow that
10 was on the call.
11   Q.  Who else at Stelor had any interaction with
12 Nine Story Production?
13   A.  Fred Hildebrand.  I'm not certain, but I
14 believe Julie DePue in the beginning when she started,
15 but I'm -- I'm not certain about the timing.
16   Q.  All right.  So was Stelor able to replace
17 Nine Story Production and find someone else to assist
18 with the music video?
19   A.  Yes.
20   Q.  And who -- who did you replace them with?
21   A.  We have since then had a number of
22 production companies approach us and made the decision
23 to do the production in house and so Stelor has hired
24 in-house animators and artists and technicians to do
25 really two things; control cost and control the

64

1  process of the actual product.
2    Q.  So as we sit here today there's been no
3  effect on the "interference" that Mr. Silvers made
4  with respect to Nine Story Productions?
5    MR. RUBINSTEIN:  Objection.  Compound.
6    THE WITNESS:  If I understand your
7    question, there was a tremendous effect.  We had
8    spent six months negotiating an extremely
9    expensive contract with the lawyers with Nine
10   Story.  We had spent more than six months
11   negotiating.  I had flown to Toronto a dozen
12   times just in regard to that relationship and so
13   it was a tremendous expense that Stelor faced and
14   that was destroyed in a conversation with Mr.
15   Silvers.
16 BY MR. HARTMANN:
17   Q.  All right.  So the only reason Stelor was --
18 did not -- you never entered into a contract with Nine
19 Story Productions, correct?  You were just negotiating
20 one?
21   A.  That -- that's true.  A true statement.
22   Q.  And the only -- your testimony is the only
23 reason that Stelor did not enter into a contract with
24 Nine Story Productions was the interference of Mr.
25 Silvers?

16 (Pages 61 to 64)

65

1    MR. RUBINSTEIN: Objection. Calls for a
2    legal conclusion and speculation of Mr. Esrig.
3 BY MR. HARTMANN:
4    Q.  I don't want any conclusions or
5 speculations. I want your understanding of the facts.
6    A.  The facts are that the individual that was
7 dealing with us -- because this is a creative business
8 and it's very much a business based on relationships
9 because you're creating a product that until it's
10 released to market you really don't know the impact of
11 the product. It's all about relationships and about
12 people being willing to work with each other. In this
13 regard Stelor was and had been building this
14 relationship and the nature of the contract was that
15 we were not going to be paying as is typically the
16 case the kind of up-front dollars based on that
17 relationship. So all of that goodwill, all of that
18 intangible goodwill had been lost based on Mr.
19 Silvers' behavior and performance which was
20 commensurate and consistent with his behavior and
21 performance in every regard in every experience we've
22 had with him without exception by the way.
23    Q.  All right. Just listen carefully to my
24 question. Was Mr. Silvers' "interference" with Nine
25 Story Productions the only reason that Stelor did not

66

1 enter into an agreement with Nine Story?
2    A.  Yes.
3    Q.  And all that is being done in house today?
4    A.  A large piece of that is being done in house
5 but as I mentioned we have other production companies
6 that have come to us and in fact that we're now
7 negotiating with to possibly take over what we've
8 done, take pieces of material that we've produced.
9    Q.  And who -- who are you having those
10 negotiations with?
11    A.  The individuals or the companies?
12    Q.  The -- let's start with the companies.
13    A.  There's -- there's so many that we're
14 involved with right now. I really couldn't tell you.
15 I've got a department. I have someone who runs that
16 who is actually dealing with the various individuals.
17    Q.  What department is that?
18    A.  The -- the person that's running all of our
19 animation, art production and whatnot.
20    Q.  And what person is that?
21    A.  Marty Jeffrey.
22    Q.  And you can't tell me today anybody that
23 Stelor is having negotiations with?
24    A.  We have so many different sets of
25 negotiations going on that I really can't recall. I'm

67

1 so busy as the CEO and president dealing with all of
2 the details in addition to spending all the time in
3 this regard that I'd have to check with Marty on who
4 the latest and greatest is.
5    Q.  Well, aside from who the latest and greatest
6 are, can you tell me anybody since the beginning of
7 Stelor's relationship with Mr. Silvers that you have
8 had any negotiations with with respect to video?
9    MR. RUBINSTEIN: Objection. Vague.
10    MR. HARTMANN: Video -- video products.
11    MR. RUBINSTEIN: Objection. Vague and
12 ambiguous.
13 BY MR. HARTMANN:
14    Q.  You can answer.
15    A.  Could you make it a question I can answer.
16    Q.  Since June 2002 tell me everybody that
17 Stelor has had discussions with regarding bringing any
18 kind of video product to the market.
19    MR. RUBINSTEIN: Objection. Vague.
20 BY MR. HARTMANN:
21    Q.  I think you mentioned Nine Story Production.
22 Who else?
23    MR. RUBINSTEIN: Objection. Vague and
24 ambiguous as to whom you're referring to when you
25 say anybody.

68

1
2 BY MR. HARTMANN:
3    Q.  You can answer.
4    Do you know understand what anybody means?
5    A.  I do.
6    Q.  Okay. Then you can answer.
7    A.  We have talked to companies like IDT, we
8 have been talking to Mainframe, we've been talking to
9 a large number of production houses which is why I'm
10 unable to tell you because there have been so many and
11 we've had so many meetings and conversations. I --
12 until I actually have a contract, as far as I'm
13 concerned that's what they are, they are negotiations
14 and conversations.
15    Q.  I understand that, but I need to know who
16 you've been having these --
17    A.  I understand.
18    Q.  -- negotiations and conversations with.
19    A.  But I've answered your question. I can't
20 recall at this time.
21    Q.  Well, has Mr. Silvers interfered in any way
22 with Stelor's conversations and negotiations with IDT?
23    A.  I am unsure.
24    Q.  You can't tell me any things that he's done
25 to interfere with that relationship today?

17 (Pages 65 to 68)

69

1    A.   Again, as I mentioned, I've been raising
2 money, running the company, growing it to the number
3 of employees --
4    Q.   So the answer is yes you can't tell me?  I
5 -- I hear --
6    A.   I'm not understanding your question because
7 your questions are very vague.
8    Q.   My question is --
9        MR. RUBINSTEIN:  Objection.  Vague and
10 ambiguous.
11 BY MR. HARTMANN:
12    Q.   -- can you tell me.
13        MR. RUBINSTEIN:  Please don't speak over
14    each other.
15 BY MR. HARTMANN:
16    Q.   Can you tell me anything that Mr. Silvers
17 has done to interfere with Stelor's relationship with
18 IT -- IDT?
19    A.   Yes.
20    Q.   What?
21    A.   IDT came to us at the recent licensing show.
22 It was because of my having to meet with Mr. Silvers
23 and his then counsel that I was unable to continue the
24 negotiations and meeting with IDT that had commenced
25 prior to that meeting and so, yes, I would construe

70

1 that as interfering with my ability to continue on
2 with this project.
3    Q.   All right.  So you -- for some -- you're
4 blaming Mr. Silvers for your inability to have a
5 meeting with IDT but other than that, has Mr. Silvers
6 done anything specific to interfere with IDT and
7 Stelor?
8        MR. RUBINSTEIN:  Objection.  Misstates prior
9    testimony.  Compound and argumentative.
10        THE WITNESS:  I thought I just answered the
11    question.
12 BY MR. HARTMANN:
13    Q.   Other than keeping you from the meeting with
14 IDT, that's what you said, right?
15    A.   You asked for an example.  I gave you an
16 example.
17    Q.   Yeah, I want to know if there's anything
18 else that Mr. Silvers has done that interferes with
19 Stelor's relationship with IDT besides keeping you
20 from the meeting?
21    A.   I can't recall.
22    Q.   All right.  How about Mainframe?  What has
23 Mr. Silvers done to interfere with Stelor's
24 relationship with Mainframe?
25    A.   I can't recall.

71

1    Q.   Who would know at Stelor what -- what facts
2 relate to any interference by Mr. Silvers with
3 Mainframe?
4    A.   I'd have to check.
5    Q.   What about the large production houses that
6 you cannot recall.  What has -- has Mr. Silvers done
7 anything to interfere with the large production
8 houses?
9    A.   Again, I'd have to check.
10    Q.   Sitting here today you can't tell us of any
11 specific conduct?
12    A.   I'm so busy.  I have so many things that I
13 do every day.  I work seven days a week.  It's just
14 hard for me to recall all of the minutia.
15    Q.   Are you aware of any long e-mails that Mr.
16 Silvers has sent to any production houses?
17    A.   There have been so many long e-mails sent to
18 so many individuals I can't recall.
19    Q.   Would sending a long e-mail be a breach of
20 the license agreement that we've marked as Exhibit 1?
21        MR. RUBINSTEIN:  Objection.  Calls for a
22    legal conclusion.
23 BY MR. HARTMANN:
24    Q.   You can answer.
25    A.   I'm trying.  What are you trying --

72

1    Q.   Is there anything in Exhibit 1 which
2 prohibits Mr. Silvers from sending a long e-mail to
3 Stelor?
4    A.   A long e-mail to Stelor or to --
5    Q.   Yes.
6    A.   Is there anything in Exhibit 1 that
7 prohibits Mr. Silvers from sending a long e-mail?
8    Q.   To Stelor.
9    A.   To Stelor Productions.
10        I'm sorry, what was the question?
11    Q.   Is there anything in the -- either of the
12 agreements that we've marked as Exhibit 1 or Exhibit 2
13 which prohibits -- based on your understanding which
14 prohibits Mr. Silvers from sending a long e-mail to --
15 a nine page e-mail to Stelor?
16    A.   Yes, there is.
17    Q.   All right.  What's that?
18    A.   In Exhibit 2 under Duties of Consultant it
19 says that consultant shall use his best efforts to
20 perform such services as may be requested by the
21 company from time to time consistent and commensurate
22 with his position as executive creative consultant
23 including but not limited to executing all papers,
24 testifying on all company-related matters and
25 otherwise cooperating in every way necessary and

18 (Pages 69 to 72)

73

1 desirable to strengthen, establish or maintain any IP
2 rights granted under this agreement or the license
3 between the company and the consultant.
4        I read that to understand that Mr. Silvers,
5 just on the face of this contract, agreed to cooperate
6 in any way necessary so that we could make this
7 stronger. Mr. Silvers in sending what you described
8 as his nine page e-mail in which there were rarely one
9 a day but in fact a multitude of those e-mails was not
10 cooperating because he had been asked on dozens of
11 occasions in the presence of company employees other
12 than myself to please stop wasting our time and
13 employees' time with those e-mails. When I was
14 traveling raising money for Stelor and trying to make
15 relationships and Mr. Silvers would write those
16 e-mails when I was on the road, there are copies of
17 correspondence, there are calls in which I begged him
18 to please let me do my job.
19    Q. How about the license agreement. Is it a
20 breach of the license agreement for Mr. Silvers to
21 send a nine page e-mail?
22        MR. RUBINSTEIN: Objection. Calls for a
23 legal conclusion.
24        THE WITNESS: Should I answer?
25 BY MR. HARTMANN:

74

1    Q. Yeah. Sure.
2        If -- if he instructs you not to answer,
3 that's when you don't answer. Objections are just for
4 the record.
5    A. Okay. I can't be specific about a nine page
6 e-mail but my understanding of both agreements, the
7 license agreement as well, is that Mr. Silvers' role
8 as the executive creative consultant is a proactive,
9 positive role. That he is there to help the company
10 achieve its goal and the goal that he spent the last
11 three years writing in those nine page e-mails which
12 was protecting the intellectual property, growing it,
13 making this the largest and stickiest children's
14 product on the planet and as well as one of his
15 ongoing concerns in all of those what you call nine
16 page e-mails was putting together the ability to come
17 from a position of strength vis-a-vis Google, Inc. and
18 prohibit Google, Inc. from putting Google or rather
19 Googles, I'm sorry, dot com out of business.
20    Q. All right.
21        Ready? All right. I appreciate that
22 answer. Let me -- let me try it again. Is there any
23 provision of the license agreement that prohibits Mr.
24 Silvers from sending a nine page e-mail to Stelor?
25    A. Not that I'm aware of specifically.

75

1    Q. All right. So that would not be a breach of
2 his agreement -- of that agreement?
3        MR. RUBINSTEIN: Objection. Calls for a
4 legal conclusion.
5        THE WITNESS: I'd have to consult with my
6 counsel to see if that had legal implications.
7 BY MR. HARTMANN:
8    Q. All right. What about a phone call. Is
9 making a phone call to Stelor a violation of either
10 the Exhibit 1 agreement or the Exhibit 2 agreement?
11        MR. RUBINSTEIN: Objection. Calls for a
12 legal --
13 BY MR. HARTMANN:
14    Q. Making a phone call to a Stelor employee as
15 you previously described.
16        MR. RUBINSTEIN: Objection. Calls for a
17 legal conclusion.
18        THE WITNESS: Making a phone call as you
19 described it is a reasonable day-to-day
20 occurrence. Making a multitude, a plethora, an
21 ongoing harunguement of those phone calls in my
22 opinion is not. Is not what the -- the contract
23 says a way to cooperate in any way necessary to
24 grow this property.
25 BY MR. HARTMANN:

76

1    Q. All right. So as I understand you you're
2 saying that by making a plethora of phone calls to
3 Stelor Mr. Silvers breached these two agreements
4 because of the cooperation language in each of the
5 agreements?
6        MR. RUBINSTEIN: Objection.
7 BY MR. HARTMANN:
8    Q. The cooperation with Stelor.
9        MR. RUBINSTEIN: Objection. Misstates prior
10 testimony.
11 BY MR. HARTMANN:
12    Q. I'm trying to understand your position.
13    A. Oh, my position, my understanding -- thank
14 you that for that question. It allows me to clarify
15 it.
16        My position is really -- is simply based on
17 Mr. Silvers' assurance that by entering into a
18 relationship with Stelor Productions myself that he
19 was going to in every way, shape possible and form
20 help us bring to market, commercialize and make our
21 program a success.
22    Q. All right. Mr. Esrig, you need to
23 understand. You have sued -- your company has sued
24 Mr. Stelors for breach of contract so I need to be
25 able to understand how the contract prohibits him from

19 (Pages 73 to 76)

Veritext/Florida Reporting Co., LLC - 19 West Flagler Street - Miami, Florida - (305) 376-8800
Benowitz - Berman - Cook - Florida Keys - Matz Traktman - Ivy

77

1 sending e-mails or making phone calls or writing
2 letters to Stelor. So that's what my question is
3 designed to do.
4    A.  Mr. Stelors? Mr. --
5    Q.  I'm sorry.
6    A.  You confused me.
7    Q.  We're here because Stelor has sued Mr.
8 Silvers for breach of Exhibit 1 which is the contract
9 and breach of Exhibit 2.
10    A.  Yes. And I --
11    Q.  And let's mark this. We'll mark this as
12 Exhibit 3.
13        (The document was marked as Exhibit No. 3
14 for identification.)
15 BY MR. HARTMANN:
16    Q.  All right. I've marked as Exhibit 3
17 Plaintiff's, that's Stelor Productions, Emergency
18 Motion for Preliminary Injunction. Have you seen that
19 before?
20    A.  Yes.
21    Q.  Okay. The very last sentence, very last
22 line on page -- on the first page says, quote,
23 Defendant -- referring to Mr. Silvers -- has committed
24 a string of material breaches. And by that you're
25 referring to the two agreements that we've just

79

1    Q.  Thank you, but my question is is -- is the
2 act of sending e-mails, letters and making phone calls
3 to Stelor, is Silvers materially breached either
4 Exhibit 1 or Exhibit 2 by that conduct? That's my
5 question.
6        MR. RUBINSTEIN: Objection. Vague and
7 ambiguous. You may want to ask about the
8 content of those e-mails.
9        THE WITNESS: I guess I can't answer that
10 without knowing exactly which e-mails are we
11 speaking of so I can reference it accordingly.
12 BY MR. HARTMANN:
13    Q.  So it's possible -- and just so I understand
14 your testimony. It's possible depending on the
15 content of an e-mail that that would breach the
16 agreement?
17        MR. RUBINSTEIN: Objection. Calls for a
18 legal conclusion.
19        THE WITNESS: I'm going to have to consult
20 with counsel because I'm not a lawyer. I don't
21 understand your question.
22 BY MR. HARTMANN:
23    Q.  Sir --
24        MR. RUBINSTEIN: You can answer as to your
25 own understanding.

78

1 marked. Take your time and look at it. Okay.
2    A.  Yes.
3    Q.  All right. I want to know whether it's your
4 position or your contention that the e-mails that Mr.
5 Silvers sent to Stelor breached either Exhibit 1 or
6 Exhibit 2?
7    A.  I'm unable to give you a legal opinion but
8 I can answer based on your -- your referencing this
9 document.
10    Q.  Well, I'm asking you specifically about the
11 e-mails and the phone calls and the letters. We're
12 going to get to other things.
13    A.  Well, this says, and after pledging Stelor
14 his full cooperation. As I said earlier, my
15 understanding of these contracts is that they were
16 based in good faith on Mr. Silvers' pledge that he
17 would provide Stelor his full cooperation in bringing
18 and helping to bring this program to the market. And
19 so if I understand your question, it is my contention
20 based on advice from counsel as well as my own opinion
21 that Mr. Silvers has created and committed a series of
22 material breaches that have impeded Stelor's
23 performance while also jeopardizing Stelor's business
24 as well as jeopardizing the Googles from Goo
25 intellectual property rights.

80

1
2 BY MR. HARTMANN:
3    Q.  I'm not asking for a legal conclusion.
4    A.  My own understanding is that Mr. Silvers has
5 materially breached both contracts by committing a
6 string of material breaches that have impeded our
7 performance while jeopardizing our business and the
8 Googles IP.
9    Q.  All right. So tell me every way that Mr.
10 Silvers has breached those contracts? Based on your
11 understanding.
12    A.  I think that Mr. Silvers has breached the
13 contracts by not cooperating in -- as the contract
14 says, quote, in every day necessary and desirable to
15 strengthen, establish or maintain the intellectual
16 property granted from Mr. Silvers in the agreement to
17 us. I think Mr. Silvers --
18    Q.  Okay. And that's -- I'm sorry. You were
19 looking at Exhibit 1?
20    A.  I'm paraphrasing.
21    Q.  Okay.
22    A.  I -- I --
23    Q.  Is there -- is there a provision in Exhibit
24 1 that you can point me to?
25    A.  I was glancing at Exhibit 2.

20 (Pages 77 to 80)

81

1　　Q.　All right.  Exhibit 2.
2　　A.　Just give me a moment.
3　　　　Yeah, here it is.  It says that Mr. Silvers
4　will otherwise -- quote -- cooperate in every way
5　necessary and desirable to strengthen, establish or
6　maintain any intellectual property right granted under
7　the agreement or the license between Silvers and
8　Stelor.  That would be Paragraph 3A, Line 4.  Starting
9　at the onset of that line.
10　　Q.　All right.  And how is it specifically that
11　Mr. Silvers has violated that provision?
12　　　　MR. RUBINSTEIN:  Objection.  Calls for
13　　a legal conclusion.  You can answer as to your
14　　understanding.
15　BY MR. HARTMANN:
16　　Q.　Yeah, what are the facts that you know?
17　　A.　The facts as I understand them is that Mr.
18　Silvers has not cooperated.  Example one, Stelor asked
19　Silvers to do a time capsule video interview and it
20　was related -- it was a metaphor -- not a metaphor per
21　se but it was related to the Walt Disney time capsule
22　interview that Disney did when he talked about the
23　creation of Mickey Mouse and his characters because in
24　our opinion and in the opinion of our experts it would
25　be a critical piece of our history when this product

82

1　makes the kind of commercial success we believe it
2　will to be able to have a background on the man who
3　created it and so this is a -- a very, very important
4　piece.  We hired a very significant employee, a senior
5　vice president, who wrote Mr. Silvers a letter
6　specifying the request for that interview and in that
7　context exactly Mr. Silvers flat out refused and again
8　I cite this to you as for an example.  This is -- this
9　is one of the most recent examples of Mr. Silvers
10　simply not cooperating in any way, shape or form.
11　　　　You want more examples?
12　　Q.　I certainly do.  I mean I need to know all
13　the facts that you guys are saying support your claim
14　for breach of contract, so I have now the fact that --
15　that he won't -- according to you will not -- refuses
16　to this do this time capsule video history.
17　　A.　He -- he wrote us a letter back actually in
18　writing and refused in writing to -- to -- it was Mr.
19　Marty Jeffrey who wrote to him, who requested and he
20　wrote back and said, no, not interested.
21　　Q.　All right.  What else -- how long since he
22　breached either of the agreements?
23　　A.　He has interfered with our abilities and our
24　lawyer's ability in the ongoing trademark office
25　matters.  We are trademarking a huge volume of Goo

83

1　related intellectual property.  We have created a
2　tremendous amount of those trademarks which are all in
3　Mr. Silvers' name as the owner and we have created a
4　large volume of domain names that are in Mr. Silvers'
5　name as the owner and Mr. Silvers -- we -- we can't
6　work with those domain names.  He has refused
7　consistently not only to give us the password but at
8　one time he wrote us and agreed to give us the
9　password and so based on that reliance we moved domain
10　names from one host to another, we went through
11　expense, we went through employee expense, and so on
12　and so forth and then of course it turned out to be a
13　lie, as has been the case throughout, and we were
14　unable to do so.
15　　　　On our trademark applications and our
16　trademark work Mr. Silvers went to the trademark
17　office and diverted everything from our counsel to his
18　name.  We have hired attorneys to do our trademark
19　work and to help us defend the intellectual property.
20　Mr. Silvers took it upon himself to fire that counsel
21　and has inserted himself in those relationships on
22　many occasions.  Stelor Productions had a trademark
23　intellectual property law firm working for it and
24　because we included Mr. Silvers in the process
25　throughout the beginning, after Mr. Silvers had met

84

1　with this law firm and with the senior partner because
2　of Mr. Silvers' behavior and performance, the law firm
3　refused to work with Stelor anymore, they refused to
4　work with Mr. Silvers.  They absolutely found his
5　conduct reprehensible, quote, and would not consider
6　continuing on.  So we then had to hire a new law firm
7　and pay all of those dollars again to get them up to
8　speed and read the files.  This is one of the many,
9　many ways Mr. Silvers has cost Stelor a tremendous
10　amount of money and time.  Mr. Silvers has been
11　insisting from --
12　　Q.　I'm trying to understand.  Are you saying
13　that Mr. Silvers fired a lawyer and that's a
14　breach of the agreement?  I'm really, really
15　interested --
16　　A.　Yes.  I'll answer that specifically.
17　　Q.　Who was -- who was the lawyer?
18　　A.　He fired Mr. William Borchard of Cowan,
19　Liebowitz, Latman I believe is the name.  And told him
20　that he did not have the authority to represent him in
21　matters at the trademark office.  You asked me what
22　relative to this agreement I believe why that was --
23　　Q.　Did he ever hire --
24　　A.　-- a breach.
25　　Q.　-- Mr. Borchard?  Mr. Silvers did he ever

21 (Pages 81 to 84)

85

1 hire Mr. Borchard?
2    A.   I'm Mr. Esrig.  I'm sorry.
3    Q.   No, no.  Did Mr. Silvers ever hire Mr.
4 Borchard to represent him?
5    A.   No, what Mr. Silvers did was grant Stelor an
6 irrevocable power of attorney for Stelor to act on Mr.
7 Silvers' behalf and -- this is so important -- instead
8 of Mr. Silvers at Stelor's expense and granted Stelor
9 the sole right to engage in those activities and Mr.
10 Silvers contractually guaranteed Stelor the right to
11 do those things and took it upon himself to violate
12 those very explicit terms of the contract and fire our
13 counsel.
14    Q.   Okay.  So the counsel that Mr. Silvers fired
15 was Mr. Borchard?
16    A.   The counsel that --
17    Q.   Whose counsel was he?  Was he Stelor's
18 counsel or Silvers' counsel?  I've gotten both here.
19    A.   Mr. Borchard.
20    Q.   What's your understanding?
21    A.   Mr. Borchard represented Stelor which
22 represented Silvers' intellectual property rights
23 based on that irrevocable power of attorney that
24 Silvers granted to Stelor in all matters relating to
25 the defense of the intellectual property.

86

1        And I might add as I mentioned earlier the
2 sole right to do so.
3    Q.   Isn't Mr. Borchard still representing
4 Stelor?
5    A.   Yes, he is.
6    Q.   So I don't quite understand how Mr. Silvers
7 fired him.
8    A.   Mr. Silvers sent Mr. Borchard one of the
9 e-mails we've been speaking about notifying him,
10 putting him on notice that he did not represent Mr.
11 Silvers and the intellectual property any longer, that
12 Mr. Silvers was going to do that himself.
13    Q.   All right.  Now we have those e-mails so
14 we'll -- you don't recall that Mr. Silvers
15 specifically said that at the -- on his behalf he
16 didn't want Mr. Borchard representing him?  You don't
17 recall that?
18    A.   I'd have to see the e-mails but I -- I did
19 provide those e-mails.
20    Q.   But nevertheless Mr. Borchard continues to
21 represent Stelor in proceedings before the Patent and
22 Trademark Office, correct?
23    A.   Your question was what breaches --
24    Q.   Yeah.
25    A.   -- did Mr. Silvers.  So I answered that.

87

1    Q.   Yeah.
2    A.   Now you're asking me another question.  Does
3 Bill Borchard represent Stelor today, continuing on,
4 yes.
5    Q.   So there's been no real difference with
6 respect to what's happening in the United States
7 Patent Trademark Office with respect to Stelor?
8    A.   That is not correct.
9    Q.   Okay.
10    A.   There is a difference.  That correspondence
11 has been diverted because of Mr. Silvers --
12    Q.   Oh, okay.  We're going to get to that, but
13 in terms of the proceedings that were filed by Stelor
14 in -- before the PTO, the actions that were filed.
15        MR. RUBINSTEIN:  Objection to the extent
16        that it calls for a legal conclusion.
17 BY MR. HARTMANN:
18    Q.   Do you know mean what I mean by the actions
19 that were filed?  The cases that were filed by Stelor
20 against Google.
21    A.   Yes.
22    Q.   Okay.  Mr. Borchard represents Stelor in
23 those proceedings, correct?
24    A.   On behalf of Mr. Silvers, yes.
25    Q.   Well, Mr. Silvers doesn't want Mr. Borchard

88

1 to represent him but Mr. Borchard does represent
2 Stelor in those cases, correct?
3    A.   Mr. Silvers does in fact based on this
4 contrary -- contract want Stelor to have an
5 irrevocable power of attorney to act and have the sole
6 capacity on his behalf instead of him to execute and
7 protect and defend anything relative to the
8 intellectual property so de facto Mr. Silvers has
9 granted Stelor absolute authority to have Mr. Borchard
10 represent Mr. Silvers' interest, the IP interest and
11 he is doing so on behalf of Stelor.
12    Q.   Okay.  You know we're really interested in
13 your interpretation of the contract and luckily --
14    A.   Thank you.
15    Q.   -- luckily we're going to have a judge
16 decide how to interpret the contract but I'm not --
17 today I don't really care about your interpretation of
18 the contract.  I really want to know whether or not
19 Mr. Borchard is continuing to represent Stelor in the
20 PTO proceedings.  Is that true?
21    A.   That is true.
22    Q.   And that's notwithstanding the fact that Mr.
23 Silvers asked that he not represent the interest of
24 Mr. Silvers?
25    A.   That's -- that is correct.  It's

22 (Pages 85 to 88)

89

1 notwithstanding that fact that Mr. Silvers tried to
2 fire him.
3    Q.   So -- so there's been no effect whatsoever
4 on Stelor in the PTO proceedings.  Mr. Silvers did not
5 fire Stelor's lawyer, correct?
6        MR. RUBINSTEIN:  Objection as to the extent
7    that it calls for a legal conclusion.
8 BY MR. HARTMANN:
9    Q.   I'm trying to understand what the effect
10 is of --
11    A.   It's -- it has cost Stelor Productions
12 additional dollars and additional time because yet
13 again Mr. Silvers has interfered with and by way of
14 interference breached his contract with us and so,
15 yes, there has been damage.
16    Q.   All right.  So by saying that he doesn't
17 want Mr. Borchard to represent him that's a breach of
18 the contract, is that what I understand your testimony
19 to be?
20    A.   No, by sending a letter releasing Mr.
21 Borchard, which he has no authority to do, I believe
22 that is a material breach of the contract, yes.
23    Q.   Releasing Mr. Borchard was a breach of the
24 contract?
25    A.   Releasing and/or firing any lawyer that

90

1 Stelor has because of our irrevocable power of
2 attorney and our sole right to do so, yes, I believe
3 that Mr. Silvers breached that contract.
4    Q.   Okay.  And the effect on Stelor has been
5 that it's cost them money?
6    A.   And time.
7    Q.   And time.
8        And by the way if -- if you've spent time on
9 something that results from Mr. Silvers' breaching the
10 contract, you can quantify what that time is worth,
11 correct?
12    A.   I'm sorry?  Tell me the --
13    Q.   Can't you quantify -- if you have an
14 employee that has to spend ten hours because of
15 something that Mr. Silvers did, can we --
16    A.   Yes, that would be correct.
17    Q.   We can quantify that?
18    A.   That would be correct.
19    Q.   We're going to come back to this a little
20 bit more later but you mentioned that Stelor has
21 obtained trademark registrations in which Mr. Silvers
22 is noted as the owner of the trademark, correct?
23    A.   Correct.
24    Q.   And the same applies to domain names?
25    A.   Yes.

91

1    Q.   And have all the domain names that Stelor
2 has acquired have they been noted as being owned by
3 Mr. -- or the registrar on them would be Mr. Silvers?
4    A.   To the best of my knowledge, yes.
5    Q.   And the domain names that we're talking
6 about would be anything with the element Goo?
7    A.   Yes.
8    Q.   And the same thing with trademarks?
9    A.   Yes.
10    Q.   All right.  How else has Mr. Silvers'
11 breached the contracts, and I'm using both, referring
12 to Exhibit 1 and Exhibit 2, as alleged in your
13 emergency motion which is Exhibit 3?  We're going to
14 get to the second part which -- which is the impeding
15 your performance and jeopardizing your business but
16 right now I just want to know the string of material
17 breaches.  And we've got the failure to do the video
18 time capsule history, we've got the trademark office
19 matters of diverting from your counsel any
20 correspondence, we've got the domain name password
21 issue, and we have the fact that Mr. Silvers asked --
22 requested that Mr. Borchard not represent Mr. Silvers.
23 Next.  What else?  What other conduct?
24        MR. RUBINSTEIN:  Objection to the last
25    question.  It's complex, compound, and calls for

92

1    legal conclusion.  You may answer if you can.
2 BY MR. HARTMANN:
3    Q.   Is there anything in that summary that's
4 wrong?
5    A.   Would you state it --
6    Q.   In that summary that I just gave you as to
7 the breach points.
8    A.   Would you restate those, please.
9    Q.   We have not -- failing -- flat out failing
10 to do the video time capsule history, right?
11    A.   Right.
12    Q.   That was a breach of the agreement?
13    A.   Right.
14    Q.   The diversion from Stelor's counsel with
15 respect to correspondence with the trademark office.
16 That was two.
17        The failure to provide passwords to Stelor
18 for domain names.  That was three.
19        And the -- Silvers firing Mr. Borchard was
20 Number 4.
21        Okay.  What's next?
22    A.   Mr. Silvers entering into discussions with
23 Google, Inc.
24    Q.   All right.  That's a breach of the
25 agreement?

23 (Pages 89 to 92)

93

1  A.  It is.
2  Q.  What provision does that breach?  Which
3 agreement?
4  A.  Again, I would have to consult with counsel
5 but my understanding is that Mr. Silvers does not -- I
6 can actually quote.  Mr. Silvers shall not initiate --
7  Q.  Which one are you on?  I'm sorry, for the
8 record.  Exhibit 2?
9  A.  Um, I'm going to -- this clause is in
10 actually both Exhibit 1 and Exhibit 2, but I -- I -- I
11 want to quote exactly where so that I don't
12 paraphrase.
13  Q.  Yeah, you -- well, the contract I think we
14 all agree says what it says.  I want to know what your
15 understanding is of what provision is breached by Mr.
16 Silvers having communications with Google, Inc."
17  THE VIDEOGRAPHER:  Five minutes left on the
18  video.
19  THE WITNESS:  Here we go.
20  Taking a break?
21 BY MR. HARTMANN:
22  Q.  You know what I was going to take a short
23 break and let you look over the agreement.
24  A.  I found it in both.
25  Q.  Go for it then.

94

1  A.  All right.  In the agreement -- the letter
2 agreement, Exhibit 2, Paragraph 2, Relationships of
3 Parties.  The last paragraph reads:  Furthermore,
4 during the time of this agreement, Silvers shall not
5 initiate or maintain any relationship or conversation
6 with Stelor's current or prospective clients, vendors,
7 any company relationships with the media, press, et
8 cetera, without the prior express written consent of
9 licensee.
10  In Exhibit 1 the License, Distribution and
11 Manufacturing Agreement under the heading of
12 Intellectual Property Protection, Section 8, Paragraph
13 E.  It reads:  Furthermore, during the term of this
14 agreement Silvers shall not initiate or maintain any
15 relationship or conversation with Stelor's current or
16 prospective client, vendor, any company relationships
17 with the media, press, et cetera, without the prior
18 express written request by licensee.
19  I would in my humble opinion interpret Mr.
20 Silvers' attempting to enter into conversations with
21 Google, Inc. a prospective vendor, a prospective
22 client, we don't know what that relationship could be,
23 to be a material breach of both contracts, both
24 clauses.
25  Now we can take a bathroom break.

95

1  MR. RUBINSTEIN:  Take a break now.
2  THE VIDEOGRAPHER:  We're going off the video
3 record.  The time is 11:25.  This is the end of
4 Tape Number 2.
5  (There was a break taken after which the
6 following proceedings were held:)
7  THE VIDEOGRAPHER:  We're now back on the
8  video record.  This is Tape Number 3.  The time
9  is 11:33 a.m.
10 BY MR. HARTMANN:
11  Q.  All right.  I think when you left off you
12 were telling me that Mr. Silvers has had
13 communications with Google, Inc. and that that would
14 be a breach of Paragraph 8E of the license agreement.
15  MR. RUBINSTEIN:  Objection to the extent it
16  misstates prior testimony.
17  THE WITNESS:  I think that's what I said to
18  you.
19 BY MR. HARTMANN:
20  Q.  That's what I thought.
21  Okay.  Now, we're going to talk about Google
22 a little bit down the road but for now I want to know
23 whether or not there are any other current or
24 prospective clients that Mr. Silvers has had
25 communications with besides Google.

96

1  A.  Current or prospective -- I'm sorry.
2  Q.  Clients.  The first -- the first one here on
3 Exhibit E that you read to us.  You said that --
4  A.  Oh.
5  Q.  There were conversations and you -- with the
6 licensees current or prospective clients, vendors, any
7 company relationships with the media, press, et cetera.
8 Let's break it down and let's talk about the
9 conversations with your current -- your being Stelor
10 current or prospective clients.
11  MR. RUBINSTEIN:  Counsel, are you referring
12  to Exhibit 1?
13  MR. HARTMANN:  Yes.
14  MR. RUBINSTEIN:  You said Exhibit A.
15  MR. HARTMANN:  I'm sorry.
16  MR. RUBINSTEIN:  Do you mean Paragraph A of
17  Exhibit 1?
18  THE WITNESS:  That's what I was going to
19  say.
20  MR. HARTMANN:  I meant Paragraph 8A of
21  Exhibit 1, thank you.
22  THE WITNESS:  Paragraph 8A.
23  Paragraph 8E you mean.
24 BY MR. HARTMANN:
25  Q.  E.  That's right.  8E.

24 (Pages 93 to 96)

97

```
 1    A.   Okay.
 2    Q.   Correct.
 3    A.   The answer is yes.  I can't give you the
 4  specific dates but Mr. Silvers has initiated
 5  conversations, for instance, with the royal family in
 6  Thailand about the intellectual property.  Mr. Silvers
 7  has sent us correspondence over the last few years of
 8  a variety of conversations he initiated with both
 9  international potential clients as well as domestic in
10  trying to promote and/or sell or effect a relationship
11  on behalf of the Googles from Goo.
12    Q.   All right.  So are you saying the tile --
13  Thai royal family was a prospective -- let's use this
14  one -- current or prospective client of Stelor?
15    A.   A prospective and --
16    Q.   Okay.  Prospective client.
17    A.   Yes.
18    Q.   And what -- what makes you think they were a
19  prospective client?  What did you do to develop them
20  as a client?
21    A.   When I say prospective client, in our plan
22  to grow the property, we are going forward in a global
23  or an international manner and so we would be looking
24  at various territorial countries, regions and I had
25  many conversations with Mr. Silvers over the years
```

98

```
 1  about those countries and those regions and things
 2  that we were looking to do and Mr. Silvers would take
 3  it upon himself to just -- to -- to do whatever he
 4  wanted to do.  He wouldn't speak with us, so when I
 5  say a prospective, I really use the word prospective
 6  as narrowly as possible because when Silvers would
 7  have these conversations -- by the way of another
 8  example.  There is a Korean animation company that we
 9  would have contemplated getting involved with for
10  possible distribution and possible -- but Mr. Silvers
11  took it upon himself to initiate a relationship and
12  had conversations with that prospective entity
13  undermining in most cases Stelor's ability to move
14  forward and so again by way of example to answer your
15  question about breaches it is an absolute in my mind
16  black and white if you contract that you will not
17  initiate conversations with a prospective client
18  relative to the intellectual property, that means you
19  do not initiate said conversations, but Mr. Silvers,
20  even though he was reminded of these clauses verbally
21  and on a variety of times in writing by counsel as
22  well as by myself as well as by employees of Stelor,
23  completely disregarded not only our request but in
24  this case both Exhibit 1 and Exhibit 2, the contracts
25  themselves.
```

99

```
 1    Q.   All right.  But that -- I appreciate that,
 2  but the question was what specifically did Stelor do
 3  to develop a -- Stelor.  Not Mr. Silvers.  Stelor.  To
 4  develop a client relationship with the Thai royal
 5  family?
 6    A.   Again, prospective client.
 7    Q.   I'm asking about a particular prospective
 8  client.
 9    A.   I am answering.
10    Q.   What did you do to make them a prospective
11  client?  You.
12    A.   Again, we have a plan for going forward
13  internationally and as such every entity that could be
14  involved or is involved with television or music or
15  merchandise could be a prospective client.  In this
16  example that you cite that I cited that family, that
17  relationship was one that Mr. Silvers had discussed
18  with me prior to his getting involved.  Mr. Silvers
19  with -- with the royal family.  Mr. Silvers was told
20  expressly please do not -- we are not ready to have
21  that level of conversation, please do not -- we are
22  going to that entity.  Mr. Silvers had told us that
23  they were responsible for or I believe he said it was
24  the daughter of the royal family who was either the
25  minister of education or had some ties into the
```

100

```
 1  education department and because we are a program that
 2  is education based entertainment I said, Steve, this
 3  is the wrong time to do that, just hold off, don't --
 4  don't talk to them.  As soon as you've got something
 5  to show them, we're going to have something developed,
 6  absolutely because Steve said that family controls
 7  that part of the world, they control the markets and
 8  the commerce and he said you want to go to them in
 9  case you're, you know, worried about our stuff getting
10  knocked off or having another company infringe.  And
11  so we said absolutely, but the timing is not right.
12  It's not right.  We can't -- we don't have an
13  agreement, we don't have something to enter into and
14  he disregarded it entirely and spoke with that
15  prospective client.  We have e-mails to that effect
16  and so that would be the example I cite you.
17    Q.   All right.  Could you read back the
18  question.  Listen very carefully.
19         THE COURT REPORTER:  (Reading)  What did you
20    do to make them a prospective client?  You.
21  BY MR. HARTMANN:
22    Q.   You can answer.  Would you please answer the
23  question?
24    A.   What did I do in what regard?
25    Q.   What did you do to make the Thai royal
```

25 (Pages 97 to 100)

101

```
 1 family a prospective client?
 2    A.  In what regard?
 3    Q.  In any regard.  What did you do?  What
 4 actions did you take?
 5    A.  The actions Stelor took was the growth of
 6 the IP and the property.
 7    Q.  I'm talking about the Thai royal family,
 8 sir.
 9    A.  I responded, sir.
10    Q.  Did you talk -- let me -- I'll make it easy
11 for you.
12        Have you ever spoken to anybody from the
13 Thai royal family?
14    A.  No.
15    Q.  Have you ever corresponded to anyone at the
16 Thai royal -- Thai royal family?
17    A.  No.
18    Q.  Has Stelor ever contacted the Thai royal
19 family?
20    A.  No.
21    Q.  Has the Thai royal family ever contacted
22 Stelor?
23    A.  I'm unsure.
24    Q.  But your testimony today is that they're a
25 prospective client?
```

102

```
 1    A.  Yes.
 2    Q.  And that's based on your conversations with
 3 Mr. Silvers?
 4    A.  Yes.
 5    Q.  But other than your conversations with Mr.
 6 Silvers you have no knowledge whatsoever of the Thai
 7 royal family and whether or not they're a prospective
 8 client?
 9        MR. RUBINSTEIN:  Objection.  Vague and
10    ambiguous.
11        THE WITNESS:  What was your question?
12 BY MR. HARTMANN:
13    Q.  Other than your interaction with Mr. Silvers
14 and what he told you about them, you have no knowledge
15 whatsoever as to whether or not the Thai royal family
16 is a prospective client.  There's no independent
17 information you have to suggest that they're a
18 prospective client of Stelor, correct?
19        MR. RUBINSTEIN:  Same objection.  What do
20    you mean by information?
21 BY MR. HARTMANN:
22    Q.  Answer the question.
23    A.  The question --
24    Q.  He --
25    A.  No, I can answer it now.
```

103

```
 1        Since those conversations with Mr. Silvers
 2 we had done due diligence and in fact it made sense to
 3 initiate conversations on a relationship with that
 4 entity.
 5    Q.  Have you done that?
 6    A.  We are not ready to do it at this juncture.
 7    Q.  All right.  So they're not ready to be a
 8 prospective client then, are they?
 9    A.  How would I know I've not spoken to them
10 yet.
11    Q.  Yeah.  Until you speak to them, you don't
12 even know whether they're a prospective client, do
13 you?
14        MR. RUBINSTEIN:  Objection.  Argumentative.
15        THE WITNESS:  That's why they're
16    prospectives.
17        Anyone is a prospective client.
18 BY MR. HARTMANN:
19    Q.  All right.  That's my point.  Everyone in
20 the world is a prospective client under your
21 understanding of this agreement, correct?
22    A.  Not necessarily.
23    Q.  Now how about the Korean animation company.
24 What's the name of that company?
25    A.  I don't recall the name of the company.
```

104

```
 1    Q.  But you yourself have had no contacts with
 2 the Korean animation company that you refer to?
 3    A.  No.
 4    Q.  And --
 5    A.  I have.  I have had.
 6    Q.  You have?
 7    A.  Yes.
 8    Q.  Okay.  When did you have those contacts?
 9    A.  I don't recall.  It was probably about a
10 year ago.  I did several meetings in Los Angeles and
11 did another meeting at the licensing show.  It could
12 be this year.  I can't remember.
13    Q.  And who did you meet with?
14    A.  I can't recall the gentleman's name.
15    Q.  And who else from Stelor was at the meeting?
16    A.  Mr. Michael DiMuccio, investor and director
17 of the board.  And in fact Mr. DiMuccio I believe was
18 at the meeting -- at one least, possibly two meetings
19 in Los Angeles as well.
20    Q.  Meetings in Los Angeles with the Korean
21 animation company?
22    A.  Uh-huh.
23    Q.  All right.  What else -- what other
24 prospective clients has Mr. Silvers interfered with?
25    A.  I'd have to refer to my -- to my files but
```

26 (Pages 101 to 104)

105

1 there have been many.
2    Q.   All right.  What files -- do you have a
3 specific file for prospective clients?
4    A.   No, just files over the years from the trade
5 shows, business cards, things of that nature.
6    Q.   But as you sit here today other than the
7 Thai royal family and the Korean animation company and
8 Google which you mentioned earlier, there are no other
9 prospective clients that Mr. Silvers has interfered
10 with, correct?
11    A.   You had asked for examples so I cited by way
12 of example but as of right now I am unable to recall
13 the other -- because this is consistent behavior on
14 his part.  The other clients.  Not prospective knowing
15 that we understand the prospective are those yet to be
16 spoken to, with the exception of Google right now that
17 I am aware of that I can tell you at this moment.
18    Q.   All right.  And we know there are no
19 existing clients that Mr. Silvers could have
20 interfered with because there are no existing clients,
21 correct?
22    A.   It depends on how you interpret clients.
23 One of my vendor relationships like my musicians I
24 would consider them to be not employees per se, not
25 consultants per se, not clients per se, but I think

106

1 they would fall into that kind of gray area between
2 the three.
3    Q.   Okay.  We've talked about the musicians
4 already, correct?
5    A.   We have.
6    Q.   All right.  So I'm just trying to make sure
7 I understand all the different ways that Mr. Silvers
8 has breached the agreement and all the different types
9 of interference that you allege do that.
10    Any other prospective clients that you can
11 tell us about today that you recall?
12    A.   Yes.
13    Q.   Okay.  Who are they?
14    A.   Bayard -- B-A-Y-A-R-D -- Publishing.
15    Q.   And how -- how is that a prospective
16 client, that company?
17    A.   We entered into an agreement with Bayard who
18 publishes children's magazines in North America called
19 Chirp, Chickadee and Owl magazines, and they ran a
20 story line in art prominently in both Chirp and
21 Chickadee magazines.  We were very excited because
22 traditionally they -- they don't bring in other
23 characters the way they brought in the Googles and
24 when I notified Mr. Silvers, as I did on an almost
25 daily basis when we spoke on progress and things we

107

1 were doing and mentioned this exciting news and told
2 him that these magazines were coming out and when the
3 month was and whatnot, I told him that I would get him
4 some reprints, some copies.  When the magazine came
5 out and we were sent the copies, I had been traveling,
6 there was some lag time and Mr. Silvers was -- is very
7 impatient and kept calling and calling and saying I
8 want you to send me 50 copies, I want you to send me a
9 hundred copies and I said that I would get him copies.
10 Mr. Silvers then wrote directly to Bayard Publishing
11 and said I am the creator and you need to send me
12 copies.  I'm paraphrasing of course, but I got a very
13 angry call from the publisher at Bayard saying who is
14 this man, why is he making demands on -- on what we
15 need to do and he insisted that this is his project.
16    And so when I contacted Silvers, he first of
17 course as usual denied it and then after a day passed
18 of his denial saying -- he -- he came back and said he
19 apologized, that he didn't think he was out of line.
20 And I said, Steve -- and I said this to him again.  We
21 said it to him verbally, we said it in the presence of
22 others, we put him on notice in writing, we had
23 counsel get involved.  I said, Steve, you and I have
24 two contracts that -- that make the basis of our
25 relationship.  You may not initiate -- you cannot

108

1 maintain or have a relationship.  You can't have a
2 conversation with any of our current clients or
3 vendors or any relationship with the media.  Now it
4 would seem to me that in this example I'm citing he
5 violates all of that.  And he said to me -- he said, I
6 can do what I want.  You can't stop me from doing what
7 I'd like to do.  And I said, you're right, but, you
8 know, you're making it impossible.  Now having had a
9 wonderful relationship with these people they think
10 that our house is in disorder and now it has effected
11 our ability to go back and have an ongoing, which was
12 by the way the nature of what that relationship was
13 going to be.  Again, by way of another example and a
14 material breach of how Mr. Silvers' continued
15 interference and injection into our day-to-day
16 activities has made it incredibly difficult for Stelor
17 Productions to bring to market and successfully go
18 about its task.
19    Q.   So when -- when did this occur with Bayard
20 Publishing?
21    A.   I don't recall the dates.
22    Q.   How long ago?
23    A.   I think that these issues were the spring
24 issues in 2003.  I can't remember if it was in the
25 April or May issue.  So maybe a little over, I don't

27 (Pages 105 to 108)

109

1 know, a year and a half, a year, something of that. I
2 can't remember.
3    Q.   And who was it at Bayard that you dealt
4 with?
5    A.   I dealt with -- there was a woman named
6 Hilary. There was -- the publisher's name was -- I
7 think it's Jacqueline but I -- I'm not sure. And
8 there was another fellow there. I -- I can't really
9 recall the specifics of the names.
10    Q.   Were you the frontman from Stelor that was
11 dealing with Bayard or was somebody else at Stelor in
12 charge of this project?
13    A.   That would be myself and as well our, at the
14 time, chief writer now consultant.
15    Q.   And who is that?
16    A.   Jeff Schector.
17    Q.   All right. You don't know Hilary's last
18 name or Jacqueline's last name?
19    A.   I'd rather not guess. I mean I -- Bane,
20 Bailey, Baylor, Bane -- I'm just not exactly sure.
21    Q.   Where is Bayard Publishing? Where are their
22 offices located?
23    A.   They were in Toronto, Canada.
24    Q.   And did I hear you say that there was an
25 agreement between Stelor and Bayard?

111

1 credibility and because they are children's
2 publications and they are beseeched by thousands of
3 other character-based companies, they had made this
4 decision to take on the Googles from Goo and in one
5 case they gave us a magazine cover, inside cover. In
6 the other case it was a -- one of the most important
7 pages. It -- it just takes -- it took me over a year
8 to put that deal together. In fact it was closer to
9 15 months of just meetings, very delicate negotiations
10 all based on my credibility, on the credibility of our
11 music and it was, I would best describe it, a
12 handshake relationship based purely on the integrity
13 of the character and the character art. It's really
14 difficult and the cost to us is -- is hard to document
15 beyond the actual time and whatnot. You can't really
16 quantify that goodwill that gets lost when an
17 individual like a Mr. Silvers inserts himself and
18 damages and effectively screws up the relationship but
19 nevertheless after that there was no more
20 relationship. I flew back to Canada, I tried to
21 explain that Mr. Silvers was very passionate -- is a
22 passionate person. It didn't really matter.
23    Q.   All right. So you're saying that after Mr.
24 Silvers contacted Bayard the relationship between
25 Bayard and Stelor stopped?

110

1    A.   A verbal agreement.
2    Q.   Verbal agreement.
3    A.   Yes.
4    Q.   So there's no written agreement?
5    A.   No, but we have, as does Mr. Silvers, copies
6 of the actual magazines in which everything came out.
7 We have -- because again of the nature of what we do
8 we've had people that I've initiated relationships
9 with and they've kind of looked at what we're doing
10 and have come to us and said let us -- we'll do this
11 and we won't charge or we'll do this and we won't -- I
12 haven't gotten into a contractual relationship wanting
13 to see the efficacy and how successful whatever the
14 particular program could be.
15    Q.   So there's no written agreement with Bayard?
16    A.   Correct.
17    Q.   And the problems that you've described with
18 Bayard -- well, first of all what are the problems?
19 What -- I mean how has Stelor been effected by
20 anything that Steve Silvers did with Bayard?
21    A.   After Steve Silvers' insertion into that,
22 not unlike what I described to you earlier with
23 another company, it just gave them a bad taste. It --
24 it kind of spooked them, it kind of gave the
25 impression that we were not or did not have the

112

1    A.   Correct. After Mr. Silvers demanded from
2 Bayard that they perform certain things including
3 sending him however many hundreds of copies --
4 whatever it was he asked for. And I had already given
5 Mr. Silvers I think a very reasonable number of
6 copies. It was just a such an unreasonable way that
7 he went about it and because we didn't give him a
8 heads up in -- in any way, shape or form, yes, that
9 was the end of our -- my handshake relationship.
10    Q.   And it's your understanding from Bayard --
11 somebody at Bayard told you that the reason we're
12 ending this relationship is that guy Steve Sellers --
13 Silvers called us?
14    A.   No, no one said that to me. It was a little
15 more under the category of we had a great
16 relationship, this was a very unsettling experience.
17 Thank you very much for your time. But the people
18 involved on our side were very clear, including Mr.
19 Schector who had a very -- who had a very fine
20 relationship. He had been part of the entire writing
21 of that story line in relation to what the issue --
22 they have themes for their issues. It was very clear
23 from the people on Stelor's side that it was Mr.
24 Silvers' insertion and that experience that soured
25 that relationship.

28 (Pages 109 to 112)

113

1  Q.  But nobody from Bayard ever said that,
2  correct?
3  A.  I'm unaware if in fact they said something
4  to Jeff or not.
5  Q.  All right.  What other prospective clients,
6  vendors, sublicensees has Mr. Silvers interfered with?
7  A.  We don't have a sublicense with anyone so
8  I --
9  Q.  Prospective.
10  A.  Oh, you said prospective sublicenses.
11       Um.  I'm sorry, could you --
12  Q.  What other prospective -- we're -- we're
13 back to the license agreement, Exhibit 1, Paragraph 8E
14 and you had told us going back a ways that Mr. Silvers
15 was breaching the agreement and you pointed me to this
16 provision of the agreement because he was having
17 conversations with licensees current or prospective,
18 clients, vendors, any company relationships with the
19 media, press, et cetera.
20       MR. RUBINSTEIN:  Object to the extent it
21       misstates prior testimony.
22 BY MR. HARTMANN:
23  Q.  It's Paragraph 8E of the license agreement
24 which is Exhibit 1.  This is one of the provisions of
25 the agreement that you contend Mr. Silvers has

114

1  breached and I'm asking you for the specific facts
2  that relate to that claim and we've gone through a few
3  of them with various prospective clients, the royal
4  Thai family, remember them?  I'm trying to illicit
5  from you your knowledge as to any other prospective
6  clients, vendors, licensees, sublicensees.
7  A.  I can't recall at this time other --
8  Q.  All right.  Now, independent of whether or
9  not Mr. Silvers has interfered with any prospective
10 clients, can you tell me who the prospective clients
11 are of Stelor?  Besides the one -- the ones you've
12 already named.  You've named Google, the royal fam --
13 the royal Thai family, the Korean animation company,
14 these are all mentioned as prospective clients.  What
15 other prospective clients does Stelor have?
16  A.  We've been in negotiations for several
17 years.  There's -- there's such a long list I -- I
18 wouldn't know where to start.
19  Q.  Do you have a list?
20  A.  I'm unaware of a formal list existing but
21 when I say list, my department heads, the people that
22 we've met at shows that we've talked to, music
23 companies, toy companies, production companies,
24 apparel companies, trading card companies, food
25 companies, all of those areas in which Stelor has been

115

1  exploring and establishing relationships.
2  Q.  All right.  What department heads are you
3  referring to?
4  A.  Marty Jeffrey, Julie DePue, Biju Pandit,
5  Michael DiMuccio, Robert Rothstein.  These would not
6  all be employees, some of these are directors and
7  investors.  Henry Epstein.
8  Q.  All right.  What department head is Marty
9  Jeffrey?
10  A.  Marty is the senior vice president of Stelor
11 Productions.
12  Q.  And what department does he head?
13  A.  All of the departments.
14  Q.  All right.  So he's the department head of
15 all the departments?
16  A.  (Witness nods head.)
17  Q.  What are the -- what departments are there
18 at Stelor?
19  A.  There is writing, there is animation and
20 art, there's multimedia, there's IT, there is business
21 affairs, there is new vendor relationship/client
22 relationship type of thing.
23  Q.  All right.  Who's -- who's the head of the
24 writing department?
25  A.  Julie DePue.

116

1  Q.  Who's the head of the animation and art
2  department?
3  A.  That would be Biju Pandit.
4  Q.  And the multimedia department?
5  A.  That would be -- that would be Mr. Pandit
6  and I -- I'm sorry to say I don't how to -- I don't
7  know the name of the employee who's very recent who's
8  working with Mr. Pandit on that.
9  Q.  And the IT department?
10  A.  Dean DePue.
11  Q.  The business affairs?
12  A.  Michael Sagan.
13  Q.  New vendors and clients?
14  A.  Michael DiMuccio.
15  Q.  Is -- Mr. DiMuccio is a -- is an investor,
16 is he not?
17  A.  Yes.
18  Q.  So he -- he is not there on a day-to-day
19 basis at Stelor?
20  A.  He's in the offices on the average of three
21 to five days a month.
22  Q.  So what -- what other employees at Stelor
23 are involved in new vendors and clients?
24  A.  That would just be Mr. DiMuccio, Mr. Epstein
25 who's also the vice chairman of the board and an

29 (Pages 113 to 116)

117

1 investor.
2    Q.   So they would have personal knowledge of all
3 the new vendors and clients that you've been
4 negotiating with over the years of which there are so
5 many that you can't think of any today?
6    A.   Including Mr. -- Mr. Jeffrey.
7    Q.   Those would be the main guys, okay.
8    A.   Right.
9    Q.   All right.  So what about prospective
10 vendors.  I mean do we have any existing vendors?
11 Does Stelor have any existing vendors?
12    A.   Yes.
13    Q.   Who are they?
14    A.   Double ee Productions, Alon Eisenberg,
15 Johnny Elkins for music.  Leach.  Leach is printing
16 and promotional services.  Jeffrey Linos would be the
17 advertising, ads solutions or ad specialty.  Andy
18 White.  I don't know her company name.  Also
19 promotional items.  Roxroy Clayton on video and
20 animation.  Michael Warren, graphic art and design.
21    Q.   These are vendors?
22    A.   These are outsourced --
23    Q.   Not employees --
24    A.   Right.
25    Q.   -- or --

118

1    A.   Right.  Outsourced vendors that perform
2 those functions that we discussed.
3    Q.   And -- and they have actually provided some
4 type of good -- goods or services to Stelor?
5    A.   Yes.
6    Q.   Okay.
7    A.   There are others but as I said there's --
8 there's -- there's so many and we -- we --
9    Q.   What about with stuffed animals?  Is there
10 any vendors, prospective vendors with respect to
11 stuffed toys?
12    A.   We've had conversations for two years now
13 with several toy companies but not production or
14 manufacturing.  We've just actually started taking
15 bids and pricing for a line of plush.
16    Q.   What toy companies have you had discussions
17 with?
18    A.   Fisher-Price, Mattel, Spin Master -- um --
19 um -- well, before they went out of business Irwin
20 Toy, although they're back in some iteration.  There's
21 been about a dozen that have been either pursuing us
22 or that over the years, again, we've been negotiating
23 with waiting until we get to market.
24    Q.   And who at Stelor is in charge of those
25 negotiations?

119

1    A.   It would be again myself, Marty Jeffrey,
2 Mike DiMuccio.
3    Q.   Have there ever been any draft contracts --
4 by that I mean proposed contracts -- that were just
5 used for discussion purposes?
6    A.   Not at this point.
7    Q.   Is there correspondence between Stelor and
8 Fisher -- Fisher-Price?
9    A.   Verbal.
10    Q.   All verbal.
11        So you wouldn't have any letters in the file
12 to or from Fisher-Price?
13    A.   Verbal.
14    Q.   Mattel?
15    A.   All of my conversations to date with
16 prospective vendors have been verbal.
17    Q.   All right.  So then you must know who you
18 speak with at Fisher-Price.  Who would that be?
19    A.   The president of Fisher-Price whose name is
20 Neil -- I want to say Friedman, but I -- I could be
21 mistaken.  We've been hearing from now for almost a
22 year from Nickelodeon has been having conversations
23 and they have been very anxious to get involved with
24 us but Marty has been fielding those conversations.
25 My initial contact was with the president, chief

120

1 operating officer.  I think his name is -- I could be
2 mistaken -- Jeffrey Dunn and I'm not sure who the
3 people are that he's been speaking with.  I know we
4 have a meeting coming up in a few weeks in Manhattan.
5 Again, there's -- because we are growing the project,
6 growing the music, growing the story lines, creating
7 and we've not been ready to really get to market,
8 we're just out there with the website and some of the
9 music.  I've been very renascent to start any of those
10 conversations until we had a licensing attorney agent
11 really do that and to that end we were approached
12 about a month ago by one of the biggest licensing
13 agents attorneys on the planet who represents
14 properties like Strawberry Shortcake and the Care
15 Bears and his feeling is based on the work Stelor
16 Productions has done to date that we have -- quote --
17 the stickiest property out there and so all of the
18 things I've described to you that is verbal now we
19 have a licensing attorney who's actually putting
20 things into motion, but in order to have these
21 contracts, you know, I've talked about, you have to
22 have something called a show Bible, a character guide,
23 a style guide which spells out how the characters
24 look, what their colors are, what they look like when
25 they turn, what fonts they use, what borders,

30 (Pages 117 to 120)

121

1 everything relative to the intellectual property and
2 the integrity of the characters and, again, by way of
3 example this attorney came to us having
4 been the -- one of the keynote speakers at a world
5 conference at the University of Southern California on
6 character art in the digital age and he used as his --
7 he used as his -- his example not only the Care Bears
8 and Strawberry Shortcake and those types of properties
9 but he used the Googles from Goo his last -- the last
10 part of his presentation, slides and whatnot was all
11 information from our website and so now we are at a
12 place -- we had planned our whole program based on a
13 five to seven year window which was one of the early
14 pieces of guidance instruction that Mr. Silvers
15 provided and that's how long it would take to grow it
16 commercially and get it to market. We've only been,
17 as you know, in business for two years and so we're
18 breaking all of those records and are just now
19 starting to enter into those agreements, those
20 contracts, those -- with every one of the vendors and
21 prospective clients that I've discussed with you.
22    Q.   Well, who is the licensing agent -- attorney
23 agent that you mentioned?
24    A.   Michael Andrews.
25    Q.   And where is he based?

122

1    A.   He's in Ottawa, Canada and I think the name
2 of his firm is Andro Roboshow or Robashod or --
3    Q.   And who's been having the contacts with
4 Mattel?
5    A.   Most of the initial contacts -- in fact
6 almost all of the contacts with the companies would
7 have been myself.
8    Q.   So who's the person at Mattel that you've
9 been dealing with?
10    A.   Again, the name was Art -- I'm just not very
11 good with -- again, there's such a volume of people
12 that I speak with and deal with I can't give you the
13 specifics. I'd have to check my -- my notes.
14    Q.   What kind of notes would you check? Do you
15 keep notes of meetings that you have with Mattel?
16    A    I keep a calendar and -- or I should say
17 I've kept a calendar and, yes, when -- you know,
18 salient names or if I promise to send music or email,
19 you know, some material, but I recently -- it was
20 destroyed and so I've had -- I'm using a Palm Pilot
21 now electronically.
22    Q.   But am I to understand that all your
23 discussions with Mattel have been verbal?
24    A.   Yes.
25    Q.   And that there's no letters going back and

123

1 forth between Mattel or Stelor?
2    A.   As I answered this question a few minutes
3 ago, yes.
4    Q.   Is that typical in the industry?
5    A.   I think given what I understand it is
6 typical in any industry when you are building a
7 relationship on a product or concept that doesn't
8 exist tangibly yet. I think the answer to that would
9 be yes. You build the relationship, you show the
10 samples, whatever that is that you might have and then
11 once the relationship is built and the credibility and
12 the integrity exists, then you start memorializing and
13 committing to paper.
14    Q.   I want to go back to Nine Mile Productions.
15 Nine High Productions. Nine -- Nine Story
16 Productions.
17    A.   Uh-huh.
18    Q.   What was the time frame that you -- that
19 Stelor was -- was dealing with them where -- where Mr.
20 Silvers got involved? When -- when was that?
21    A.   I just can't recall. I'm very -- I'm very
22 bad with dates.
23    Q.   And who was it at Nine -- Nine Story
24 Productions that you dealt with?
25    A.   You had asked me that twice before and again

124

1 I can't recall. At the time I was dealing with Steve
2 somebody and Mark I think Blain or Blair.
3    Q.   All right. And -- and your -- the Korean
4 animation company. Do you recall their name?
5    A.   Not off the top of my head, no.
6    Q.   Who introduced Stelor to the Korean
7 animation company?
8    A.   I believe we had met them at a show and
9 then Mr. Silvers in one of his e-mails to me said that
10 he had a relationship with that company and so -- and
11 then I -- I contacted them after they came to our
12 booth. Again, I'm just not remembering the time line
13 and how it took place.
14    Q.   The fact that Stelor does not have the Thai
15 royal family as a client today is because Stelor is
16 not ready to have clients yet, isn't that correct?
17       MR. RUBINSTEIN  Objection. Argumentative.
18       THE WITNESS: I'm sorry, do you have a
19   question?
20 BY MR. HARTMANN:
21    Q.   The fact that the Thai royal family is not a
22 client of Stelor's at this point that's because Stelor
23 is not yet ready to have any clients, correct?
24       MR. RUBINSTEIN: Same objection.
25       THE WITNESS: What's your question?

31 (Pages 121 to 124)

125

```
 1      MR. HARTMANN: Read it back.
 2      THE WITNESS: I don't understand your
 3 question.
 4      MR. HARTMANN: Read it back.
 5      THE COURT REPORTER: (Reading) The fact
 6 that Thai royal family is not a client of
 7 Stelor's at this point that's because Stelor is
 8 not yet ready to have any clients, correct?
 9      THE WITNESS: Is your question that Stelor
10 is not ready to have any clients? You made a
11 statement.
12 BY MR. HARTMANN:
13   Q.  No, with respect to the Thai royal family.
14 The reason that they're not a client at the present
15 time is because Stelor is not ready to have clients
16 right now.
17   A.  Stelor is ready now to have start bringing
18 in clients. That's why I'm -- I'm having difficulty.
19   Q.  Okay. I didn't understand it from before.
20 So you are ready to have clients now?
21   A.  As I just mentioned.
22   Q.  All right. Tell me all the clients that --
23 you don't have any clients right now?
24   A.  As I just mentioned to you we are just
25 now -- we've just entered into the relationship with
```

126

```
 1 Mr. Andrews in the last five weeks, we've just now
 2 started to initiate all of the relationships, we've
 3 just now started to commit to paper, if you will, meet
 4 with, put together deals the clients we've discussed.
 5   Q.  So how far off are you on -- on your first
 6 deal?
 7   A.  When I spoke with Mr. Andrews last week we
 8 were thinking that given the launch of some of our
 9 software things that we have been developing we're
10 looking to have deals in place by probably March or
11 April.
12   Q.  What deals do you expect to have in place in
13 March or April?
14   A.  We expect to start having licensed
15 relationships with clients who will utilize the
16 property or the images of the property or the
17 characters or the music.
18   Q.  Okay. What -- what clients?
19   A.  We have a -- a deal right now that would be
20 probably the best example with i-Tunes in which we met
21 the man who created and founded i-Tunes for Apple
22 Computer and actually hired him as a consultant to
23 Stelor and in that relationship one of the things he
24 brought to the table was that he got our music in
25 front of just hundreds and hundreds of other
```

127

```
 1 children's labels not only on i-Tunes but we were the
 2 featured album several times primarily when Disney
 3 lost their exclusive. There was never by the way a
 4 children's category at i-Tunes. We met with -- his
 5 name is Denzyl Feigelson. They put together a deal
 6 with Disney and we got the albums up. We are in the
 7 process -- and, again, Mr. Andrews will take care of
 8 creating that contract and license. The albums have
 9 been on the Internet. We've not taken in any revenue.
10 We've taken in no sales or -- but, again, what we're
11 trying to do is get the product out there promoted.
12 There's been a phenomenon it seems on the Internet.
13 We had six million -- six million hits I believe in
14 October and we had just hundreds of thousands of
15 unique visitors coming into the site, playing the
16 music and playing the games. So I'm -- again, I'm --
17 I'm guessing but if we get to market by April, we
18 would start having -- those relationships would all be
19 memorialized, would turn into contract relationships.
20   Q.  Those being the i-Tunes relationship?
21   A.  Those -- yes, those types of existing --
22 either that we've had negotiations with -- that's a
23 good example because we -- we get the benefit of the
24 promotion, we've got it on the website, somebody can
25 click and they can go look at the album, listen to the
```

128

```
 1 music, they can send it to their friends and it's just
 2 getting it out there by word of mouth and it's been
 3 tremendous for us as far as publicity.
 4   Q.  What other --
 5      MR. RUBINSTEIN: I would ask Mr. Silvers to
 6 refrain from making -- having side conversations
 7 with counsel during Mr. Esrig's testimony.
 8      MR. HARTMANN: Well, he doesn't have to
 9 refrain from that whatsoever.
10      MR. RUBINSTEIN: I think it's distracting
11 to the deponent.
12      MR. HARTMANN: Is that distracting you that
13 he's talking to his attorney?
14      THE WITNESS: It's very -- it's been very
15 distracting.
16      MR. HARTMANN: All right. Well, I think
17 he's entitled to talk with his counsel during the
18 deposition.
19      MR. RUBINSTEIN: Would you like to take a
20 break to discuss it with your client?
21      MR. HARTMANN: No, we don't have to discuss
22 that. He's entitled to talk to his lawyer
23 during the deposition. He's not disrupting it at
24 all.
25      MR. RUBINSTEIN: We disagree.
```

32 (Pages 125 to 128)

129

1      MR. HARTMANN: Well, the video luckily is on
2  so that we'll let the jurors or whoever it is
3  view for themselves.
4      MR. RUBINSTEIN: That is fortunate.
5 BY MR. HARTMANN:
6   Q.  What other licenses do you anticipate in
7 March or April coming up? What other deals are close?
8   A.  I couldn't be specific with you at this
9 time.
10   Q.  Why not?
11   A.  Because there are -- it's -- everything is
12 in negotiation and until Mr. Andrews and our IP
13 counsel gives me a contract, it's just a negotiation
14 so --
15   Q.  All right. So tell me everything that's in
16 negotiation. You've talked about Mattel and
17 Fisher-Price. What else is in negotiation?
18   A.  I'd have to -- to talk to Mr. Jeffrey and
19 Mr. Andrews and just find out what they've been
20 working on.
21   Q.  But you haven't tried to contact the royal
22 Thai family?
23   A.  I have not contacted the royal Thai family.
24   Q.  And you don't have any deals anticipated
25 with them in March or April?

130

1   A.  I'm unsure. We have someone who has been
2 looking into that part of the world so I'm not sure if
3 they're going to be presented with an offer. I --
4 I -- I couldn't answer that today.
5   Q.  Who's looking into that end of the world?
6   A.  Mr. DiMuccio's business partners.
7   Q.  Who are they?
8   A.  I'm -- I'm unsure of their names.
9   Q.  What -- what business is Mr. DeMuccio in?
10   A.  Mr. DeMuccio is involved in a variety of
11 companies, health and wellness, film and multimedia
12 production, seminar production, publishing, a variety
13 of businesses.
14   Q.  Do you -- do you know the name of any of his
15 companies?
16   A.  He's got about four or five. I think one of
17 them is called Good Vibrations or Good Vibrations
18 International, I'm not sure.
19   Q.  All right. This may be a convenient place
20 to take a break.
21      MR. RUBINSTEIN: When would you like to
22 reconvene?
23      MR. HARTMANN: I don't know maybe -- I'd
24 like to say 45 minutes but honestly in our Coral
25 Gables probably got to be realistic and say an

131

1 hour.
2      THE WITNESS: Is there a restaurant nearby
3 where I can get a salad or something?
4      MS. MCQUILKIN: Yeah, there's -- I can give
5 you --
6      MR. HARTMANN: There's 20 of them.
7      THE WITNESS: Like walking distance.
8      MR. RUBINSTEIN: We're off the record.
9      THE VIDEOGRAPHER: We're now going off the
10 video record. This is the end of Tape Number 3.
11 The time is 12:20 p.m.
12      (There was a lunch break taken after which
13 the following proceedings were held:)
14      THE VIDEOGRAPHER: We're now back on the
15 video record. The time is 1:33. This is Tape
16 Number 4.
17 BY MR. HARTMANN:
18   Q.  All right. We're back after lunch.
19 Everybody feeling okay?
20   A.  Absolutely.
21   Q.  All right. Well, I wanted to continue with
22 what we were kind of talking about in terms of the
23 string of material breaches that are alleged in
24 Exhibit 3 which is the Emergency Motion for
25 Preliminary Injunction and we've been going through a

132

1 number of those. Without summarizing those, can you
2 tell me any other ways in which Silvers has breached
3 either the license agreement or the consulting
4 agreement, that have been marked as Exhibit 1 and 2?
5
6      MR. RUBINSTEIN: Object to -- to the extent
7 that it calls for a legal conclusion. Go ahead
8 and answer as far as you can.
9      THE WITNESS: I just don't want to waste
10 time. Can you read me back the list we've gone
11 through?
12 BY MR. HARTMANN:
13   Q.  Okay.
14   A.  Thank you.
15   Q.  I think we started out with the fact that
16 according to your testimony Silvers flatly refused to
17 do the video time capsule history.
18   A.  (Witness nods head.)
19   Q.  Then we had the -- you had trademark office
20 matters which Number 1 was diverting from Stelor's
21 counsel the status as correspondent on the -- with the
22 trademark office. And then I guess a relative of that
23 was the fact that Silvers fired Mr. Borchard. That
24 was Number 3 I guess. That Silvers had had contacts
25 with Google, Inc. which you testified was a breach of

33 (Pages 129 to 132)

133

1 Paragraph 8E of the license agreement because they're
2 a potential client or sublicensee or vendor or all of
3 those I think you said they had potential for that.
4    A.   Yes.
5    Q.   Then we had the other matters in which
6 potential -- Paragraph 8E violations I'll call them or
7 other potential clients, vendors or sublicensees were
8 contacted. We've identified the Thai royal family,
9 the Korean animation company that you don't recall the
10 name of, Bayard Publishing. And I don't think you
11 were able to tell me any potential clients, respect --
12 respective clients, vendors, or licensees that had
13 been contacted by Mr. Silvers.
14    A.   Thank you.
15    Q.   And that's pretty much where we're at. So
16 anything else that you can tell us today as to how Mr.
17 Silvers is in material breach of either Exhibits 1 or
18 2?
19    A.   I would say that's representative of the
20 breaches, some of the breaches Mr. Silvers has.
21    Q.   All right. Now let's -- I just want to skip
22 ahead to the 2004 trade show. Did Stelor have a booth
23 there?
24    A.   Yes, this past June.
25    Q.   Okay. Was -- did Mr. Silvers interfere with

134

1 any potential clients, vendors or licensees at the
2 2004 trade show?
3    A.   I have no knowledge of that.
4    Q.   By the way did Stelor provide notice to Mr.
5 Silvers of its position that the license agreement had
6 been breached by Mr. Silvers' behavior?
7    A.   Yes, over the course of the license
8 agreement on several occasions, on many occasions
9 verbally we had those conversations and I had given
10 Mr. Silvers copies of letters from our counsel to us
11 at various points indicating those breaches.
12    Q.   All right. But was there any letter or
13 other writing provided to Mr. Silvers advising him of
14 Stelor's position? I'm not -- and besides the lawsuit
15 that was filed against him for breach of contract.
16 Was there any notice in writing provided to Mr.
17 Stelors prior to filing the lawsuit that it was your
18 position that he had breached the license agreement?
19       MR. RUBINSTEIN: Objection. Vague and
20    ambiguous. I think you mean Mr. Silvers not Mr.
21    Stelors.
22 BY MR. HARTMANN:
23    Q.   Mr. Silvers, I'm sorry.
24    A.   To the best of my recollection there had
25 been over the course of the relationship several times

135

1 when Stelor put Silvers on notice of interference and
2 breach of the license agreement.
3    Q.   And that would be in writing?
4    A.   Again, to the best of my recollection I
5 believe that there were e-mail and letters -- yes,
6 written correspondence, as far as I can remember.
7    Q.   All right. Were you the author of the
8 e-mail?
9    A.   I believe so. It would have either been
10 myself or our attorneys.
11    Q.   And which attorneys would those be?
12    A.   It would have been either Akin, Gump or
13 Thelen, Reid. Thelen, Priest, Reid. Thelen -- I'm
14 not -- I don't remember the name of the firm.
15    Q.   Let me -- what about letters. Who would
16 have authored the letters advising Mr. Silvers that he
17 was in breach of the licensing agreement?
18    A.   It would have been myself and our -- our
19 lawyers by the way from Akin, Gump they just --
20 their -- their whole department moved to Thelen, Reid,
21 so it was the same lawyers but they were in a
22 different firm.
23    Q.   Which branch of Akin, Gump did you use?
24    A.   Um --
25    Q.   Which -- which city?

136

1    A.   They were in Tysons Corner, Virginia I
2 believe.
3    Q.   And is that where -- where is Thelen,
4 Priest, Reid located?
5    A.   I believe they're in Washington, D.C.
6    Q.   Do you recall the name of the lawyer or
7 lawyers at Akin, Gump that was assisting Stelor at
8 that time?
9    A.   Glenna Parde or Pardo or par something.
10 Joseph Tiano, Eric Cowan, but there were two others.
11 I can't recall their names.
12    Q.   And so at that time -- well, okay. Let me
13 see if I can get a roster of Stelor's counsel. They
14 had Akin, Gump that became Thelen, Priest at some
15 point in time?
16    A.   Yes.
17    Q.   And do you recall when that was?
18    A.   I can't remember when they switched.
19    Q.   Is Thelen, Priest -- Priest, Reid firm are
20 they presently providing any legal services to Stelor?
21    A.   Yes.
22    Q.   Just answer yes or no.
23    A.   Yes.
24    Q.   Okay. And general, without disclosing any
25 attorney-client information, what type of legal

34 (Pages 133 to 136)

137

1 services?  Generally speaking.
2    A.   Corporate general, all of our attorneys work
3 together, so a variety of legal services.
4    Q.   Did any attorneys assist Stelor in preparing
5 the license agreement that we've marked as Exhibit 1?
6    A.   Yes.
7    Q.   Which -- which attorneys did that?
8    A.   Akin, Gump.
9    Q.   Okay.  All right.  Okay.  So we have the
10 Akin, Gump which became Thelen, Riest -- Priest, Reid.
11    A.   I think it's Thelen, Reid.
12    Q.   Thelen, Reid.
13    A.   Yeah.
14    Q.   Okay.  And then we have the -- the Finnegan
15 firm, right?  With Mr. Hefter.  And how long has
16 Stelor been using the Finnegan firm as counsel in any
17 capacity?
18    A.   Finnegan, Henderson came on board after
19 Edell, Shapiro, Flynn withdrew and, again, I don't
20 recall the date of that.
21    Q.   All right.  So before the Finnegan firm
22 there was the Edell, Shapiro, Flynn firm.  And who was
23 the lawyer there who was --
24    A.   Ira Edell.  I'm sorry.
25    Q.   Can you spell Edell for us?

138

1    A.   Edell.  E -- E-D-E-L-L.
2    Q.   And what type of services did Mr. Edell in
3 general provide for Stelor?
4    A.   Trademark intellectual property law.
5    Q.   And you said that they withdrew.  Do you
6 know when they withdrew?
7    A.   I don't recall the timing, no.
8    Q.   Do you know why they withdrew?
9    A.   They would not -- they were unwilling to
10 work with Mr. Silvers and the senior partner Ira Edell
11 wrote us and basically said that -- that he didn't
12 have the --
13        MR. RUBINSTEIN:  I'm going to object to the
14    extent it calls for attorney-client privilege and
15    instruct you not to answer the contents of any
16    communications received from your attorneys.
17        THE WITNESS:  Okay.
18 BY MR. HARTMANN:
19    Q.   All right.  But without giving any legal
20 advice that was offered in a letter that Mr. Edell
21 wrote, you learned by letter from his firm that he was
22 withdrawing and not going to represent Stelor anymore?
23    A.   Yes.
24    Q.   And in that letter it explained that Steven
25 Silvers was the purpose for their withdrawal?  The

139

1 reason.
2        MR. RUBINSTEIN:  Object to the scope of the
3    question.  It calls for the content of
4    attorney-client privilege material.  Instruct you
5    not to answer.
6        MR. HARTMANN:  How is that attorney-client
7    privilege?
8        MR. RUBINSTEIN:  A letter from his attorney.
9        MR. HARTMANN:  Yes.
10        MR. RUBINSTEIN:  And you're asking for the
11    contents thereof.
12        MR. HARTMANN:  No.  Yeah, but if I write a
13    letter to my client saying it was a great Marlins
14    game last night, hope to do it again, it's not
15    attorney-client privilege.  It has to relate to
16    offering or giving legal advice.
17        MR. RUBINSTEIN:  Are you asking for the
18    contents of the letter?
19        MR. HARTMANN:  No, I'm asking him whether or
20    not in that letter it states that the purpose --
21    the reason behind the firm withdrawing had
22    something to do with Mr. Silvers.
23        MR. RUBINSTEIN:  Same objection.  Instruct
24    you not to answer.
25 BY MR. HARTMANN:

140

1    Q.   You -- you of course have those letters in
2 your Stelor files as we sit here today?
3    A.   Yes.
4    Q.   All right.  You said earlier this morning
5 that one of the reasons -- just recap this.  One of
6 the reasons that Mr. Silvers is in breach of the
7 agreement is that he's had communications with Google
8 and that that violates Section 8E of the license
9 agreement.  And the reason for that is that Google is
10 a potential client, licensee, vendor, whatever; right?
11    A.   Yes.
12    Q.   Okay.  Why do you think Google is a
13 potential client?
14    A.   We had planned and in fact had obtained
15 counsel for Mr. Silvers vis-a-vis this plan to effect
16 a coexistence relationship or agreement wherein we
17 could either be the children's arm of Google, Inc. or
18 do some sort of barter or service with Google and it
19 was Mr. Silvers' idea to his credit, he wrote me in
20 one of his e-mails, that given who they were and the
21 size and the financial fortitude and whatnot, that it
22 could be the best of all worlds since we were the
23 senior trademark that it made perfect sense for us to
24 effect some sort of relationship.  And so we went down
25 that path and -- and it's very consistent with --

35 (Pages 137 to 140)

141

1 although Mr. Silvers over the last few years had
2 been -- had written voluminous e-mail about suing them
3 and going after them. In August of 2001 Mr. Silvers
4 had written the founders of Google, Inc. a letter
5 specifying that they coexist or establish a coexist
6 relationship with Googles.com and we thought again in
7 our effort to commercialize the business that it would
8 be the best possible solution of all worlds to effect
9 some sort of relationship, either client, vendor,
10 barter, joint venture, that type of thing.
11    Q.  All right. Now, the -- you mentioned Mr.
12 Silvers wrote a letter to Google in August of '01.
13 Are you aware of any other communications that Mr.
14 Silvers has ever had with Google about anything?
15    A.  Yes, I have seen other e-mail that Mr.
16 Silvers had written and Mr. Silvers had told us on
17 many occasions about phone calls and efforts that he
18 engaged in to -- to establish a dialogue with Google,
19 Inc.
20    Q.  All right. So you've seen an e-mail from
21 Steven Silvers to Google?
22    A.  Yes.
23    Q.  Basically trying to approach them to
24 establish some kind of a relationship along the lines
25 you just discussed?

142

1    A.  Yes.
2    Q.  And you've seen an August '01 letter from
3 Mr. Silvers to Google along those lines?
4    A.  To Larry Paige at Google, Inc.
5    Q.  Okay. Now, that was back in 2001. Has
6 Google ever done anything in those three years hence
7 to indicate any interest whatsoever in being a
8 prospective client of Stelor?
9    A.  No.
10    Q.  So it's fair to say that they're not a
11 prospective client at this point?
12    A.  No, we had -- I had called on several
13 occasions and up through the time of last late spring
14 when we entered into negotiations with Google about
15 coexistence or some sort of relationship it's been an
16 ongoing strategy for us given what we are developing
17 and one of our -- the pieces of our site called --
18 which is Goo Search about some sort of partnership.
19    Q.  But as you said there's been no interest
20 whatsoever on Googles' part which --
21    MR. RUBINSTEIN: Objection. Misstates prior
22 testimony.
23 BY MR. HARTMANN:
24    Q.  With respect to the relationship?
25    A.  Again, I would be unaware.

143

1    Q.  You're not aware of any interest on Googles'
2 part in which they've wanted to discuss or consider a
3 relationship with Stelor?
4    A.  No, quite the contrary. I've gotten the --
5 the indication from counsel that there's -- in fact
6 could be interest in -- in some sort of relationship,
7 but I was also told very specifically that because of
8 Mr. Silvers' insertion and Mr. Silvers' adversarial
9 position to Stelor that Google, Inc. was by definition
10 unwilling to speak with us until this -- the -- this
11 adversarial relationship was either resolved or in
12 fact they could be dealing with the rightful
13 intellectual property party.
14    Q.  And when you say you were told this, you
15 were told this by your own lawyers, correct?
16    A.  That's right.
17    Q.  All right. I'm not asking what your lawyers
18 were telling you. I don't think your lawyer today
19 wants you to talk about what your lawyers have talked
20 about because they're going to end up being fact
21 witnesses if you keep doing that, but I want to
22 refocus the question because maybe you didn't
23 understand me. Do you have any personal knowledge --
24 you personally -- that Google has expressed an
25 interest in a relationship with Stelor? Not your

144

1 lawyers. That Google has done that -- said that.
2    A.  No.
3    Q.  Now you -- you yourself have had numerous
4 contacts with Google, correct?
5    A.  Yes.
6    Q.  Could you tell me about those?
7    A.  I started calling Google, Inc. probably in
8 late '02 and had not heard back. Have never gotten a
9 response.
10    Q.  Stelor obtained a license to the Googles IP
11 in the middle of '02, correct?
12    A.  Yes.
13    Q.  So it doesn't make sense that Stelor would
14 be contacting Google about any kind of relationship
15 prior to June of 2000.
16    A.  That's correct.
17    Q.  Let's mark this as four I guess
18    (The document was marked as Exhibit No. 4
19 for identification.)
20 BY MR. HARTMANN:
21    Q.  All right. I've marked as Exhibit 4 an
22 Internet article under the Business Gazette dated July
23 30th, 2004. A story about the Stelor/Google trademark
24 dispute in front of the United States Patent and
25 Trademark Office. Have you seen this particular

36 (Pages 141 to 144)

145

1 article before?
2   A.  Yes.
3   Q.  Okay.  On the second page you are attributed
4 with the statement that you and others have written
5 and called Google's headquarters since at least
6 2001 trying to meet with company executives to work
7 out a solution.
8       Have you called -- you personally have you
9 called Google's headquarters any time prior to the
10 date of the license agreement between Stelor and
11 Silvers?
12   A.  No.
13   Q.  All right.  What others had written and
14 called Google's headquarters since at least 2001?
15   A.  Steven Silvers.
16   Q.  Any others besides him?
17   A.  Not that I'm aware of.
18   Q.  But you were aware that Google officials
19 never responded to the earlier inquiries?
20   A.  Yes.
21   Q.  All right.  And have you had any substantive
22 discussions with anybody at Google regarding a
23 relationship between Stelor and Google?
24   A.  No.
25   Q.  Have your counsel, have any lawyers on your

146

1 behalf had any substantive discussions with Google
2 regarding a relationship with Stelor?
3       MR. RUBINSTEIN:  Objection to the extent
4     that it calls for attorney-client communications.
5     You can answer outside those communications.
6 BY MR. HARTMANN:
7   Q.  I'm not asking for any communications.  I'm
8 asking you for a fact.  And that is whether or not
9 your lawyers have had any substantive conversations
10 with Google?
11   A.  Yes.
12   Q.  They have.  Which lawyers are those?
13   A.  William Borchard and present counsel.
14   Q.  Referring to Mr. Rubinstein?
15   A.  Yes.
16   Q.  Have you received any correspondence from
17 Google in connection with discussions to form a
18 relationship between Stelor and Google?
19   A.  Personally?
20   Q.  Yes.
21   A.  No.
22   Q.  Have your lawyers received any
23 correspondence that's been shared with you?
24   A.  Yes.
25   Q.  And are they from Google or Google's

147

1 lawyers?  As you understand it.
2   A.  I would believe it would be from Google's
3 lawyers.
4   Q.  And the lawyers that have received that
5 correspondence are who?
6   A.  Cowan, Liebowitz.
7   Q.  Mr. Borchard?
8   A.  Yes.  And also Mr. Rubinstein.
9   Q.  Have you -- have you ever made any proposals
10 to Google in connection with any business transaction
11 between Google and Stelor?
12   A.  Again, personally Steve Esrig?
13   Q.  Yes.
14   A.  No.
15   Q.  Have you had your -- have you instructed
16 your lawyers to do that?
17   A.  Yes.
18   Q.  All right.  What business proposal did
19 Stelor through its lawyers make to Google?
20       MR. RUBINSTEIN:  Object to the extent that
21     it calls for attorney-client privilege, the
22     contents which I instruct you not to disclose.
23 BY MR. HARTMANN:
24   Q.  Yeah, I don't want the attorney-client
25 privilege legal advice, if there is any.  I just want

148

1 to know the information that your lawyers conveyed
2 with your authority to Google for which there's no
3 privilege.
4       MR. RUBINSTEIN:  You may answer.
5       THE WITNESS:  We had offered -- I can't
6     remember if it was three, four or five different
7     settlement possibilities.  I think this was in
8     June or July at the time that we met with Mr.
9     Silvers and his then law firm Larry Stumpf about
10     possible ways to come to some sort of an
11     agreement or a coexist or relationship.
12 BY MR. HARTMANN:
13   Q.  All right.  Did you ever advise Mr. Silvers
14 that you were making a proposal to Google?
15   A.  Yes.
16   Q.  When did you do that?
17   A.  We had a conversation in again June and
18 July.  I met with Finnegan, Henderson; Cowan,
19 Liebowitz; Larry Stumpf; Steven Silvers; I can't
20 remember the lawyers from the firm in New York who
21 attended, but we were discussing the fact that we were
22 currently involved in negotiations that were happening
23 while we spoke with Google, Inc.
24   Q.  All right.  And did discuss what those
25 negotiations were about?

37 (Pages 145 to 148)

149

1    A.   Yes.  And the -- and the -- at one point all
2  of the attorneys asked us to leave the room so that
3  they could speak more specifically I think about the
4  contents.
5    Q.   All right.  So what proposals did Stelor
6  make?
7    A.   As I said, there were either three or four
8  different proposals that had been put together that
9  dealt with everything from coexisting to partnering to
10 setting up links or hyperlinks on their site and ours,
11 those types -- and different permutations of those --
12 those items.
13   Q.   Was -- did -- did Stelor ever offer to
14 convey the Googles.com domain name to Google?
15   A.   No.
16   Q.   Did Stelor ever provide any financial
17 parameters to Google?
18        Let me rephrase that.  Did Stelor ever give
19 a price tag to Google for any -- any of the
20 relationships -- any of the relationships that were
21 under discussion?
22   A.   Yes.  I seem to remember in one of the
23 negotiations there was a discussion of a license
24 agreement, of Google, Inc. taking a license from
25 Googles.com but it was -- they were very preliminary.

150

1    Q.   What kind of financial figure was mentioned
2  in connection with the license?
3    A.   I can't recall what the numbers were.
4    Q.   Who would know?
5    A.   Mr. Borchard.
6    Q.   And did you ever clear those numbers with
7  Mr. Silvers prior to making the offer to Google?
8    A.   Because we had, A, started and -- and they
9  were preliminary negotiations and, B, because we have
10 the sole right to act on his behalf and instead of him
11 in regards to license agreements and sublicense and
12 whatnot, we did not contact Mr. Silvers because we had
13 just started that process.  In fact a big part of the
14 meeting with Mr. Silvers was let us do our job and get
15 there.  At that point Mr. Silvers had on one hand
16 written me saying that we should do what we were doing
17 negotiate, work out a coexist or a working
18 relationship but for the most part he had kept calling
19 and writing saying that we needed to -- to quote Mr.
20 Silvers to extort as much money from Google, Inc. as
21 possible pre IPO and we've got countless e-mails to
22 this effect because this was our opportunity to have
23 leverage with them.  And our position was, you know,
24 they were the -- the 80-pound gorilla.  We wanted to
25 at least get to the table and see if there was

151

1  something to be worked out.
2    Q.   I'm going to move to strike the extortion
3  language as totally unresponsive and -- and
4  inflammatory.
5        So I take it the answer then is, no, you did
6  not run anything by Mr. Silvers prior to making a
7  financial proposal with Google?
8    A.   I'm sorry, what was your question?
9    Q.   The question was I asked you five minutes
10 ago whether or not you had received or -- or advised
11 Mr. Silvers of any proposals that you were making with
12 Google regarding financial terms.
13   A.   Oh --
14   Q.   And I got all the -- all the --
15   A.   Yes.
16   Q.   -- language about --
17   A.   Yes, I did have a conversation, several with
18 Mr. Silvers.
19   Q.   So you -- you told him the dollars that were
20 being discussed?
21   A.   We started to talk about it.  I actually
22 called him to ask him what he thought would be
23 appropriate in the way of what it was worth and where
24 we should go and so on and so forth.
25   Q.   All right.  And what -- and did Mr. Silvers

152

1  approve the dollar figure that Stelor was going to use
2  in its negotiations with Google?
3    A.   I'm trying to remember the e-mail he wrote.
4  We had a conversation and I called Mr. Silvers and I
5  said, you know -- he answered the phone on a speaker
6  phone.  I said, you know, we're going to get things
7  started.  It's obviously very confidential.  What do
8  you think we should do?  What do you think this is
9  worth?  What do you want from this?  And so on and so
10 forth.  Mr. Silvers told me first that he was alone
11 and we started having this conversation.  A few
12 minutes into the conversation, I heard another man's
13 voice.  I said, Steve, what's going on?  Is there
14 somebody there?  He said no.  I said, well, I don't
15 feel comfortable continuing this conversation.  The
16 next day I received an e-mail from Steve apologizing
17 for lying that there was someone there, but it was in
18 that conversation and that e-mail in which we
19 discussed what -- what he thought would be appropriate
20 as far as value, license value, settlement value,
21 those types of numbers so I guess the answer is yes.
22   Q.   The answer is yes you did advise Mr. -- Mr.
23 Silvers of the dollar figure that was going to be
24 proposed by Stelor to Google?
25   A.   No, that's not correct.  Yes, I did ask Mr.

38 (Pages 149 to 152)

153

1 Silvers for his opinion on what that dollar figure
2 should look like.
3    Q.  Okay.  I'm asking you whether or not you
4 asked for his opinion on what the dollar figure was.
5 What -- as presented to Google.
6    A.  Again, I --
7    Q.  Let me backtrack.  Did Stelor ever make a
8 proposal with a price tag to Google?
9    A.  Stelor's lawyers did, yes.
10    Q.  Okay.  What were the price tags?
11    A.  Again, as I said --
12    Q.  You don't remember?
13    A.  Right.
14    Q.  All right.  Did -- before it made the offers
15 or the proposals to Google with a price tag, was that
16 information provided to Mr. Silvers?  That
17 information.
18    A.  At that -- I -- I don't remember at that
19 point because the attorneys were making those offers
20 not Stelor.
21    Q.  So you don't know whether or not Mr. Silvers
22 knew that there were proposals going to Google with
23 specific dollar figures?
24    A.  Again, our attorneys were speaking to Mr.
25 Silvers' attorney Mr. Stumpf so I -- I can't really

154

1 answer that.
2    Q.  So the answer is no you don't know.
3    A.  I don't know.  Yes, that's right.
4    Q.  Fine.  Okay.  Stelor can't sell any of the
5 Googles IP to Google, can it?
6    A.  Absolutely not.  Mr. Silvers is the owner.
7    Q.  So what does Stelor have to offer Google
8 since it's a mere licensee of the Googles IP?
9    A.  Stelor can offer Google its rights as the
10 senior trademark to get involved with a company that
11 will be the largest children's company of its kind
12 relative to the name Googles.com.  We can't sell the
13 IP.  Silvers is the owner.  We wouldn't attempt to
14 sell the IP because we are very clear everything we've
15 done, every benefit inures to Mr. Silvers as the
16 owner, but Stelor has the rights as the exclusive
17 worldwide licensee to enter into a relationship that
18 benefits not only Mr. Silvers but Stelor as well as
19 far as commercializing the property.
20    Q.  All right.  So has Stelor ever offered to
21 sell any Googles' IP to Google?
22    A.  No.
23    Q.  Has Stelor ever offered to sell the
24 Googles.com domain name to Google?
25    A.  No.

155

1    Q.  Have you personally had any conversations
2 with anybody about -- at Google about having a
3 relationship between Google and Stelor?
4    A.  Have I had a conversation with someone at
5 Google, Inc.  No, I testified earlier that I've never
6 had a conversation with anyone at Google, Inc.
7    Q.  All right.  So in this article where
8 you've -- you mentioned that you -- you and others
9 have called since 2001 as a result of those contacts,
10 you've never had any -- you yourself have never had
11 any conversations with Google, Inc.?
12    A.  Correct.
13    Q.  And other than your lawyers nobody else at
14 Stelor has either?
15    A.  Correct.
16    Q.  Okay.  What -- other than the conversations
17 that you told me about that Mr. Silvers -- the
18 contacts that Mr. Silvers had back in 2001, are you
19 aware of any other conversations or communications
20 that Mr. Silvers has had with Google, Inc.?
21    A.  Only the -- the conversations that he
22 verbally shared with me when he would try to call or
23 e-mail.  Beyond that, no.
24    Q.  And when -- when -- what was the time frame
25 for those conversations when Mr. Silvers told you?

156

1    A.  It's hard -- it's -- because there were so
2 many hundreds and hundreds of e-mails from Mr. Silvers
3 I don't remember which one when or which conversation
4 when.
5    Q.  All right.  So any time Mr. Silvers would
6 have contacted Google, Inc. your knowledge of that
7 would be based on an e-mail that he provided to you?
8    A.  Or conversations that he had with me.
9    Q.  All right.  So -- but you don't have any
10 recollection as to the time period where those
11 communications were taking place?
12    A.  I do.  I recall that it was all prior to May
13 roughly of 2002 before Stelor got involved.  These
14 were the things that Mr. Silvers told me he did prior
15 to that or when he was with the Aurora Collection.
16    Q.  So after the June 2002 license agreement
17 you're unaware of any contacts that Mr. Silvers has
18 had with Google, Inc., correct?
19    A.  Correct.
20    Q.  All right.  I wanted to run you -- let's
21 mark this.
22        (The document was marked as Exhibit No. 5
23 for identification.)
24 BY MR. HARTMANN:
25    Q.  Five?

39 (Pages 153 to 156)

157

1    I've marked as Exhibit 5 your declaration
2 which was filed in support of Stelor's Emergency
3 Motion for a Preliminary Injunction. And I hope
4 you've seen it before since you signed it.
5    A.   Yes.
6    Q.   If you want to take a minute and look at it,
7 that's fine.
8    I'm looking at Paragraph 6 and I would like
9 to ask you some questions about that. In Paragraph 6
10 you state in the second sentence that Stelor acquired
11 Aurora's rights under its agreement with Silvers at
12 considerable expense. How much did Stelor pay to
13 acquire Aurora's rights?
14    A.   Stelor entered into an asset purchase
15 agreement for $30 million. In addition to which
16 Stelor paid -- I can't recall exactly, but it was
17 several hundred thousand dollars in cash to pay off
18 debts of Aurora so that Aurora did not go bankrupt and
19 the property fall into creditors' hands.
20    Q.   All right. How much money did Stelor
21 actually pay in connection with the acquisition of
22 Aurora's rights?
23    A.   Again, the asset purchase was for $30
24 million.
25    Q.   Did you pay $30 million, sir?

158

1    A.   And I -- can I finish my answer?
2    Q.   I want you to answer my question.
3    A.   I'm trying to answer your question but I
4 can't if you interrupt me while I'm answering.
5    Q.   Well, I -- I can't -- I need -- your
6 unresponsive answers are just going to have us here
7 until tomorrow.
8    A.   Could you repeat the question, please.
9    Q.   How much did you actually pay?
10    A.   Stelor entered into an asset purchase
11 agreement for $30,000. We paid off several, I
12 believe, hundred thousand dollars or maybe it was --
13 it was between a hundred and two hundred thousand in
14 actual dollars to pay off existing debt of Aurora. We
15 incurred another roughly $40,000 in legal fees. So
16 Stelor actually paid roughly $200,000 at the time that
17 it acquired the asset purchase agreement.
18    Q.   All right. So you paid Aurora $30,000?
19    A.   No.
20    Q.   You paid off debt.
21    A.   No.
22    We paid Aurora -- we paid off Aurora's
23 expenses, legal fees for their trademark counsel, it
24 was roughly a hundred -- I want to guess about 150,
25 160,000 in addition to those moneys that we wrote out

159

1 paying off vendors from Aurora. Vendors associated
2 with the Googles from Goo and so on and so forth. We
3 incurred roughly $40,000 of legal expense and other
4 expenses relative to the purchase. Those were
5 out-of-pocket dollars that was your question.
6    Q.   How much did Aurora receive from Stelor, if
7 anything?
8    A.   Aurora received no dollars beyond that which
9 we paid.
10    Q.   To the -- to the lawyers and the vendors?
11 How much --
12    A.   Correct.
13    Q.   So Aurora received nothing.
14    MR. RUBINSTEIN:   Objection. Asked and
15 answered.
16 BY MR. HARTMANN:
17    Q.   I don't think I've gotten an answer yet.
18    A.   I think I've answered it three times.
19    MR. RUBINSTEIN:   Answer it again.
20 BY MR. HARTMANN:
21    Q.   How -- how many dollars --
22    A.   I'm sorry?
23    Q.   How many dollars did Aurora receive from
24 Stelor in the acquisition?
25    A.   They did not. They received an asset

160

1 purchase agreement.
2    Q.   They received no dollars?
3    A.   Correct.
4    Q.   That's what I thought.
5    All right. And then we know that you -- you
6 also had money that was paid to Mr. Silvers in
7 following up and having the new license agreement with
8 him, correct?
9    A.   Correct.
10    Q.   Now in Paragraph 7 you say that your --
11 Stelor's interest, enthusiasm was tempered by
12 legitimate concerns and reservations and that Stelor
13 was wary that Silvers' background could jeopardize the
14 Googles program. Are you with me there?
15    A.   Yes.
16    Q.   And that background is, what, the criminal
17 conviction that Mr. Silver -- Silvers had had?
18    A.   Yes, seven or eight years in a Federal
19 penitentiary for cocaine distribution, possession,
20 whatnot.
21    Q.   How did -- how did you find out about that?
22    A.   We found out initially through someone at
23 the Aurora Collection. I can't recall who that was.
24    Q.   Well, how was it that you found out from
25 someone at the Aurora Collection? How was that

40 (Pages 157 to 160)

161

1  information conveyed to you?
2     A.  It was conveyed verbally.
3     Q.  By one person at Aurora or more than one
4  person?
5     A.  I believe that it was conveyed by Mike
6  Farrington the former CEO of Aurora who conveyed it to
7  someone else and so on and so forth, but I only was
8  told by one person.
9     Q.  But you don't know who that was?
10    A.  I can't recall.
11    Q.  When were you told?
12    A.  I can't recall.
13    Q.  And of course you advised the Stelor board
14  of Mr. Silvers' background?
15    A.  There was not a Stelor board at that time.
16    Q.  When was the Stelor board formed?
17    A.  In late May of 2002 Stelor Productions had
18  its first board meeting.
19    Q.  And who were the initial board members?
20    A.  Henry Epstein, Steven Esrig, Paul Pichante,
21  Dr. Robert Rothstein, Robert Morris, Harvey Nagley,
22  and Steven Weinstein.
23    Q.  And did the Stelor board have formal
24  meetings after it was formed in May of 2002?
25    A.  Yes.

162

1     Q.  And were there minutes kept of those
2  meetings?
3     A.  Yes.
4     Q.  And those -- Stelor would have those in its
5  files?
6     A.  Yes.
7     Q.  Who kept the minutes?
8     A.  The recording secretary.
9     Q.  Were they taped the meetings?
10    A.  No.
11    Q.  Who's -- who's the recording secretary?
12    A.  Steven Weinstein.
13    Q.  So did you ever tell the Stelor board about
14  Mr. Silvers' background?
15    A.  Yes.
16    Q.  So that would be reflected in the minutes of
17  the particular board meeting where you advised him of
18  that?
19    A.  I don't believe it was discussed at a board
20  meeting.
21    Q.  Wouldn't that be important for the board to
22  know?
23        MR. RUBINSTEIN:  Objection. Argumentative.
24  BY MR. HARTMANN:
25    Q.  You can answer.

163

1     A.  It had been discussed.  Discussed is
2  discussed.  It was disclosed and discussed.  I just
3  don't believe it was at a board meeting that it was
4  discussed.
5     Q.  All right.  Were there informal meetings of
6  the directors?
7     A.  I wouldn't say -- well, it depends.  Two or
8  three directors would go to dinner.  Mr. Silvers would
9  come into town and meet with one or two of the
10  directors.  I mean --
11    Q.  At the time that you signed -- that Stelor
12  entered into the license agreement in May of '02, was
13  there a board at Stelor at that point in time?
14    A.  Yes, the board members --
15    Q.  And --
16    A.  -- had been formed.
17    Q.  And did everybody on the board know of Mr.
18  Silvers' background?
19    A.  Yes.
20    Q.  But you -- but you don't recall that it was
21  ever discussed at a formal meeting?
22        MR. RUBINSTEIN:  Objection.  Asked and
23  answered.
24        THE WITNESS:  I'd have to go back and look
25  at the minutes.  I just don't recall.

164

1
2  BY MR. HARTMANN:
3     Q.  How did they know?
4     A.  I told them.
5     Q.  So you personally told the other board
6  members prior to May of 2000 about Mr. Silvers'
7  background?
8        MR. RUBINSTEIN:  Asked and answered.
9  BY MR. HARTMANN:
10    Q.  You can answer.
11    A.  Yes, and one of our board members, Robert
12  Morris, an attorney, I believe printed from Google,
13  Inc. or typed in Mr. Silvers' name and the entire file
14  on his incarceration and charges came up.
15    Q.  But you already knew about the background
16  prior to Mr. Morris --
17    A.  Yes
18    Q.  -- Googling it?
19        All right.  Looking at your affidavit of
20  Paragraph 8.  You state in the middle of the paragraph
21  Stelor has spent approximately $3 million?
22    A.  Yes.
23    Q.  Okay.  How -- how have you spent that money?
24    A.  That -- when this was done in October it was
25  about three -- I think we're closer to between three

41 (Pages 161 to 164)

165

1 and a half and $4 million and we've spent that money
2 developing the intellectual property, developing
3 music, developing story lines, developing art,
4 overhead for running the company.
5    Q.   All right. So developing music. The funds
6 that you've used to develop the music would you pay to
7 the musicians that you've mentioned to me previously?
8    A.   Yes, yes.
9    Q.   Any other musicians that have been paid
10 anything by Stelor to develop the music?
11    A.   Yes, we've paid -- I -- I don't remember
12 amounts and names but, yes, we've paid other parties
13 in regard to the development of the music.
14    Q.   Where is the music produced, I guess, from
15 the standpoint of being put into like a disk form or
16 cassette tape or whatever forms it's done.
17    A.   We haven't manufactured or produced for
18 sale, if I understand your question.
19    Q.   Right. So basically it's just available
20 digitally?
21    A.   It's available digitally, yes.
22    Q.   All right. And you mentioned this morning
23 that it is available on i-Tunes?
24    A.   Yes.
25    Q.   But it's not -- it's not like if somebody

166

1 wanted to by a CD they could?
2    A.   I'm not quite sure the exact mechanics, but
3 you can go to i-Tunes and download the contents.
4    Q.   I'm going to get to that. I'm just trying
5 to find out whether you can order and buy a CD?
6    A.   We -- we don't have CDs. We haven't
7 manufactured them.
8    Q.   There's been no expenses to manufacture a
9 CD?
10    A.   No.
11    Q.   And -- and the music is not out in any other
12 tangible form other than digitally?
13    A.   On our website it's out.
14    Q.   Okay.
15    A.   Snippets of the songs are on the website.
16    Q.   All right. Now if I go to i-Tunes and I
17 want to get the Google music, hear this music, I can
18 download it, correct?
19    A.   Yes.
20    Q.   And I pay for that?
21    A.   Yes.
22    Q.   And who gets the money for that?
23    A.   I believe it goes to an organization called
24 AWAL -- Artists Without a License -- which is the
25 entity through Mr. Feigelson that we will be

167

1 finalizing a license agreement and a contract I think
2 January or February.
3    Q.   And when you finalize that contract will
4 Stelor receive any income from the downloading of the
5 Googles music?
6    A.   Yes.
7    Q.   But to this point Stelor has not received a
8 penny for the music being available on the Internet?
9    A.   Yes.
10    Q.   That's correct?
11    A.   That is correct.
12    Q.   Is there a license agreement of any kind
13 with Mr. Feigelson's company?
14    A.   No.
15    Q.   All right. Any other music expenses that
16 would go into the three to $4 million that Stelor has
17 spent to develop the Googles concept and Googles' IP
18 than what you've told me about?
19    A.   We've spent --
20    Q.   I'm asking about the music.
21    A.   Yeah, just in the category of music with the
22 musicians we have spent 30 or $40,000 just in legal
23 fees relative to the -- to the contracts with the
24 musicians and that type of thing. We've got invested
25 in the music somewhere -- we've got several hundred

168

1 thousands I believe invested by this point just in the
2 music.
3    Q.   I'm just trying to figure out the nature of
4 the music investment. So we have musicians. Have we
5 paid Mr. Feigelson any money?
6    A.   Yes, Mr. Feigelson gets paid as a
7 consultant.
8    Q.   And what does -- how much money does he
9 make?
10    A.   He bills -- when he works in a month, it's,
11 I believe, $7,000 a month.
12    Q.   Okay. Any other expenses in the music
13 category?
14    A.   Musicians, legal consultants. No, I think
15 that covers it.
16    Q.   All right. And all this would be visible on
17 the -- on the Stelor's books and records?
18    A.   Yes.
19    Q.   How about story lines. What type of
20 expenses have we -- have you incurred there?
21    A.   Again, writers, consultants, whatnot. I'd
22 have to check my -- the books.
23    Q.   Writers that are not employees of Stelor?
24    A.   Yes. Employees and nonemployees, yes.
25    Q.   Okay.

42 (Pages 165 to 168)

169

1    A.  Consultants, that type of thing.
2    Q.  How many story lines are there?
3    A.  Right now there are -- there -- there are --
4 I can't tell you the actual amount.  There are dozens
5 relative to the species or the characters or the
6 planet of the characters.
7    Q.  And is the story line designed to be in a
8 book later or what media is the story line designed
9 for?
10    A.  They're designed to be in books, on the
11 Internet, episodes on our site, scripted for direct a
12 video, Goosical episodes, coloring book story lines,
13 that type of thing.
14    Q.  And these are something that are -- have
15 been reduced now to some tangible form where we could
16 see them?
17    A.  Yes.
18    Q.  And -- and the -- who are the people that
19 are not employees of Stelor that have been involved
20 and received compensation for the story lines?
21    A.  Jeff Schector, Ron Wolf, there are --
22 there's a list of writers that I'm not familiar with
23 their names but who've contributed various content.
24    Q.  And that's a list that Stelor has in its
25 files?

170

1    A.  Yes, I believe so.
2    Q.  Now do I understand that Stelor has these
3 writers work on a -- what's known as a work for hire
4 principal where the copyrights of their work will be
5 owned by Stelor?
6    A.  Yes.
7    Q.  And that would be the same with the music?
8    A.  Yes.
9        Well, your -- please repeat your question so
10 I can answer.
11    Q.  Is it the same with the music that the
12 artists are -- have a work for hire relationship?  You
13 know what I mean by that?
14    A.  Yes, I do.
15    Q.  Because you said you've spent $40,000 in
16 legal fees, you know, the other people in the room
17 here that do this kind of thing would assume that that
18 has to do with the work for hire agreement --
19    A.  Yes, that's correct.
20    Q.  -- which allows Stelor to own the copyrights
21 notwithstanding the fact that a different artist was
22 the author of that particular --
23    A.  Yes.
24    Q.  -- work?
25        MR. RUBINSTEIN:  Steve, if you could let Mr.

171

1 Hartmann finish his question before you respond.
2        THE WITNESS:  Right.
3        MR. RUBINSTEIN:  Thank you.
4 BY MR. HARTMANN:
5    Q.  But for both the music and the story lines
6 we have creative people who are working with Stelor
7 being compensated and it's a work for hire
8 relationship where Stelor will own the copyrights for
9 those works.  That's your understanding?
10    A.  Yes.
11    Q.  What about the art?
12        MR. RUBINSTEIN:  Objection.  Vague and
13 ambiguous.
14 BY MR. HARTMANN:
15    Q.  Expenses.
16        MR. RUBINSTEIN:  Is there a question?
17 BY MR. HARTMANN:
18    Q.  Out of the three or four -- well, let me go
19 back.  Out of the three -- three to four million that
20 we've spent, how much has been spent on the story
21 lines?
22    A.  I'd have to check again the books.
23    Q.  Whatever it is it would all be reflected in
24 the --
25    A.  Yes.

172

1    Q.  -- books and records?
2        How about the art?  What type of art has
3 Stelor obtained in connection with the three to $4
4 million that it's spent as set out in Paragraph 8 of
5 the affidavit?
6    A.  I'm not understanding.  What type of art or
7 what type of expenses?  In other words how much have
8 we paid for the actual --
9    Q.  Well, I first want to know what type of art.
10 When you say art, I need to know what that is.
11    A.  2D, 3D, a variety of graphic art, character
12 development, anything that falls under the category of
13 an artist doing a picture or a drawing of some sort.
14 And, again, I'd have to look at the books but between
15 in-house and outside artists significant dollars.  I
16 just couldn't give you an exact dollar amount.
17    Q.  What -- who are some of the outside artists?
18    A.  I can't think of Ron's last name.  Charles
19 Barnett, Michael Warren, I don't know the young man
20 that works with Michael but there are several outside.
21    Q.  Is there a particular company that Stelor
22 uses or just people?
23    A.  No, individuals.
24    Q.  All right.  Then how many in-house artists
25 are there?

43 (Pages 169 to 172)

173

1   A.  Yes, I'm sorry.  Red Rover Creations is one
2 of the outside houses.  I'm sorry.
3   Q.  That's good.  That's fine.  You can
4 interrupt me for that kind of stuff.  Red Rover.  Is
5 that different than for Charles Barnett --
6   A.  Yes.
7   Q.  -- and Mike Warren?
8       How many artists are there on staff
9 full-time employees at Stelor?
10  A.  Five full-time artists.  Six, I'm sorry.
11  Q.  All right.  Which -- and is there actual
12 tangible graphic work and drawings that Stelor has as
13 a result of spending this money for the artists?
14  A.  Yes.
15  Q.  And do you have an idea of how much money
16 has been spent by Stelor out of the $3 million set out
17 in your affidavit in Paragraph 8 on art?
18  A.  I'd have to look at the books.
19  Q.  Okay.  Which leads us to overhead.  What is
20 the overhead for Stelor?  Say -- say, per month.
21  A.  It's been growing so rapidly over the last
22 four months because we've been staffing up and -- I
23 would say somewhere between 50 and a hundred thousand
24 dollars a month at this point.  That would be the burn
25 rate, overhead, outside sources, somewhere in there.

174

1 Again, I'd have to check my ledger.
2   Q.  Well, you're including outside sources that
3 we already discussed in the overhead?
4   A.  Outside consultants, contracts of that type,
5 yes, that -- that would all be my overhead.
6   Q.  All right.  But aside from your outside or
7 outsourced consultants that you've told me about
8 before in connection with story line, music and art,
9 what -- what other overhead does Stelor have?  Does
10 Stelor -- let me break it down.  Does Stelor pay rent
11 to you to locate its offices at your house?
12  A.  Yes.
13  Q.  How much rent a month?
14  A.  Approximately $4,000.
15  Q.  All right.  And of course you receive a
16 salary?
17  A.  Yes.
18  Q.  And how much is that?
19  A.  $18,000.
20  Q.  A month?
21  A.  Yes.
22  Q.  All right.  Anyone in your family receive a
23 salary?
24  A.  No.
25  Q.  Are there any other significant overhead

175

1 items besides the ones you've told me about so far?
2   A.  Mainly salaries and -- and kind of just
3 general operations costs.
4   Q.  All right.  In Paragraph 9 of your affidavit
5 that we've marked as Exhibit 5.  Well, let -- let me
6 go up to Paragraph 8.  You talk about the employees
7 have devoted themselves to making Stelor and the
8 Googles successful and profitable.  Do you see where I
9 am?
10  A.  Yes.
11  Q.  Is Stelor profitable?
12  A.  No.
13  Q.  Has it ever made a profit since it started
14 in the middle of 2002?
15  A.  No.
16  Q.  Has Stelor ever paid any royalty money to
17 Mr. Silvers?
18  A.  No.
19  Q.  Does Stelor owe any royalties to Mr. Silvers
20 as we sit here today to your knowledge?
21  A.  Not to my knowledge.
22  Q.  All right.  In Paragraph 9, toward the --
23 the last part of it, you say that Silvers commenced a
24 campaign to inject and entwine himself in the very
25 fabric of Stelor's business.  Do you see that

176

1 sentence?
2   A.  Yes.
3   Q.  Now this morning we discussed the contention
4 that Silvers has, you know, interfered with Stelor.
5 Is there anything in addition to what you told me this
6 morning by which Mr. Silvers has injected and entwined
7 himself into the very fabric of Stelor's business?
8   A.  No, I think I covered it all this morning.
9   Q.  And what is the fabric of Stelor's business?
10  A.  Commercializing Googles and the Planet of
11 Goo.
12  Q.  The way we talked about it this morning?
13  A.  Yes.
14  Q.  And in fact the major way that you've
15 commercialized it from 2002 to the present is really
16 through the website, is it not?
17  A.  Yes.
18  Q.  You don't have any manufactured products,
19 correct?
20  A.  Correct.
21  Q.  We're not selling anything?
22  A.  Correct.
23  Q.  The website is pretty much the commercial
24 activity of the company at this point, correct?
25  A.  The website and now our presence on i-Tunes,

44 (Pages 173 to 176)

177

1  correct.
2      Q.  Now you mentioned before that Mr. Silvers
3  is the owner of the Googles IP as we call it, right?
4      A.  Yes.
5      Q.  And you understand that -- that as the owner
6  of the Googles IP, Mr. Silvers has a duty to maintain
7  the quality control of how Stelor uses that IP?
8      A.  Yes, it's his contractual right.
9      Q.  And you understand what that is to maintain
10 quality control?
11     A.  Yes.
12     Q.  What is your understanding of that?
13     A.  May I refer to the --
14     Q.  Sure.
15         THE VIDEOGRAPHER:  Excuse me.  We've got
16 five minutes left on the tape.
17 BY MR. HARTMANN:
18     Q.  Okay.
19     A.  Thank you very much.
20         In the license agreement under five,
21 Notices, Quality Control and Samples, Paragraph C, it
22 says:  Prior to the commencement of manufacture and
23 sale of licensed products, Stelor shall submit to
24 Silvers for his input, at no cost to Silvers, a
25 reasonable number of samples of all licensed products

178

1  which Stelor intends to manufacture and sell and of
2  all promotional and advertising material associated
3  therewith.
4      Q.  I appreciate that, but I'm asking you what
5  your understanding is of what quality control is.
6      A.  I'm sorry.  You did.
7          My understanding of quality control is that
8  Stelor insures and protects in the context of the
9  intellectual property any product that comes from
10 Stelor, the quality that the artistic integrity is
11 maintained, the flavor, if you will, and integrity of
12 the character is maintained so that everything is
13 consistent with the intellectual property that we
14 receive from Mr. Silvers.
15     Q.  And that's a -- that's a duty that Stelor as
16 the licensee has to the owner of the trademark to
17 maintain it?
18     A.  Yes.
19     Q.  And the -- you agree that the owner has the
20 ability to monitor what the licensee is doing in order
21 to insure standards of quality control?
22     A.  Yes.
23     Q.  All right.  Let's go back to Exhibit 3
24 which you should have in front of you there.  This is
25 again your Emergency Motion for Preliminary

179

1  Injunction.
2      A.  Yes.
3      Q.  And I want to ask you about the specific
4  things that you're asking the court to do, okay?
5      A.  Yes.
6      Q.  If you want -- I mean -- I could use the
7  rest room so maybe take a two minute -- well, you got
8  to take a break anyway, right?
9          THE VIDEOGRAPHER:  Yes.
10         MR. HARTMANN:  All right.  Let's just take a
11 short break and when we come back, I'll ask you
12 these questions.
13         THE VIDEOGRAPHER:  This is the end of Tape
14 Number 4 of the videotaped deposition.  The time
15 is 2:33.
16         (There was a break taken after which the
17 following proceedings were held:)
18         THE VIDEOGRAPHER:  We're now on back on the
19 video record.  This is Tape Number 5.  The time
20 is 2:46 p.m.
21 BY MR. HARTMANN:
22     Q.  All right.  I had asked you to look at
23 Exhibit 3 before the break.  That's our -- the Stelor
24 Emergency Motion for Preliminary Injunction.  And I
25 want to refer you to Part A on Page 2 which is where

180

1  the -- the matters in which you are asking the court
2  to compel performance by Mr. Silvers on various
3  matters and they're set forth here in A, B, C, et
4  cetera.  We're going to run through those, but right
5  before we do that, do you see right above that it says
6  also order the defendant to specifically perform his
7  contractual obligations.  Above A on Page 2.
8      A.  Yes.
9      Q.  All right.  So I just want to make sure
10 we're clear on this.  You're not asking the judge to
11 prevent Silvers from doing something that's unrelated
12 to the contract.  Your specific request with the court
13 is make him do what you say he should do under the
14 contract, right?
15     A.  No.
16     Q.  Okay.  Because it says here order the
17 defendant to specifically perform his contractual
18 obligations as follows.  So I read that as suggesting
19 that it's your position, for example, in A that the
20 contract obligation of Silvers is to perform A.
21 That's how I read that.  Do you agree?
22     A.  No.
23     Q.  So you would agree then that Silvers is not
24 required to order -- wait.  Is not required to
25 instruct the United States Patent and Trademark Office

45 (Pages 177 to 180)

181

1 to send all communications regarding the Googles
2 trademark to Stelor's appointed counsel. That's not
3 required by the contract or it is?
4        MR. RUBINSTEIN: Objection. Calls for a
5    legal conclusion.
6 BY MR. HARTMANN:
7    Q. You can answer.
8    A. No, I expect Mr. Silvers to adhere to his
9 contract. That is my expectation.
10    Q. That's my point. The reason you filed this
11 lawsuit is that you think Mr. Silvers is not adhering
12 to his contractual obligations, correct?
13    A. Yes.
14    Q. And you filed the lawsuit and you're asking
15 the judge make Silvers comply with the contract?
16    A. Yes.
17        MR. RUBINSTEIN: Objection.
18 BY MR. HARTMANN:
19    Q. That's what this is all about, right?
20    A. Yes.
21    Q. Okay. So these -- just so I don't have to
22 waste a lot of time. When we go through this A, B, C,
23 it's your understanding that Silvers is required by
24 the contract to, for example, in A, instruct the
25 United States Patent and Trademark Office as set forth

182

1 in Part A?
2    A. Yes.
3    Q. Okay. Now, I've looked at the contract. I
4 don't see anything that expressly says that Mr.
5 Silvers is required to instruct the United States
6 Patent and Trademark Office to send all communications
7 to Mr. Hefter as you've asked in Part A. So I need
8 your help in finding the contract provision which
9 would allow the court to instruct Mr. Silvers along
10 those lines.
11        MR. RUBINSTEIN: And I'm going to object to
12    the extent that it calls for Mr. Esrig's legal
13    conclusions from the contract.
14        But you may answer to the best of your
15    ability.
16        THE WITNESS: What was the question?
17 BY MR. HARTMANN:
18    Q. Where in the contract does it say that Mr.
19 Silvers is required to instruct the United States
20 Patent Office and Trademark Office to send all
21 communications regarding the Googles trademarks to
22 Stelor's duly appointed counsel?
23    A. It is my understanding that both the
24 consulting agreement as well as the License,
25 Distribution, and Manufacturing Agreement specify that

183

1 not only would Mr. Silvers cooperate in every way
2 necessary and desirable to strengthen, establish or
3 maintain intellectual -- the intellectual property
4 rights granted to us but that he won't interfere and
5 by definition I believe that by Mr. Silvers diverting
6 communications from the trademark office to himself it
7 poses the potential risk of Stelor not being able to
8 manage or Stelor's counsel being able to effectively
9 manage its trademark program. And so to that end I've
10 asked the judge to make Mr. Silvers adhere to the
11 language in the contract.
12    Q. And what language is that? That's my
13 question. Where is it in the contract that the judge
14 is going to look to find the authority to instruct Mr.
15 Silvers -- to order Mr. Silvers to instruct the USPTO?
16 That's what I'm trying to find out.
17    A. Well, as a layman I think you would find it
18 under duties of consulting in the letter and in the
19 license agreement I think you would find that under --
20 under intellectual property protection in terms of the
21 rights that Mr. Silvers has granted to Stelor and so I
22 think again as a layman that it would be quite obvious
23 to any court that if Mr. Silvers has contractually
24 agreed, promised, warranted that he will maintain,
25 help, defend all of the IP that by definition it means

184

1 he won't interfere with Stelor's ability to manage the
2 IP in an appropriate manner.
3    Q. That assumes of course that unless --
4 that -- that by not having Stelor's lawyer be the
5 correspondent with the trademark office that that is
6 somehow an interference which obviously the court will
7 decide and we're not asking you to decide the things
8 the judge is going to decide. What I'm trying to do
9 is find out what the judge is going to consider so
10 your -- just to summarize your testimony is Paragraph
11 8, Intellectual Property Protection, somewhere in
12 there is the basis for instructing Mr. Silvers to
13 contact the USPTO and have your lawyer as the
14 correspondent, that's the source of that request?
15    A. Um --
16    Q. As I -- yes?
17    A. May I answer as a layman?
18    Q. Yes.
19    A. Which I am. I will also argue that in
20 Section 11, Infringements, that we have the sole
21 right, in its discretion and at our expense, to take
22 any and all actions against third persons to protect
23 the IP rights. And in this case it is my opinion that
24 we are trying to protect Mr. Silvers from himself.
25    Q. Well, we're -- we're going to get to the

46 (Pages 181 to 184)

185

```
 1  actions that Stelor and other people have filed in the
 2  PTO but I'm really asking you now about your request
 3  to have the court instruct Mr. Silvers to advise the
 4  PTO to send all communications to your lawyer.
 5      A.  I stand by my answer.  I think that both of
 6  those speak for themselves.  What Stelor is doing
 7  through counsel is protecting the IP rights,
 8  protecting the IP itself, protecting the program that
 9  we've set in place and spent millions of dollars for
10  to commercialize the property and to that end we are
11  moving forward with that protection.
12      Q.  And how is -- how is having Mr. Silvers
13  listed as the correspondent how does that prevent
14  Stelor from doing whatever it needs to do?
15      A.  Again, I think it speaks to Mr. Silvers
16  inserting himself in the -- in the process.  I guess
17  by way of example if Mr. Silvers -- because he -- he
18  removed.  He took off the attorney's name and put
19  himself.  If we got notice of a defect or a problem or
20  an opposition or any kind of issue and for some reason
21  we didn't find out about it because Mr. Silvers didn't
22  adequately serve notice to us, by definition we would
23  be exposing the property to action and by definition
24  we would not be appropriately protecting the rights of
25  the IP and so -- and I base that example on Mr.
```

186

```
 1  Silvers' track record in -- in his however many years
 2  it's been interfering with our ability to bring the
 3  thing to market, but --
 4      Q.  Can you tell me one way in which Mr. -- when
 5  did Mr. Silvers change the name of the correspondent
 6  to the Googles trademark?
 7      A.  I'm not sure when he did that.
 8      Q.  Can you tell me any way that that has
 9  prevented Stelor from bringing any product to market?
10  Name one product and tell me how his changing the name
11  of the correspondent in that trademark file has in any
12  way effected Stelor's ability to bring a product to
13  market?  First let's do all the products.
14      A.  I am unqualified to give you a legal
15  opinion.
16      Q.  I'm not asking for a legal opinion.
17      A.  You are.
18      Q.  You're the president and CEO of Stelor.
19      A.  Yes.
20      Q.  You just told me that what he does is
21  preventing you from coming to market.  By the way
22  that's fine to tell your board of directors when you
23  want a scapegoat but we're going into court and I want
24  to know --
25      MR. RUBINSTEIN:  Objection.  Argumentative.
```

187

```
 1  BY MR. HARTMANN:
 2      Q.  I want to know what he did that's causing
 3  Stelor problems so how -- when he changed the name on
 4  the correspondent file to Steven Silvers, what
 5  products did that keep Stelor from bringing to market?
 6  List them all.
 7      A.  Just another example in the string of
 8  interference that Mr. Silvers and intentional
 9  insertion to prevent us from getting to market.
10      Q.  You want to read the question back or do you
11  just want to say zero and we can move on to the next
12  question?
13      MR. RUBINSTEIN:  Objection.  Argumentative.
14      MR. HARTMANN:  Read the question back.
15      It's going to go a lot quicker if you answer
16  them.
17      THE WITNESS:  It'll go as quick as it goes
18  if you ask me a question that's answerable.
19      THE COURT REPORTER:  (Reading)  I want to
20  know what he did that's causing Stelor problems
21  when he changed the name on the correspondent
22  file to Steven Silvers, what products did that
23  keep Stelor from bringing to market?  List them
24  all.
25      MR. RUBINSTEIN:  Object to that question.
```

188

```
 1  It calls for facts not in evidence and lacks
 2  foundation.
 3      MR. HARTMANN:  Well, I agree there's no
 4  facts in evidence but we're trying to discover
 5  what facts could be put into evidence to support
 6  the relief that's requested in this emergency
 7  motion.
 8      MR. RUBINSTEIN:  And the question assumes
 9  the answer.
10  BY MR. HARTMANN:
11      Q.  Are there any products, sir, that Stelor has
12  been unable to bring to market because Mr. Silvers has
13  changed the name of the correspondent name with the
14  Patent and Trademark Office to him?
15      A.  Yes.
16      Q.  Okay.  What --
17      A.  Potentially every product that Stelor would
18  like to bring to market is threatened by the
19  continuation of Mr. Silvers' interference with our
20  ability to run our company.  Every product.
21      Q.  I appreciate the threat and stuff.  What I
22  want to know is is there any particular product --
23  forget the threats -- that have actually not been
24  brought to market because of Mr. Silvers changing the
25  name with the trademark office?
```

47 (Pages 185 to 188)

189

```
 1   A.  I have to stay with my answer.  Every single
 2   product that Stelor is in the process of creating is
 3   threatened if Stelor is unable to do its business and
 4   as I cited in my example earlier, is unable to receive
 5   correspondence through the appropriate IP counsel so
 6   that if there is in fact a defect or problem with any
 7   of those trademarks and we do not find out about it
 8   and given that Stelor has no confidence in Mr.
 9   Silvers' ability to adhere, we have asked the court to
10   both interpret and enforce our understanding of
11   protecting the intellectual property.
12   Q.  So all this would be cured if Stelor had
13   knowledge of whatever the trademark owner would
14   typically know from the trademark office, right?
15       MR. RUBINSTEIN:  Calls for speculation.  You
16   may answer.
17       THE WITNESS:  If I understand your question
18   and I appreciate you boiling it down, all of this
19   would be cured if Mr. Silvers would adhere to the
20   contracts that he entered into with Stelor
21   Productions.
22   BY MR. HARTMANN:
23   Q.  See, I don't think that's boiling it down.
24   Let me try to boil it down to this particular issue
25   that's in Part A of your emergency motion.  And that
```

190

```
 1   is what's -- what's really at work here is Stelor
 2   wants to know what's happening with those trademark
 3   registrations, correct?
 4   A.  That is Stelor's right under the contract.
 5   Q.  You're entitled to your interpretation of
 6   the contract, as I said, but I need -- let's try to
 7   listen to the question.
 8       What's -- what the concern here is on
 9   Stelor's part is knowing what activity is taking place
10   in the trademark office with respect to the particular
11   trademarks, correct?
12   A.  Yes.
13   Q.  That's why you want Mr. Hefter to be the
14   corespondent, correct?
15   A.  Yes.
16   Q.  Okay.  Now, wouldn't that all be cured if --
17   if Mr. Silvers just sent copies of anything he got
18   from the trademark office to your lawyer?
19   A.  I couldn't speculate.
20   Q.  You don't think that would cure it?
21   A.  I couldn't speculate that Mr. Silvers would
22   do anything.
23   Q.  No, I'm asking you to assume that Mr.
24   Silvers would send copies of anything he got from the
25   trademark office to Mr. Hefter, wouldn't that cure the
```

191

```
 1   whole problem?
 2       MR. RUBINSTEIN:  Objection.  Vague and
 3   ambiguous as to what you mean by the whole
 4   problem.
 5   BY MR. HARTMANN:
 6   Q.  You can answer.
 7   A.  I would answer it the same way.  I can't
 8   speculate.
 9   Q.  You don't want to speculate, okay.
10       What -- what information by the way in Part
11   A.  What -- are you aware of any communications that
12   relate to the Googles trademarks that have not been
13   made available to Mr. Hefter?
14   A.  I'm unaware of anything in regard to what
15   communications have or have not been made available.
16   Q.  So you're not aware of any correspondence
17   from the Patent and Trademark Office to Mr. Silvers
18   that -- that you have not been provided?
19   A.  How would I be aware of something that which
20   we haven't been receiving?
21   Q.  Well, sure.  You can say I know there's a
22   letter out there but I haven't been given it.
23   A.  But how would I know that the letter is not
24   there if the correspondence isn't going to counsel or
25   us.
```

192

```
 1   Q.  So you filed this lawsuit asking the judge
 2   to make Steven Silvers switch correspondence even
 3   though you're unaware of with any information that
 4   your lawyers have been denied.
 5   A.  I --
 6       MR. RUBINSTEIN:  Objection.  Argumentative.
 7       THE WITNESS:  I'm sorry.  I filed this
 8   lawsuit to make Mr. Silvers adhere to the
 9   contract he entered into with Stelor Productions.
10   BY MR. HARTMANN:
11   Q.  You know that's a nice refrain.  I know
12   that's your interpretation.  The judge is going to
13   interpret the contract to see if you're right but this
14   is the particular issue that the judge is going to be
15   discussing so we've already talked about the contract
16   that relates to this.  And what I'm just trying to
17   understand is what basis you have to think that Mr.
18   Hefter doesn't have all the information he needs with
19   respect to the Googles trademark?
20   A.  Oh, you've just added something.  I can help
21   you with that answer.  The basis would be the track
22   record to date and the performance of Mr. Silvers
23   relative to the contract.  My basis for believing that
24   Mr. Silvers would not provide us the copies that
25   you're speaking of is strictly based on from day one
```

48 (Pages 189 to 192)

193

1 the lies and deceit that Mr. Silvers practices in his
2 day-to-day business activities all of which, many of
3 which are documented in his e-mails, some of which
4 I've mentioned earlier. I have no reason to as the
5 CEO and president of Stelor Productions given Mr.
6 Silvers' track record with Stelor, not his prison
7 record or his past, just his track record dealing with
8 Steve Esrig. I have absolutely no confidence, zero,
9 in Mr. Silvers' ability to practice anything in
10 integrity and so I'm looking to the court to make that
11 determination.
12    Q.   So the reason you filed this lawsuit in
13 Federal court was because you're afraid in -- in
14 general -- for general principals based on things that
15 have happened years ago that Mr. Silvers won't comply
16 with the agreement?
17    A.   No.
18        MR. RUBINSTEIN: Objection. Misstates prior
19 testimony.
20        THE WITNESS: No, I filed this lawsuit
21 because Mr. Silvers --
22        MR. HARTMANN: Okay. I just want to --
23        THE WITNESS: -- has breached his contract
24 in several areas.
25

194

1 BY MR. HARTMANN:
2    Q.   I think we've been through all of that.
3    A.   Thank you.
4    Q.   And we'll let the court decide that and
5 that's really the larger case, but this specific issue
6 is going to be heard by the judge at a hearing and we
7 need to have the evidence that would relate to why
8 Stelor needs to have their lawyer as the correspondent
9 of record with the PTO. That's what I really want to
10 focus on not, you know, I'm afraid he's going to
11 breach the contract because of other things he's done.
12 I want to know in particular is there any issue that
13 you're aware of where Mr. Hefter hasn't gotten all the
14 information he needs from the Patent and Trademark
15 Office regarding the Googles trademarks?
16    A.   As I said earlier, I can only rely on my
17 experience with Mr. Silvers and, again --
18    Q.   I guess --
19    A.   -- in all due respect --
20    Q.   I'll have to depose Mr. Hefter then.
21    A.   Absolutely.
22`   Q.   So we'll have to talk to him about being
23 deposed since you don't have any knowledge that
24 relates to this. As I'm hearing. I haven't heard one
25 fact.

195

1    A.   I've answered your questions to the best of
2 my ability, counselor.
3    Q.   Okay.
4        MR. RUBINSTEIN: You may want to try asking
5 him why Stelor needs Mr. Hefter to receive
6 correspondence from the trademark office.
7 BY MR. HARTMANN:
8    Q.   I've asked him that six different ways.
9        Now are you aware that a lot of the
10 trademark office communications are a matter of public
11 record?
12    A.   Yes.
13    Q.   And in fact your lawyers can go on-line and
14 get that?
15    A.   As can Mr. Silvers.
16    Q.   That's right.
17        And so there really would be no need, would
18 there, for your lawyers to be the correspondent of
19 record with the Patent and Trademark Office if they
20 can access all that information on-line?
21    A.   No, I disagree. I think there is a
22 need that --
23    Q.   Why is that?
24    A.   Because I have a contract too between myself
25 and Mr. Silvers in which Stelor has the sole right, it

196

1 doesn't say Stelor has some rights, it says sole and
2 my understanding of that term sole means -- and by the
3 way it says sole exclus -- it says absolutely
4 exclusive even to Mr. Silvers it says that we have
5 those rights and not that Mr. Silvers has those
6 rights. The way I read the language when it says that
7 Stelor has the sole right exclusive even to the
8 licensor, no, I don't think that it is incumbent upon
9 Stelor or Stelor's counsel so that Stelor can incur
10 additional legal fees for them to go on-line to start
11 tracking down correspondence that should be mailed or
12 sent or e-mailed or however it's done as a matter of
13 appropriate business course.
14    Q.   The sole rights that Stelor has are simply
15 to use the IP, correct?
16    A.   Not correct. I would -- I would beg to
17 differ.
18    Q.   Who owns the IP?
19    A.   Mr. Silvers is the intellectual property
20 owner. Mr. Silvers entered into a contract to which
21 Silvers -- to which Stelor not only paid considerable
22 and is going to pay considerable consideration, but
23 I -- would disagree with you in that when Mr.
24 Silvers granted Stelor Productions the sole right
25 exclusive even to himself that I think I'm going to

49 (Pages 193 to 196)

197

1 depend on the judge's interpretation of that language
2 such that Mr. Silvers has no right to interfere, take
3 our law firm's name off the USPTO or in any way
4 interfere with Stelor's business to effectively
5 commercialize and bring the Googles from Goo to
6 market.
7    Q.   Yeah, I'm just trying to understand how that
8 interferes with Stelor's business.
9    A.   I've explained it to the best of my
10 abilities.
11   Q.   You have.  I appreciate that.
12       The -- have -- have you ever asked Mr.
13 Silvers if he would provide copies of communications
14 from the PTO?
15   A.   No.
16   Q.   Do you know who customarily is the
17 correspondent at the USPTO with respect to a
18 trademark?
19   A.   In my experience it usually is the trademark
20 or the IP counsel.
21   Q.   Right.  And it's a counsel of whom?  The
22 owner or the licensee?
23   A.   Traditionally my understanding is unless the
24 owner has granted those rights and, again, has granted
25 those sole rights exclusive even to him or herself,

198

1 traditionally it would be the owner, but in this case
2 based on the contract language it is abundantly clear
3 that those rights belong to the licensee, Stelor
4 Productions.
5    Q.   But you can't point me to any contract
6 language that says Silvers shall instruct the USPTO to
7 name Stelor's lawyer as the correspondent, correct?
8        MR. RUBINSTEIN:  Argumentative.
9        THE WITNESS:  What's the question?
10 BY MR. HARTMANN:
11   Q.   You can't point me to any language in that
12 contract, Exhibit 1, in which Silvers is obligated to
13 appoint Stelor's lawyer as the correspondent with the
14 USPTO?
15   A.   I've referred you to two sections of the
16 contract that I think in fact make that point.
17   Q.   I just want to make sure that we're on the
18 same page.
19       Now, the lawyer that was -- was listed as
20 the correspondent -- by the way your affidavit says it
21 was two months ago that -- it's at the Paragraph 11 I
22 think.  Paragraph 11 of your affidavit, Exhibit 5.
23       MR. RUBINSTEIN:  Was there a question?
24 BY MR. HARTMANN:
25   Q.   I'm just referring him to that before I ask

199

1 the question.
2       Within the past two months.  You had
3 previously said you weren't sure.  Does that refresh
4 your recollection --
5    A.   Yes.
6    Q.   -- that you swore in this affidavit?
7    A.   Yes.
8    Q.   It was within the last two months of October
9 21st, 2004 that Silvers unilaterally without
10 authorization from Stelor instructed the USPTO to send
11 all correspondence for each of the Googles
12 applications and registrations to Steven Silvers.  See
13 that?
14   A.   Yes.
15   Q.   Instead of duelers (sic) -- Stelor's duly
16 appointed attorneys.  At the bottom of Paragraph 11.
17   A.   Yes.
18   Q.   All right.  Who -- two months ago who were
19 Stelor's duly appointed attorneys?
20   A.   As of the date of this.
21   Q.   Two months ago from October.
22   A.   I'm sorry.  The question is?
23   Q.   Well, the affidavit is dated October and
24 you're saying --
25   A.   So within the past two months that would

200

1 mean September and August and during that time that
2 would be Finnegan, Henderson, Farabow, Garrett and
3 Dunner and/or Cowan, Liebowitz and Latman.
4    Q.   All right.
5    A.   But relative to that question I believe
6 Finnegan and Henderson.
7    Q.   But in any event it certainly was not Ira
8 Edell, correct?
9    A.   Correct.
10   Q.   He was long gone?
11   A.   Correct.
12   Q.   He had been fired.  No, I think you said he
13 withdrew.
14   A.   Yes.
15   Q.   And the reason he withdrew is that he didn't
16 want to work with Steven Silvers as you told us?
17   A.   Yes.
18   Q.   Now, if Ira Edell was listed as the
19 correspondent of record at the time Mr. Silvers
20 changed the name, wouldn't that have been the best
21 step to take to protect that trademark registration?
22       MR. RUBINSTEIN:  Objection.  Calls for a
23 legal conclusion.  You can answer if you know the
24 answer.
25       THE WITNESS:  I do know the answer to this.

50 (Pages 197 to 200)

201

1     MR. RUBINSTEIN: Please answer.
2     THE WITNESS: Excellent question. I raised
3  that question -- I raised that question both to
4  counsel and I called the trademark office and I
5  said why is Mr. Edell's name still on the
6  application. And I was told by the trademark
7  office that it takes them sometimes upwards of
8  six months to a year before their records are
9  updated to reflect the changes. And I said,
10  well, I was concerned vis-a-vis my counsel
11  receiving appropriate notice. And they said your
12  counsel has already taken care of having notice
13  sent but that on the record that you are --
14  quoting to me -- that in fact that -- that
15  usually does not happen overnight.
16 BY MR. HARTMANN:
17    Q.  All right. So you would agree that at the
18 time Mr. Silvers switched this registration from Mr.
19 -- well, let's go ahead and mark this.
20    What is this, six?
21    (The document was marked as Exhibit No. 6
22 for identification.)
23 BY MR. HARTMANN:
24    Q.  I'm marking as Exhibit 6 just a printout
25 from the USPTO which reflects that for the Googles

202

1 mark the correspondent is Ira E. -- Ira C. Edell of
2 Edell, Shapiro and Finnan, a Rockville, Maryland law
3 firm. And as of two months ago October Mr. Edell was
4 definitely not the attorney for either the licensee or
5 the trademark owner, correct?
6    A.  Correct.
7    Q.  Now you mentioned that your lawyers, I take
8 it it's Mr. Hefter, had contacted them at the PTO to
9 get the correspondents changed and you said that
10 those -- that -- that information had already been
11 provided to the USPTO?
12    A.  Yes. Mr. Hefter informed me that Finnegan,
13 Henderson had filed the appropriate paperwork or
14 information necessary to update the contact
15 information and he did that at the time that he came
16 in and took over for Mr. Edell which again, I don't
17 remember if it was a year ago, I just don't recall the
18 date, and then further to that I personally called the
19 office because when we were doing -- we have an
20 employee who monitors trademark and domains. When we
21 saw Mr. Edell's name still, we were concerned and
22 thought maybe it hadn't been attended to and called up
23 the trademark office and was told, no, that it's a
24 matter of course that they don't update -- it doesn't
25 happen overnight, but in fact it happens sometimes

203

1 within six to twelve months, but they had assured me
2 that correspondence at that time prior to Mr. Silvers
3 taking us off was going to Finnegan, Henderson.
4    Q.  If that's the case, sir, why do you have to
5 file a lawsuit in Federal court in order to have the
6 court instruct Mr. Silvers to send out communications
7 to Mr. Hefter if he was already getting it?
8    MR. RUBINSTEIN: Objection. Vague and
9 ambiguous. Argumentative. Answer if you can.
10    THE WITNESS: Because Mr. Silvers went in
11 and took Mr. Hefter off of the case and diverted
12 correspondence to him and I filed that lawsuit to
13 have the court have Mr. Silvers conform and
14 adhere to his contractual obligations --
15 BY MR. HARTMANN:
16    Q.  Right. What is --
17    A.  -- to Stelor Productions.
18    Q.  What is your understanding based on that at
19 the time Mr. Silvers had himself placed as the
20 correspondent that Mr. Hefter was listed at the PTO as
21 the correspondent? What is your basis for that?
22    A.  My basis was Mr. Hefter telling me on
23 several occasions that they had in fact in every way
24 that Ira Edell was listed taken the necessary steps, I
25 don't know what the language is, I don't know if it's

204

1 called substituting them out or replacing them but he
2 in layman's terms said that they had in fact taken
3 care of updating and notifying the PTO and that --
4 again as I confirmed on the phone with them that it
5 took time to do so.
6    Q.  Was Mr. Silvers ever apprised of the fact
7 that Mr. Edell had been fired and that Mr. Hefter was
8 filing replacements for him?
9    A.  First, Mr. Hefter was the counsel after Mr.
10 Edell withdrew. He was not fired.
11    Q.  I'm sorry, withdrew, in your terms.
12    A.  Secondly --
13    Q.  The question was was Mr. Silver -- Silvers
14 advised?
15    A.  Yes, Mr. Silvers was advised and in writing
16 on several occasions was very excited and in
17 conversations was very excited that, quote, Stelor
18 Productions had retained the services of the number
19 one on the planet IP litigation firm, end quote.
20    Q.  All right. But my question is did Mr.
21 Silvers advise that Mr. Hefter was going to file
22 replacements with the trademark office to serve as
23 correspondent in place of Mr. Edell?
24    A.  Yes.
25    Q.  When?

51 (Pages 201 to 204)

205

1    A.    By both Stelor as well as by Mr. Hefter.
2    Q.    When was that?
3    A.    That was -- at least one time that I'm aware
4 of at the meeting with Hefter, Borchard, Silvers,
5 Stumpf, Esrig, DiMuccio and the other attorneys that
6 I'm not aware of from the New York law firm.
7    Q.    Okay. And that's roughly, when, July of
8 2004?
9    A.    That was in I think June of 2004.
10    Q.    That was my next question then. Have your
11 counsel -- has Stelor's counsel requested that the PTO
12 list them as a correspondent on the Googles IP
13 trademarks?
14    A.    Yes, I believe so.
15    Q.    And what -- how did the PTO respond?
16    A.    I'm unaware of how they responded to counsel
17 having not been in the conversation between counsel
18 and the USPTO.
19    Q.    But as we sit here today you can't tell me
20 any specific information that Stelor has failed to
21 receive from the PTO that has had any effect on your
22 business, any specific information?
23    A.    Yes.
24    Q.    You can tell me?
25    A.    You said I cannot.

206

1    Q.    You cannot. You agree with that?
2    A.    Did you say you cannot or you can?
3    Q.    Cannot.
4    A.    I cannot tell you that which I'm unaware of.
5    Q.    Okay. And would all this -- all this
6 Federal lawsuit stuff about having Mr. Hefter placed
7 as the correspondent with the PTO, would that all be
8 mitigated if -- if Steven Silvers simply said I'll
9 send you copies of whatever I get or whatever I send
10 in?
11        MR. RUBINSTEIN: Objection. Vague and
12    ambiguous.
13 BY MR. HARTMANN:
14    Q.    Wouldn't that keep your lawyer advised as
15 to all PTO actions?
16    A.    I don't know, would it? How would I know
17 that? I just know that we have a contract and a
18 license that affords us the ability to manage and
19 protect the IP and we view this as well as counsel as
20 a weakening of our ability to do both of those things.
21    Q.    But the answer is you don't know whether
22 Steven Silvers sending copies to Mr. Hefter would be
23 sufficient to keep Mr. Hefter informed about anything
24 happening with those trademarks?
25    A.    Based on Mr. Silvers' track record we do not

207

1 have that confidence.
2    Q.    I'm asking you if you have the confidence.
3 I'm asking you from an informational standpoint
4 whether that would be sufficient. You don't know?
5    A.    No, I am answering it that I believe that
6 Mr. Silvers' insertion into the trademark office or
7 any place else that diminishes or weakens our ability
8 to protect our investment and the property is not
9 allowable and we are looking to the court to determine
10 whether or not we are in our right.
11    Q.    Okay. Let's talk about Part B. I'm -- I'm
12 really kind of interested in knowing what you did to
13 determine whether you were in your right before you
14 filed the lawsuit because that may have serious
15 repercussions for your company down the road, but I
16 guess -- let me ask you about Part B on Page 2 of
17 Exhibit 3 where you are asking the court to order Mr.
18 Silvers to cease and desist from communicating with
19 the USPTO regarding the Googles trademarks. Do you
20 see that part?
21    A.    Yes.
22    Q.    And the Googles trademarks are the ones that
23 are owned by Mr. Silvers, correct?
24    A.    Yes.
25    Q.    And you're asking the court to basically put

208

1 a gag on Mr. Silvers about communicating with the
2 USPTO? Is that how I understand that?
3        MR. RUBINSTEIN: Objection. The document
4    speaks for itself.
5 BY MR. HARTMANN:
6    Q.    Is that what you want the judge to do?
7    A.    I agree the document does speak for itself.
8 We want Mr. Silvers to cease and desist from
9 communicating with the trademark office regarding the
10 Googles trademark.
11    Q.    Okay. Show me in the contract where Mr. --
12 Mr. Silvers is prohibited from communicating with the
13 trademark office regarding his own trademarks.
14        MR. RUBINSTEIN: Calls for a legal
15    conclusion. You can answer if you can show him.
16        THE WITNESS: I stand by my earlier answer
17    about intellectual property protection in Section
18    A in Infringements in Section 11. In Paragraph
19    3, Section A, Duties of Consultant in the letter
20    agreement. I believe that -- and, again, I speak
21    as a layman so I'm not entirely certain that
22    there are not additional paragraphs but my
23    understanding of those clauses leads me to
24    believe that Mr. Silvers needs to abide by the
25    terms of the contract and cease and desist from

52 (Pages 205 to 208)

209

1    interfering with the work of Stelor Productions
2  to commercialize the IP.
3 BY MR. HARTMANN:
4    Q.   Are you aware of any communications that Mr.
5 Silvers has had with the USPTO regarding the Googles
6 trademark?
7    A.   I'm aware that Mr. Silvers diverted
8 communications to himself.
9    Q.   Well, we just discussed that as part of A.
10 That's a question of who's the correspondent.  Here
11 you're asking for a gag order on Mr. Silvers so my
12 question is what communications has he made that
13 support having a gag order entered?
14    MR. RUBINSTEIN:  Objection.  Lacks
15 foundation.
16 BY MR. HARTMANN:
17    Q.   There must -- there must be something he's
18 communicated to the Patent and Trademark Office,
19 right?
20    A.   Again, I answer the way I have all day.  We
21 have had a consistent pattern of behavior from Mr.
22 Silvers in regards to our ability to commercialize
23 this product.  And we are finally at the point where
24 we are looking to the court for relief to have Mr.
25 Silvers adhere to the contracts that he entered into

210

1 with Stelor Productions.
2    Q.   Mr. Esrig, do you think the judge is going
3 to listen to stories about trade shows that are three
4 years old and gag Mr. Silvers?
5    MR. RUBINSTEIN:  Argumentative.  Calls for a
6 legal conclusion.
7 BY MR. HARTMANN:
8    Q.   I want to know what particular
9 communications you're aware of to the Patent and
10 Trademark Office.  That's what you're asking the judge
11 to do.  We're not three years ago with the trade
12 shows, okay, we're in the here and now and you've
13 asked a Federal judge and you've sued my client in
14 Federal court to -- who owns trademarks and asked the
15 judge to keep him from communicating with the
16 trademark office regarding his own property.  So I
17 really need to know if you're aware of any
18 communications that he has made to the Patent and
19 Trademark Office about any of these trademarks.  If
20 you don't know of any, you just say you don't know.
21    A.   I'm happy to tell you everything I know,
22 counselor.
23    Q.   All right.
24    A.   And so I will tell you again.
25    Q.   Let's start with communications that he's

211

1 made that gave rise to this.
2    A.   I am looking for the judge to interpret the
3 language and I feel certain that the court will take
4 into account not only three years ago but all of Mr.
5 Silvers' correspondence and behavior up through May
6 when Mr. Silvers and I stopped speaking.  I think the
7 judge and the court will take into account Mr.
8 Silvers' background, Mr. Silvers -- this is not a
9 singular breach -- the many areas that Mr. Silvers has
10 interfered and I am willing to rely on the court's
11 interpretation and I am also happy to continue to
12 answer every and any question you give to me but I can
13 only answer them from my position of knowing that I
14 can only tell you what I know, and I can only answer
15 honestly and so you've had my answer several times
16 through the day but, again, I believe both contracts
17 have language that afford us the ability to have the
18 defendant, Mr. Silvers, cease and desist from
19 communicating with the United States Trademark Office
20 regarding the Googles trademarks.
21    Q.   Well, that was a really nonresponsive
22 answer.  I'm going to make it real easy for you.  Part
23 B of the preliminary injunction request you asked the
24 court to order Silvers to cease and desist from any
25 communications with the Patent and Trademark Office

212

1 regarding his own trademarks.  I've asked you what
2 communications you're aware of that would give rise to
3 any issues relating to his communications with the
4 trademark office and all I hear about is trade shows
5 and the contract which doesn't address this so, here,
6 we're going to mark this as Exhibit 7 and I want you
7 to write down on Exhibit 7 each and every
8 communication to the Patent and Trademark Office that
9 Silvers has made prior to you filing the lawsuit.  And
10 we'll take a break if you want.
11    At least you get a break.
12    MS. MCQUILKIN:  Ken.
13    THE WITNESS:  Would you like me to read my
14 answer?
15 BY MR. HARTMANN:
16    Q.   Your option.
17    A.   Injunction B.  Silvers' communications to
18 the PTO.  As I have answered repeatedly throughout
19 today's deposition, I am looking (Stelor Productions)
20 to the court for relief from Mr. Silvers' continued
21 interference with our ability to maintain and defend
22 as well as commercialize the intellectual property
23 Stelor Productions has invested so heavily in.  To
24 that end Silvers' communications to the PTO is a
25 continued breach of his contractual obligations to

53 (Pages 209 to 212)

213

1 grant Stelor Productions the, quote, sole right even
2 unto himself to act on his behalf and instead of in
3 regard to this intellectual property. Therefore, we
4 contend in our action that Mr. Silvers both cease and
5 desist from communicating with the USPTO regarding the
6 Googles trademarks.
7       MR. RUBINSTEIN:  Madam Court Reporter, did
8    you get all of that?
9 BY MR. HARTMANN:
10    Q.   Yeah, I sure could have saved you a lot of
11 time if I'd known you were going to write all this.
12 This is what we'll do.  Since my question was the
13 specific communications that Silvers has made to the
14 PTO, I'm going to circle this in red and I'll give it
15 back to you with a red pen and I want you to circle
16 the particular communications that I asked you about
17 and if there are none, you should just go and write
18 none.  I can't tell you what to do.
19    A.   Okay.
20       MR. RUBINSTEIN:  Steve, it's up to you if
21    you want to write anything more.  You can -- this
22    is an oral deposition not a written deposition.
23       THE WITNESS:  So that's adequate.
24 BY MR. HARTMANN:
25    Q.   So I've asked you to circle any

214

1 communications in red and let the record reflect that
2 the defendant -- or the witness has declined to do so.
3 I guess that's where we'll have to leave it.
4       MR. RUBINSTEIN:  Can I get a copy of this?
5       MR. HARTMANN:  Yeah, when we're done.
6    Did you mark this?  Could you?
7       (The document was marked as Exhibit No. 7
8    for identification.)
9 BY MR. HARTMANN:
10    Q.   Okay.  Let's go to C here on this
11 preliminary injunction.  Maybe we'll do a little bit
12 better with that one.  In this one you're asking the
13 judge to order Mr. Silvers not to take any action in
14 the pending cancellation proceeding Google, Inc. has
15 brought to cancel the registration for Googles and
16 Design.  Do you see that?
17    A.   Yes.
18    Q.   Now just so the record is clear and it says
19 a number of matters pending in the trademark office
20 between Stelor and Google, right?
21    A.   Yes.
22    Q.   But this is not something that involves
23 Stelor, this is an action that Google, Inc. filed
24 against Mr. Silvers individually, correct?
25    A.   No.

215

1    Q.   Okay.  What am I missing?
2    A.   I believe by definition if it involves the
3 Googles and Design that which -- that which Stelor has
4 the exclusive rights to protect and defend instead of
5 on behalf of Mr. Silvers that Stelor has a commitment
6 based on some of the previous quoted paragraphs from
7 the license to defend that action.  And by definition
8 that Steven Silvers not take the action because in his
9 contract and license to Stelor he has granted Stelor
10 the sole rights even unto himself to protect and
11 defend this intellectual property.
12    Q.   Mr. Esrig, I really appreciate hearing your
13 interpretation of the agreement, you're certainly
14 entitled to that and the judge is certainly going to
15 decide whether you're right or wrong, but you've got
16 to listen carefully to my questions.  My question is
17 is this the action that Googles, Inc. filed against
18 Mr. Silvers individually --
19    A.   That was not your question.
20    Q.   -- out of the various cases that we've --
21 we've discussed about there's other cases involving
22 Stelor and Google.  I don't want to -- I want to rule
23 those out.  I want to make sure we know what case
24 we're talking about in Part C.  What you're asking the
25 judge to do relates to the action that Google, Inc.

216

1 filed against Mr. Silvers individually.  That was my
2 question.  Is that your understanding?
3    A.   Yes.
4    Q.   So Mr. Silvers is an individual defendant in
5 a case brought by Google against him, right?  That's
6 the case we're talking about.
7    A.   Yes.
8    Q.   And you want the judge to prevent him from
9 taking any action in that case, correct?
10    A.   Yes.
11    Q.   Where in the contract does it say he's
12 prohibited from defending himself when he gets sued?
13       MR. RUBINSTEIN:  Argumentative.  The
14    contract speaks for itself.
15 BY MR. HARTMANN:
16    Q.   I don't see it there so I'm just, you know,
17 inviting you to, you know, help me figure it out.
18       MR. RUBINSTEIN:  Are you asking for his
19    interpretation of the contract?
20 BY MR. HARTMANN:
21    Q.   I'm asking him for the contractual basis
22 that they're going to present to the judge as to why
23 Mr. Silvers can't defend himself when he's sued.
24       MR. RUBINSTEIN:  You can answer to the
25    extent of your abilities.

## 54 (Pages 213 to 216)

217

1 BY MR. HARTMANN:
2    Q.  The contract governs this, right?  Isn't
3 that what you told me before?
4    A.  Absolutely.
5    Q.  Help -- help me out.  Where in the contract
6 does it say that Mr. Silvers can't defend himself when
7 he's sued?
8    A.  Are you asking me a different question,
9 counselor?
10    Q.  I don't think so.
11    A.  I think you just did.
12       MR. RUBINSTEIN:  Can you read back the
13    question.
14 BY MR. HARTMANN:
15    Q.  Just answer the question I asked you.  Where
16 in the contract does it say that Mr. Silvers can't
17 defend himself when he gets sued?
18    A.  That's a different question.
19    Q.  Answer it.
20    A.  Can you just tell which one you want me to
21 answer?  And I'm happy to do so.
22    Q.  Answer the one I just gave you.  Answer any
23 of them.
24    A.  I'm going to answer the question that is
25 germane to this which is --

218

1    Q.  Well, I don't want you to answer your own
2 question.
3    A.  No, no, I'm going to answer your question.
4    Q.  Okay.  You're going to show me in the
5 contract where Mr. Silvers is prohibited from
6 defending himself when he's sued?
7    A.  That's a different question.
8    Q.  Then answer it.
9    A.  I believe that the Constitution grants Mr.
10 Silvers the right to defend himself on an individual
11 action.  I believe that Mr. Silvers sold his rights in
12 this intellectual property, granted them to Stelor
13 Productions and gave Stelor the, quote -- which I'm
14 happy to show you the clause.
15    Q.  Please do.
16    A.  The sole right.
17    Q.  That's my question is show me the clause.
18    A.  Okay.  We'll start with Paragraph 8 under
19 intellectually -- intellectual property protection
20 where Silvers grants Stelor the irrevocable power of
21 attorney to act for and on Silvers' behalf.  Let's
22 see, for and on.  It says instead of Silvers.  So I
23 would interpret that as being instead of Steven
24 Silvers.  To execute and file any document and to do
25 any lawfully permitted act to further the purpose of

219

1 the foregoing with the same legal force and effect as
2 if executed by Silvers.  That would be the first
3 piece.
4    Q.  All right.
5    A.  Then we go to that Stelor shall have the
6 sole right, not the shared right but the sole right,
7 in its discretion and at its expense to take any and
8 all actions against third persons to protect the
9 intellectual property rights licensed in this
10 agreement.  I would conclude that Google, Inc. is a
11 third party and so we have the sole right, not the
12 shared right with Mr. Silvers, to do so.
13    Q.  We're talking about a case where he's the
14 defendant.  I just want to maybe save you some time.
15    A.  No, I just -- you asked me to --
16    Q.  Okay.
17    A.  To give you where in the contract and so --
18    Q.  All right.
19    A.  -- that's what I have been doing.
20    Q.  If that's your position, okay.
21       Why don't we take a look at Paragraph 12 of
22 the contract.
23    A.  Which contract?
24    Q.  The one you just had.  Paragraph 12, Roman
25 Numeral 12.  It's actually -- I'm going to go to Page

220

1 7 which is the second part of it, but Paragraph 12 is
2 the -- it's called indemnity.  Have you looked at
3 Paragraph 12C with respect to this issue at all?
4    A.  Yes.
5    Q.  All right.  And you see there that with
6 respect to certain claims each party has the right to
7 participate, at its sole expense, in any suit
8 instituted against it.  Do you see that part?  Roman
9 Numeral I-I-I.  Little three there.
10    A.  Yes.
11    Q.  All right.  Each party.  Would Mr. Silvers
12 be a party?
13    A.  Yes.
14    Q.  Would he have the right to participate at
15 his expense in any suit instigated -- instituted
16 against him?
17       MR. RUBINSTEIN:  Calls for a legal
18    conclusion.
19       THE WITNESS:  I need to -- to let my lawyer
20    make that conclusion.
21 BY MR. HARTMANN:
22    Q.  All right.  Would you do that?  Would you
23 have your lawyers look at that and see if they want to
24 withdraw that part of the injunction?
25       MR. RUBINSTEIN:  Argumentative.

55 (Pages 217 to 220)

221

1 BY MR. HARTMANN:
2    Q.   Now let me ask you something. All this talk
3 about the power of attorney and how only Stelor can
4 act on behalf of Mr. Silvers, isn't it the case, sir,
5 that Stelor and Mr. Silvers are now adverse? Have you
6 heard the term adverse?
7    A.   Yes.
8    Q.   You have sued -- Stelor has sued him?
9 You're opponents in a lawsuit. Do you think that
10 would have any bearing on the distribution of rights
11 and obligations in this license agreement once the
12 parties are adverse?
13        MR. RUBINSTEIN:   Calls for a legal
14    conclusion.
15 BY MR. HARTMANN:
16    Q.   Have you given that any thought?
17    A.   I'd have to check with counsel.
18    Q.   I mean does it seem right if you're suing
19 Mr. Silvers that you can pick his lawyer? Does that
20 seem right to you?
21    A.   Ask me the question again. Does something
22 seem right to me is that --
23    Q.   Does it seem right to you that Stelor can
24 sue Mr. Silvers and Stelor can pick his lawyer?
25    A.   I was unaware that Stelor was saying that we

223

1 term, for Stelor to expect to have Mr. Silvers adhere
2 to the license which is a 30 or 40 year plus license
3 based on an intellectual property, absolutely, yes, I
4 think it is not only fair but I am looking to the
5 court and I believe based on possibly existing
6 precedent with other licensors who have acted perhaps
7 inappropriately or have done what Mr. Silvers has --
8 that we claimed that he has done, yes, I believe that
9 when you are granted the exclusive rights, even unto
10 your licensor and you're granted the right to act on
11 his behalf and instead of him, and it is a sole right
12 that has been granted that even later down the road
13 when there might be an adverse time, maybe there's a
14 dispute about royalties or maybe there's a dispute
15 like with Winnie the Pooh and Disney about how things
16 were paid. I think it's possible that in fact there
17 might be at some point in time an adverse position but
18 that does not change the chronology or I believe the
19 intent of the contract, but since I'm not a lawyer,
20 I'm looking to a court to define that for me.
21    Q.   Are you aware of anything in the agreement
22 which addresses what happens when the parties are
23 adverse, the licensee and the licensor? Are you aware
24 of anything that addresses that?
25    A.   I'd have to check with counsel.

222

1 had to pick his lawyer to defend against Stelor.
2    Q.   Oh, you're not aware that Stelor has hired
3 counsel to file lawsuits on behalf of Mr. Silvers?
4    A.   I am aware that Stelor has hired counsel to
5 protect the intellectual property but your question is
6 quite different.
7    Q.   No, my question is very specific. Has
8 Stelor hired counsel to represent Mr. Silvers?
9    A.   Yes.
10    Q.   And you're adverse to Mr. Silvers and you're
11 suing him.
12    A.   Yes, in a separate action.
13    Q.   That separate -- oh, I'm not trying -- I'm
14 not trying to say you hired me, believe me.
15    A.   That's what I think you said.
16    Q.   Oh, I don't think so but I mean I don't want
17 to create the impression. Obviously let the record
18 reflect that Stelor has not hired Mr. Silvers' present
19 counsel in this litigation.
20    A.   Thank you for clarifying that.
21    Q.   My question is do you think it's fair for
22 Stelor once they're adverse to Mr. Silvers to have
23 anything to do with what he does or doesn't do in
24 court now that you have adverse interests?
25    A.   I think it's absolutely fair, to use your

224

1    Q.   But you would agree that Mr. Silvers has
2 different interest than Stelor does with respect to
3 all the trademarks now that we're involved in the
4 litigation that Stelor has filed?
5        MR. RUBINSTEIN:   Vague and ambiguous.
6 BY MR. HARTMANN:
7    Q.   You would agree that we have different
8 interests?
9    A.   Not in regard to this contract that we've
10 adhered to, no.
11    Q.   All right. Now also in Part C you're
12 asking the court -- and let's just see if I understand
13 this -- to keep Mr. Silvers from filing an answer,
14 making any other submissions in the action brought by
15 Google. In other words he's just supposed to lay
16 down. That's what you're asking the court to order
17 him to do, just lay down.
18    A.   I'm sorry, I can't concur with any of your
19 interpretations of --
20    Q.   I'm asking for your interpretation.
21    A.   I can give you my interpretation. I --
22 first of all you want him to lay down. Is that a
23 boxing term? I'm not quite sure where you're going
24 with that.
25    Q.   You don't want him to take any steps to

56 (Pages 221 to 224)

225

1 defend himself in the action that Google filed against
2 him, correct?
3    A.  I want him to adhere to his contract because
4 he no longer has the right --
5    Q.  We all want --
6       MR. RUBINSTEIN:  Let him finish his answer.
7 BY MR. HARTMANN:
8    Q.  I'm really asking you a specific question
9 and we're just going to be here all day if --
10   A.  What's the specific -- I came down here to
11 be with you all day.
12   Q.  All right.  So you want the judge to enter
13 an order that says I hereby order Steven Silvers to
14 adhere to his contract, right?
15   A.  Yes.
16   Q.  Does that solve the problem of what that
17 might mean, if we don't agree on what the obligations
18 under the contract are or the rights?
19   A.  Again, in all due respect --
20   Q.  We need to be more specific, do we not?
21   A.  In all due respect I believe you can't be
22 anymore specific than saying that given that Stelor
23 has the sole right exclusive to Stelor to defend the
24 IP, that would include defending Mr. Silvers and the
25 cancellation proceeding brought forth by Google, Inc.

226

1    Q.  But if you're wrong that Stelor does not
2 have the sole right to defend the IP, then you would
3 agree that there's nothing improper with Mr. Silvers
4 defending himself when he's sued?
5    A.  I can't join you in your speculation because
6 I disagree with you at your very, very basic premise.
7    Q.  All right.  But you will have your lawyers
8 look at that provision we pointed out, right?
9    A.  Yes.
10      MR. RUBINSTEIN:  Argumentative.
11 BY MR. HARTMANN:
12   Q.  Now, we've already talked about the
13 communications with Mr. Silvers and Mr. Googles -- and
14 Googles so we're not going to go over that.
15      Do you see anything in the agreement that
16 prohibits Mr. Silvers from talking about Google --
17 from talking with Google?
18      MR. RUBINSTEIN:  Calls for a legal
19 conclusion.
20 BY MR. HARTMANN:
21   Q.  Let's start with the license agreement.  Is
22 there anything in that agreement that prevents Mr.
23 Silvers from communicating with Google?
24      MR. RUBINSTEIN:  Same objection.
25      THE WITNESS:  You'll say if I can answer or

227

1 not because when you do that, I'm not sure if you
2 want me to answer or not.
3       MR. RUBINSTEIN:  I will instruct you not to
4 answer.
5       THE WITNESS:  Okay.
6       THE VIDEOGRAPHER:  Five minutes left on the
7 video.
8 BY MR. HARTMANN:
9    Q.  What we're doing is we're looking for the
10 contractual provision which would prohibit Mr. Silvers
11 from communicating with Google.  Is that what he's
12 doing?  That's what I thought we were doing.  I just
13 want to sure.
14   A.  I -- actually, no, I was looking -- you
15 raised the point and, again, I was going to answer
16 your point as a layman, but I guess it speaks to the
17 contractual provisions that basically says at Section
18 14 if a term -- you identified Section C but it says
19 if a term, clause or provision is held invalid or
20 unforceable by a court of competent jurisdiction,
21 such invalidity shall not effect the validity or
22 operation of any other term, clause or provision and
23 such invalid term, clause or provision shall be deemed
24 to severed from the agreement.
25      Again, so I am anxious for the court to

228

1 interpret and to act on my lawsuit.
2    Q.  All right.  But I think what I asked, sir,
3 was whether there was any provision in the license
4 agreement that would prohibit Mr. Silvers from
5 communicating with Google as you've asked the judge to
6 enter an injunction prohibiting him from doing that so
7 I'm asking where in the contract does it say Mr.
8 Silvers can't communicate with Google?  That was my
9 question.
10      MR. RUBINSTEIN:  Object to the extent that
11 it asks for Mr. Esrig's legal conclusions.
12      THE WITNESS:  I was -- I was advised I
13 can't answer that when you asked the question.
14 BY MR. HARTMANN:
15   Q.  Okay.  Can you answer it now?
16   A.  I have to defer to my counsel.
17      MR. RUBINSTEIN:  No, you can answer the
18 question to the best of your ability.
19      THE WITNESS:  I -- and I've done that
20 already.
21 BY MR. HARTMANN:
22   Q.  Okay.  Two minutes.  Do you want to take a
23 break now?  Or let's just go.
24   A.  Are we taking a break?
25   Q.  Now what if Mr. Silvers, who owns the

57 (Pages 225 to 228)

229

1 trademarks for example, wanted to sell those to a
2 third party?
3        MR. RUBINSTEIN: Objection. Calls for
4    speculation.
5 BY MR. HARTMANN:
6    Q. He can do that, can't he? He doesn't need
7 your permission, does he?
8        MR. RUBINSTEIN: Argumentative.
9        THE WITNESS: If I understand you
10   correct -- your question, Mr. Silvers is the
11   owner of the intellectual property. I -- I can't
12   imagine that if Mr. Silvers wanted to sell his
13   property as long as it wasn't adverse or didn't
14   violate our contract, I couldn't imagine that
15   that would be problematic.
16 BY MR. HARTMANN:
17   Q. So you're not asking the judge then to
18 prohibit Mr. Silvers from speaking to Google about
19 selling -- selling his property?
20       MR. RUBINSTEIN: Objection. Vague and
21 ambiguous. The lawsuit speaks for itself.
22       THE WITNESS: May I answer?
23       MR. RUBINSTEIN: If you can, please.
24       THE WITNESS: I certainly would because as
25 I just answered you by definition Mr. Silvers I

231

1 IP?
2        MR. RUBINSTEIN: Object to the extent it
3    misstates --
4        MR. HARTMANN: Fair?
5        MR. RUBINSTEIN: -- the prior testimony.
6 BY MR. HARTMANN:
7    Q. Is that fair -- a fair summary?
8    A. Yes.
9    Q. Okay. We better take a break here for the
10 tape.
11       THE VIDEOGRAPHER: This is the end of Tape
12   Number 5. The time is 3:48.
13       (There was a break taken after which the
14 following proceedings were held:)
15       THE VIDEOGRAPHER: We're now back on the
16   video record. This is Tape Number 6. The time
17   is 4:0 -- 4:01 p.m.
18 BY MR. HARTMANN:
19   Q. All right. Let's look at Exhibit 3,
20 Paragraph D which is your Emergency Motion for
21 Preliminary Injunction. And it's on Page 3 of the
22 motion.
23   A. Thank you.
24   Q. All right. Here you're asking the court to
25 prohibit Mr. Silvers from, quote, interfering in the

230

1 believe is prohibited from speaking with Google
2 who we have, A, started discussions with, those
3   discussions may be settlement, partnership, joint
4   venture, vendor, client based and so the
5   contracts are very specific to that. B, Mr.
6   Silvers by way of a long, long paper trail of
7   evidence has made it clear --
8        MR. HARTMANN: Five minutes here.
9        THE VIDEOGRAPHER: When he's done.
10 BY MR. HARTMANN:
11   Q. Okay.
12   A. This is a sideline thing. As soon as I hit
13 the sidelines, the two-minute clock is done.
14       He's made it clear that at -- most of the
15 time he's been adversarial to Google and has wanted to
16 take them on an inaction. During a brief amount of
17 time, agreed that Stelor should in fact negotiate and
18 work out some sort of relationship. And so to answer
19 your question, yes, I agree that Mr. Silvers does not
20 have the right to enter into discussions with Google,
21 Inc.
22   Q. All right. So to summarize this. It's okay
23 for Mr. Silvers to talk about somebody besides Google
24 about selling his IP but in your view the contract
25 prohibits him from talking to Google about selling his

232

1 proceeding Stelor has brought at the TTAB against
2 Google, right?
3    A. Yes.
4    Q. All right. This has -- this is an action in
5 Mr. Silvers is not a party, meaning he's not a
6 plaintiff or a defendant in that or a petitioner or a
7 respondent as they call them.
8        MR. RUBINSTEIN: Objection. Calls for a
9    legal conclusion. If you know.
10       THE WITNESS: I think that sounds right.
11 BY MR. HARTMANN:
12   Q. Stelor filed the action against Google --
13   A. Yes.
14   Q. -- correct?
15   A. Okay. And -- and there's -- there's one --
16 well, actually there's one in front of the -- there's
17 an action to cancel Googles' trademark that Stelor
18 filed and then there's a separate action to oppose
19 Googles' application for a new trademark; is that your
20 understanding?
21   A. Yes.
22   Q. Okay. So I'll call those proceedings one
23 and two. Proceeding One would be to cancel Googles'
24 trademark. Proceeding Two will be to oppose their new
25 trademark. With me?

58 (Pages 229 to 232)

233

```
 1    A.  Yes.
 2    Q.  All right.  Just trying to simplify this.
 3        Now you asked the court to prohibit Mr.
 4  Silvers from interfering.  Now has Mr. Silvers done
 5  anything to interfere with the proceedings that Stelor
 6  brought against Google, either one or two?
 7    A.  Yes.
 8    Q.  All right.  Has he written any letters to
 9  the PTO in either of these cases?
10    A.  I'm unaware of letters.  Other than --
11    Q.  Okay.  Has he filed any pleadings in either
12  of these cases?
13    A.  I'm unaware if he has.
14    Q.  All right.  So has he -- how has he
15  interfered with the case that Stelor brought in front
16  of the PTO, either one of the cases against Google?
17    A.  Mr. Silvers took it upon himself to fire or
18  discharge Cowan, Liebowitz, Latman who is our attorney
19  of record for bringing these actions forward.
20    Q.  Well, then you can hire them, can't you?
21        MR. RUBINSTEIN:  Argumentative.
22  BY MR. HARTMANN:
23    Q.  I don't understand.
24    A.  Well --
25    Q.  You hired the Cowan, Latman firm, right?
```

234

```
 1    A.  Yes.
 2    Q.  So what does it matter what Mr. Silvers does
 3  as far as whether he hires them or not?
 4    A.  That's what I'm looking to the court to
 5  determine.  If we hired them under our rights, under
 6  the license agreement and the letter agreement, then
 7  it would be my reasonable conclusion that Mr. Silver
 8  does not have the right to fire the attorneys and/or
 9  interact with those attorneys in a deleterious fashion
10  and so we would like the court to order Mr. Silvers to
11  cease and desist from interfering in those proceedings
12  and as a general rule firing and/or releasing counsel
13  who's bringing forth the proceedings in my mind is a
14  fairly significant interference.
15    Q.  So Mr. Borchard no longer represents Stelor
16  then?
17    A.  Mr. Borchard --
18    Q.  He's been fired by Mr. Silvers and he no
19  longer represents Stelor?
20    A.  No.  He represents Stelor.
21    Q.  So how has Stelor been effected by Mr.
22  Silvers, quote, firing him?
23    A.  Well, Stelor pays every minute of legal
24  expense that is generated by Mr. Silvers' continued
25  interference and so by definition if Cowan, Liebowitz
```

235

```
 1  has to engage in additional letter writing or spend
 2  additional time researching because of Mr. Silvers'
 3  actions, then Stelor has to pay that and unfortunately
 4  since everyone seems to be paying for Mr. Silvers,
 5  Stelor is looking to the court so that we can, I
 6  guess, cauterize this wound.
 7    Q.  All right.  Let me see if I can understand
 8  what the wound is.  Stelor is paying money to Mr.
 9  Borchard because Mr. Silvers fired him from
10  representing Mr. Silvers, is that what you're saying?
11  I'm sorry, I'm really having trouble following you.
12    A.  What I'm saying is that --
13    Q.  It's been a long day.
14    A.  -- every time Mr. Silvers interferes in this
15  instance your example is with our cancellation
16  proceeding in the USPTO, and he involves himself with
17  our counsel who we pay for who is significantly
18  expensive, we have to pay for his interference.  We
19  have to pay for their reactions and so we'd like the
20  court to have Mr. Silvers adhere to his contract and
21  stop interfering with our abilities to protect and
22  defend the IP.
23    Q.  But specifically what is it that he's doing
24  that's interfering?  I'm really honestly having
25  trouble with this.  He fired Mr. Borchard, that's one
```

236

```
 1  thing, from being his lawyer not Stelor's lawyer.
 2    A.  No.
 3    Q.  Correct?
 4    A.  Not correct.
 5    Q.  Okay.  Who did he -- who did he fire Mr. --
 6  who hired Mr. Borchard?
 7    A.  Stelor Productions.
 8    Q.  All right.  So how did Mr. Silvers fire him
 9  then if you hired him?
10    A.  He sent a correspondence demanding that
11  Borchard withdraw and cancel the proceedings with
12  Stelor Productions and the trademark office and my
13  point to you is that --
14    Q.  And you ignored him, right?
15        MR. RUBINSTEIN:  Please let him finish the
16  question.
17        THE WITNESS:  I was in the middle of an
18  answer.
19        MR. RUBINSTEIN:  I mean let him finish the
20  answer.
21        THE WITNESS:  Oh.
22  BY MR. HARTMANN:
23    Q.  It's just that we've heard that before.  I'm
24  just trying to make it quicker.  Okay.
25        So he sent a letter making demands, okay, we
```

59 (Pages 233 to 236)

237

```
 1 I got that far.  And how did that effect Stelor?
 2    A.  It cost us money.
 3    Q.  Okay.  Other than costing you money, has it
 4 had any effect?
 5    A.  It makes it more difficult for me to be
 6 proactive in my job and grow the IP when I'm spending
 7 my time dealing with Mr. Silvers' behavior.
 8    Q.  All right.  Now yes or no, Mr. Silvers has
 9 not filed any pleadings in the proceeding Stelor
10 brought against Google?
11    A.  Yes.
12    Q.  He has not made any formal appearance in
13 either of the actions that Stelor has filed against
14 Google?
15    A.  Correct.
16    Q.  And he has done nothing that effects the
17 merits of Stelor's claim against Google in either
18 proceeding?
19        MR. RUBINSTEIN:  Objection.  Calls for
20    speculation.
21        THE WITNESS:  I can't speculate.
22 BY MR. HARTMANN:
23    Q.  You can't tell me of anything he's done
24 that has prejudiced Stelor as to the merits of its
25 claims that its brought in those cases?
```

238

```
 1    A.  I can't speculate on --
 2    Q.  I'm not asking you to speculate.  I'm asking
 3 you if you know anything to tell me.  If you don't
 4 know anything, say I don't know anything.  That's
 5 fine.
 6    A.  I can answer that if you will restate the
 7 question so I can answer whether I know or don't know.
 8 What's your question?
 9    Q.  Do you know of anything that Mr. Silvers has
10 done in either of the two proceedings in front of the
11 PTO that we're discussing now, Stelor versus Google,
12 which has prejudiced Stelor's position on the merits
13 of those cases?
14    A.  I am unaware of anything he has done or may
15 have done.
16    Q.  All right.  In Part E here you're asking the
17 court to order Mr. Silvers to cooperate immediately
18 and fully with Stelor in the above-mentioned
19 proceedings.  Those are the two proceedings that we
20 just discussed where Stelor is taking on Google,
21 right?
22    A.  Yes.
23    Q.  Now have you ever -- is Mr. -- what has Mr.
24 Silvers done -- well, first of all let me ask you
25 this.  Where in the -- never mind.  I'm going to get
```

239

```
 1 the same answer.
 2    Q.  How has Mr. Silvers failed to cooperate with
 3 Stelor in the above-mentioned proceedings?
 4    A.  I can only answer your question -- you've
 5 taken a piece of the sentence, but I'll complete it
 6 for you.  It says to order the defendants to cooperate
 7 immediately and fully with Stelor in the
 8 above-mentioned proceedings -- here's I think the
 9 important part of this sentence -- consistent with
10 Silvers' contractual obligations, including providing
11 any evidence in the form of documentation, testimony
12 or otherwise, in Mr. Silvers' possession that Stelor
13 feels is necessary to prevail in these proceedings and
14 protect the Googles intellectual property rights.
15    Q.  All right.  What evidence in defendant's
16 possession does Stelor feel is necessary to prevail in
17 your proceedings?
18    A.  Stelor approached Mr. Silvers through
19 counsel and asked him questions and asked him to
20 provide from his records evidence relative to these
21 proceedings and Mr. Silvers has either refused and/or
22 lied and said he doesn't have the evidence and we have
23 other, of course, correspondence from Mr. Silvers
24 earlier that said in fact that he did have the
25 evidence and so in this particular piece we are asking
```

240

```
 1 the court to have him cooperate and provide for us the
 2 evidence that at one time he said he had and when was
 3 asked now says he does not that we feel is necessary
 4 so we can prevail in our proceedings so that we can
 5 protect the Googles intellectual property rights.
 6    Q.  I appreciate that and you can read the --
 7 you can read the paragraph all you want, but my
 8 question is what evidence is it that you want him to
 9 give you that you've asked?  What evidence have you
10 asked and be -- can you be specific?
11    A.  I can -- I can cite one example.  There
12 are -- there is several things but let me be specific.
13    Q.  Give me the several things.
14    A.  Specific to this was files, articles he had
15 about Google, Inc. running Google aliens episodic
16 and/or on their site at one point in time that he had
17 told us about prior to the contract taking place and
18 the license taking place that he had referred to in
19 e-mails to us and -- but had not provided us the
20 actual evidence -- excuse me.
21    Q.  You specifically --
22        MR. RUBINSTEIN:  Bless you.
23        THE WITNESS:  Excuse me.
24 BY MR. HARTMANN:
25    Q.  All right.  Who specifically asked Mr.
```

60 (Pages 237 to 240)

241

1 Silvers to provide that evidence, that specific
2 evidence?
3    A.  I believe it would be Mr. Borchard at Cowan,
4 Liebowitz.
5    Q.  All right.  And is that request made in
6 writing by the way?
7    A.  Yes.
8    Q.  So any evidence that was requested by Mr.
9 Borchard would be in a letter from Mr. Borchard to Mr.
10 Silvers?
11    A.  I believe that's true.
12    Q.  You're not aware of any other evidence that
13 was requested that was not provided?
14    A.  I -- I am unsure but I do know that that
15 example you've cited is so.
16    Q.  Okay.  What are -- what are the other
17 several instances of evidence that he's refused to
18 turn -- turn over?
19    A.  I can't recall.  I'd have to check Mr.
20 Borchard --
21    Q.  Okay.
22    A.  -- and the file.
23    Q.  All right.  What about testimony.  Has he
24 been asked to testify?  Has Mr. Silvers been asked to
25 testify?

242

1    A.  I'm unaware if he's been asked to testify.
2    Q.  So he certainly hasn't refused to testify
3 since he hasn't been asked?
4    A.  I can only speak to the refusal I'm aware of
5 which is the example I've cited to you.
6    Q.  Okay.  Other than that, you're not aware of
7 any other refusals to provide evidence?
8    A.  Mr. Silvers' pattern has been to simply
9 refuse, not unlike what I mentioned earlier, his
10 refusal to do the interview for the time capsule so,
11 again, what I understand from Cowan, Liebowitz is that
12 Mr. Silvers' refusal to provide that or his denial
13 that he has it or his argument that it was -- he never
14 said it are all part and parcel of his pattern of
15 behavior which is why we're asking the court to have
16 him cease and desist from interfering and/or compel
17 him to cooperate.
18    Q.  But I -- I mean other than what you've told
19 me there's no other evidence of Mr. Silvers'
20 interfering.  You've told me all that evidence,
21 correct?
22    A.  That I'm aware of, yes, at this time.
23    Q.  Does Stelor have a stock option plan?
24    A.  Yes.
25    Q.  Is it a written plan?

243

1    A.  Yes.
2    Q.  When was it created?
3    A.  At the first board of directors meeting in
4 May or June of '02.
5    Q.  And was the written plan was memorialized at
6 or about May of '02?
7    A.  May or June of '02, yes.
8    Q.  How many people have options with Stelor?
9    A.  I'm not sure of the exact number.
10 Somewhere between 12 and 30 I'm guessing.
11    Q.  Are they all people who have invested
12 through the subscription agreement?
13    A.  No.
14    Q.  Do all the employees have options?
15    A.  No, not all.  Some.
16    Q.  Which employees?
17    A.  I'd have to check the -- the table.
18    Q.  Have any of them increased their options
19 since May of '02?
20    A.  Who?
21    Q.  Have any of the people that have options
22 under the options plan increased the number of options
23 they have or the number of stock that they have
24 options on since May of '02?
25    A.  We have granted additional options to

244

1 employees.  Is there a question?  I'm sorry.
2    Q.  Yeah, that's what --
3    A.  Yeah, we have granted additional options.
4    Q.  I hadn't seen the agreement so I'm a
5 little -- trying to phrase it right, but there have
6 been employees that have received additional options
7 after first receiving some and then they receive more?
8    A.  Yes.
9    Q.  Which employees are those?
10    A.  As I answered earlier, I'd have to
11 check the--
12    Q.  That would all be recorded in the company's
13 books and records?
14    A.  We have -- yes, we have documentation.
15    Q.  Which employee is in charge, as you
16 described it earlier of monitoring the trademark and
17 domain name registrations?
18    A.  That was up until very recently Dean DePue
19 our IT.
20    Q.  Dean DePue?
21    A.  Yes.
22    Q.  And you say until recently.  He's no longer
23 doing it?
24    A.  We've hired -- we've -- that -- that
25 responsibility has shifted to our recent hire of

61 (Pages 241 to 244)

245

1 Michael Sagan.
2    Q.  How long had Mr. DePue been in charge of
3 monitoring the trademark and domain name
4 registrations?
5    A.  Pretty much it was one of the primary duties
6 he was hired for, but I couldn't tell you how long
7 that's been. I don't remember when he was hired.
8    Q.  All right. Are you aware of any trademark
9 registrations that Stelor has allowed to lapse?
10   A.  No.
11   Q.  Are you aware of any domain name
12 registrations that Stelor has allowed to lapse?
13   A.  Yes.
14   Q.  Which ones are those?
15   A.  There were three domain names that Stelor
16 received from Aurora that were on the list that we
17 discussed with Mr. Silvers from the onset that we had
18 no interest in keeping an inventory. One was Google
19 Games and it was on advice of counsel then that if
20 it's not Googles, that it would be inappropriate for
21 us. The other two names Mr. Silvers had misspelled
22 and it was Googleus (sic) and so we said to him then
23 would be no reason for us to continue to pay for and
24 maintain because of his spelling issues two names that
25 not only were not our names but Googleus and so we

246

1 told Mr. Silvers this and we told him we would not
2 renew it and so we in fact let those lapse. Neither
3 of which by the way as you know -- Googleus is not
4 intellectual property.
5    Q.  I don't understand that. Why not?
6    A.  Because we are not the Googleus from Goo.
7 We are the Googles from Goo and so --
8    Q.  Well, let me ask you this. Does the
9 intellectual property cover anything with the element
10 Goo?
11      MR. RUBINSTEIN:  Calls for a legal
12   conclusion. You can answer if you know.
13 BY MR. HARTMANN:
14   Q.  Yeah, I just want your understanding.
15   A.  It does and in this case because we gave Mr.
16 Silvers very specific -- we discussed this with him.
17 We said to him that it would cause confusion. We did
18 not want to simply because Goo was in the first piece
19 of the name hold onto two names Googleus.com or
20 Googleus.net, whatever they were, that we would
21 continue to pay for and Mr. Silvers by the way
22 since he was the owner, he was welcome to maintain
23 them and keep them. He choose not to.
24   Q.  Other than those particular domain names,
25 are you aware of any other domain names that were in

247

1 place with Stelor that -- that were -- that lapsed?
2    A.  No, we've kept and maintained every other
3 name.
4    Q.  And the person that would be knowledgeable
5 about that would be Mr. DePue?
6    A.  And now Mr. Sagan.
7    Q.  And now Mr. Sagan.
8       Now in your memorandum in support of your
9 preliminary injunction you -- your lawyers I guess
10 claim that there's an issue relating to the passwords
11 for certain domain names. Are you familiar with that?
12   A.  Yes.
13   Q.  You -- you referred to that this morning a
14 little bit.
15   A.  Yes.
16   Q.  Now which domain names is it that this issue
17 relates to?
18   A.  Well, I think it relates to all of them, but
19 specifically it relates to Googles.com in that Mr.
20 Silvers had promised us in writing that he would let
21 us have those passwords since we have agreed in
22 writing on countless occasions that he is the owner,
23 we've put things in his name as the owner
24 consistently, and that we are only an administrative
25 or technical contact so we can maintain these names

248

1 but he's refused to give us the password and then he
2 threatened to shut down the Googles.com site, the very
3 essence of -- of the business right now if we,
4 quote -- if he had to play hardball with us to achieve
5 one of his demands.
6    Q.  Well, you've shut down the site, haven't
7 you?
8    A.  No, not to my knowledge.
9    Q.  You're unaware that the Stelor sites or the
10 Googles.com site has been shut down for maintenance?
11   A.  Oh, for maintenance. I'd have to check with
12 our IT guy.
13   Q.  Yeah.
14   A.  But I --
15   Q.  And that -- would that be Michael Sagan now?
16   A.  Or Dean DePue.
17   Q.  Okay. And you -- you were able to shut down
18 the Googles.com website without having a password?
19   A.  No, no, as a matter of fact I was about to
20 answer your question when you interrupted. I can't
21 remember since we've had that site ever having that
22 site not on-line, ever having shut it down to do
23 maintenance. I can't remember ever that ability and
24 it is my understanding that without the administrative
25 password we can't shut it down but, again, I'm not an

62 (Pages 245 to 248)

Veritext/Florida Reporting Co., LLC - 19 West Flagler Street - Miami, Florida - (305) 376-8800
Benowitz - Berman - Cook - Florida Keys - Matz Traktman - Ivy

249

1 IT person. I'm just answering your question to the
2 best of my recollection.
3    Q.   What -- what is -- what is available on the
4 website now?  You said there were six million hits.
5 What do they all do?
6    A.   Music and games and characters and
7 information relating to the Googles from Goo, those
8 type of things.
9    Q.   And who controls the content on the website?
10    A.   That would be again our -- our IT people and
11 our -- the team inside who -- the writers, the
12 artists and so on and so forth.
13    Q.   Who has the passwords for the host server?
14    A.   I believe those passwords would be Mr.
15 Silvers.  Again --
16    Q.   You're not sure?
17    A.   I'm not an IT person so to the best of my
18 knowledge.
19    Q.   All right.  But the passwords that you're
20 mad about have nothing to do with the host server,
21 correct?  They have to do with the registration of the
22 domain name.
23        MR. RUBINSTEIN:  Objection.
24    Mischaracterizes his prior testimony.  You can
25    answer.

250

1        THE WITNESS:  Well, I was going to say
2    you've mischaracterized in a motion that I --
3 BY MR. HARTMANN:
4    Q.   I'm not trying to mischaracterize.  I'm
5 trying to understand what it is you're complaining
6 about.
7    A.   We're complaining about Mr. Silvers' threat
8 to shut down our website.  We're complaining about our
9 ability to work and do things on the website.  We're
10 complaining about in our effort to maintain and
11 administer all the domain names without the password,
12 even to renew a name we have had critical names lapse
13 that Mr. Silvers has not paid for or renewed.  We have
14 had letters, countless letters and phone calls to Mr.
15 Silvers begging him to renew names on time, that names
16 have expired.  We just recently, maybe a month ago,
17 had some of our names including Gootunes.com lapse.
18 We went on and tried to renew it, we tried every way
19 we could.  Without the password we could not.  We were
20 so concerned because it's so critical to our business.
21 That's exactly what I'm referring to.
22    Q.   All right.  So you're telling me that
23 without the password Stelor can't renew the domain
24 name?
25    A.   Correct.

251

1    Q.   That's your understanding, right?
2    A.   That's my understanding.
3    Q.   What else can't it do without the password
4 as your understanding is?
5        How is it limited -- it controls the
6 content of the website, correct?
7    A.   Right.
8    Q.   And it can make changes to the website,
9 correct?
10    A.   To the contents, yes, I believe so.
11    Q.   So what is it that it can't do by not having
12 the password?
13    A.   I --
14    Q.   How is Stelor limited by not having the
15 password?  And we're not talking about the -- with the
16 server.
17    A.   Right.  I understand.
18    Q.   Because I think that's a separate issue and
19 with all due respect I think you're wrong about that.
20 I think you guys have that password.  What Mr. Silvers
21 has is the password for the registration of the domain
22 name.  So let's -- let's take Network Solutions and
23 Googles.com.  Let's take that in particular, okay.
24        This is, what, eight?
25        (The document was marked as Exhibit No. 8

252

1 for identification.)
2 BY MR. HARTMANN:
3    Q.   All right.  I've marked as Exhibit 8 a
4 document from the Whois search of Network Solutions
5 and this is for Googles.com and that's the domain name
6 that we've just been discussing, correct?
7    A.   Yes.
8    Q.   Registrant:  Silvers Entertainment Group,
9 Inc., okay, that's Mr. Silvers, right?
10    A.   Yes.
11    Q.   Administrative contact:  Steve Esrig.
12 That's you, right?
13    A.   (Witness nods head.)
14    Q.   So were you aware that you were -- you are
15 the administrative contact on this?
16    A.   Yes.
17    Q.   Now what is it that it is since -- and you
18 could -- as the administrative contact you can
19 delegate that to others by giving Network Solutions
20 notice, correct?
21        You can say that -- to Network Solutions,
22 Dean DePue is going to be doing this.
23        MR. RUBINSTEIN:  Objection.  Vague and
24 ambiguous.
25

63 (Pages 249 to 252)

253

1 BY MR. HARTMANN:
2    Q.   I know I'm oversimplifying it but --
3    A.   Yeah, I'm -- I'm not sure. I don't know if
4 I need Mr. Silvers' permission or if I need his
5 password to make a change to that. I'm just not sure.
6    Q.   All right. So I'd be wasting my time asking
7 you what rights and duties the administrative contact
8 has because you're not sure. And the reason is you
9 don't really serve as a hands-on administrative
10 contact, you delegate that to somebody else at Stelor?
11    A.   That's correct.
12    Q.   But you would agree that under the rules of
13 Network Solutions whatever those rules are and what
14 they allow the administrative contact to do certainly
15 Stelor can do those?
16    A.   I think that's reasonable.
17    Q.   And if it's not doing those it's because it
18 hasn't figured out what the rules are at Network
19 Solutions, it's not because they don't have a password?
20       MR. RUBINSTEIN: Argumentative.
21       THE WITNESS: I couldn't hear you over Mr.
22 Silvers' belch.
23 BY MR. HARTMANN:
24    Q.   Probably it was my stomach growling.
25       Well, I'm going to take back the question.

254

1       Now as administrative contact isn't Stelor
2 able to maintain the website?
3    A.   I don't know how you define maintain in that
4 for instance we are looking for a more cost -- cost
5 effective and a more secure host server. They were
6 explaining this to me the other day. And we had
7 contacted Mr. Silvers at some point in the recent past
8 about moving this and had said that at that time what
9 we -- we had indicated what we wanted to do. Mr.
10 Silvers wrote back a very lengthy e-mail about the
11 process and that he disagreed with what we were doing
12 and how we were doing and so we then said to Mr.
13 Silvers, look, you know, we understand that for
14 whatever reason you don't trust Stelor. Why don't we
15 have a third party, a trustee. We even said, you
16 know, at the time we didn't mind if Mr. Stumpf, who's
17 Mr. Silvers' then attorney, administered as long as we
18 didn't have problems. You know, I had a full-time
19 employee as I mentioned earlier who was managing this.
20 They were paying for it. And Mr. Silvers turned us
21 down flat and was just unwilling to be cooperative in
22 that regard.
23    Q.   He was unwilling to give you the
24 password but --
25    A.   Not only that, sir. He was unwilling to

255

1 give his own attorney the password or a third party,
2 an escrow, a trustee. Stelor said don't give us the
3 password. Just don't inhibit our ability to do the
4 work that we're doing relative to the website and he
5 refused.
6    Q.   All right. That's what I want to know.
7 What work that you need to do relative to the website
8 is inhibited by Mr. Silvers not giving you the
9 password? That's what I'm trying to understand.
10    A.   Again, to the best of my understanding
11 because I don't -- I'm not a technical person. I can
12 only refer you to some of the specific examples such
13 as our attempt to -- to renew a domain name and being
14 unable to do that because we don't have a password,
15 our ability to move it to another server or another
16 whatever those things are called.
17    Q.   Yeah.
18    A.   Which we can't do without Mr. Silvers'
19 password.
20    Q.   Have you ever asked Mr. Silvers to move it
21 to another server?
22    A.   Actually as I just referenced to you we did
23 through counsel go to him and as I said we got a
24 rather lengthy e-mail response about where, how, why,
25 when, why it wasn't a good thing and when it was

256

1 ultimately said and done it had not been moved because
2 we were at an impasse as you know.
3    Q.   All right. I'm just unaware of any request
4 by Stelor but you're telling me there was a specific
5 request in e-mail or in writing to Mr. Silvers asking
6 to move to a --
7    A.   Yes.
8    Q.   -- specific new server?
9    A.   Yes. From -- from Mr. Hefter.
10    Q.   All right. Now, the domain names are all
11 owned by Mr. Silvers, correct?
12    A.   Yes.
13    Q.   And so you're just basically allowed to use
14 them?
15    A.   Just a licensee.
16    Q.   You mentioned before that the -- that
17 certain domain names had lapsed because of Mr.
18 Silvers' failure to renew.
19    A.   Yes.
20    Q.   What -- what domain names are those?
21    A.   Googlegame -- Googlegames. Googleus.
22    Q.   I thought you just told me that you decided
23 to let those lapse on advice of counsel?
24    A.   Oh, I'm sorry, I misunderstood your
25 question. Would you repeat it?

64 (Pages 253 to 256)

257

1  Q.  No, I'm asking for -- you mentioned that Mr.
2  Silvers had caused some important domain names to
3  lapse.
4  A.  Oh, yes, yes, yes.
5  Q.  I'm sorry.
6  A.  I'm sorry.
7  Q.  I'm asking you what those are.
8  A.  I can only -- I'm just going to give you one
9  off the top of my head it was called Gootunes.com. It
10  lapsed in October. It is a critical name. We're not
11  sure why it lapsed but we tried to renew it. We -- in
12  fact we went through so many different gyrations and
13  as I mentioned to you there have been numerous times
14  throughout the period of the relationship where we've
15  been getting notice as the administrative or the
16  technical contact that Mr. Silvers has not paid, has
17  not renewed, things are expiring, we have
18  correspondence on the day the thing was supposed to
19  expire and calls to Mr. Silvers please renew this,
20  please before it goes and of course Mr. Silvers has
21  been at least consistently uncooperative.
22  Q.  So you -- you specifically asked Mr. Silvers
23  to renew Gotunes and he refused to do so?
24  A.  No, Gootunes would be the recent -- there
25  was a list of I think nine names that expired. The

258

1  last letter. I -- I can't recall but we have
2  documentation that I'm happy to share with you.
3  Actually that we provided to you.
4  Q.  I don't think so because you haven't
5  provided us with any documents.
6  A.  Oh, that's not true, sir, we provided you
7  with CDs. I've got the Federal --
8  Q.  No, you didn't.
9  A.  Absolutely we did.
10  Q.  All right. Well, we haven't got --
11  A.  We have the tracking from Fed Ex that shows
12  that you received the package with the CDs and the
13  forms and it was delivered to your law firm. I won't
14  argue but we've got that and it was done when you
15  asked. It was taken care of by Mr. Liebowitz and I
16  can -- I'm happy to provide you -- if you'd like Amy
17  to get you the tracking number showing it was
18  delivered.
19  MS. MCQUILKIN:  I would like to see it
20  because we were supposed to exchange documents
21  when you were here before and I didn't get any.
22  THE WITNESS:  We have the Fed Ex. You want
23  me to have Amy go ahead and -- you know what, is
24  there a phone she can use?
25  MS. MCQUILKIN:  Who gave it? Did Larry send

259

1  it to us?
2  MR. HARTMANN:  Rob.
3  MS. MCQUILKIN:  Or Rob Liebowitz.
4  THE WITNESS:  I don't remember, but I
5  remember getting confirmation that's why -- I'll
6  give you the tracking number.
7  MS. MCQUILKIN:  Yeah, I'll call Rob when we
8  get finished. I'll ask what he sent. It did not
9  make its way to my desk.
10  THE WITNESS:  When we're done let's just
11  print the copy of the delivery and the
12  acceptance. That's the easiest way because
13  we've -- we've got that on the -- the account.
14  MS. MCQUILKIN:  I just want to find it.
15 BY MR. HARTMANN:
16  Q.  All right. Just so I understand now.
17  The -- by -- by Mr. Silvers not giving the domain name
18  password with the registrar to Stelor that, as I
19  understand your testimony, prevents Stelor from
20  renewing the domain name registration?
21  A.  Yes.
22  Q.  And that it prevents you from moving it to a
23  different server?
24  A.  Yes.
25  Q.  All right. Anything else that you can't do

260

1  because Mr. Silvers has the password?
2  A.  I'm unsure because I just don't understand.
3  I'm not -- I don't understand the technical pieces of
4  what's involved.
5  Q.  Now have other people at Stelor had any
6  conversations with Mr. Silvers about any of the
7  matters we've discussed? Any of the members of the
8  board? About the specific matters we've discussed
9  here A, B, C, D, E.
10  A.  Of the board of directors is that your
11  question?
12  Q.  Yes.
13  A.  To my knowledge the only director who hasn't
14  really had a direct conversation but in the meeting
15  with Stumpf would be Michael DiMuccio in June.
16  Q.  Okay. And he was at the meeting in June?
17  A.  Yes.
18  (The document was marked as Exhibit No. 9
19  for identification.)
20 BY MR. HARTMANN:
21  Q.  All right. This was -- I've marked as
22  Exhibit 9, a letter from Good Vibrations
23  International, Inc. to Steve. And this was attached
24  by your lawyers in the papers that were filed with the
25  preliminary injunction. Have you seen this before?

65 (Pages 257 to 260)

261

1    A.   Yes.
2    Q.   This was an e-mail letter that says it was
3  followed up by a hard copy.  Do you recall it being
4  followed up by a signed copy?
5    A.   I received a registered copy, a registered
6  letter or the original, I'm sorry, of this.
7    Q.   Okay.  At the very bottom it says, copy,
8  Paul Hawa.  Who's -- who's that?
9    A.   I don't know, but I'm going to assume it's
10 one of Mr. DiMuccio's attorneys.
11   Q.   All right.  He starts out saying it's come
12 to his attention that we are having more trouble with
13 Mr. Silvers.  Did you have any understanding as to how
14 its -- this came to his attention, the more trouble
15 with Mr. Silvers?
16   A.   Um --
17   Q.   I'm not asking you to read his mind, but
18 did you follow-up with him after this letter?  Did you
19 have any discussions?
20   A.   After this letter absolutely I followed up.
21   Q.   How did it come to his attention that Stelor
22 was having more trouble with Mr. Silvers?
23        MR. RUBINSTEIN:  Objection.  Calls for
24   speculation.
25        THE WITNESS:  I don't really know.  I just

262

1  know that I would say this is a scathing letter
2  and I was -- I was both stunned and -- and very
3  upset because I interpret this letter as -- as an
4  indirect threat against me so I -- I called Mike.
5  BY MR. HARTMANN:
6    Q.   All right.  In the second paragraph it says,
7  after the meeting in New York, June, with Silvers and
8  his lawyers, Stumpf, and you've already discussed
9  that, and regardless of what you told me, I knew this
10 matter wasn't over.  The question is what did you tell
11 Mr. DiMuccio after the meeting in New York?  What is
12 he referring to here?
13   A.   I think he's referring to the conversation
14 that he and I had with Mr. Borchard and Mr. Hefler who
15 were at that meeting that they felt that Mr. Stumpf
16 was a very reasonable man and that we would be able to
17 reach some sort of accord.  That was my understanding
18 also that day when I left that there would be some
19 sort of accord reached.
20   Q.   And that's what you told Mr. DiMuccio --
21   A.   Yes.
22   Q.   -- after the June meeting?
23   A.   Yeah.  Yeah, we -- we really felt strongly
24 that -- especially after the nature of the meeting
25 that -- at least I was -- I may have been wishful

263

1  thinking but I thought that maybe this thing was going
2  to be taken care of finally because Mr. Stumpf was
3  involved.
4    Q.   All right.  Now it says that Mr. DiMuccio
5  says that you, Steve, are telling him that Silvers is
6  destroying Stelor's ability to bring in the much
7  needed capital.  Is that what you told Mr. DiMuccio?
8    A.   I think he's mischaracterizing what I may
9  have said.  I would never have said to a director or
10 to an investor just simply as a general matter of -- of
11 being responsible that the capital that we're raising,
12 the subscription, the investment capital that -- that
13 my ability was being destroyed, but I'm not denying
14 that I said something like it and knowing how accurate
15 and how brilliant Michael DiMuccio is, I'm sure he
16 heard me say something relative to the recent
17 situation when we filed the litigation and of course I
18 would interpret that by having filed litigation
19 against Mr. Silvers.  I am required to disclose that
20 litigation to any potential investor and again de
21 facto investors are kind of, I think, hesitant to
22 invest in a company that is involved in this type of
23 contract dispute with its licensor.
24   Q.   Have you advised the other board members
25 that Mr. Silvers has filed an action to terminate the

264

1  license?
2    A.   Yes.
3    Q.   All right.  Can you tell me anything that
4  Mr. Silvers has done that has destroyed Stelor's
5  ability to bring in much needed capital?
6    A.   I would say that the -- the biggest thing
7  Mr. Silvers has done is initiated conversations with
8  Google, Inc.
9    Q.   All right.  What investors have you lost
10 because Mr. Silvers initiated -- by the way initiated
11 the conversations.  We talked about those this
12 afternoon, right, those were back in 2001?
13   A.   No, no, no, no.
14   Q.   Before -- but before the license agreement?
15   A.   No, I'm talking about Mr. Silvers'
16 conversations with Google, Inc. currently.
17   Q.   All right.  Well, gee, I didn't recall you
18 telling me that when I asked you.  Let me ask you
19 again.  Tell me about all conversations in 2004 that
20 Mr. Silvers has had with Google.
21   A.   The only conversations I'm aware of
22 through -- through you, through his counsel with
23 Google have been going on, I don't know, for the last
24 two months I guess.
25   Q.   Oh, all right.  So it's -- it's Silvers'

66 (Pages 261 to 264)

265

1 lawyers then who are having the conversations not Mr.
2 Silvers.
3      MR. RUBINSTEIN: Calls for speculation.
4 BY MR. HARTMANN:
5    Q. I'm asking what you know, sir. I thought
6 we already went through this.
7    A. I know. No, no, I know -- again, it's a
8 different question. I know that through you
9 representing Silvers -- Kozyak, Tropin -- that Silvers
10 has approached Google, Inc.
11    Q. How do you know that?
12    A. Because my attorneys tell me so.
13    Q. Okay. So you don't -- I mean -- okay.
14      And you don't know whether your attorneys
15 are guessing or not?
16    A. I actually would say on the record that
17 Larry Hefter doesn't guess.
18    Q. Okay. Right. So are you telling me that
19 Stelor is unable to raise capital because Mr.
20 Stelor -- Silvers' lawyers have talked to Google? Is
21 that what -- how I'm reading this?
22    A. I would say that's Mr. DiMuccio's contention
23 and I am telling you that it is but a part of Mr.
24 Silvers' behavior that inhibits and makes our job to
25 promote and commercialize the IP that more difficult.

266

1 By the way the sentence reads in order to bring
2 Googles.com to market. That is part and parcel of
3 why, to quote you earlier, we have filed this
4 litigation against your client to have the court
5 compel Mr. Silvers to adhere to the license so that we
6 could go ahead and make this the world acclaimed
7 success he alleges that it could be and that we know
8 it will be and here you've got -- I would think Mr.
9 DiMuccio is the biggest investor, $600,000. I think
10 that this is a -- a reasonable concern he has.
11    Q. So if the court doesn't enter an injunction
12 on A, B, C, D and E there, it's going to be impossible
13 for you to bring Googles to market?
14      MR. RUBINSTEIN: Calls for speculation.
15      THE WITNESS: Yeah, I -- I can't speculate
16 on that.
17 BY MR. HARTMANN:
18    Q. There's still a chance even if the court
19 doesn't enter the gag orders and the other things that
20 you want that Google -- that Stelor could bring
21 Googles.com to -- or Googles in general to market?
22    A. Again, I -- I can't speculate on --
23    Q. All right. So first of all I mean you filed
24 a lawsuit against Mr. Silvers. That's not what I'm
25 asking about. I'm asking about what Silvers is doing

267

1 to destroy Stelor's ability to bring in the much
2 needed capital.
3    A. Well --
4    Q. Can you name any particular investor who has
5 chosen not to invest because Mr. Silvers or anything
6 he's done?
7    A. I'd have to check our records of -- of who's
8 been in the process.
9    Q. You can't tell me any as you sit here today?
10      MR. RUBINSTEIN: Asked and answered.
11 BY MR. HARTMANN:
12    Q. Without checking your records.
13    A. I'd have to check those records.
14    Q. All right. It says that the board
15 instructed you to file the lawsuit, is that true?
16    A. Yes.
17    Q. And that would be reflected in the minutes?
18    A. Yes.
19    Q. That was a formal board meeting?
20    A. Yes.
21    Q. Why?
22      MR. RUBINSTEIN: Calls for a narrative. You
23 can answer.
24 BY MR. HARTMANN:
25    Q. Why did the board instruct you to file the

268

1 lawsuit?
2    A. The board is actually -- has been asking for
3 me for the last two years to take an action to stop
4 Mr. Silvers' interference and I have for two years
5 because of the nature of my relationship with Mr.
6 Silvers on his behalf certainly has been a love/hate
7 relationship tried to put off being adversarial
8 throughout this entire time. My purpose has been from
9 the beginning to bring this -- to give birth to this
10 brilliant intellectual property and the board finally
11 got fed up based on Mr. Silvers' continued actions and
12 behavior and gave me a direct dictate as the chief
13 executive officer to have counsel file suit.
14    Q. And did the board discuss the notion that
15 once Stelor filed suit against Silvers and created an
16 adverse situation it was more likely that Silvers
17 would have communications with Google? Was that
18 discussed with the board?
19    A. There was a great amount of discussion.
20 There -- there was hours of discussion. I can't
21 recall if that was a part or not.
22    Q. All right. Now, Mr. DiMuccio further in the
23 third paragraph down complains that Silvers has
24 furthermore set about negotiating with Google, Inc.
25 exclamation point. What's wrong with Steve Silvers

67 (Pages 265 to 268)

269

```
 1   negotiating with Google, Inc. as to his rights as
 2   opposed to Stelor's?
 3       A.  As I answered to you on a variety of
 4   occasions today, it is Stelor's contention that Mr.
 5   Silvers, while I have agreed with you, owns the
 6   property and has the right to sell those property
 7   rights, relative to Google, Inc. and based on his
 8   position over the last -- since the onset of the
 9   license that he may not negotiate with Google, Inc.
10   for a variety of reasons, primarily bad faith on his
11   part with us because we are the Google, Inc.
12   negotiating party because we were granted --
13           MR. RUBINSTEIN:  Let him answer the
14   question, please.
15           THE WITNESS:  We've been granted those
16   rights by Mr. Silvers to do so.  It would seem to
17   me that it is ridiculous for Google, Inc. knowing
18   how large they are at this point to negotiate
19   with either party as you and I spoke about when I
20   was here a week ago when the licensor and the
21   licensee is divided or adversarial and so this
22   investor and director understands that which
23   everyone understands how is it that Silvers can
24   sell his rights and the ability to deal with
25   Google, Inc. by the way, and I have and you I
```

270

```
 1   believe have hundreds and hundreds of e-mails in
 2   which Silvers has laid out very methodically and
 3   carefully his position relative to us either
 4   suing or partnering or filing of this or that,
 5   your opinion.  There -- there are pieces after
 6   years of that, how is it that now he's
 7   negotiating with them and files probably the most
 8   egregious part of the breaches, files through
 9   counsel his declaration and statement that he has
10   no problem with Google, Inc.
11   BY MR. HARTMANN:
12       Q.  All right.  I'm just trying to understand
13   why your board believes that Mr. Silvers is prohibited
14   by the agreement to sell his own -- his own interest
15   in the IP, not the Stelor interest.  I'm referring to
16   his specific separate interest.
17       A.  You and I covered this earlier several times
18   but I can't speak for the board.  I can only speak for
19   Steven Esrig.  And I believe that based on my
20   understanding of the contract as a layman he has the
21   right as the owner of the IP to sell that right but he
22   does not have the right to interfere with our
23   relationship and ongoing or potential relationship and
24   because the agreement he had with us says that he will
25   cooperate in any way necessary to help enforce those
```

271

```
 1   intellectual property rights -- let me see.  He will
 2   use his best efforts to perform such services as may
 3   be requested by us and cooperate in every way
 4   necessary and desirable to strengthen, establish or
 5   maintain the right granted, then I would read that on
 6   the face that he would not try to sell or be involved
 7   with the party who prior to his getting into a license
 8   agreement with us we are trying to negotiate with in
 9   fact.  There is in this license two references to a
10   company, one of the assets we got with the
11   intellectual property called Ganz and Mr. Silvers has
12   a coexistence agreement with Ganz, Inc. under Schedule
13   A on Licensed Trademarks it says:  The following
14   licensed trademarks form part of this agreement.  (i)
15   the Googles word and design trademarks in
16   International Class Code 016 of the USPTO and the
17   coexistent trademark agreement with Ganz, Inc. of
18   Canada in International Class Code 028 of the USPTO
19   which is hereto attached and made a part of this
20   Schedule A:
21           Interestingly enough is that same agreement
22   Mr. Silvers -- an agreement that predates the
23   license -- writes that Ganz in any lawsuit or any
24   action has no rights in that action, it is only Steven
25   Silvers, et al., that would have the right to bring an
```

272

```
 1   action and one of the things when Mr. Silvers was
 2   selling at that time me about us getting into a
 3   relationship together was the fact that we were the et
 4   al.  That by -- by virtue of the fact that we were the
 5   licensee that Silvers and Stelor were the only parties
 6   that had the right to do so.  So if that's so and
 7   again that document is a document attached to this
 8   that I'm sure you have.  By definition if that's so,
 9   then Silvers said that only you, Stelor, and me,
10   Silvers, can sue these guys if we're going to get into
11   an action it would seem to me since that's one of the
12   assets, one of the pieces of the contract, that I
13   would find it to be significant bad faith for Silvers
14   to enter into, negotiate or have anything to do with
15   Google, Inc. separate and apart from Stelor
16   Productions.
17       Q.  What if the matters in which Silvers wants
18   to communicate with Google have nothing to do with the
19   Google/Stelor relationship which by the way I didn't
20   hear much about this morning but let's assume there is
21   one.  Isn't he entitled to do that?
22           MR. RUBINSTEIN:  Calls for speculation.
23           THE WITNESS:  And I -- there's an old saying
24   where I come from.  If my grandmother had them,
25   she would have been my grandfather.  I don't know
```

68 (Pages 269 to 272)

273

1  about anything else only then -- I can only speak
2  to you respectfully about, as you know, my
3  understanding of this contract and our good faith
4  efforts to adhere to it.
5 BY MR. HARTMANN:
6    Q.  If the relationship as you put it between
7  Googles and Stelor is dead and there's no chance of
8  any relationship, then is there any impediment on Mr.
9  Silvers communicating with Google?
10   A.  Well, you've just cited an example that's
11 not true.  Not only is it not dead --
12   Q.  No, but I'm asking you to assume that.
13   A.  Oh, you're asking me to speculate --
14   Q.  I'm not asking you --
15   A.  -- if the relationship were dead.
16   Q.  Yes.
17   A.  Would Mr. Silvers then --
18      MR. RUBINSTEIN:  Object.  It calls for
19  speculation.
20      THE WITNESS:  Yeah, I -- I wouldn't be able
21  to speculate on that.
22      MR. HARTMANN:  All right.  Let's take a
23  quick break.  Talk to you guys.
24      THE VIDEOGRAPHER:  We're going off the video
25  record.  The time is 4:50.

274

1      (There was a break taken after which the
2  following proceedings were held:)
3      THE VIDEOGRAPHER:  We're now back on the
4  video record.  The time is 4:58.
5      MR. HARTMANN:  We're back?
6      THE VIDEOGRAPHER:  Yes, we're back.
7      MR. HARTMANN:  All right.  This is Ken
8  Hartmann.  It's about five o'clock.  We're going
9  to stop here.  We are basically done with the
10  deposition today.  Of course, you know, you know,
11  preserving our right to take further depositions
12  either of this witness or corporate
13  representatives on the merits of the case at
14  large, if the case is not dismissed or -- for one
15  reason or another but in terms of our preliminary
16  injunction discovery with this particular witness
17  we're -- we are done.  We have no further
18  questions.
19      Any cross?
20      MR. RUBINSTEIN:  No cross.
21      MR. HARTMANN:  All right.  Thank you.
22      MR. RUBINSTEIN:  Thank you.
23      THE VIDEOGRAPHER:  This is the end of the
24  videotaped deposition.  The time is 4:59 p.m.
25      (The deposition was concluded at 5:00 p.m.)

275

1   (The reading, signing and notice of filing
2  were not waived.)
3
4
5          EXCEPT FOR THE CORRECTIONS
           MADE HEREIN BY ME, I CERTIFY
           THIS IS A TRUE AND ACCURATE
6          TRANSCRIPT.
           FURTHER DEPONENT SAYETH NOT
7
8          _____
9              DEPONENT

   STATE OF FLORIDA      )
10                        ) SS:
   COUNTY OF MIAMI-DADE  )
11
       Sworn and subscribed to before me this _____ day
12 of _____, 2004.
13 PERSONALLY KNOWN _____ OR I.D. _____
14
15         _____
16             Notary Public in and for the
               State of Florida at Large.
17 My Commission Expires:
18
19
20
21
22
23
24
25

276

1 STATE OF FLORIDA     )
                       ) SS
2 COUNTY OF MIAMI-DADE )
3   I, Debbie L. Oates, RPR and Notary Public in and
  for the State of Florida at Large, do hereby certify
4 that Steven Esrig was duly sworn by me.
     Witness my hand and seal this 16th day of
5 December, 2004, in the City of Miami, County of
  Miami-Dade, State of Florida.
6
7

8
         Debbie L. Oates, RPR
9        Notary Public - State of Florida
         My Commission # DD 315936
10       Expires: July 25, 2008
11
12
         CERTIFICATE
13
   STATE OF FLORIDA     )
14                       ) SS
   COUNTY OF MIAMI-DADE )
15
     I, Debbie L. Oates, RPR, do hereby certify that
16 the foregoing deposition was taken before me at the
   time and place therein designated; that my shorthand
17 notes were thereafter transcribed into this
   computer-assisted transcript under my supervision;
18 that the reading, signing, and notice of filing of the
   deposition were not waived; and that the foregoing
19 pages, numbered from 1 through 275, constitute a true
   record thereof.
20   I FURTHER CERTIFY that I am not of counsel; I am
   not related to nor employed by any attorney to this
21 cause; and I am not financially interested in the
   outcome thereof.
22   DATED at Miami, Miami-Dade County, Florida, this
   16th day of December, 2004.
23
24       _____
         Debbie L. Oates, RPR
25

69 (Pages 273 to 276)

# LICENSE, DISTRIBUTION
# AND MANUFACTURING AGREEMENT

This **LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT** between Steven A. Silvers and Stelor Productions, Inc. is effective as of June 1, 2002 and is entered into by and between Steven A. Silvers (**LICENSOR**), an Individual, whose official address is 3741 NE 163rd Street, PMB #325, North Miami Beach, FL 33160 and Stelor Productions, Inc. (**LICENSEE**), a Delaware corporation with its current offices located at: 14701 Mockingbird Drive, Darnestown, Maryland, 20874.

## WITNESSETH

**WHEREAS, LICENSOR** is the sole and exclusive owner of the **GOOGLES** characters identified more fully in "Schedule A" attached hereto (the "Licensed Property");

**WHEREAS, LICENSOR** is the sole and exclusive owner of the **GOOGLES** trademarks identified more fully in "Schedule A" attached hereto (the "Licensed Trademarks");

**WHEREAS, LICENSOR** has the power and authority to grant to **LICENSEE** the right, privilege and license to use, manufacture, distribute, and sell those types of products that incorporate or are otherwise based on the Licensed Property as identified in "Schedule A" attached hereto (the "Licensed Products") and to use the Licensed Trademarks on or in association with such Licensed Products;

**WHEREAS, LICENSEE** has or will have the ability to manufacture, have manufactured, have sub-manufactured, distribute and sell or have sold and distributed the Licensed Products in the Licensed Territory more clearly defined in Schedule A (the Territory) and to use the Trademark(s) on or in association with the Licensed Products;

**WHEREAS, LICENSEE** desires to obtain from **LICENSOR** an exclusive license to use, manufacture, have manufactured and sell Licensed Products in the Territory and to use the Licensed Trademarks on or in association with the Licensed Products;

**WHEREAS, LICENSEE** has agreed, pursuant to a letter agreement, to act as a consultant for **LICENSOR**; and

**NOW, THEREFORE**, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do hereby agree as follows:

## I. LICENSE GRANT

    A.      LICENSOR hereby grants to **LICENSEE**, for the Term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to **LICENSOR**), worldwide, sub licensable right and license to use, reproduce, modify, create derivative works of, manufacture, have manufactured, market, advertise, sell, distribute, display, perform, and otherwise commercialize the Licensed Products and Licensed Properties in the Territory. The license includes a license under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with the creative characters known as The Googles, anything that contains the letters GOO (in upper or lower case) together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

EXHIBIT

"A"

EXHIBIT

B.    LICENSOR hereby grants to LICENSEE for the term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use the Licensed Trademarks on or in association with the Licensed Products as well as on packaging, promotional, and advertising material associated therewith.

C.    LICENSEE shall have the right to sublicense LICENSEE's rights under this Agreement; provided that any and all such sublicenses shall be subject to the terms and conditions of this Agreement.

D.    No licenses will be deemed to have been granted by either party to any of its Intellectual Property Rights, except as otherwise expressly provided in this Agreement.

E.    LICENSEE agrees to place on all Licensed Products, where practicable, the phrase "created by Steven A. Silvers" or other similar wording.

## II. TERM OF THE AGREEMENT

This Agreement and the provisions hereof, except as otherwise provided, shall be in full force and effect commencing on the date of execution by both parties and shall extend for a Term as recited in "Schedule A" attached hereto (the "Term").

## III. COMPENSATION

A.    In consideration for the licenses granted hereunder, LICENSEE agrees to pay to LICENSOR, during the Term of this Agreement, a royalty in the amount recited in "Schedule A" attached hereto (the "Royalty") based on LICENSEE's Net Sales of Licensed Products. "Net Sales" shall mean the gross revenues on a cash basis (i.e., actually collected by LICENSEE but without counting any gross revenues twice) excluding shipping and handling charges, sales taxes, VAT, and other taxes imposed upon sales less (i) customary trade discounts, (ii) allowances actually shown on the invoice (except cash discounts not deductible in the calculation of Royalty) (iii) bona fide returns, charge backs, refunds or credits (net of all returns actually made or allowed as supported by memoranda actually issued to the customers), (iv) sales of remainder inventory made at less than the total of LICENSEE's actual cost of goods and actual direct selling costs solely for purposes of liquidation or close-out, (v) other uncollectible accounts, (vi) cooperative advertising allowances, (vii) sales commissions paid.

B.    The Royalty owed LICENSOR shall be calculated on a quarterly calendar basis on collected funds (the "Royalty Period") and shall be payable no later than thirty (30) days after the termination of the preceding full calendar quarter, i.e., commencing on the first (1st) day of January, April, July and October with the exception of the first and last calendar quarters which may be "short" depending upon the effective date of this Agreement.

C.    With each Royalty Payment, LICENSEE shall provide LICENSOR with a written royalty statement in a form acceptable to Licensor. Such royalty statement shall be certified as accurate by a duly authorized officer of Licensee, reciting on a country-by-country basis, the stock number, item, units sold, description, quantity shipped, gross invoice, amount billed to customers less discounts, allowances, returns and reportable sales for each Licensed Product. Such statements shall be furnished to Licensor whether or not any Licensed Products were sold during the Royalty Period. The LICENSEE hereby further agrees to provide the LICENSOR with a list of all of it's sub licensees added during the current royalty period.

D.    If LICENSEE sells any Licensed Products to any party affiliated with LICENSEE, or in any way directly or indirectly related to or under the common control with LICENSEE, at a price less than the average weighted price charged to other parties, the Royalty payable to LICENSOR shall be computed on the basis of the averaged weighted price charged to other parties if the Licensed Products are not ultimately resold to unaffiliated third parties.

E.    All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties and may offset or be offset from any other payments due to **LICENSEE** under this or any other agreement between the parties.

F.    Late payments shall incur interest at the rate of ONE PERCENT (1%) per month from the date such payments were originally due.

## IV. AUDIT

A.    **LICENSOR** shall have the right, at its own expense, to have a nationally recognized certified public accounting firm, upon at least thirty (30) days written notice and no more than twice per calendar year, to inspect during normal business hours, **LICENSEE's** books and records and all other documents and material in the possession of or under the control of **LICENSEE** with respect to the subject matter of this Agreement at the place or places where such records are normally retained by **LICENSEE**.

B.    In the event that such inspection reveals an underpayment discrepancy greater than 5% of the amount of Royalty owed **LICENSOR** from what was actually paid, **LICENSEE** shall have the opportunity to conduct its own audit. If **LICENSEE** agrees to the amount, if any, of any discrepancy, **LICENSEE** shall pay such discrepancy, plus interest, calculated at the rate of ONE AND ONE-HALF PERCENT (1 1/2%) per month. Upon settlement of any underpayment discrepancy, no further audit by **LICENSOR** shall be requested that year. That period end date shall represent the new period start date for future audits for underpayment discrepancies. In the event that such discrepancy is in excess of TEN THOUSAND UNITED STATES DOLLARS ($10,000.00), **LICENSEE** shall also reimburse **LICENSOR** for the cost of auditing fees in connection therewith.

C.    All books and records relative to **LICENSEE's** obligations hereunder shall be maintained and kept accessible and available to **LICENSOR** for inspection for at least three (3) years after the expiration of the initial or any subsequent term.

D.    In the event that an investigation of **LICENSEE's** books and records is made, certain confidential and proprietary business information of **LICENSEE** may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be held in confidence by **LICENSOR** and shall not be used by **LICENSOR** or disclosed to any third party for a period of two (2) years from the date of disclosure, or without the prior express written permission of **LICENSEE** unless required by law, except **LICENSOR** may not disclose at any time to any third party any such confidential and proprietary business information which are trade secrets of **LICENSEE**. It is understood and agreed, however, that such information may be used by **LICENSOR** in any proceeding based on **LICENSEE's** failure to pay its actual Royalty obligation.

## V. WARRANTIES AND OBLIGATIONS

A.    ~~LICENSOR represents and warrants that:~~

(i)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of **LICENSOR** and this Agreement is a valid and binding obligation of **LICENSOR**, enforceable in accordance with its terms;

(ii)    the execution, delivery and performance by **LICENSOR** of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which **LICENSOR** is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on **LICENSOR**;

(iii)    **LICENSOR** owns the exclusive rights in and to the **Licensed Intellectual Property, Licensed Trademarks, Licensed Patents and Licensed Copyrights necessary to effectuate the granting of the Licensing Rights from the LICENSOR to the LICENSEE as contemplated herein.**

3



(iv)       the Licensed Intellectual Property and Licensed Trademarks do not infringe the rights, including without limitation, Intellectual Property Rights, of any third party; and

(v)      except as set forth in Schedule B attached hereto, **LICENSOR** has not received any notice from any third party of any alleged or actual infringement of the Licensed Intellectual Property or Licensed Trademarks and the Licensed Intellectual Property and/or Licensed Trademarks are not the subject, and has not been the subject, of any previous or pending litigation with the exception of the Ganz litigation which has been resolved.

B.  **LICENSEE** represents and warrants that:

(i)      the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of **LICENSEE** and this Agreement is a valid and binding obligation of **LICENSEE**, enforceable in accordance with its terms;

(ii)      the execution, delivery and performance by **LICENSEE** of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which **LICENSEE** is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on **LICENSEE**; and

(iii)      it will use its commercially reasonable efforts to promote, market, sell and distribute the Licensed Products.

C.    <u>Disclaimer of Warranties</u>. EXCEPT AS EXPRESSLY PROVIDED ABOVE, NEITHER PARTY MAKES ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, REGARDING THIS AGREEMENT AS TO ANY MATTER INCLUDING, BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

D.    **LICENSEE** shall be solely responsible for the manufacture, production, sale and distribution of the Licensed Products or to have such Licensed Products manufactured, produced, sold and distributed, and will bear all related costs associated therewith.

<u>**VI. NOTICES, QUALITY CONTROL, AND SAMPLES**</u>

A.    The Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices.

B.    The Licensed Products shall be of a high quality which is at least equal to comparable products manufactured and marketed by **LICENSEE** and in conformity with a standard sample provided by **LICENSEE**.

C.    Prior to the commencement of manufacture and sale of the Licensed Products, **LICENSEE** shall submit to **LICENSOR for his input**, at no cost to **LICENSOR**, a reasonable number of samples of all Licensed Products which **LICENSEE** intends to manufacture and sell and of all promotional and advertising material associated therewith.

<u>**VII. NOTICES AND PAYMENT**</u>

A.    Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at the above-stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

B.    Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.

## VIII. INTELLECTUAL PROPERTY PROTECTION

A.     **LICENSOR** hereby grants **LICENSEE** all right, power and interest to seek, obtain and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Trademarks, Licensed Copyrights and any other Intellectual Property Rights granted herein. **LICENSOR** further agrees to assist **LICENSEE** as may be required to apply for and obtain recordation of and from time to time enforce, maintain and defend such Intellectual Property Rights. **LICENSOR** hereby grants **LICENSEE** an irrevocable power of attorney for the initial and any subsequent terms of this Agreement to act for and on **LICENSOR's** behalf and instead of **LICENSOR**, at **LICENSEE's** expense, to execute and file any such document(s) and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by **LICENSOR**.

B.     **LICENSOR** shall retain all rights, title and interest in the Licensed Intellectual Property and Licensed Trademarks and any modifications thereto based solely on such Licensed Intellectual Property. **LICENSEE** acknowledges **LICENSOR's** exclusive rights in the Licensed Intellectual Property and, further, acknowledges that the Licensed Intellectual Property and/or the Licensed Trademarks rights are unique and original to **LICENSOR** and that **LICENSOR** is the owner thereof. **LICENSEE** shall not, at any time during or after the effective Term of the Agreement, dispute or contest, directly or indirectly, **LICENSOR's** exclusive right and title to the Licensed Intellectual Property and/or the Licensed Trademarks(s) or the validity thereof.

C.     **LICENSEE** agrees that its use of the Licensed Intellectual Property and/or the Licensed Trademarks(s) inures to the benefit of **LICENSOR** and that the **LICENSEE** shall not acquire any rights in the Licensed Intellectual Property and/or the Licensed Trademarks(s) except for the license granted herein.

D.     **LICENSOR** shall retain all rights, title and interest in and to the Licensed Intellectual Properties. The LICENSOR owns the exclusive rights to the Licensed Intellectual Property. **LICENSOR** hereby waives and releases **LICENSEE** from any and all current or future claims or causes of actions by third parties, whether known or unknown, arising out of or relating to such Licensed Intellectual Properties including, but not limited to, any claim that Licensed Products violate, infringe on or misappropriate any of **LICENSOR's** Intellectual Property Rights.

E.     Each party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable to effect any of the provisions under this Section (Intellectual Property Protection). The party requesting such shall reimburse the other party for the expenses incurred as a result of such cooperation. The parties agree to take any actions or prepare or execute any documents reasonably requested by the other party. Furthermore, during the term of this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

## IX. TERMINATION

A .     **Right to Terminate on Notice.** This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party fails to cure such breach.

B. LICENSEE shall have the right to terminate this Agreement at any time on thirty (30) days written notice to LICENSOR. In such event, all moneys paid to LICENSOR shall be deemed non-refundable and LICENSEE's obligation to pay any unpaid royalties shall be accelerated and shall become immediately due and payable.

C. Additionally, if, after five years of the initial intellectual property license, there are three consecutive years during which royalty payments to LICENSOR are less than one hundred thousand dollars ($100,000.00), LICENSOR has the option to cancel this Agreement in accordance with Section IX. TERMINATION, Para. A.

## X. POST TERMINATION RIGHTS

A. Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEE shall provide LICENSOR with a complete schedule of all inventory of Licensed Products then on hand or on order (the "Inventory").

B. Upon expiration or termination of this Agreement, LICENSEE shall be entitled, for an additional period of six (6) months, to continue to sell such Inventory. Such sales shall be made subject to all of the provisions of this Agreement and to an accounting for and the payment of a Royalty thereon. Such accounting and payment shall be due and paid within thirty (30) days of the quarterly calendar cited as the period basis for royalty calculation. LICENSEE shall have the right to continue the use of the name(s) associate with the products and articles that encompass this Agreement for so long as LICENSEE is actively selling its inventory of articles and products. At the conclusion of LICENSEE'S efforts in this regard, LICENSEE agrees to discontinue the use of names, trademarks, signs, advertising and anything else that might make it appear that the LICENSEE is still handling the articles and products of LICENSOR.

C. Upon the expiration or termination of this Agreement, all of the license rights of LICENSEE under this Agreement shall forthwith terminate and immediately revert to LICENSOR and LICENSEE, except as detailed above in Section (B) of the "Post Termination Rights" Section, shall immediately discontinue all use of the Licensed Property and the like, at no cost whatsoever to LICENSOR.

D. Upon termination of this Agreement for any reason whatsoever, LICENSEE agrees to immediately return to LICENSOR all material relating to the Licensed Intellectual Property. Furthermore, upon termination or expiration of this Agreement, LICENSEE agrees to immediately inform all of it's sub licensees regarding the said termination or expiration of this Agreement.

## XI. INFRINGEMENTS

A. During the Term of this Agreement and any and all option/renewal periods, LICENSEE shall have the sole right, in its discretion and at its expense, to take any and all actions against third persons to protect the Intellectual Property Rights licensed in this Agreement.

B. Upon request by either party to the other, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such lawsuit. Each party shall reimburse the other party for the expenses incurred as a result of such cooperation.

## XII. INDEMNITY

A. LICENSEE agrees to indemnify and hold harmless LICENSOR, its agents, heirs, assigns and representatives, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSOR based on product liability but excluding any claims based solely upon the use of the Licensed Intellectual Property or Licensed Trademarks by LICENSEE in accordance with the terms of this Agreement.

6

B.    **LICENSOR** agrees to indemnify and hold harmless **LICENSEE**, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against **LICENSEE** based on or arising from (i) any infringement, misappropriation or other related action involving the Licensed Intellectual Property or Licensed Trademarks; or (ii) any breach of **LICENSOR**'s obligations, representations, warranties or duties under this agreement.

C.    With respect to any claims falling within the scope of the foregoing indemnifications: (i) each party agrees promptly to notify the other of and keep the other fully advised with respect to such claims and the progress of any suits in which the other party is not participating; (ii) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (iii) each party shall have the right to participate, at its sole expense, in any suit instituted against it; and (iv) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld or delayed.

## XIII.  LIMITATION OF LIABILITY

A.    IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT (INCLUDING LOSS OF PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE), NO MATTER WHAT THEORY OF LIABILITY, EVEN IF THE EXCLUSIVE REMEDIES PROVIDED FOR IN THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE AND EVEN IF EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OR PROBABILITY OF SUCH DAMAGES. THE PROVISIONS OF THIS SECTION "LIMITATION OF LIABILITY" ALLOCATE THE RISKS UNDER THIS AGREEMENT BETWEEN LICENSOR AND LICENSEE AND THE PARTIES HAVE RELIED UPON THE LIMITATIONS SET FORTH HEREIN IN DETERMINING WHETHER TO ENTER INTO THIS AGREEMENT.

B.    EACH PARTY'S LIABILITY TO THE OTHER UNDER THIS AGREEMENT FOR CLAIMS RELATING TO THIS AGREEMENT, WHETHER FOR BREACH OF CONTRACT OR IN TORT, SHALL BE LIMITED TO THE AGGREGATE ROYALTY FEES PAID BY LICENSEE TO LICENSOR DURING THE TWELVE MONTH PERIOD PRECEDING THE CLAIM.

## XIV.  INSURANCE

**LICENSEE** shall, throughout the Term of this Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business as required by state and federal law(s), standard Product Liability Insurance naming **LICENSOR** as an additionally named insured. Such policy shall provide protection against any and all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The amount of coverage shall be as specified in "Schedule A" attached hereto. **LICENSEE** agrees to furnish **LICENSOR** a certificate of insurance evidencing same within ninety (90) days after issuance of same, and, in no event, shall **LICENSEE** manufacture, distribute or sell the Licensed Products prior to receipt by **LICENSOR** of such evidence of insurance.

## XV.  FORCE MAJEURE

**LICENSEE** shall not be liable for any failure of performance hereunder due to causes beyond its reasonable control, including but not limited to acts of God, fire, explosion, vandalism, strikes, lockouts, work stoppages, other labor difficulties, supplier failures, storm or other similar catastrophes, any law, order, regulation, direction, action or request of the state, local or federal government or of any government agency, commission, court, bureau, corporation or other instrumentality of any one or more of such governments, or of any civil or military authority, national emergencies, insurrections, riots, or wars.

### XVI. JURISDICTION AND DISPUTES

A. This Agreement shall be governed in accordance with the laws of the State of Florida without regard to its principles of conflicts of laws.

B. All disputes under this Agreement shall be resolved by the courts of the State of Florida including the United States District Court for Florida and the parties all consent to the jurisdiction of such courts, agree to accept service of process by mail, and hereby waive any jurisdictional or venue defenses otherwise available to it.

### XVII. AGREEMENT BINDING ON SUCCESSORS

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, successors and assigns.

### XVIII. WAIVER

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

### XIX. SEVERABILITY

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

### XX. NO JOINT VENTURE

Nothing contained herein shall constitute this arrangement to be employment, a joint venture or a partnership.

### XXI. ASSIGNABILITY

Neither party may assign by any act or operation of law the rights and obligations of this Agreement unless in connection with a transfer of substantially all of the assets of **LICENSEE** and/or with the consent of **LICENSOR**, which shall not be unreasonably withheld or delayed. By way of example and not limitation, **LICENSEE** may freely assign its rights and obligations under this Agreement to Stelor Productions, Inc.

### XXII. INTEGRATION

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may be in conflict with said Agreement.

### XXIII. RATIFICATION

The LICENSOR hereby agrees to the transfer of this License from the LICENSEE (The Aurora Collection, Inc.) to Stelor Productions, Inc. as contemplated by the Asset & Purchase Agreement, dated May 1ˢᵗ, 2002, and           executed           between           the           above           mentioned           parties



**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his/her hand and seal the day indicated.

STEVEN A. SILVERS                                    STELOR PRODUCTIONS, INC.

Steven A. Silvers                                    By: _____
Title:  Owner/LICENSOR                               Printed Name: _Steven A. Esrib_
Dated:  _5/09/02_                                    Title: _President_
                                                     Dated: _5/9/02_

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003

5/9/02



## "SCHEDULE A"

### LICENSED INTELLECTUAL PROPERTY

The following Licensed Intellectual Property forms part of this Agreement:  A License under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with a creative character known as Googles, anything that contains the letters GOO (in upper or lower case), together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the Planet Goo, slides,  computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

### LICENSED TRADEMARKS

The following Licensed Trademarks form part of this Agreement: (i) "The Googles" (word and design) Trademarks in International Class Code (016) of the U.S.P.T.O. and the co-existent Trademarks Agreement with Ganz, Inc. of Canada in International Class Code (028) of the U.S.P.T.O., which is hereto attached and made a part of this "Schedule A" document, (ii) "Oogle", (iii) "Iggle", (iv) "Oggle", (v) "GooRoo", (vi) "Planet Goo", (vii) "GooMu", (viii) "GooToons", (ix) "GooStuff", (x) "GooKids",  (xi) "GooStore" and (xii) any other trademarks, whether registered, pending or future or common law, used in connection with the Licensed Property, including , but not limited to, any trademark incorporating the phrase "Goo" currently in existence.

### LICENSED PRODUCTS

The following Licensed Products form part of this Agreement:  all products which comprise the likenesses, stories, ideas, concepts, or, designs of the Licensed Property, including without limitation, stuffed toy figurines, videos, stickers, t-shirts or other clothing items, slides, movies, cartoons, books (comic and otherwise), posters, playing, trading and collector cards, CDs, cassette tapes, DVDs, TV programs, motion pictures, all other forms of communication and publication, programs, computer Web site(s), membership lists and clubs, and any other products.

### DERIVATIVES

A Derivative as defined in this agreement shall mean a product or service that is utilized by the LICENSEE and developed by a party other than the LICENSOR but is used in conjunction with licensed products, articles and /or services. It can be a product or service produced by the LICENSEE or a third party (inventor, sub licensee etc,) that in its use enhances the value of the Googles Universe but does not have a conflict with an already existing Googles product idea or concept as outlined in this agreement. It may not possess the "Googles" or "GOO" in it's name and would therefore fall under the LICENSOR'S exclusive ownership as defined in the amended agreement but can be used in conjunction with the "Goo" Universe by the LICENSEE.

### TERRITORY

The following countries shall constitute the Territory: Global/Worldwide rights.

### TERM

This Agreement shall commence on the date executed below by both parties and shall be for a thirty (30) year term.   This Agreement shall automatically renew for one additional ten (10) year term on the same terms and conditions provided for herein ("Renewal Term"). Upon expiration of the first Renewal Term of ten (10) years, this Agreement shall automatically renew for a second ten  (10) year   extended Term on the

same terms and conditions provided for herein, unless LICENSOR provides written notice of its intention to not to renew this Agreement within one hundred eighty (180) days prior to expiration of the Renewal Term.

## ROYALTY RATE

LICENSEE shall pay the following royalty rates: (i) SIX PERCENT (6%) of Net Sales of Licensed Products that are based solely on the Licensed Intellectual Property and (ii) THREE PERCENT (3%) of Net Sales of Licensed Products that are based solely on Derivative Products and (iii) In the case of Sub Licenses royalties will be TEN PERCENT (10%) of Net sales after subtracting licensing costs and royalties paid to third parties only.

## PRODUCT LIABILITY INSURANCE

Minimum Product Liability Insurance shall be Two Million U.S. dollars ($2,000,000.00) combined single limit for each single occurrence for bodily injury and/or for property damage.

*SUCCESSION*
*Rights of Survivor*

5/9/02

In the event of the Death of Licensor all of the Licensor's rights under this agreement Shall go to his heirs, assigns or legal representatives as he has lawfully designated in writing.

_Steve A. Silvers_
5/09/02

5/9/02

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003
5/9/02

11

COPY

June 1, 2002

Mr. Steven Silvers
3741 N.E. 163rd Street
PMB # 324
North Miami Beach, FL 33160

Dear Steven:

    This letter agreement ("Agreement") will serve to memorialize the terms of the consultancy arrangement between Stelor Productions, Inc. ("Company") and Steven A. Silvers ("Consultant").

    1.    Engagement of Consultant.

          a.    Company hereby engages Consultant as an independent contractor to the Company. Consultant's title shall be Executive Creative Consultant. Company is relying on Mr. Silvers to continue his role of "Papa Googles" and continue to offer his creative input to the Company.

          b.    In consideration for the covenants of Consultant contained herein, Company will pay Consultant the following: (i) a signing bonus of ten thousand dollars ($10,000) and (ii) a monthly consultancy fee of five thousand five hundred dollars ($5,500) beginning on June 1, 2002, and continuing each month thereafter for twelve (12) months. Company shall pay Consultant six thousand dollars ($6,000) monthly for a second 18-month period, beginning June 1, 2003.   All payments made to Consultant will not be offset against any royalties paid by the Company to Consultant pursuant to the License, Distribution and Manufacturing Agreement. Company will continue to reimburse The Aurora Collection, Inc. for the existing health plan if available, or if not available, will reimburse consultant $300 per month during the term of this Agreement. During the term of the Agreement, Company will reimburse The Aurora Collection, Inc. for, if available, the use of a leased company vehicle, with company to reimburse The Aurora Collection, Inc for insurance coverage. Consultant agrees to pay all costs of maintenance and upkeep. Stelor will write an agreement with Consultant granting him options for 1,000 shares of Stelor's stock under Stelor's stock option plan. If the number of options available under the Stelor Productions current plan is increased during the Consultant's service Company will issue an additional one thousand option shares (1,000)

          c.    It is agreed by company that in the event the Company fails to compensate the Consultant as outlined in this Agreement and in accordance with the terms of this Agreement (including all option periods surrounding same) for two consecutive months and if after thirty (30) days fails to cure alleged breach, then Consultant has the right (option) to terminate this Agreement and among other legal remedies afforded Consultant to seek redress before the Court, the License Agreement shall, likewise immediately terminate. This caveat shall exist only if Consultant is not paid for other than "good Cause" termination as outlined below at section five (5) b of this Agreement.

    2.    Relationship of Parties. The relationship of Company and Consultant established under this Agreement is of an independent contractor. Nothing in this Agreement shall be construed to give any party the power to direct or control the daily activities of any of the other parties, or to constitute the parties as principal and agent, employer and employee, franchiser and franchisee, partners, joint venturers, co-owners, or otherwise as participants in a joint undertaking. The parties understand and agree that none of the parties grants any other party the power or authority to make or give any agreement, statement, representation, warranty, or other commitment on behalf of any other party, or to enter into any contract or otherwise incur any liability or obligation, express or implied, on behalf of any other party, or to transfer, release, or waive any right, title, or interest of any other party. Furthermore, during the term of

        2

      EXHIBIT

    DLO 12-13-04

this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

3.    Duties of Consultant.   Consultant's duties hereunder are as follows:

a.    Consultant shall use his best efforts to perform such services as may be requested by Company from time to time consistent and commensurate with his position as Executive Creative Consultant, including, but not limited to, executing all papers, testifying on all Company related matters and otherwise cooperating in every way necessary and desirable to strengthen, establish or maintain any intellectual property right granted under this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant. The Consultant shall make himself available to the Company by way of telephone, fax, email, video conferencing (if deemed necessary) on an as needed basis and during reasonable business hours Monday through Friday. Consultant shall further make himself available, in person, if deemed necessary, to the Company so long as the Consultant is given a minimum of ten (10) days written notice if Consultant is, at the time of said request, residing outside of the Continental United States and three (3) days written notice by the Company if Consultant is residing, at the time of said request, within the Continental United States. In either case, Consultant must maintain a United States address for purposes of receiving correspondence, samples, checks etc. Written notice may also be deemed given if communicated via Consultant's personal email address or a fax number to be provided to the Company. Written notice must be sent via U.S. Mail certified, return receipt requested, or via a nationally recognized mail carrier service with "signature" required. Written notice may also be sent if communicated via Consultant's personal email address or a fax number to be provided to the Company. However, the latter shall not be used for any "official" notice purposes.

b.    During the term of this Agreement and for a period of (1) years after the termination or expiration of this Agreement, Consultant shall not, either individually or in conjunction with a third party, engage in any business, trade, or profession as owner, officer, manager, employee, consultant or otherwise if such business competes in any material way with Company's business of developing, creating, selling, manufacturing, distributing, or marketing products, media or materials for children.

c.    Consultant shall offer Company a right of first refusal to license, develop, manufacture, market or sell any and all children's characters or other products, ideas, inventions or creations created by Consultant that are not within the scope of this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant. If Consultant provides Company with any new idea's either relating to The Googles as well as anything entirely new that may not relate to the current universe of characters and /or idea's, that upon submission of such new idea or concept which shall be placed in writing Company shall have one hundred and twenty (120) days to accept and enter into an agreement for said property.

d.    Consultant agrees to hold harmless, defend and indemnify Company and its officers, directors, employees, agents and servants from and against any and all claims, damages and expenses, including reasonable legal fees and expenses, of whatever kind and nature directly or indirectly arising out of or on account of or resulting from the Consultant's activities (other than as expressly authorized by Company) including, without limitation, Consultant's failure to comply with his obligations under this Agreement, acts or omissions.

4.    Duties of Company.

2.

a.    Company shall reimburse Consultant for all reasonable travel and living expenses that are deemed to be essential to Company's success and are pre-approved by an authorized officer of the Company and incurred as a direct result of Consultant's obligations under this Agreement such as attending tradeshows, board meetings, etc. The Company shall, upon proper documentation having been presented to the Company, or its official/designated representative, within seven (7) days of receipt of same, reimburse Consultant said incurred expenses as approved by Company.

5.    Term and Termination.

a.    Subject to the provisions for termination as provided herein, this Agreement shall commence upon execution and shall have a term of thirty (30) months.

b.    Company may immediately terminate this Agreement upon the occurrence of any of the following: (i) a material breach of any provision of this Agreement by Consultant; (ii) a failure by Consultant, after written notice, to perform such duties required of Consultant as outlined in this agreement; (iii) the initiation of any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding by Consultant, or if any such proceeding is instituted against Consultant; (iv) the conviction of Consultant of any felony crime; (v) any use, sale or possession by Consultant of any illegal drug or controlled substance that is prosecutable under US Federal Laws. Written notice to mean by way of Certified mail, return receipt requested, or by way of a Nationally recognized mail service, Courier service etc.

c.    Upon termination or expiration of this Agreement by either party, Consultant shall immediately return to Company all Proprietary Information (as defined below) in Consultant's possession, custody or control in whatever form held (including copies, compilations, summaries, or embodiments thereof relating to Proprietary Information) and provide written certification that all such material has been returned.

d.    Company agrees to provide Consultant thirty (30) days Notice, from date of said written notice of termination by the Company, within which to cure any alleged breach it has made against the Consultant identified in paragraph three (3) under "Duties of Consultant".

6.    Proprietary Information; Proprietary Rights.

a.    In the course of performing his duties under this Agreement, Consultant may obtain information relating to Company and/or its customers, suppliers or other third parties that is of a confidential and proprietary nature ("Proprietary Information"). Such Proprietary Information may include, without limitation, trade secrets, research and development, customer lists, vendor lists, schedule of accounts, plans, programs, inventions, computer software, know-how, inventions, product information, techniques, processes, schematics, data, financial information and sales and marketing plans. Consultant shall, at all times, both during the term of this Agreement and for a period of two (2) years thereafter its termination, keep in trust and confidence all such Proprietary Information, and shall not use such Proprietary Information other than in the course of performing his duties as expressly provided in this Agreement, nor shall Consultant disclose any such Proprietary Information to any person without Company's prior written consent except as required or needed in any legal and/or Court action by Consultant against the Company or any other third party. This pertains to only that information not otherwise gathered from public sources, knowledge already in the public eye or a matter of public record, and/or any other third party other than Consultant.

3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT FLORIDA

STELOR PRODUCTIONS, INC.          )
(a Delaware corporation)          )
                                  )     CASE NO. 04-80954 - CIV - HURLEY
          Plaintiff,              )     Magistrate: Judge James M. Hopkins
                                  )
     v.                           )
                                  )
STEVEN A. SILVERS                 )
(a resident of Palm Beach County, Florida)  )
                                  )
          Defendant.              )
                                  )

---

### PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

Plaintiff STELOR PRODUCTIONS, INC. ("Stelor") brings this motion for a

preliminary injunction to enjoin the Defendant from unilateral actions which materially

breach his contractual obligations and, if left unchecked, will further undermine and

irreparably injure the Plaintiff, its business, and the intellectual property rights which

Defendant has licensed and entrusted exclusively to the Plaintiff.

Stelor submits with this motion a Memorandum of Points and Authorities in

Support of Plaintiff's Motion for Preliminary Injunction, as well as a proposed Order for

the Court. As more fully explained in that Memorandum, Stelor holds an exclusive

license from Defendant to develop characters and other intellectual property (the

"Googles Intellectual Property") based on the story and concept "Googles and the

Planet of Goo" created by Defendant. After granting Stelor sole rights to maintain,

enforce, and defend the Googles Intellectual Property, and after pledging Stelor his full

cooperation, Defendant has committed a string of material breaches that have impeded



3
EXHIBIT

Stelor's performance while jeopardizing Stelor's business and the Googles Intellectual Property Rights.

Stelor accordingly respectfully requests that, during the pendency of this case, this Court preliminarily enjoin Defendant, his agents, assigns, nominees, representatives, and any and all persons or entities acting in concert with any of them, and also order the Defendant to specifically perform his contractual obligations, as follows:

A.    To order the Defendant to immediately instruct the United States Patent and Trademark Office ("USPTO") to send all communications regarding the Googles Trademarks to Stelor's duly appointed counsel:

|                    |                                                                                                        |
|--------------------|--------------------------------------------------------------------------------------------------------|
|                    | Laurence R. Hefter<br>Finnegan, Henderson, Farabow,<br>  Garrett & Dunner, L.L.P.                       |
| prior to 1/15/05   | 1300 I Street NW<br>Washington DC 20005                                                                 |
| after 1/15/05      | 901 New York Avenue<br>Washington DC 20001                                                              |

B.    To order the Defendant to cease and desist from communicating with the USPTO regarding the Googles Trademarks;

C.    To order the Defendant to not take any action in the pending cancellation proceeding Google, Inc. has brought to cancel the registration for GOOGLES & Design (Reg. No. 2,087,590) at the Trademark Trial and Appeal Board ("TTAB"), including filing an answer, making any other submissions, and contacting Google, Inc. for any reason including to negotiate a settlement;

2

D.    To order the Defendant to cease and desist from interfering in the proceedings Stelor has brought at the TTAB to cancel Google, Inc.'s trademark registration for GOOGLE (Reg. No. 2,806,075) and oppose Google, Inc.'s application to register GOOGLE (Ser. No. 76/314,783), including making any submissions in these proceedings and contacting Google, Inc. for any reason including to negotiate a settlement; and

E.    To order the Defendant to cooperate immediately and fully with Stelor in the above-mentioned proceedings consistent with Defendant's contractual obligations, including providing any evidence (in the form of documentation, testimony, or otherwise) in Defendant's possession that Stelor feels is necessary to prevail in these proceedings and protect the Googles Intellectual Property Rights.

Dated:  10/25/04                                Respectfully submitted,


                                                *for* Christopher Oget
                                                Stanley A. Beiley    F.B.N. 0145114
                                                Florida Bar No. 004848
Of Counsel:                                     SACHER ZELMAN VAN SANT PAUL BEILEY,
                                                HARTMAN, ROLNICK & WALDMAN P.A.
Laurence R. Hefter                              1401 Brickel Avenue, Suite 700
FINNEGAN, HENDERSON, FARABOW,                   Miami, FL 33131
GARRETT & DUNNER, L.L.P.                         Tel:  305-371-8797
1300 I Street, N.W.                             Fax:  305-374-2605
Washington, D.C.  20005-3315
Tel:  202-408-4000                              Attorneys for Plaintiff,
Fax:  202-408-4400                              STELOR PRODUCTIONS, INC.


                            3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT FLORIDA

STELOR PRODUCTIONS, INC.    )
(a Delaware corporation)    )
                            )    CASE NO. 04-80954 - CIV - HURLEY
            Plaintiff,      )
                            )    Magistrate:  Judge James M. Hopkins
    v.                      )
                            )
STEVEN A. SILVERS          )
(a resident of Palm Beach County, Florida)  )
                            )
            Defendant.      )
                            )

## PROPOSED ORDER GRANTING PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

### Findings of Fact and Conclusions of Law

Having reviewed the Complaint, pleadings, declarations, and evidence submitted by the parties, the Court hereby makes the following findings of fact and conclusions of law and directs the entry of such orders, as follows:

A.    Plaintiff and Defendant have entered into a valid "License, Distribution, and Manufacturing Agreement" ("License Agreement") and Consulting Agreement.

B.    Plaintiff has a substantial likelihood of success of proving at trial that Defendant has materially breached his obligations under these agreements and caused Plaintiff significant harm.

C.    Plaintiff faces a substantial threat of irreparable injury if a preliminary injunction is not granted.

D.    The threatened injury to Plaintiff outweighs any harm a preliminary injunction may cause the Defendant.

E.    A preliminary injunction would not disserve the public interest.

## Order for Preliminary Injunction

Plaintiffs' Motion for Preliminary Injunction is hereby granted and it is hereby ORDERED that:

Defendant, his agents, assigns, nominees, representatives, and any and all persons or entities acting in concert with any of them, are hereby ordered until the final resolution of this case:

A.    To immediately instruct the United States Patent and Trademark Office ("USPTO") to send all communications regarding the Googles Trademarks to Stelor's duly appointed counsel:

|  |  |
|---|---|
|  | Laurence R. Hefter<br>Finnegan, Henderson, Farabow,<br> Garrett & Dunner, L.L.P. |
| prior to 1/15/05 | 1300 I Street NW<br>Washington DC 20005 |
| after 1/15/05 | 901 New York Avenue<br>Washington DC 20001 |

B.    To refrain from communicating with the USPTO regarding the Googles Trademarks;

C.    To not take any action in the pending cancellation proceeding Google, Inc. has brought to cancel the registration for GOOGLES & Design (Reg. No. 2,087,590) at

2

the Trademark Trial and Appeal Board ("TTAB"), including filing an answer, making any

other submissions, and contacting Google, Inc. for any reason including to negotiate a

settlement;

D.     To refrain from interfering in the proceedings Stelor has brought at the

TTAB to cancel Google, Inc.'s trademark registration for GOOGLE (Reg. No. 2,806,075)

and oppose Google, Inc.'s application to register GOOGLE (Ser. No. 76/314,783),

including making any submissions in these proceedings and contacting Google, Inc. for

any reason to negotiate a settlement; and

E.     To cooperate with Stelor in the above-mentioned proceedings consistent

with Defendant's contractual obligations, including providing any evidence (in the form

of documentation, testimony, or otherwise) in Defendant's possession that Stelor feels

is necessary to prevail in these proceedings and protect the Googles Intellectual

Property Rights.


**SO ORDERED.**

Dated: _____, 2004


_____

United States District Court Judge

3

Presented by:
Stanley A. Beiley
Florida Bar No. 004848
SACHER ZELMAN VAN SANT PAUL BEILEY,
HARTMAN, ROLNICK & WALDMAN P.A.
1401 Brickel Avenue, Suite 700
Miami, FL  33131
Tel:  305-371-8797
Fax:  305-374-2605


Of Counsel:

Laurence R. Hefter
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, L.L.P.
1300 I Street, N.W.
Washington, D.C.  20005-3315
Tel:  202-408-4000
Fax:  202-408-4400

4



Laser Hair Removal | Skin F

FREE consultation & $50 c
when you mention this ad. Click

» Home

**Quick Search**

[    ] Go

Advanced Search
Archives

Contact Us
Featured Sponsor
Visit our Advertisers

Download
Media Kit

**News by Community**

Select One
Aspen Hill
Bethesda

**Sports by Community**

Select One
Aspen Hill
Bethesda

**EASY FINDER**

Births
Columns
Editorials
Engagements
Letters
Movie Finder
Obituaries
Police Reports
Restaurant Finder
Reunions
Weddings

**GAZETTE SECTIONS**

Business
Classifieds
Entertainment
Local Calendars
Sports

**LOCAL NONPROFITS**

Frederick
Montgomery
Prince George's

**RELATED SITES**

The Bowie Star
The Business Gazette
DCMilitary.com
Weekend Edition

THE GAZETTE

# Four-eyed aliens take on Web giant

E-Mail This Article

**by C. Benjamin Ford**
*Staff Writer*

July 30, 2004

Google.com may be a beloved, powerhouse search engine, but Googles.com has four beloved aliens named Oogle, Oggle, Iggle and GooRoo on its side.

Last week, Stelor Productions of Darnestown, parent of Googles.com, filed trademark proceedings with the U.S. Patent and Trademark Office against Google Inc. of Mountain View, Calif., for venturing into Googles' domain: children's books, stickers and clothing.



Steven A. Esrig, CEO of Stelor Productions, says the Internet search engine Google.com is infringing on his company's trademark for its Googles Web site and merchandise.

*Brian Lewis/*
*The Gazette*

Googles -- colorful, four-eyed aliens who burst into songs about the importance of eating healthful breakfasts and protecting the environment -- were created in 1997, before the search engine's launch, for use in educational entertainment products.

Steven A. Esrig is CEO of Stelor Productions, which has the rights to the characters to develop music, stuffed toys and animated online games.

"We were first in this trademarked space," Esrig said.

Google officials did not return calls for comment.



4
EXHIBIT
DLO 12-13-04

About Us
Advertising Info
Contact Us
Employment
Photo Reprints
Newspaper Locator

"These cases happen all the time," said Stephen David Amitay, a lawyer in Bethesda who has worked on patent and copyright cases.

"The key is you have to show damages," Amitay said. "You pretty much have to show that it will cause confusion and hurt the business or reputation. You have to show damages or it's just two things named Google."

Esrig said he and others have written and called Google's headquarters since at least 2001, trying to meet with company executives to work out a solution.

But Google officials never responded, he said.

Google has harmed Googles -- the company, not the aliens -- because it has created confusion among Internet users and made it difficult to attract new investors, Esrig said.

Esrig, 46, said he consults with his children, Jared, 8, and Ilia, 12. The site has online games, message boards and animated stories aimed at children 2 to 10.

His privately held company, with seven full-time workers and 28 contracted animators and musicians, has invested

Advertisement



DARCARS CHEV
WWW.DARCARS.CO
VIRTUAL SHOWROOM

LANHAM, MD 20706
301-459-1300

Ads by Goooooogle

**New York Times Newspaper**
Stay Informed! Save 50% on Fast & Convenient Delivery of the NY Times
www.nytimes.com

**Searching For Newspapers?**
We'll Pay You $300 Right Now To Take A Newspaper Survey!
HighPaySurveys.com

**Travel Trade News**
Worlds Leading Travel Trade News Read it Now - Register Free
www.TravelMole.com

**Buy/Sell Locally-Denver**
Avoid the hassle & cost of shipping Deal with online Denver community
www.LiveDeal.com

"multimillions" on a range of product and character development, Esrig said.

The company has yet to make money, but it released its first album of original children's songs this week and will soon follow with computer games, he said.

Googles will remain a free Web site, but portions of it will have exclusive conter those who buy a subscription, he said.

Before the story of the trademark dispute broke in The Wall Street Journal, Googles.com had roughly 200,000 hits a day. Since then, the appeal of a cyber versus-Goliath saga has prompted an outpouring of media interest. On Wednes print reporters and four television crews, including CNN and Fox News, interviev Esrig. The site's hits have since doubled.

John M. Augustine, a trademark lawyer in Chicago and an expert on intellectual property, said Googles may have a strong case because it had the trademark fir

"Sometimes size doesn't matter," Augustine said.

*This report originally appeared in The Business Gazette.*

Return to top

Copyright © 2004 The Gazette - ALL RIGHTS RESERVED.
Privacy Statement

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT FLORIDA

STELOR PRODUCTIONS, INC.
(a Delaware Corporation)

        Plaintiff,

        v.

STEVEN A. SILVERS
(a resident of Palm Beach County, Florida),

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. 04-80954 - CIV -
HURLEY

## DECLARATION OF STEVEN A. ESRIG

I, Steven A. Esrig, hereby declare as follows:

1.    I am the President and CEO of Stelor Productions, Inc. ("Stelor"). I have been employed by Stelor since its inception, and I have held my current position for more than two years. The facts stated herein are based upon my own personal knowledge and/or on corporate records and documents maintained by Stelor in the ordinary course of business.

2.    In 2001, a company by the name of The Aurora Collection, Inc. ("Aurora") hired my company, EGG International LLC, as a consultant to find a buyer for Aurora and its products, including a product known as the "Googles."

3.    In or about 1991, Steven A. Silvers ("Silvers") authored a children's book entitled "Googles and the Planet of Goo." This book made little critical or commercial impact when it entered a marketplace crowded with children's titles from bigger and better financed publishers and more famous authors.



5
EXHIBIT
DLO 12-13-04

4.    Silvers licensed Aurora to develop the Googles concept into a multimedia entertainment and educational business. Aurora did not succeed.

5.    During Silvers' relationship with Aurora, Silvers and Aurora had many disagreements which developed into an adverse relationship. Silvers also has a criminal background which made Silvers unsuited to serve as figurehead or spokesperson for an enterprise aimed at providing wholesome and enriching entertainment to an audience of impressionable children. He spent seven years in a federal penitentiary for conspiring to possess with intent to distribute cocaine, possession with intent to distribute cocaine, interstate travel in aid of racketeering, and conspiring to defraud the United States.

6.    Stelor was formed in 2002 to pick up where Aurora had left off and develop the "Googles" concept into a reality. Stelor acquired Aurora's rights under its agreement with Silvers at considerable expense. Stelor saw potential in the "The Googles" story, trademarks, copyrights, and other intellectual property. Stelor's founders also had confidence in their ability to raise the needed funds and to create a compelling and attractive "Googles" universe that would enlighten, entertain, educate, and develop children by providing them with fascinating and uplifting products, programs, and services.

7.    Stelor's enthusiasm and interest, however, were tempered by legitimate concerns and reservations. Aware of Aurora's aborted efforts, and wary that Silvers' background could jeopardize the "Googles" program, Stelor's representatives, including me, insisted that any arrangement with Silvers contain certain safeguards and protections. Thus, when on or around June 1, 2002, after months of extensive

negotiations, Stelor and Silvers entered into an exclusive "License, Distribution, and Manufacturing Agreement," ("the "License Agreement") and a Consulting Agreement, Stelor bargained for, and obtained, a number of promises, commitments, and obligations from Silvers designed to ensure Stelor's ability to develop the "Googles" program free from undue interference by Silvers. Anxious to achieve what he himself has described as his "dream," Silvers agreed to these and other contractual obligations and restrictions.

8.     Stelor, believing that the License Agreement and Consulting Agreement provided it with the necessary rights and protections, then threw itself enthusiastically into the task of using its best efforts to develop the "Googles" concept and intellectual property into a thriving entertainment phenomenon. To this end, Stelor has spent approximately three million dollars, and its principals and employees have devoted themselves tirelessly to making Stelor and the "Googles" successful and profitable, both for themselves and for the benefit of Silvers.

9.     However, Silvers, having received from Stelor $186,500, obligations for options for Stelor stock, and health insurance, has not lived up to his part of the bargain. After giving Stelor the exclusive rights, even as to Silvers, to develop and market the "Googles" concept without interference from him, Silvers commenced a campaign to inject and entwine himself into the very fabric of Stelor's business.

10.     In furtherance of its rights and duties under the License Agreement, Stelor has applied for and maintains numerous federal trademarks and service marks, including but not limited to: GOOGLES and Design (Reg. No. 2,087,590); IGGLE (Reg. No. 2,496,754); OGGLE (Reg. No. 2,496,753); OOGLE (Reg. No. 2,496,755);

GOOROO (App. No. 76/591,381); GOOLALA (App. No. 76/591,394); GOOMAIL (App. No. 76/592,805); GOOPETS (App. No. 76/592,806); GOOSICAL(S) (App. No. 76/591,384); GOOTAINMENT (App. No. 76/591,385); GOOTER (App. No. 76/591,393); GOOTUNE(S) (App. No. 76/592,804); GOOWARE (App. No. 76/591,389); GOOWEAR (App. No. 76/591,391); GOOLAGONG (App. No. 76/591,383); GOO (App. No. 76/591,382); GOOBERRY (App. No. 76/591,388); GOOGLES EDUTAINMENT (App. No. 76/591,386); GOOBOO (App. No. 76/591,378); GOOBOP (App. No. 76/591,390); GOOGEAR (App. No. 76/591,387); and GOOKIDS (App. No. 76/591,392) (the "Googles Trademarks").  These applications and registrations list "Silvers Entertainment," Silvers' company, as the owner, but specify that all correspondence between the USPTO and Stelor be mailed to Stelor's duly appointed counsel of record.

11.    Within the past two months, Silvers has unilaterally, without authorization from Stelor, instructed the USPTO to send all correspondence for each of the Googles applications and registrations to "Steven A. Silvers / Silvers Entertainment Group, Inc. / 8983 Okeechobee Blvd., Ste 202, PMB 203 / West Palm Beach, FL 33411," instead of to Stelor's duly appointed attorneys.

12.    Stelor's exclusive license under the License Agreement specifically extends to websites and domain names and includes the following domain names: GOOGLES.COM, GOOKIDS.COM, GOOTOYS.COM, PLANETOFGOO.COM, GOOMAIL.NET, THEGOOGLESMAIL.COM, GOOGLESMAIL.COM, GOOGLESFROMGOO.COM, OOGLESFROMGOO.COM, THEGOOGLES.COM, THEGOOGLESFROMGOO.COM, and approximately eighty (80) more (hereinafter referred to as the "Googles Domain Names").

705301_1                                          4

13.     Stelor has developed and operates a website devoted to the "Googles" characters, offering a variety of services and features geared to delighting children and their parents. At present, the website is the public's window into the Googles' world. Being able to operate and modify this website is among Stelor's most important priorities. To ensure its ability to do so, Stelor must have immediate and unfettered access to the Googles Domain Names.

14.     Despite Stelor's constant urging, Silvers insists on keeping the Googles Domain Names under lock and key and thereby jeopardizes Stelor's substantial investment of time, money, talent, and creative energy. Silvers has repeatedly refused to provide Stelor with the passwords for these Domain Names, making it impossible for Stelor to properly manage and use the Googles Domain Names to which it was licensed. Silvers has also made it abundantly clear in correspondence to Stelor's counsel that he has "absolutely no intentions" of turning over to Stelor the passwords for any of the Googles Domain Names, and that the only way he will turn over these passwords is "when a judge orders [him] to do so."

15.     Pursuant to its exclusive right under the License Agreement to enforce the Googles Trademarks, on July 6, 2004 Stelor, through its intellectual property counsel, filed at the Trademark Trial and Appeal Board ("TTAB") a petition to cancel the trademark registration for GOOGLE (Reg. No. 2,806,075) owned by Google, Inc., and a Notice of Opposition against Google, Inc.'s application for GOOGLE (Ser. No. 76/314,783).

16.     For instance, Silvers has written to Stelor's intellectual property counsel and instructed them to take no further actions in the cancellation and opposition

proceedings brought by Stelor at the TTAB. Silvers' refusals to cooperate with Stelor's enforcement efforts imperil Stelor's ability to carry out its right and duty to enforce the Googles Trademarks as is necessary to protect Stelor's substantial investment in the Googles business. For instance, Silvers may possess evidence vital to Stelor's actions against Google, Inc., and Silvers' refusal to cooperate with Stelor in the opposition and cancellation proceedings threatens to impair Stelor's enforcement efforts.

17.     On September 22, 2004, Google, Inc. brought a cancellation proceeding at the Trademark Trial and Appeal Board ("TTAB") to cancel the registration for GOOGLES & Design (Reg. No. 2,087,590). This proceeding is currently pending before the TTAB. An answer to Google, Inc.'s petition for cancellation is due on November 9, 2004.

18.     Silvers has written to Stelor's intellectual property counsel and claimed the right to defend the cancellation proceeding brought by Google, Inc. himself, and has "instructed" Stelor's counsel to take no action on his behalf.

19.     Silvers has repeatedly threatened to communicate with the press without requesting prior authorization from Stelor. Silvers has also held himself out as a Stelor representative at crucial industry trade shows.

20.     Silvers' actions in breach of the License Agreement and Consulting Agreement have caused Stelor incalculable damage. His actions have required several members of Stelor's Board of Directors, several of Stelor's limited staff and me, Stelor's President and CEO, to spend innumerable hours dealing with, and attempting to correct, the problems caused by Silvers' actions. This time should have been spent advancing the business of Stelor and has resulted in considerable delay in Stelor being

able to complete tasks necessary for it to become a viable business. His actions also have caused Stelor to spend considerable money in attorneys' fees dealing with the actions and threats of Mr. Silvers.

21. I have first hand knowledge of the truth of the statements above and represent them to be truthful and accurate and complete.

I, being hereby warned that willful false statements and the like are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, state that all statements made herein of my own knowledge are true; and all statements made herein on information or belief are believed to be true.

Signed at Darnestown, Md , this 21st day of October , 2004

Steven A. Esrig

Thank you for your request. Here are the latest results from the TARR web server.

This page was generated by the TARR system on 2004-03-07 11:39:54 ET

**Serial Number:** 75150767

**Registration Number:** 2087590

**Mark**



**(words only):** GOOGLES

**Standard Character claim:** No

**Current Status:** Section 8 and 15 affidavits have been accepted and acknowledged.

**Date of Status:** 2003-06-28

**Filing Date:** 1996-08-02

**Transformed into a National Application:** No

**Registration Date:** 1997-08-12

**Register:** Principal

**Law Office Assigned:** LAW OFFICE 106

If you are the applicant or applicant's attorney and have questions about this file, please contact the Trademark Assistance Center at TrademarkAssistanceCenter@uspto.gov

**Current Location:** 900 -Warehouse (Newington)

**Date In Location:** 2003-08-08

---

## LAST APPLICANT(S)/OWNER(S) OF RECORD

1. Googles Children's Workshop, Inc., The

**Address:**
Googles Children's Workshop, Inc., The
P.O. Box 60210
Potomac, MD 208590210
United States
Legal Entity Type: Corporation
State or Country of Incorporation: New Jersey



6
EXHIBIT
DLO 12-13-04

---

## GOODS AND/OR SERVICES

children's books
**International Class:** *016*
**First Use Date:** 1994-06-00
**First Use in Commerce Date:** 1996-06-00

**Basis:** 1(a)

---

## ADDITIONAL INFORMATION

(NOT AVAILABLE)

---

## MADRID PROTOCOL INFORMATION

(NOT AVAILABLE)

---

## PROSECUTION HISTORY

2003-06-28 - Section 8 (6-year) accepted & Section 15 acknowledged

2003-03-26 - Section 8 (6-year) and Section 15 Filed

2003-03-26 - PAPER RECEIVED

1997-08-12 - Registered - Principal Register

1997-05-20 - Published for opposition

1997-04-18 - Notice of publication

1997-03-21 - Approved for Pub - Principal Register (Initial exam)

1997-03-04 - Communication received from applicant

1997-02-21 - Non-final action mailed

1997-02-14 - Case file assigned to examining attorney

1996-10-09 - Communication received from applicant

---

## CONTACT INFORMATION

**Correspondent (Owner)**
IRA C. EDELL (Attorney of record)

IRA C. EDELL
EDELL, SHAPIRO & FINNAN, LLC
1901 RESEARCH BLVD, SUITE 400
ROCKVILLE, MARYLAND 20850

INJUNCTION          B

SILVERS COMMUNICATIONS TO P.TO

As I have answered repeatedly throughout today's deposition I am looking (Stelor Productions) to the court for relief from Mr. Silvers continued interference with our ability to maintain, and defend as well as commercialize the intellectual property Stelor Productions has invested so heavily in, to that end "Silvers communications to the P.T.O." is a continued breach of his contractual obligations to grant Stelor Productions the "sole right, even unto himself to act on his behalf and instead of" in regard to this intellectual property.

Therefore we contend in our action that Mr. Silvers "cease and desist from communicating with the USPTO regarding the Googles Trademarks.

EXHIBIT
DLO 12-13-04

**NetworkSolutions**  FREE OFFERS    WHOIS    VIEW ORDER    CUSTOMER SERVICE    ACCOUNT MANAG

| HOME | REGISTER A DOMAIN | CREATE A WEB SITE | BUY E-MAIL | PURCHASE HOSTING | PROMOTE YOUR SITE | GROW YOUR BUSINESS | TRANSFER YOUR DOMAI |

## Private Registration
### Protect your privacy from spammers and telemar

## WHOIS SEARCH RESULTS

WHOIS RECORD 362

### googles.com

IMAGE NOT AVAILABLE

Certified Offer Service - Make an offer on this domain
Backorder - Try to get this name when it becomes available
Similar Names - See suggested alternatives for this domain

The data contained in Go Daddy Software, Inc.'s WhoIs database,
while believed by the company to be reliable, is provided "as is"
with no guarantee or warranties regarding its accuracy. This
information is provided for the sole purpose of assisting you
in obtaining information about domain name registration records.
Any use of this data for any other purpose is expressly forbidden without the prior written
permission of Go Daddy Software, Inc. By submitting an inquiry,
you agree to these terms of usage and limitations of warranty. In particular,
you agree not to use this data to allow, enable, or otherwise make possible,
dissemination or collection of this data, in part or in its entirety, for any
purpose, such as the transmission of unsolicited advertising and
and solicitations of any kind, including spam. You further agree
not to use this data to enable high volume, automated or robotic electronic
processes designed to collect or compile this data for any purpose,
including mining this data for your own personal or commercial purposes.

Please note: the registrant of the domain name is specified
in the "registrant" field. In most cases, Go Daddy Software, Inc.
is not the registrant of domain names listed in this database.

Registrant:
  Silvers Entertainment Grp. Inc
  8987 Okeechobee Blvd.
  Ste. 202, PMB 203
  West Palm Beach, Florida 33411
  United States

  Registered through: GoDaddy.com
  Domain Name: GOOGLES.COM
    Created on: 18-Jul-97
    Expires on: 17-Jul-06
    Last Updated on: 19-Apr-04

Administrative Contact:
  Esrig, Steve  sesrig@stelorproductions.com
  Stelor Productions, Inc.
  14701 Mockingbird Drive
  Darnestown, Maryland 33411
  United States



8
EXHIBIT
DLO 12-13-04

BUY IT! IT'S AVAILABLE!
FOR RELATED DOMAINS:

googles
googles
googles
googles
googles
googles
googles

SEARCH AGAIN

Enter a search term:

e.g. networksolutions.c

Search by:
  ○ Domain Name
  ○ NIC Handle
  ○ IP Address

SEAR

RELATED CATEGORIES

safety goggles
eye protection
motorcycle goggles
swimming goggles
ski goggles

swim goggles
protective clothing
safety apparel
safety gear
safety equipment



3019633636 Fax -- 3019903636

Technical Contact:
Esrig, Steve  sesrig@stelorproduction.com
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874
United States
3019633636   Fax -- 3019903636

Domain servers in listed order:
 NS1.SECURE.NET
 NS2.SECURE.NET

The previous information has been obtained either directly from the registrant or a
registrar of the domain name other than Network Solutions. Network Solutions,
therefore, does not guarantee its accuracy or completeness.

Show underlying registry data for this record

**Travel**
Car Rental
Hotels
Airline

**Financial Planning**
Debt
Credit Cards
Loans

**Business and Finance**
Affiliate Program
Student Loans
Stocks

| | |
|---|---|
| **Current Registrar:** | GO DADDY SOFTWARE, INC. |
| **IP Address:** | 128.121.122.247  (ARIN & RIPE IP search) |
| **IP Location:** | US(UNITED STATES)-COLORADO-ENGLEWOOD |
| **Record Type:** | Domain Name |
| **Server Type:** | Apache 1 |
| **Lock Status:** | REGISTRAR-LOCK |
| **Web Site Status:** | Active |
| **DMOZ** | no listings |
| **Y! Directory:** | see listings |
| **Secure:** | No |
| **E-commerce:** | No |
| **Traffic Ranking:** | 1 |
| **Data as of:** | 08-Jun-2004 |



When you register a domain name, current policies require that the contact information for your domain name registrati
included in a public database known as WHOIS. To learn about actions you can take to protect your WHOIS information
www.internetprivacyadvocate.org.

NOTICE AND TERMS OF USE: You are not authorized to access or query our WHOIS database through the use of high-vo
automated, electronic processes or for the purpose or purposes of using the data in any manner that violates these term
The Data in Network Solutions' WHOIS database is provided by Network Solutions for information purposes only, and to
persons in obtaining information about or related to a domain name registration record. Network Solutions does not gua
accuracy. By submitting a WHOIS query, you agree to abide by the following terms of use: You agree that you may use
only for lawful purposes and that under no circumstances will you use this Data to: (1) allow, enable, or otherwise supp
transmission of mass unsolicited, commercial advertising or solicitations via direct mail, e-mail, telephone, or facsimile;
enable high volume, automated, electronic processes that apply to Network Solutions (or its computer systems). The co
repackaging, dissemination or other use of this Data is expressly prohibited without the prior written consent of Network
You agree not to use high-volume, automated, electronic processes to access or query the WHOIS database. Network So
reserves all rights and remedies it now has or may have in the future, including, but not limited to, the right to terminat
access to the WHOIS database in its sole discretion, for any violations by you of these terms of use, including without lir
excessive querying of the WHOIS database or for failure to otherwise abide by these terms of use. Network Solutions re
right to modify these terms at any time.



Back to top | About Us | Partnerships | Customer Service | Site Map

| Home | Register a Domain | Create a Web Site | Buy E-mail | Purchase Hosting | Promote Your Site | Grow Your Business | Transfer Your Domains | Renew Services | Account Manage |

Review our Policies, Service Agreement, and Legal Notice
© Copyright 2004 Network Solutions. All rights reserved.

# Good Vibrations International Inc.

**NIKKEN**
Independent Distributor

PORT ST. CHARLES, SUITE 329, ST. PETER, BARBADOS, WEST INDIES
Tel/Fax: (888) 267-5885    E-mail: goodvibes@5pillars.com    www.5pillars.com/goodvibes

Steve,

It has come to my attention that we are having more trouble with Mr. Silvers. As you know, I have $600,000 invested in Stelor (the largest investor), not the least of which are many hours of my personal time, and even though I am now on the board of directors, I am extremely worried. This is beginning to seriously endanger mine and your future.

After the meeting in New York (June) with Silvers and his lawyers (Stumpf), and regardless of what you told me, I knew that this matter wasn't over. Now you are confirming my worst fear, by telling me that Silvers is destroying Stelor's ability to bring in the much needed capital - you know we require, in order to bring googles.com to market.

I was certain that after the board instructed you to file the law suit against Silvers, this action would legally protect my investment. However, now Silver's attorney has successfully defeated the emergency nature of our suit and has, furthermore, set about negotiating with Google, Inc.!

I have seen countless and lengthy emails from Steven A. Silvers personally, that INSIST Stelor enforces its legal rights and go after Google, Inc.; DEMANDING we file suit! And, now you tell me that Silver's lawyer (expecting a piece of the settlement) has submitted a document stating that "Mr. Steven Silvers does not dispute Google, Inc.'s right to its domain name..." How convenient!

Steve! What the hell is going on? Are you on top of this? Is there a chance that I have been wrong about you and that you don't know what you're doing? I am seriously considering action against you personally. I hope I am making myself very clear. Do something about this! Protect our investment! Protect our company from this despicable, conniving and crazed person... I would hate to think of the consequences that would surely follow!

Regrettably yours,

_____
Michael A. DiMuccio

c.c. Paul Hawa

P.S. I am emailing this to you for urgency sake, however, a registered original is following by mail – take it seriously.


9
EXHIBIT
DLO 12-13-04